AFFIDAVIT

I, Jennie Emmons, being duly sworn, depose and say:

Introduction

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have served as a Special Agent since 1997. My experience includes federal investigations of complex white collar crime, child sexual exploitation, international kidnapping, and human trafficking. In the course of these investigations, I have gained an understanding of current technology, to include computers and cellular phones, and have conducted analyses of the data related to these devices, for the purpose of solving and proving crimes.

2. This affidavit is submitted in support of an application for a search warrant to obtain cell phone information regarding 802-377-1303 (SUBJECT PHONE) as described in Attachment A. As discussed more fully below, there is probable cause to believe that individuals associated with Gregory Davis, whose deceased body was discovered on January 7, 2018, committed wire fraud, in violation of 18 U.S.C. § 1343; kidnapping, in violation of 18 U.S.C. § 1201; and murder to obstruct justice, in violation of 18 U.S.C. § 1512(a)(1). There is probable cause to believe that the cell phone information described in Attachment B will provide evidence of those crimes.

3. This case is being investigated by the FBI and the Vermont State Police (VSP). Since this affidavit is being submitted for the limited purpose of supporting a search warrant application, I have not included details of every aspect of the investigation. Except as otherwise noted, the information contained in this affidavit was relayed to me by members of VSP or FBI, or obtained by me personally.

Probable Cause

4. On January 8, 2018, VSP Detective Denis Girouard submitted an application for a Vermont state search warrant for Gregory Davis's former residence. The affidavit in support of that application contains a general overview of the initial phases of the homicide investigation. I have spoken with Det. Girourard, and he informed me that the contents of his affidavit remain true and correct. I adopt and incorporate that affidavit, attached as Exhibit A, as part of this affidavit.

5. I have spoken with FBI Special Agent Patrick Hanna, who participated in a follow-up interview of Melissa Davis, Gregory Davis's wife, on January 8, 2018. He told me that Melissa Davis stated:

a. Melissa Davis and Gregory Davis were married with six children. Ms. Davis is pregnant with the couple's seventh child. Their family has lived in Vermont for approximately three years. At the time of Gregory Davis's death, the family was living at 884 Hawkins Road, Danville, Vermont.

b. Sometime after 2011, Gregory Davis told her that he began working on an investment deal with a person named Gregory Gac. Gregory Davis contacted Gac by phone, text, and possibly by email. More recently, she understood that the contact was by text, as Gregory

1

Davis's email was not working. The investment deal involved the oil industry. Gregory Davis told her that he had supply contacts for the oil, and Gac was able to bring in investors. Gregory Davis mentioned that Gac had two specific investors, Serhat and Murat. Melissa Davis understood that Gac had done business with Serhat and Murat before, and they had the means to make the investments.

    c. Melissa Davis was told by Gregory Davis that wire transfers had taken place for this investment deal. The first one was for $30,000.00. A receipt was provided by Gac to Gregory Davis showing the wire transfer from Bank of America. Gregory Davis consulted with a lawyer about this wire transfer, and the lawyer told him it was fraudulent. Gregory Davis then contacted Gac and Gac tried to convince Gregory Davis that the deal, and the investors, were legitimate. Three subsequent wire transfer of approximately $10,000.00 each were wired by Gac to Gregory Davis, which appeared to reassure Gregory Davis.

    d. Gregory Davis told Melissa Davis that two additional wires transfers occurred later, which came to a TD Bank account for Gregory Davis's company, Mode Commodities. The first one was $40,000.00. The second, more recent transfer, was for $75,000.00. Melissa understood that the purpose of these wires was for Gac to show Gregory Davis the investors were real and to provide some compensation to Gregory Davis. The Davis family lived off this money, and made some improvements to the 884 Hawkins Road property.

    e. After the Davis family moved to Vermont, Gregory Davis took a job with a company in Barre called Safety Kleen. Gregory Davis told his wife that he planned to talk to the FBI about the potential fraud involving Gac and that he had told Gac that he was going to the FBI.

    6. On January 8, 2018, I spoke to FBI Special Agent Robert Lyons of the Newark Division regarding his interview with Sheryl Davis, the mother of Gregory Davis. On January 9, 2018, Agent Lyons sent me a written summary of the interview, which I also reviewed. I learned that Sheryl Davis had information about an earlier fraudulent scheme Gregory Davis was involved in. According to Special Agent Lyons, Sheryl Davis was distraught over her son's death, but told him:

    a. Approximately four or five years ago, while Gregory Davis and his family were residing in the Westfield, New Jersey area, Gregory Davis entered into a business venture with a person whom Gregory Davis referred to as "Robert." Davis did not know "Robert's" last name. Sheryl Davis never met "Robert." "Robert's" company, "Sovern" (phonetic), was based in the Virginia area. To do business with Sovern, Gregory Davis created some type of limited liability company called "Vector" (phonetic), which was based in the Las Vegas, Nevada area.

    b. Around this time, Gregory Davis e-mailed Sheryl Davis a digital copy of the business agreement for this venture for her review, since she had previous experience reviewing real estate and other contracts for Deutsche Bank. Sheryl Davis reviewed the business agreement and informed Gregory Davis that she thought it did not represent his interests sufficiently. Despite her advice, Gregory Davis went ahead with the business agreement.

  c. Sheryl Davis understood that Gregory Davis and another individual were responsible for locating prospective investors for the business venture. Gregory Davis located one business investor, who invested approximately $180,000. $150,000 of the $180,000 investment was wired to "Robert" and approximately $30,000 was split equally between Gregory Davis and another business partner

  d. Looking back, Sheryl Davis now believes Gregory Davis might have been involved in some type of fraud scheme operated by "Robert." During this period, approximately four or five years ago, Gregory Davis was researching law enforcement and regulatory agencies to report some type of information. Gregory Davis never informed Sheryl Davis what information he wished to report, to what agencies he was considering reporting such information, or who and what were the subject of his concern. Sheryl Davis suspects it might have involved "Robert.".

  e. The last time Sheryl Davis saw Gregory Davis was on December 28, 2017, when he and several of his children visited Sheryl Davis's residence in Freehold, New Jersey.

  f. Sheryl Davis often communicated with Gregory Davis via his cellular telephone number: 802-377-1303. Sheryl Davis also stored two e-mail addresses in her cellular telephone contacts for Gregory Davis, greggd2015@gmail.com and gregory.davis@safety-kleen.com. Sheryl Davis could not recall how old these e-mail addresses were as she had them stored in her cellular telephone contact list.

  7. On January 9, 2018, I learned from VSP Detective Sergeant Angela Baker, who is one of the investigators assigned to this matter, that Gregory Davis's body was discovered approximately 15 miles from his residence in Barnet, Vermont, on January 7, 2018, at approximately 4:30 p.m.

  8. On January 9, 2018, I learned from FBI Special Agent Joseph Brewer of the Albany Division, a technically trained agent currently deployed to the Vermont State Police's St. Johnsbury Barracks to assist with this investigation, that the latitude and longitude of the location of Gregory Davis's body was 44 degrees 16'30"N and 72 degrees 10'25"W. Agent Brewer was provided with this information by VSP Detective Trooper Cari Crick, who is also working on the investigation.

  9. On January 9, 2018, Detective Baker also told me that Gregory Davis's cellular phone was located on his body in his left inner coat pocket. The phone is an Apple iPhone, Model A1522, IMEI 359323061224195. According to Melissa Davis, the phone number is 802-377-1303. The service provider for this phone is Verizon. The phone is owned by Safety Kleen. Detective Baker told me that Safety Kleen management provided consent for the search of the phone.

  10. Record checks conducted by the employees of the FBI Albany – Burlington Vermont Resident Agency revealed that a Gregory Gac resides at 19705 Chartwell Hill, Excelsior, Minnesota 55331. FBI records show that Gac was interviewed for an FBI investigation regarding an investment fraud matter. The investigation was based in Los Angeles, California, and resulted in the arrest of a person by the name Serhat Gumrukcu in February 2017.

11. On January 9, 2018, I contacted FBI Special Agent Heather Stachnik of the Los Angeles Division. Special Agent Stachnik advised that she began investigating Serhat Gumrukcu for a real estate investment scheme and a check fraud scheme. She told me the following:

    a. During the course of the investigation, she learned that Gumrukcu was involved in numerous additional fraud schemes, to include purporting to be an American doctor who had a special cure for cancer and AIDS, and another involving the oil industry. Gumruku is a Turkish national living in the USA and had some medical training in Turkey.

    b. I have reviewed a report of a July 7, 2017 interview Agent Stachnik had with Gac. Gac advised he was an escrow agent for Gumrukcu. Gac claimed he met Gumrukcu through a friend of a friend and that Gac wrote the term sheet for an oil investment deal. The investment deal was in an oil trading company with a company called Mode Lauren LLC (hereinafter "Mode"). The investors were Serhat Gumrukco and Murat Gumrukco, Serhat's older brother. Gac expected to receive residuals from the deal. Gumrukco did not make payments as specified in the deal's term sheet and got in arrears with his obligations to Mode. Gumrukco ended up transferring his interest in Mode to his brother, Murat. Gac was told by a business associate that the Gumrukcos are very wealthy and part of the Turkish royal family. Gac also told Special Agent Stachnik that he had talked to "Greg Davis" on the phone, but had not met him in person.

    c. According to Agent Stachnik, Gumrukcu was charged by the state of California with fraud-related offenses that include his dealings with Gac. Gumrukcu is scheduled for a court appearance on January 24, 2018. He is currently released without conditions.

12. Current record checks performed by employees of the Albany Division – Burlington Vermont Resident Agency, further identified Serhat Gumrukco. The records indicate Gumrukco is currently living in West Hollywood, California and uses the cellular telephone number 310-590-8250. The service provider for this phone is T-Mobile.

13. On January 9, 2018, VSP Detective Sergeant Tyson Kinney reviewed text messages on Gregory Davis's phone. Further investigation by other state police personnel showed that Davis's phone had a contact for a gac@quadfin.com, with the address: 19705 Chartwell Hill, Shorewood, Minnesota, 55331, phone: 612-395-5317, home: 952-470-1969. Gregory Davis had exchanged text messages with Gregory Gac at 612-669-9441 as recently as January 4, 2018.

14. Detective Sergeant Tyson Kinney told me about his review of certain text messages contained on Gregory Davis's phone between the user of Davis's phone and 612-669-9441.

    a. According to these messages, in summary, it appears Gregory Davis and Gregory Gac were involved in a purported business venture with investors. A contract was in place with the investors. The contract stipulated that if the investors failed to meet their responsibilities, a $75,000 monthly late fee would be levied. As of October 2016, the investors collectively had accrued over $900,000 in late fees. As of October 2016, Gregory Davis was offering several options to Gac to resolve matters with investors so they could move forward with the business.

    b. As of November 2017, Gregory Davis appeared fed up with what he deemed fraudulent activity and was trying to cut his ties. In one particular text, Gregory Davis and Gac refer to the

4

use of a banking "app" called the US Bank app for the purposes of performing a wire transfer. On November 28, 2017, the two discussed a wire transfer of $50,000.

   c. On December 13, 2017, Gregory Davis texted Gac the following: "Greg, it is always best to square things between people. Goodness when it is the prosecutor's office it's nasty, hard and very unforgiving. Can we agree to seriously work to come to the table this week."

   d. On December 27, 2017, Gregory Davis texted Gac: "Happy post Christmas. We need to get things resolved and settled. Please advise as to what they are going to put on the table to accomplish this. Clearly the UBS was just another misrepresenting distraction. It's been duly noted. I look to your reply. GD."

   e. On December 28, 2017, Gregory Davis wrote a long text message to Gac, which in summary, appeared to cut ties with Gac, and offered to terminate their relationship under the terms of the contract or the relationship "conversely will end in a series of indictments, clearly bearing civil and criminal repercussions. They are in control of how it ends, but it is the end." From the context of the text messages, "they" appears to refer to Serhat and Murat.

   f. On December 29, 2017, Gregory Davis wrote a text message to Gac, demanding a settlement of approximately $980,000 to exit the business deal with Gac, Serhat, and Murat, pursuant to their contract. Further conversation continued at the end of December in which Gac references conversations with Serhat.

   g. A final text message to Gac from Gregory Davis, dated January 4, 2018 was located on Gregory Davis's phone which states: "There has now been a history of fraudulent banking documentation that has become the standard. In many instances the banks could not corroborate the claims of the partners. However, in some instances the banks very seriously denied association with the documents and their intention. As regards the TS, all have had a hand in crafting it. Murat himself was directly involved the late sheet segment, to which we gave NO rebuttal. This was then fully executed. We have suffered multiple banking debacles which of itself are VERY serious instances. Therefore, as we've discussed it would be prudent to address the outstanding accounting. Have Murat and Serhat present something to speak to. Let's hopefully close that matter and move forward. Without this our hands will be forced to turn this in to authorities which neither party wants. Please have an honest but serious discussion with the brothers as regards all of the above and let's re-congregate to resolve the immediate matter and discuss how we can move forward. Regards, GD."

   15. Detective Sergeant Baker also told me about a suspicious 911 call made near the time of the kidnapping:

   a. The Vermont 911 call center received a call from 802-473-0535 at 8:40 p.m. on January 6, 2018 – a short time before Davis's abduction. The 911 call center's technology identified the call as coming from a location on North Danville Road, Danville, Vermont, only a short distance from the Davis residence.

   b. During the call, a male stated that he shot his wife and was going to shoot himself, and gave an address of 1772 Cross Road (with no town information), after which the phone hung up.

5

The call information was relayed to the Vermont State Police in St. Johnsbury, Vermont. The Vermont State Police attempted to locate a Cross Road in the St. Johnsbury area without success.

      c. The Vermont State Police thereafter requested that AT&T ping the phone in question due to the exigent circumstance. Several pings were conducted. The ping information showed that the call came from the North Danville Road location. It was learned that the phone was a Tracfone with AT&T service with no subscriber information available. After the Vermont State Police checked the North Danville location and several possible Cross Roads outside the town of St. Johnsbury, the matter was closed. At that time, Gregory Davis's body had not been discovered.

      16. On January 10, 2018, I consulted with Agent Brewer, who has specialized training and experience related to cell phone technology. Agent Brewer advised me, in reference to information requested in Attachment B, Subsection I (b), that the descriptions pertain to technology for precision location identification.

      17. On January 10, 2018, I confirmed with Supervisory Deputy U.S. Marshal Carl Staley of the Burlington Vermont office the U.S. Marshal Service that Gregory Davis was not arrested by their agency. Further, it was confirmed Marshal Staley that there had been no active federal warrants for Davis.

Facts about Cell Site Information

      18. In my training and experience, I have learned that Cellco Partnership d/b/a Verizon Wireless ("Verizon") is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

      19. Based on my training and experience, I know that Verizon can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes

      20. Based on my training and experience, I know that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as

Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

Authorization Request

21. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

22. I further request that the Court direct Verizon to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Verizon, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

23. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

24. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Dated at Burlington, in the District of Vermont, this 10th day of January 2018.

_____
Jennie Emmons
Special Agent, FBI

Sworn to and subscribed before me this 10th day of January 2018.

_____
Honorable John M. Conroy
United States Magistrate Judge