AFFIDAVIT

I, Jennie Emmons, being duly sworn, depose and say:

Introduction

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have served as a Special Agent since 1997. My experience includes federal investigations of complex white collar crime, child sexual exploitation, international kidnapping, and human trafficking. In the course of these investigations, I have gained an understanding of current technology, to include computers and online accounts, and have conducted analyses of the data related to such accounts, for the purpose of solving and proving crimes.

2. This affidavit is submitted in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc. to disclose to the government copies of the information described in Attachment B, contained in the accounts serhat.gumrukcu@gmail.com and murtagumrukcu@gmail.com, described in Attachment A. As discussed more fully below, there is probable cause to believe that individuals associated with Gregory Davis, whose deceased body was discovered on January 7, 2018, used these accounts in the commission of wire fraud, in violation of 18 U.S.C. § 1343; kidnapping, in violation of 18 U.S.C. § 1201; and murder to obstruct justice, in violation of 18 U.S.C. § 1512(a)(1). There is probable cause to believe that the information described in Attachment B will provide evidence of those crimes. More specifically, there is probable to believe that the information requested in Attachment B will help identify a person or persons involved in the kidnapping and murder of Mr. Davis, as well as evidence of the fraud scheme described in more detail below.

3. This case is being investigated by the FBI and the Vermont State Police (VSP). Since this affidavit is being submitted for the limited purpose of supporting a search warrant application for the email addresses and serhat.gumrukcu@gmail.com and murtagumrukcu@gmail.com, I have not included details of every aspect of the investigation. Except as otherwise noted, the information contained in this affidavit was relayed to me by members of VSP or FBI, or obtained by me personally.

Probable Cause

A.      The Abduction and Shooting

4. On January 7, 2018, VSP responded to a homicide in Barnet, VT. The victim, identified as Gregory Davis, date of birth October 27, 1968, was found partially covered by snow near the base of a snow bank on a pull off area near the west side of Peacham Road. Gregory Davis was found handcuffed and had been shot multiple times in the head and torso. Davis, it was learned, had resided at 884 Hawkins Road, Danville, VT. Gregory Davis's body was discovered approximately 15 miles from his residence.

5. On the same date, VSP Detectives responded to Davis's home and interviewed his wife, Melissa Davis. Melissa Davis advised VSP Detectives that at approximately 9:00 p.m. on January 6, 2018, a male purporting to be a U.S. Marshal came to the Davis's home. This male

had handcuffs, a gun, and was wearing a jacket and mask with an eye opening, both of which had a U.S. Marshals emblem. The male's vehicle had red and blue emergency lights activated on the dash. The male said he had an arrest warrant for Greg Davis for racketeering and that Greg Davis was going to be brought to Virginia.

6. On January 10, 2018, I confirmed with Supervisory Deputy U.S. Marshal Carl Staley of the Burlington Vermont office of the U.S. Marshals Service that Gregory Davis was not arrested by their agency. Further, it was confirmed by Marshal Staley that there had been no active federal warrants for Gregory Davis.

B.   Gregory Davis's Business Dealings

7. Melissa Davis told the VSP Detectives that Davis had been involved in the oil investment business and had concerns about his business partners being involved in fraud. FBI Special Agent Patrick Hanna participated in a follow-up interview with Melissa Davis on January 8, 2018. I have spoken with Agent Patrick Hanna, and he told me that Melissa Davis stated:

a. Melissa Davis and Gregory Davis were married with six children. Melissa Davis is pregnant with the couple's seventh child. Their family has lived in Vermont for approximately three years. At the time of Gregory Davis's death, the family was living at 884 Hawkins Road, Danville, Vermont.

b. Sometime after 2011, Gregory Davis told her that he began working on an oil investment deal with a person named Gregory Gac. Gregory Davis contacted Gac by phone, text, and possibly by email. Gregory Davis told her that he had supply contacts for the oil, and Gac was able to bring in investors. Gregory Davis mentioned that Gac had two specific investors, Serhat and Murat. Melissa Davis understood that Gac had done business with Serhat and Murat before, and they had the means to make the investments.

c. Melissa Davis was told by Gregory Davis that wire transfers had taken place for this investment deal. The first one was for $30,000.00. A receipt was provided by Gac to Gregory Davis showing the wire transfer from Bank of America. Gregory Davis consulted with a lawyer about this wire transfer, and the lawyer told him it was fraudulent. Gregory Davis then contacted Gac and Gac tried to convince Gregory Davis that the deal, and the investors, were legitimate. Three subsequent wire transfers of approximately $10,000.00 each were wired by Gac to Gregory Davis, which appeared to reassure Gregory Davis.

d. Gregory Davis told Melissa Davis that two additional wires transfers occurred later, which came to a TD Bank account for Gregory Davis's company, Mode Commodities. The first one was $40,000.00. The second, more recent transfer, was for $75,000.00. Melissa understood that the purpose of these wires was for Gac to show Gregory Davis the investors were real and to provide some compensation to Gregory Davis. The Davis family lived off this money, and made some improvements to the 884 Hawkins Road property.

e. After the Davis family moved to Vermont, Gregory Davis took a job with Safety Kleen, a company located in Barre, VT. Gregory Davis told his wife that he planned to talk to the FBI about the potential fraud matter and that he had told Gac that he was going to the FBI.

8. On January 8, 2018, I spoke to FBI Special Agent Robert Lyons of the Newark Division regarding his interview with Sheryl Davis, the mother of Gregory Davis. On January 9, 2018, Agent Lyons sent me a written summary of the interview, which I also reviewed. I learned that Sheryl Davis had information about an earlier fraudulent scheme Gregory Davis was involved in. According to Special Agent Lyons, Sheryl Davis was distraught over her son's death, but told him:

a. Approximately four or five years ago, while Gregory Davis and his family were residing in the Westfield, New Jersey area, Gregory Davis entered into a business venture with a person whom Gregory Davis referred to as "Robert." Sheryl Davis did not know "Robert's" last name. Sheryl Davis never met "Robert." "Robert's" company, "Sovern" (phonetic), was based in the Virginia area. To do business with Sovern, Gregory Davis created some type of limited liability company called "Vector" (phonetic), which was based in the Las Vegas, Nevada area.

b. Around this time, Gregory Davis e-mailed Sheryl Davis a digital copy of the business agreement for this venture for her review, since she had previous experience reviewing contracts for Deutsche Bank. Sheryl Davis reviewed the business agreement and informed Gregory Davis that she thought it did not represent his interests sufficiently. Despite her advice, Gregory Davis went ahead with the business agreement.

c. Sheryl Davis understood that Gregory Davis and another individual were responsible for locating prospective investors for the business venture. Gregory Davis located one business investor, who invested approximately $180,000. $150,000 of the $180,000 investment was wired to "Robert" and approximately $30,000 was split equally between Gregory Davis and another business partner

d. Looking back, Sheryl Davis now believes Gregory Davis might have been involved in some type of fraud scheme operated by "Robert." During this period, approximately four or five years ago, Gregory Davis was researching law enforcement and regulatory agencies to report some type of information. Gregory Davis never informed Sheryl Davis what information he wished to report, to what agencies he was considering reporting such information, or who and what were the subject of his concern. Sheryl Davis suspects it might have involved "Robert."

e. The last time Sheryl Davis saw Gregory Davis was on December 28, 2017, when he and several of his children visited Sheryl Davis's residence in Freehold, New Jersey.

9. On January 9, 2018, Detective Baker also told me that Gregory Davis's cellular phone was located on his body in his left inner coat pocket. The phone is an Apple iPhone, Model A1522, IMEI 359323061224195. According to Melissa Davis, the phone number is 802-377-1303. The service provider for this phone is Verizon. The phone is owned by Safety Kleen. Detective Baker told me that Safety Kleen management provided consent for the search of the phone.

3

10. Record checks conducted by the employees of the FBI Albany – Burlington Vermont Resident Agency revealed that a Gregory Gac resides at 19705 Chartwell Hill, Excelsior, Minnesota 55331. FBI records show that Gac was interviewed for an FBI investigation regarding an investment fraud matter. The investigation was based in Los Angeles, California, and resulted in the arrest of a person by the name Serhat Gumrukcu in February 2017.

11. On January 9, 2018, I contacted FBI Special Agent Heather Stachnik of the Los Angeles Division. Agent Stachnik advised that she began investigating Serhat Gumrukcu for a real estate investment scheme and a check fraud scheme. She told me the following:

a. During the course of the investigation, she learned that Serhat was involved in additional fraud schemes, to include purporting to be an American doctor who had a special cure for cancer and AIDS, and another involving the oil industry. Serhat is a Turkish national currently living in the USA. Serhat is known to be married to a William Anderson Wittekind.

b. I have reviewed a report of a July 7, 2017 interview Agent Stachnik had with Gac. Gac advised he was an escrow agent for Serhat. Gac claimed he met Serhat through a friend of a friend and that Gac wrote the term sheet for an oil investment deal. The investment deal was in an oil trading company with a company called Mode Lauren LLC (hereinafter "Mode"). The investors were Serhat and Murat Gumrukcu, Serhat's older brother. Gac expected to receive residuals from the deal. The Gumrukcus did not make payments as specified in the deal's term sheet and got in arrears with the obligations to Mode. Serhat ended up transferring his interest in Mode to his brother, Murat. Gac was told by a business associate that the Gumrukcus are very wealthy and part of the Turkish royal family. Gac also told Agent Stachnik that he had talked to "Greg Davis" on the phone, but had not met him in person.

c. According to Agent Stachnik, Serhat was convicted by the state of California with fraud-related offenses that include his dealings with Gac. He was recently sentenced to five years probation.

12. Current record checks performed by employees of the Albany Division – Burlington Vermont Resident Agency, further identified Serhat Gumrukcu. The records indicate is currently living in West Hollywood, California and uses the cellular telephone number 310-590-8250. The service provider for this phone is T-Mobile.

13. Information obtained from FBI Task Force Officer Jeff Sweeney of Customs and Border Protection show that Murat Gumrukcu, a Turkish national, traveled alone to the United States on December 18, 2017, from Germany to Las Vegas, Nevada. He is scheduled to return to Germany on March 2, 2018. Murat Gumrukcu's I-94 travel record shows a Las Vegas address, 2700 2704 Las Vegas, Las Vegas, NV 89109. Murat's current travel information shows him departing the U.S. from San Francisco, CA.

14. In the course of the FBI Los Angeles investigation regarding Serhat, an additional person by the name of Berk Eratay was identified as having partnered with Serhat in a potential fraud scheme in Las Vegas, in which Serhat introduced a person claiming to be a Saudi Arabian prince to a potential victim. According to record checks performed by FBI Los Angeles, Eratay

shows a current address of 2700 Las Vegas Blvd. S, Unit 2704, Las Vegas, Nevada. This appears to be the destination address listed by Murat on his I-94 information.

15. On January 9, 2018, VSP Detective Sergeant Tyson Kinney reviewed text messages on Gregory Davis's phone. Further investigation by other state police personnel showed that Gregory Davis's phone had a contact for a gac@quadfin.com, with the address: 19705 Chartwell Hill, Shorewood, Minnesota, 55331, phone: 612-395-5317, home: 952-470-1969. Gregory Davis had exchanged text messages with Gregory Gac at 612-669-9441 as recently as January 4, 2018.

16. Detective Sergeant Tyson Kinney told me about his review of certain text messages contained on Gregory Davis's phone between what appears to be Gregory Davis and Gac.

a. According to these messages, in summary, it appears Gregory Davis and Gac were involved in a business venture with investors. A contract was in place with the investors. The contract stipulated that if the investors failed to meet their responsibilities, a $75,000 monthly late fee would be levied. As of October 2016, the investors collectively had accrued over $900,000 in late fees. As of October 2016, Gregory Davis was offering several options to Gac to resolve matters with the investors so they could move forward with the business.

b. On December 13, 2017, Gregory Davis texted Gac the following: "Greg, it is always best to square things between people. Goodness when it is the prosecutor's office it's nasty, hard and very unforgiving. Can we agree to seriously work to come to the table this week."

c. On December 27, 2017, Gregory Davis texted Gac: "Happy post Christmas. We need to get things resolved and settled. Please advise as to what they are going to put on the table to accomplish this. Clearly the UBS was just another misrepresenting distraction. It's been duly noted. I look to your reply. GD."

d. On December 28, 2017, Gregory Davis wrote a long text message to Gac, which in summary, showed Greg Davis wished to terminate the business relationship under the terms of the contract or, Greg Davis threatened, the relationship "conversely will end in a series of indictments, clearly bearing civil and criminal repercussions. They are in control of how it ends, but it is the end." From the context of the text messages, "they" appears to refer to Serhat and Murat.

e. On December 29, 2017, Gregory Davis wrote a text message to Gac, demanding a settlement of approximately $980,000 to exit the business deal with Gac, Serhat, and Murat, pursuant to their contract. Further conversation continued at the end of December in which Gac references conversations with Serhat.

f. A final text message to Gac from Gregory Davis, dated January 4, 2018 was located on Gregory Davis's phone which states: "There has now been a history of fraudulent banking documentation that has become the standard. In many instances the banks could not corroborate the claims of the partners. However, in some instances the banks very seriously denied association with the documents and their intention. As regards the TS, all have had a hand in crafting it. Murat himself was directly involved the late sheet segment, to which we gave NO rebuttal. This was then fully executed. We have suffered multiple banking debacles which of itself are VERY serious instances. Therefore, as we've discussed it would be prudent to address the outstanding

5

accounting. Have Murat and Serhat present something to speak to. Let's hopefully close that matter and move forward. Without this our hands will be forced to turn this in to authorities which neither party wants. Please have an honest but serious discussion with the brothers as regards all of the above and let's re-congregate to resolve the immediate matter and discuss how we can move forward. Regards, GD."

17. On January 12, 2018, a search warrant was executed at 19705 Chartwell Hill, Excelsior, MN, the residence of Gregory Gac. Gac was also interviewed by VSP Detectives and Agent Hanna. I spoke to Agent Hanna about the interview of Gac and he advised that Gac stated:

a. Gac owns a company called Quadrant Financial which he runs out of his home in Excelsior, MN. Gac conducts investment business with brothers, Serhat and Murat Gumrukcu. The brothers own a business called Lauran Trading, which is based in Oman. Serhat and Murat have been working successfully with Gac on deals for over three years.

b. Gac met Gregory Davis through other business associates. They have never met in person and have only communicated through phone, text and email. Gac put together an oil-related deal with the Gumrukcu brothers and Gregory Davis. Gac is aware that Gregory Davis has expressed frustration with the Gumrukcu brothers' failure to perform on their obligations in the deal. Gac advised that a third, $40,000, payment is still due to Gregory Davis. A total of three payments, totaling $100,000, were to be paid to Gregory Davis in lieu of the large late fee that had been accrued by the Gumrukcu brothers.

c. Gac advised that in February 2016, Serhat told Gac that Murat was upset that Gregory Davis had called officials at the National Bank of Abu Dhabi to verify that Serhat and Murat maintained accounts there. The bank did not provide an answer to Gregory Davis, but the brothers learned of this inquiry and Murat was angered because it threatened the brothers' reputations at the bank. During the search warrant at Gac's residence, Gac's notes regarding this matter were located and the notes reflect that Murat was offended.

d. Gac does not believe Gregory Davis and the Gumrukcu brothers have ever met in person though they have talked in conference calls. Gac does not believe Gregory Davis and the Gumrukcu brothers ever spoke directly outside the conference calls.

e. Gac communicates with Murat exclusively through email. Serhat has told Gac that no one is provided with Murat's phone number.

f. According to Gac, while Serhat is the main point of contact for the brothers, Murat is in control of the money.

g. When the interviewers told Gac that Gregory Davis had been murdered, Gac claimed to have no knowledge about the murder.

h. On January 12, 2018, Serhat told Gac that his brother was arranging for the third payment to be made to Gregory Davis, and directed Gac to contact Murat via email about that payment.

i. Gac agreed to cooperate with law enforcement and has since provided information related to his conversations with the Gumrukcu brothers. An upcoming in-person meeting between Gac

6

and Serhat Gumrukcu in San Francisco, to discuss a new business deal unrelated to Gregory Davis, was planned for January 31, 2018. This meeting was cancelled by the participants shortly before it was to occur.

18. On January 26, 2018, I spoke to Detective Baker about her review of the contents of Gac's phone, which was seized during the aforementioned search warrant at Gac's residence. According to Detective Baker, Gac's recent texts with Gregory Davis are consistent with those found on Gregory Davis's phone. Further, Detective Baker observed Gac communicated with Serhat at the telephone number 301-590-8250.

   a. Detective Baker observed that Gac alerted Serhat to Gregory Davis's discontent with Serhat and Murat. On December 29, 2017, Gac forwarded the aforementioned December 28, 2017 text from Gregory Davis to Gac along to Serhat. In this text Gregory Davis states that he witnessed fraud and alludes to potential civil and criminal repercussions. On prior dates, dating back over a year, Gac summarized in text messages to Serhat, Gregory Davis's anger about the business dealings with the Gumrukcu brothers.

   b. In the fall of 2017, numerous texts were sent to Serhat from Gac regarding Gregory Davis's communications with Gac, to include a September 17, 2017 text to Serhat stating, "Gregg is going ballistic, and I don't know if I can control him any more. I heard from Murat that he was returning to Miami today or tomorrow, but nothing specific about meeting. I've heard nothing about meeting with your parents, and nothing from Marc. I'll be getting a call from Gregg soon, and he's going to explode." Further, on September 25, 2017, Gac texted Serhat, stating, "I'm getting nastygrams from Gregg Davis. Anything I can tell him? I'll reach out to UBS shortly" and on October 31, 2017, "...Thanks for pinging Murat. Our friend is all over me again." And, on December 13, 2017, Gac texted Serhat, "Gregg Davis is getting antsy again, and I haven't heard from Murat in four weeks. Gregg wants to see a path forward with ML. With nothing from UBS, I haven misting to tell him. I believe he's on the road to prosecution again, believing there's no future."

   C. Email addresses for Serhat and Murat Gumrukcu

19. On February 09, 2018, I learned from Lt. Todd Baxter of VSP that VSP's review of Gac's computers revealed email communication between Gac and Serhat Gumrukcu at serhat.gumrukcu@gmail.com. On the same date I spoke to Detective Talmadge of the VSP's Technology Investigation Unit, who identified an email message from Gac to Serhat Gumrukcu at serhat.gumrukcu@gmail.com, dated February 3, 2017, for which the subject was Mode Lauran. In the body of the email, Gac states, in part, to Serhat Gumrukcu: "Dear Serhat, I need your diplomatic skills. Murhat hasn't contact me for more than a week, and Greg Davis is getting upset to the point where he may do something irreversible, which would be a pain for me and lots worse for you." Detective Talmadge observed a more recent communication involving this email address, dated in July 2017, from Gac to Serhat, though neither Davis nor Mode Lauran were specifically discussed.

20. On February 9, 2018, I reviewed the publically available information available on the Facebook account for Serhat D. Gumrukcu. Under "Contact Info," the email address serhat.gumrukcu@gmail.com is provided. Further, the male shown in profile photo for this Facebook account appears to be the same Serhat Gumrukcu known in this investigation.

21. On February 7, 2019, Gac shared with Agent Hanna his recent email communication with Murat Gumrucku. On January 14, 2018, Gac wrote to Murat Gumrukcu at the email address murtagumrukcu@gmail.com, which is quoted in part: "Dear Murhat, I spoke with Serhat last week, and he let me know that you are well…Of the three transfers, only two have arrived: $34,965 on November 13th and $29,965 on November 27th. Were you able to send the third one? I would like to make sure it hasn't been lost in transit. I am going to meet with Serhat in San Francisco on the 31st. When you send (or resend) the third transfer, could you please add an amount for me to cover travel expenses? Mr. Davis last contacted me more than a week ago. I don't take silence as a good sign. During our last conversation, he expressed concern about adherence to the term sheet. As always, I welcome your updates. Regards, Greg." After receiving no response, Gac wrote again to Murat Gumrukcu at the same email to check-in, since he had not heard from him, and added that he has been "paying $1,500 per quarter to keep the Mode Lauren controlled account open…" On January 22, 2018, after no response, Gac followed up again on February 1, 2018, but again got no response. On February 7, 2018, Gac received a reply from the email address. In the email, Murat Gumrucku stated that he had been in the U.S. for about a month, that the third payment should have already taken place (and that he will check on it), and that he is committed to carrying on with the deal." This string of email communication was forward to Agent Hanna the same day.

22. On February 9, 2018, Detective Talmadge identified an email message, dated December 13, 2017, from Gac to Murat Gumrukcu at murtagumrukcu@gmail.com, in which Gac states, in part: "Dear Murhat, Greg Davis again has expressed concern and frustration at the lack of progress and at the absence of firm direction in proceeding toward implementation of the Mode Lauran program. I fear he may pursue "nuclear option" if I can't offer him clear guidance on how we are going to move ahead."

D. The 911 Caller

23. On January 8, 2017, Detective Baker informed me of a suspicious 911 call made near the time and location of Gregory Davis's kidnapping. The VT 911 call center received a call from 802-473-0535 at 8:40 p.m. on January 6, 2018. The 911 call center's technology identified the call as coming from a location on North Danville Road, Danville, VT, only a short distance from the Davis residence.

   a. During the call, a male stated that he shot his wife and was going to shoot himself, and gave an address of 71772 Cross Road (with no town information), after which the phone hung up. The call information was relayed to VSP in St. Johnsbury, Vermont. VSP attempted to locate a Cross Road in the St. Johnsbury area without success.

   b. VSP thereafter requested that AT&T ping the phone in question due to the exigent circumstance. Several pings were conducted. The ping information showed that the call came

8

from the North Danville Road location. It was learned that the phone was a prepaid phone with AT&T service. No subscriber information was available. After the VSP checked the North Danville location and several possible Cross Roads outside the town of St. Johnsbury, the matter was closed. At that time, Gregory Davis's body had not been discovered.

24. On January 15, 2018, AT&T responded to a search warrant for information associated with the cellular number 802-473-0535 which placed the suspicious call to 911 on January 6, 2018, near the time and location of Gregory Davis's kidnapping.

25. The data provided by AT&T was reviewed by Special Agent James Wines of the FBI's Cellular Analysis Survey Team. After this review, and consultation with AT&T security personnel, Agent Wines advised me that the phone was prepaid phone purchased at a Walmart on January 5, 2018. The records showed only two calls being made by the phone, a four second call to a Pizza Hut in St. Johnsbury, VT at 4:14 p.m. on January 6 and the 911 call at 8:42 p.m. on January 6. The phone used only two sectors of the same cell tower, located in St. Johnsbury, VT, for all cell site activity. Agent Wines also told me that this phone was activated, meaning that it can operate on the network, shortly before 4:00 p.m. on January 6th, within minutes of the Pizza Hut call.

26. On January 16, 2018, Agent Wines advised that he learned from contacts at Walmart security that the prepaid phone was purchased with cash on January 5, 2018 at 4:14 p.m. at the Walmart located at 100 Supercenter Drive, Clearfield, PA. Agent Wines forwarded numerous security camera images of the individual purchasing the phone, which were obtained from Walmart security. The images show a bearded, adult, white male purchasing the phone. The male arrived and departed in a white Ford Explorer. The camera footage indicates the vehicle parked in the Walmart parking lot around 3:55 p.m. and exited the lot around 4:17 p.m.

27. On January 19, 2018, I learned from Special Agent Patrick Hanna that FBI personnel in Pennsylvania had canvassed gas stations and other locations in the vicinity of the Walmart at 100 Supercenter Drive, Clearfield, PA, to determine if additional security camera footage of the bearded, white male and/or the white Ford Explorer could be located. Additional video footage of the suspect male and vehicle were located at a BP gas station at 14624 Clearfield Shawville Highway, Clearfield, PA 16830.

28. I reviewed stills of this footage, which included images of the bearded, white male and the white Ford Explorer, and they appear to be the same person and vehicle shown in the Walmart security video. The suspect male purchased gas at the BP station. I see what appears to be a smartphone in the suspect male's hand. A time stamp on this video put the stop at the gas station in the 4:27 p.m. time period on January 5, 2018. The person depicted in the still images does not appear consistent with photographs obtained of Gac or either Gumrukcu.

29. On January 26, 2018, a representative at Ford Motor Company identified this vehicle in the surveillance images as a 2015 Ford Explorer - Utility Police Interceptor model.

9

Background Concerning Email

30. In my training and experience, I have learned that Google, Inc. provides a variety of on-line services, including electronic mail ("email") access, to the public. Google, Inc. allows subscribers to obtain email accounts at the domain name gmail.com, like the email account[s] listed in Attachment A. Subscribers obtain an account by registering with Google, Inc.. During the registration process, Google, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved email for Google, Inc. subscribers) and information concerning subscribers and their use of Google, Inc. services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

31. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

32. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

33. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

34. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## Conclusion

35. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, Inc. who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Authorization Request

36. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

Dated at Burlington, in the District of Vermont, this ____9th____ day of February 2018.

_____
Jennie Emmons
Special Agent, FBI

Sworn to and subscribed before me this __9th__ day of February 2018.

_____
Honorable John M. Conroy
United States Magistrate Judge