AFFIDAVIT

I, Jennie Emmons, being duly sworn, depose and say:

Introduction

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have served as a Special Agent since 1997. My experience includes federal investigations of complex white collar crime, child sexual exploitation, international kidnapping, and human trafficking. In the course of these investigations, I have gained an understanding of current technology, to include computers and online accounts, and have conducted analyses of the data related to such accounts, for the purpose of solving and proving crimes.

2. This affidavit is submitted in support of an application for a search warrant to obtain cell phone information regarding cell towers controlled by Cellco Partnership d/b/a Verizon Wireless as described in Attachment A. As discussed more fully below, there is probable cause to believe that individuals associated with Gregory Davis, whose deceased body was discovered on January 7, 2018, committed wire fraud, in violation of 18 U.S.C. § 1343; kidnapping, in violation of 18 U.S.C. § 1201; and murder to obstruct justice, in violation of 18 U.S.C. § 1512(a)(1). There is probable cause to believe that the cell tower information described in Attachment B will provide evidence of those crimes.

3. This case is being investigated by the FBI and the Vermont State Police (VSP). Since this affidavit is being submitted for the limited purpose of supporting a search warrant application, I have not included details of every aspect of the investigation. Except as otherwise noted, the information contained in this affidavit was relayed to me by members of VSP or FBI, or obtained by me personally.

Probable Cause

A. The Abduction and Shooting

4. On January 7, 2018, VSP responded to a homicide in Barnet, VT. The victim, identified as Gregory Davis, date of birth October 27, 1968, was found partially covered by snow near the base of a snow bank on a pull off area near the west side of Peacham Road. Gregory Davis was found handcuffed and had been shot multiple times in the head and torso. Davis, it was learned, had resided at 884 Hawkins Road, Danville, VT. Gregory Davis's body was discovered approximately 15 miles from his residence.

5. On the same date, VSP Detectives responded to Davis's home and interviewed his wife, Melissa Davis. Melissa Davis advised VSP Detectives that at approximately 9:00 p.m. on January 6, 2018, a male purporting to be a U.S. Marshal came to the Davis's home. This male had handcuffs, a gun, and was wearing a jacket and mask with an eye opening, both of which had a U.S. Marshals emblem. The male's vehicle had red and blue emergency lights activated on the dash. The male said he had an arrest warrant for Greg Davis for racketeering and that Greg Davis was going to be brought to Virginia.

1

6. On January 10, 2018, I confirmed with Supervisory Deputy U.S. Marshal Carl Staley of the Burlington Vermont office of the U.S. Marshals Service that Gregory Davis was not arrested by their agency. Further, it was confirmed by Marshal Staley that there had been no active federal warrants for Gregory Davis.

B. Gregory Davis's Business Dealings

7. Melissa Davis told the VSP Detectives that Davis had been involved in the oil investment business and had concerns about his business partners being involved in fraud. Special Agent Patrick Hanna participated in a follow-up interview with Melissa Davis on January 8, 2018, during which Melissa Davis stated:

a. Melissa Davis and Gregory Davis were married with six children. Melissa Davis is pregnant with the couple's seventh child. Their family has lived in Vermont for approximately three years. At the time of Gregory Davis's death, the family was living at 884 Hawkins Road, Danville, Vermont.

b. Sometime after 2011, Gregory Davis told her that he began working on an oil investment deal with a person named Gregory Gac. Gregory Davis contacted Gac by phone, text, and possibly by email. Gregory Davis told her that he had supply contacts for the oil, and Gac was able to bring in investors. Gregory Davis mentioned that Gac had two specific investors, Serhat and Murat. Melissa Davis understood that Gac had done business with Serhat and Murat before, and they had the means to make the investments.

c. Melissa Davis was told by Gregory Davis that wire transfers had taken place for this investment deal. The first one was for $30,000.00. A receipt was provided by Gac to Gregory Davis showing the wire transfer from Bank of America. Gregory Davis consulted with a lawyer about this wire transfer, and the lawyer told him it was fraudulent. Gregory Davis then contacted Gac and Gac tried to convince Gregory Davis that the deal, and the investors, were legitimate. Three subsequent wire transfers of approximately $10,000.00 each were wired by Gac to Gregory Davis, which appeared to reassure Gregory Davis.

d. Gregory Davis told Melissa Davis that two additional wires transfers occurred later, which came to a TD Bank account for Gregory Davis's company, Mode Commodities. The first one was $40,000.00. The second, more recent transfer, was for $75,000.00. Melissa understood that the purpose of these wires was for Gac to show Gregory Davis the investors were real and to provide some compensation to Gregory Davis. The Davis family lived off this money, and made some improvements to the 884 Hawkins Road property.

e. After the Davis family moved to Vermont, Gregory Davis took a job with a company in Barre, VT called Safety Kleen. Gregory Davis told his wife that he planned to talk to the FBI about the potential fraud matter and that he had told Gac that he was going to the FBI.

8. On January 9, 2018, Detective Baker also told me that Gregory Davis's cellular phone was located on his body in his left inner coat pocket. The phone is an Apple iPhone, Model A1522, IMEI 359323061224195. According to Melissa Davis, the phone number is 802-377-1303. The service provider for this phone is Verizon. The phone is owned by Safety Kleen.

2

Detective Baker told me that Safety Kleen management provided consent for the search of the phone.

9. Record checks conducted by the employees of the FBI Albany – Burlington Vermont Resident Agency revealed that a Gregory Gac resides at 19705 Chartwell Hill, Excelsior, Minnesota 55331. FBI records show that Gac was interviewed for an FBI investigation regarding an investment fraud matter. The investigation was based in Los Angeles, California, and resulted in the arrest of a person by the name Serhat Gumrukcu in February 2017.

10. On January 9, 2018, I contacted FBI Special Agent Heather Stachnik of the Los Angeles Division. Agent Stachnik advised that she began investigating Serhat Gumrukcu for a real estate investment scheme and a check fraud scheme. She told me the following:

   a. During the course of the investigation, she learned that Serhat was involved in additional fraud schemes, to include purporting to be an American doctor who had a special cure for cancer and AIDS, and another involving the oil industry. Serhat is a Turkish national currenty living in the USA. Serhat is known to be married to a William Anderson Wittekind.

   b. I reviewed a report of a July 7, 2017 interview Agent Stachnik had with Gac. Gac advised he was an escrow agent for Serhat. Gac claimed he met Serhat through a friend of a friend and that Gac wrote the term sheet for an oil investment deal. The investment deal was in an oil trading company with a company called Mode Lauren LLC (hereinafter "Mode"). The investors were Serhat and Murat Gumrukcu, Serhat's older brother. Gac expected to receive residuals from the deal. The Gumrukcus did not make payments as specified in the deal's term sheet and got in arrears with the obligations to Mode. Serhat ended up transferring his interest in Mode to his brother, Murat. Gac was told by a business associate that the Gumrukcus are very wealthy and part of the Turkish royal family. Gac also told Agent Stachnik that he had talked to "Greg Davis" on the phone, but had not met him in person.

   c. According to Agent Stachnik, Serhat was charged by the state of California with fraud-related offenses that include his dealings with Gac. He was recently sentenced to five years probation.

11. Current record checks performed by employees of the Albany Division – Burlington Vermont Resident Agency, further identified Serhat Gumrukcu. The records indicate is currently living in West Hollywood, California and uses the cellular telephone number 310-590-8250. The service provider for this phone is T-Mobile.

12. Information obtained from FBI Task Force Officer Jeff Sweeney of Customs and Border Protection show that Murat Gumrukcu, a Turkish national, traveled alone to the United States on December 18, 2017, from Germany to Las Vegas, Nevada. Murat Gumrukcu's I-94 travel record shows a Las Vegas address, 2700 2704 Las Vegas, Las Vegas, NV 89109. Murat's current travel information showed him departing the U.S. from Houston on March 28, 2018.

13. In the course of the FBI Los Angeles investigation regarding Serhat, an additional person by the name of Berk Eratay was identified as having partnered with Serhat in a potential fraud scheme in Las Vegas, in which Serhat introduced a person claiming to be a Saudi Arabian

3

prince to a potential victim. According to record checks performed by FBI Los Angeles, Eratay shows a current address of 2700 Las Vegas Blvd. S, Unit 2704, Las Vegas, Nevada. This appears to be the destination address listed by Murat on his I-94 information.

  14. On January 9, 2018, VSP Detective Sergeant Tyson Kinney reviewed text messages on Gregory Davis's phone. Further investigation by other state police personnel showed that Gregory Davis's phone had a contact for a gac@quadfin.com, with the address: 19705 Chartwell Hill, Shorewood, Minnesota, 55331, phone: 612-395-5317, home: 952-470-1969. Gregory Davis had exchanged text messages with Gregory Gac at 612-669-9441 as recently as January 4, 2018.

  15. Detective Sergeant Tyson Kinney told me about his review of certain text messages contained on Gregory Davis's phone between what appears to be Gregory Davis and Gac.

  a. According to these messages, in summary, it appears Gregory Davis and Gac were involved in a business venture with investors. A contract was in place with the investors. The contract stipulated that if the investors failed to meet their responsibilities, a $75,000 monthly late fee would be levied. As of October 2016, the investors collectively had accrued over $900,000 in late fees. As of October 2016, Gregory Davis was offering several options to Gac to resolve matters with the investors so they could move forward with the business.

  b. On December 13, 2017, Gregory Davis texted Gac the following: "Greg, it is always best to square things between people. Goodness when it is the prosecutor's office it's nasty, hard and very unforgiving. Can we agree to seriously work to come to the table this week."

  c. On December 27, 2017, Gregory Davis texted Gac: "Happy post Christmas. We need to get things resolved and settled. Please advise as to what they are going to put on the table to accomplish this. Clearly the UBS was just another misrepresenting distraction. It's been duly noted. I look to your reply. GD."

  d. On December 28, 2017, Gregory Davis wrote a long text message to Gac, which in summary, showed Greg Davis wished to terminate the business relationship under the terms of the contract or, Greg Davis threatened, the relationship "conversely will end in a series of indictments, clearly bearing civil and criminal repercussions. They are in control of how it ends, but it is the end." From the context of the text messages, "they" appears to refer to Serhat and Murat.

  e. On December 29, 2017, Gregory Davis wrote a text message to Gac, demanding a settlement of approximately $980,000 to exit the business deal with Gac, Serhat, and Murat, pursuant to their contract. Further conversation continued at the end of December in which Gac references conversations with Serhat.

  f. A final text message to Gac from Gregory Davis, dated January 4, 2018 was located on Gregory Davis's phone which states: "There has now been a history of fraudulent banking documentation that has become the standard. In many instances the banks could not

4

corroborate the claims of the partners. However, in some instances the banks very seriously denied association with the documents and their intention. As regards the TS, all have had a hand in crafting it. Murat himself was directly involved the late sheet segment, to which we gave NO rebuttal. This was then fully executed. We have suffered multiple banking debacles which of itself are VERY serious instances. Therefore, as we've discussed it would be prudent to address the outstanding accounting. Have Murat and Serhat present something to speak to. Let's hopefully close that matter and move forward. Without this our hands will be forced to turn this in to authorities which neither party wants. Please have an honest but serious discussion with the brothers as regards all of the above and let's re-congregate to resolve the immediate matter and discuss how we can move forward. Regards, GD."

    16.    On January 12, 2018, a search warrant was executed 19705 Chartwell Hill, Excelsior, MN, the residence of Gregory Gac. Gac was also interviewed by Agent Hanna, along with VSP Detectives. Gac stated:

    a.    Gac owns a company called Quadrant Financial which he runs out of his home in Excelsior, MN. Gac conducts investment business with brothers, Serhat and Murat Gumrukcu. The brothers own a business called Lauran Trading, which is based in Oman. Serhat and Murat have been working successfully with Gac on deals for over three years.

    b.    Gac met Gregory Davis through other business associates. They have never met in person and have only communicated through phone, text and email. Gac put together an oil-related deal with the Gumrukcu brothers and Gregory Davis. Gac is aware that Gregory Davis has expressed frustration with the Gumrukcu brothers' failure to perform on their obligations in the deal. Gac advised that a third, $40,000, payment is still due to Gregory Davis. A total of three payments, totaling $100,000, were to be paid to Gregory Davis in lieu of the large late fee that had been accrued by the Gumrukcu brothers.

    c.    Gac advised that in February 2016, Serhat told Gac that Murat was upset that Gregory Davis had called officials at the National Bank of Abu Dhabi to verify that Serhat and Murat maintained accounts there. The bank did not provide an answer to Gregory Davis, but the brothers learned of this inquiry and Murat was angered because it threatened the brothers' reputations at the bank. During the search warrant at Gac's residence, Gac's notes regarding this matter were located and the notes reflect that Murat was offended.

    d.    Gac does not believe Gregory Davis and the Gumrukcu brothers have ever met in person though they have talked in conference calls. Gac does not believe Gregory Gac and the Gumrukcu brothers ever spoke directly outside the conference calls.

    e.    Gac communicates with Murat exclusively through email. Serhat has told Gac that no one is provided with Murat's phone number.

    f.    According to Gac, while Serhat is the main point of contact for the brothers, Murat is in control of the money.

    g.    When the interviewers told Gac that Gregory Davis had been murdered, Gac claimed to have no knowledge about the murder.

5

  h. On January 12, 2018, Serhat told Gac that his brother was arranging for the third payment to be made to Gregory Davis, and directed Gac to contact Murat via email about that payment.

  17. On January 26, 2018, I spoke to VSP Detective Angela Baker about her review of the contents of Gac's phone, which was seized during the aforementioned search warrant at Gac's residence. According to Detective Baker, Gac's recent texts with Gregory Davis are consistent with those found on Gregory Davis's phone. Further, Detective Baker observed Gac communicated with Serhat at the telephone number 301-590-8250.

  a. Detective Baker observed that Gac alerted Serhat to Gregory Davis's discontent with Serhat and Murat. On December 29, 2017, Gac forwarded the aforementioned December 28, 2017 text from Gregory Davis to Gac along to Serhat. In this text, Gregory Davis stated that he believed he has witnessed fraud and alluded to potential civil and criminal repercussions. On prior dates, dating back over a year, Gac summarized in text messages to Serhat, Gregory Davis's anger about the business dealings with the Gumrukcu brothers.

  b. In the fall of 2017, numerous texts were sent to Serhat from Gac regarding Gregory Davis's communications with Gac, to include a September 17, 2017 text to Serhat stating, "Gregg is going ballistic, and I don't know if I can control him any more. I heard from Murat that he was returning to Miami today or tomorrow, but nothing specific about meeting. I've heard nothing about meeting with your parents, and nothing from Marc. I'll be getting a call from Gregg soon, and he's going to explode." Further, on September 25, 2017, Gac texted Serhat, stating, "I'm getting nastygrams from Gregg Davis. Anything I can tell him? I'll reach out to UBS shortly" and on October 31, 2017, "…Thanks for pinging Murat. Our friend is all over me again." And, on December 13, 2017, Gac texted Serhat, "Gregg Davis is getting antsy again, and I haven't heard from Murat in four weeks. Gregg wants to see a path forward with ML. With nothing from UBS, I haven misting to tell him. I believe he's on the road to prosecution again, believing there's no future."

  18. I have spoken with FBI personnel who have begun reviewing bank records obtained during the investigation, including bank records for a U.S. bank account in Serhat Gumrukcu's name. Those bank records show that between March 2017 and October 2017, Serhat received funds from an unknown Turkish bank account totaling over $220,000. Some of these funds appear to be have funded the payments to Gac and Davis.

  19. On February 9, 2018, a search warrant was served on Google for records and information associated with murtagumrukcu@gmail.com and serhat.gumrukcu@gmail.com, which had been identified through Gac directly or Gac's electronic devices. Google returned records related to this warrant on February 28, 2018, some of which I have reviewed. My review of the email messages further corroborate that the Gumrukcu brothers, Gac and Gregory Davis were involved in a business deal, and that Davis was applying pressure on the Gumrukcu brothers by threating to go to the authorities about the Gumrukcus' fraud. Moreover, the emails show that Murat expressed anger at these threats. In late 2015, Murat told Gac that he was finding Gregory Davis's behavior "unacceptable," that he was "highly disturbed" and that he did

"NOT wanna hear ridiculous and vulgar threats from him" because his 50k payment was on the way. About two weeks after this email, Murat wrote to Gac, expressing more frustration with Gregory Davis, stating (in part), "As planned, we will initiate this trade to shut him up but I doubt our partnership will survive longer than a couple of lifts … He called me a fraud a second time, there will be no third time. I am trying to clean a mess here and all I hear are threats. . . . If he will harm you or Serhat in any means I will make sure I will find something to return the favor." The records further show that on December 13, 2017, Gac wrote an email message to Murat, in part stating: "Gregg Davis again has expressed concern and frustration at the lack of progress and at the absence of firm direction in proceeding toward implementation of the Mode Lauran program. I fear he may pursue a 'nuclear option' if I can't offer him clear guidance on how we are going to move forward."

20. On March 16, 2018, FBI personnel in Las Vegas conducted a search warrant at the residence of Berk Eratay when Murat was present at the residence. Multiple phones and other computer-related items were collected and Murat was interviewed. Murat claimed to have difficulty speaking and understanding English. Murat adamantly denied ever having any communication with Gac and stated he only knew of him through his brother, Serhat. Murat stated he has no knowledge about the death of any business partner of Gac's.

C.    911 Caller

21. On January 8, 2018, Detective Baker informed me of a suspicious 911 call made near the time and location of Gregory Davis's kidnapping. The VT 911 call center received a call from 802-473-0535 at 8:40 p.m. on January 6, 2018. The 911 call center's technology identified the call as coming from a location on North Danville Road, Danville, VT, only a short distance from the Davis residence.

   a. During the call, a male stated that he shot his wife and was going to shoot himself, and gave an address of 71772 Cross Road (with no town information), after which the phone hung up. The call information was relayed to VSP in St. Johnsbury, Vermont. VSP attempted to locate a Cross Road in the St. Johnsbury area without success.

   b. VSP thereafter requested that AT&T ping the phone in question due to the exigent circumstance. Several pings were conducted. The ping information showed that the call came from the North Danville Road location. It was learned that the phone was a prepaid phone with AT&T service with no subscriber information available. After the VSP checked the North Danville location and several possible Cross Roads outside the town of St. Johnsbury, the matter was closed. At that time, Gregory Davis's body had not been discovered.

22. On January 15, 2018, AT&T responded to a search warrant for information associated with the cellular number 802-473-0535, which placed the suspicious call to 911 on January 6, 2018, near the time and location of Gregory Davis's kidnapping.

23. The data provided by AT&T was reviewed by Special Agent James Wines of the FBI's Cellular Analysis Survey Team. After this review, and consultation with AT&T security personnel, Agent Wines advised me that the phone was prepaid phone purchased at a Walmart

on January 5, 2018. The records showed only two calls being made by the phone, a four second call to a Pizza Hut in St. Johnsbury, VT at 4:14 p.m. on January 6 and the 911 call at 8:42 p.m. on January 6. The phone used only two sectors of the same cell tower, located in St. Johnsbury, VT, for all cell site activity. Agent Wines also told me that this phone was activated, meaning that it can operate on the network, shortly before 4:00 p.m. on January 6th, within minutes of the Pizza Hut call.

24. On January 16, 2018, Agent Wines advised me that he learned from contacts at Walmart security that the prepaid phone was purchased with $100 cash on January 5, 2018 at 4:14 p.m. at the Walmart located at 100 Supercenter Drive, Clearfield, PA. Agent Wines forwarded numerous security camera images of the individual purchasing the phone, which were obtained from Walmart security. The images show a bearded, adult, white male purchasing the phone. The male arrived and departed in a white Ford Explorer. The camera footage indicates the vehicle parked in the Walmart parking lot around 3:55 p.m. and exited the lot around 4:17 p.m.

25. On January 19, 2018, I learned that FBI personnel in Pennsylvania had canvassed gas stations and other locations in the vicinity of the Walmart at 100 Supercenter Drive, Clearfield, PA, to determine if additional security camera footage of the bearded, white male and/or the white Ford Explorer could be located. Additional video footage of the suspect male and vehicle were located at a BP gas station at 14624 Clearfield Shawville Highway, Clearfield, PA 16830.

26. I reviewed stills of this footage, which included images of the bearded, white male and the white Ford Explorer, and they appear to be the same person and vehicle shown in the Walmart security video. The suspect male purchased gas at the BP station. I saw what appears to be a smartphone in the suspect male's hand. A time stamp on this video put the stop at the gas station in the 4:27 p.m. time period on January 5, 2018. The person depicted in the still images does not appear consistent with photographs obtained of Gac or either Gumrukcu.

D. New Phone Identified through Cell Tower Connection Data

27. In early March 2018, I learned from Agent Wines about his review of certain AT&T cell tower data obtained as a result of search warrants issued by this court in January 2018. Agent Wines received a list of cellular devices connecting to a tower covering the area of Clearfield, Pennsylvania, where the 911 phone was purchased. The data included devices connecting to the tower at or about the time the 911 phone was purchased. Agent Wines compared this data to data he received listing cellular devices connecting to a tower covering the area of Danville, Vermont, where the abduction took place. The data included devices connecting to the tower at or about the time of Gregory Davis's abduction. Only one cellular phone was common to both sets of data, and it was a device with phone number 201-208-7436 and IMEI number 86423703243563. Further investigation by Agent Wines determined that the device that connected to towers in Pennsylvania and Danville, Vermont, is an Android cell phone purchased in a Walmart located at 201 Southeast Salem Street, Oak Grove, Missouri on November 13, 2017 at approximately 10:58 am, described in Attachment B(I)(1) and additional service (minutes/data) for that phone was purchased at a Walmart located at 2025 W. Business

8

Highway 60, Dexter, Missouri on January 4, 2018 at approximately 10:20 am, described in Attachment B(I)(3). Agent Wines obtained receipts for these purchases, which show these purchases, like the 911 cell phone purchase in Pennsylvania on January 6, 2018, were made with $100 cash. The details on the receipt suggest that the customer paid with a $100 bill for all three purchases.

28. Agent Hanna obtained a search warrant for historical cell site and location information for this phone on March 2, 2018, from this Court. Agent Wines and I have reviewed the information obtained from this warrant. Analysis of the data shows the phone assigned number 201-208-7436 interacted with cell towers in the area of Monte Vista, Colorado for a brief time on December 29, 2017 between 10:00 am and 1:00 p.m., to include the area of Longitude: -106.09396/Latitude: 37.54580, as described in Attachment B(I)(2). The phone's next activity was in the area of 2025 W. Business Highway 60, Dexter, Missouri on the evening of January 3, 2018 at approximately 6:00 pm to January 4, 2018 at 1:00 p.m. described in Attachment B(I)(3). Thereafter, it continued on roads in a northern and eastern direction through Illinois, Indiana and Ohio. Analysis of the data shows the phone interacted with cell towers in the Columbus, Ohio, area, to include the area of Longitude -82.83502/Latitude 39.92979, for a time period between January 4, 2018 at 7:30 p.m. to January 5, 2018 at 11:20 a.m., as described in Attachment B(I)(4). The phone thereafter continued on roads through Pennsylvania, New York and Connecticut. Analysis of the data shows the phone interacted for a period of time with cell towers around Southington, Connecticut, to include the area of Longitude -72.9084/Latitude 41.5663, on January 6, 2018 from approximately 12:00 am to 10:00 a.m., as described in Attachment B(I)(5). The data shows the phone then continued through Massachusetts and arrived in Vermont on January 6, 2018, at approximately 11:37 a.m. The phone then traveled north, consistent with travel on Interstate 91, and arrived in the area of St. Johnsbury, Vermont, at about 1:30 p.m. Throughout the afternoon and into the evening of January 6, 2018, the data shows the phone was in the areas of St. Johnsbury and Danville, Vermont. The phone remained in the general area in which Gregory Davis's abduction took place (at approximately 9:00 p.m.) and where his body was recovered the next day. After approximately 9:24 p.m., the phone appears to have traveled south out of the Danville/St. Johnsbury area, consistent with travel on Interstate 91. The last reported cell site or location data was at 10:01 p.m., after which the phone had no more interaction with the AT&T network.

29. Further analysis of the data shows that during the travel to Vermont the phone remained in the same general area for extended periods, consistent with overnight stays, to include: an extended time period in Dexter, Missouri, from January 3 to 4, 2018, during which time minutes were purchased for the phone at the aforementioned Walmart in Dexter, Missouri; an extended time period in Columbus, Ohio from January 4 to 5, 2018; and, an extended time period in Southington, Connecticut from January 5 to 6, 2018. Furthermore, during the travel to Vermont, the phone passed through the area of Clearfield, Pennsylvania during the time period in which the 911 phone was purchased at the Walmart in Clearfield, Pennsylvania.

Facts about Cell Towers in General

9

30. Many cellular service providers maintain antenna towers ("cell towers") that serve specific geographic areas. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity. These cell towers allow the wireless devices to transmit or receive communications, such as phone calls, text messages, and other data. The tower closest to a wireless device does not necessarily serve every call made to or from that device.

31. In addition to a unique telephone number, each cell phone is identified by one or more unique identifiers. Depending on the cellular network and the device, the unique identifiers for a cell phone could include an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").

32. Cellular service providers routinely maintain historical cell-tower log information, including records identifying the wireless telephone calls and communications that used a particular tower. For each communication, these records may include the telephone call number and unique identifiers for the wireless device in the vicinity of the tower that made or received the communication ("the locally served wireless device"); the source and destination telephone numbers associated with the communication (including the number of the telephone that called or was called by the locally served wireless device); the date, time, and duration of the communication; the "sectors" (i.e., the faces of the towers) that received a radio signal from the locally served device; and the type of communication transmitted through the tower (such as phone call or text message), the available information is further described in Attachment B(II).

33. Based on the above facts, there is reason to believe that the records described in Attachment B would identify which wireless devices were in the vicinity of the towers listed in Attachment B. This information, in turn, will assist law enforcement in determining which persons were in the area at the time of the relevant events. Specifically, as with the 201 phone, I hope to use the information described above to determine if another phone was used by the 911 caller.

Authorization Request

34. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

35. I further request that the Court direct Cellco Partnership d/b/a Verizon Wireless to disclose to the government any information described in Attachment B that is within its possession, custody, or control. Because the warrant will be served on Cellco Partnership d/b/a Verizon Wireless, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

36. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

37. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Dated at Burlington, in the District of Vermont, this 27th day of March 2018.

_____
Jennie M. Emmons
Special Agent, FBI

Sworn to and subscribed before me this 27th day of March 2018.

_____
Honorable John M. Conroy
United States Magistrate Judge