# EXHIBIT 1

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Vermont

In the Matter of the Search of )
*(Briefly describe the property to be searched* )  Case No.  2:18-mj-4
*or identify the person by name and address)* )
Data associated with Google account berkeratay@gmail.com )
that is stored at premises controlled by Google, Inc. )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512(a)(1) | Killing another person with intent to prevent communication to law enforcement |
| 18 U.S.C. § 1201 | Use of interstate facility or interstate travel for kidnapping |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1958 | Murder for hire |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Patrick R. Hanna, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 25, 2020

*Judge's signature*

City and state:  Burlington, Vermont

Hon. John M. Conroy, U.S. Magistrate Judge
*Printed name and title*

## Attachment A

1.      This warrant is directed to Google, Inc. (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with Google Account berkeratay@gmail.com (the "SUBJECT ACCOUNT"), including all data preserved by the Provider in connection the preservation request on March 2, 2020, reference number 3543528.

2.      A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Attachment B(I) below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Attachment B(II) below.

## Attachment B

### I. Information to be produced by the Provider

Within ten (10) days of the date of service, to the extent within the Provider's possession, custody, or control, including deleted information retrievable by the Provider, the Provider is directed to produce the following information associated with the SUBJECT ACCOUNT, including any information preserved as described in Attachment A:

    a.    Passwords or other protective devices in place and associated with the SUBJECT ACCOUNT, including passwords associated with an Android device;

    b.    Communications delivered through the Google service known as Gmail, including any secondary or backup email addresses associated with the SUBJECT ACCOUNT;

    c.    Web search history, including, but not limited to, mobile and desktop browser searches;

    d.    Email addresses attached to the SUBJECT ACCOUNT;

    e.    Google Map location saved and/or frequent locations, favorite and/or starred locations including, but not limited to, searches conducted using the Google Map and/or Waze services;

    f.    Google Voice Incoming or outgoing phone calls, voicemails, including voicemail content and any and all incoming or outgoing text message history, together with the content thereof to include SMS, MMS, or any other form of text message communication;

    g.    Communication including, but not limited to, audio, video, text message and/or chat delivered through the Google, Inc. service known as Google Hangouts;

    h.    Downloaded, installed, and/or purchased applications;

i.     Posts, status updates, and/or any other information including photographs and/or video for the Google, Inc. service known as Google +;

j.     Photographs and/or videos that are contained and/or were uploaded in the Google, Inc. services known as Google Photos, Picasa web albums, Google +, or any other Google, Inc. service designed to store video, photographs, and/or data, including the metadata for each file;

k.     Electronic files, folders, media, and/or data uploaded and/or contained on the Google, Inc. service known as Google Drive;

l.     Entries created, deleted, or modified using the Google, Inc. service known as Google Keep;

m.     Contacts stored using the Google. Inc. service known as Google Contacts, including any contacts stored in the Google Inc. service known as Gmail.  This request is to include any and all contact services offered by Google, Inc.;

n.     Historical account information, including call forwarding numbers and account backup telephone number; subscriber registration information, sign-up IP address and associated time stamp, telephone connection records, billing information, stored text message content, stored voicemail content, any and all apps installed using referenced email, Google Play Store transactions, call records, and IP log information;

o.     Additional accounts linked by cookies;

p.     Location History:  All location data whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation precision measurement information such as timing advance or per call measurement data, and Wi-Fi location. Such data shall include the GPS coordinates, the dates and times of all location recordings, and origin of how the location recordings were obtained and estimated radius.

q.      The contents of all text messages, voicemails, recorded calls, emails, and chat messages associated with the account, including stored or preserved copies of chat logs, emails sent to and from the account, draft communications, the source and destination addresses associated with each communication, the date and time at which each communication was sent, and the size and length of each communication;

r.      All records or other information regarding the identification of the SUBJECT ACCOUNT subscriber and/or user(s), to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, login IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

s.      All device information associated with the SUBJECT ACCOUNT;

t.      All records or other information stored at any time by an individual using the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, and files;

## II. Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1201 (kidnapping),

1343 (wire fraud), 1512(a)(1) (murder to obstruct justice), and 1958 (murder for hire), for the period January 1, 2017 to July 1, 2018, including the following:

a. Any data that helps show the identity of the person who created the SUBJECT ACCOUNT, and the identity of person(s) who used the account, including data that helps show the whereabouts of such person(s);

b. Any and all data relating to the death of Gregory Davis, including any information related to persons interested in his death, involved in causing his death, and/or hiring someone to kill him;

c. Any and all data that helps show a connection between the user of the SUBJECT ACCOUNT and Gregory Davis, including any people associated with Davis, including Gregory Gac, Serhat Gumrukcu, Murat Gumrukcu, Aron Ethridge and Jerry Banks;

d. Any and all data, including calls, voicemails, text messages, and emails between the user of the SUBJECT ACCOUNT and others, regarding Davis and/or the criminal offenses above;

e. Any and all data that helps show the location of the users for the SUBJECT ACCOUNT;

f. Any and all data that helps show the location of any people associated with Gregory Davis, including those listed above in paragraph c; and

g. Any and all data regarding financial transactions involving the user of the SUBJECT ACCOUNT.

AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and say:

Introduction

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently
assigned to the Burlington Resident Agency in Vermont.  I have been an FBI Special Agent for
17 years.  My duties as an FBI Special Agent include investigating violations of Title 18 of the
United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement,
public corruption, money laundering and related white-collar crimes, as well as violent crimes
and criminal enterprises.  I have participated in investigations of criminal violations of various
federal laws.  I have executed search and arrest warrants, interviewed and interrogated subjects,
witnesses, and victims, and conducted surveillance.  In the course of these investigations, I have
gained an understanding of current technology, to include computers and online accounts,
cellular telephones and associated records and data, and have conducted analyses of the data
related to such accounts and devices, for the purpose of solving and proving crimes.

2.      I am submitting this Affidavit in support of an Application for a Search Warrant
authorizing the production and review of Google account information associated with Berk
Eratay, more specifically described in Attachment A.  As discussed below, there is probable
cause to believe that Jerry Banks was involved in the abduction and murder of Gregory Davis,
whose deceased body was discovered on January 7, 2018 and that Eratay was involved in
arranging for Banks' participation in the murder. There is probable cause to believe that Davis'
abduction and murder involved the following federal crimes: wire fraud, in violation of 18
U.S.C. § 1343; kidnapping, in violation of 18 U.S.C. § 1201; murder to obstruct justice, in
violation of 18 U.S.C. § 1512(a)(1), and murder for hire, 18 U.S.C. § 1958. There is probable
cause to believe that the information described in Attachment B will provide evidence of those
crimes. I have been involved in the investigation of these crimes since January 2018 and have
participated in the review of material from a number of search warrants obtained during the
investigation. In summary, there is probable cause to believe that Davis was involved in a
financial fraud scheme and was murdered by someone hired by others involved in the fraud
scheme to silence Davis. In the past several months, I have learned about evidence linking Banks
and Eratay to the murder scheme.  I am now seeking Google data for the period from July 1,
2017 to July 1, 2018, the same period for which the court authorized previous search warrants
associated with data involving Banks.

3.      This case is being investigated by the FBI and the Vermont State Police (VSP).
Since this affidavit is being submitted for the limited purpose of supporting a search warrant
application for a single account, I have not included details of every aspect of the investigation.
Except as otherwise noted, the information contained in this Affidavit is based upon my personal
knowledge and observations, my training and experience, conversations with other law
enforcement officers and witnesses, and my review of documents and records.

Probable Cause

A.   The Abduction and Shooting

4.   On January 7, 2018, VSP responded to a homicide in Barnet, VT. The victim, identified as Gregory Davis, date of birth October 27, 1968, was found partially covered by snow near the base of a bank on a pull off area near the west side of Peacham Road. Gregory Davis was found handcuffed and had been shot multiple times in the head and torso. Davis resided at 884 Hawkins Road, Danville, VT at the time. Gregory Davis' body was discovered approximately 15 miles from his residence.  Evidence gathered from the crime scene included .22 caliber cartridge casings.

5.   On the same date, VSP Detectives responded to Davis' home and interviewed his wife, Melissa Davis. Melissa Davis advised VSP Detectives that at approximately 9:00 p.m. on January 6, 2018, a male claiming to be a U.S. Marshal came to the Davis' home. This male had handcuffs, a gun, and was wearing a jacket and mask with an eye opening, both of which had a U.S. Marshals emblem. The male's vehicle had red and blue emergency lights activated on the dash. The male said he had an arrest warrant for Greg Davis for racketeering and that Greg Davis was going to be brought to Virginia.

6.   On January 10, 2018, Agent Jennie Emmons confirmed with Supervisory Deputy U.S. Marshal Carl Staley of the Burlington Vermont office of the U.S. Marshals Service that Gregory Davis was not arrested by their agency. Further, it was confirmed by Marshal Staley that there had been no active federal warrants for Gregory Davis.

B.   Gregory Davis' Business Dealings

7.   Melissa Davis told the VSP Detectives that Davis had been involved in the oil investment business and had concerns about his business partners being involved in fraud. I participated in a follow-up interview with Melissa Davis on January 8, 2018, during which Melissa Davis stated:

a.   Melissa Davis and Gregory Davis were married with six children. At that time, Melissa Davis was pregnant with the couple's seventh child. Their family has lived in Vermont for approximately three years. At the time of Gregory Davis' death, the family was living at 884 Hawkins Road, Danville, Vermont.

b.   Sometime after 2011, Gregory Davis told her that he began working on an oil investment deal with a person named Gregory Gac. Gregory Davis contacted Gac by phone, text, and possibly by email. Gregory Davis told her that he had supply contacts for the oil, and Gac was able to bring in investors. Gregory Davis mentioned that Gac had two specific investors, Serhat and Murat.  Melissa Davis understood that Gac had done business with Serhat and Murat before, and they had the means to make the investments.

c.   Melissa Davis was told by Gregory Davis that wire transfers had taken place for this investment deal. The first one was for $30,000. A receipt was provided by Gac to Gregory Davis showing the wire transfer from Bank of America. Gregory Davis consulted with a lawyer

2

about this wire transfer, and the lawyer told him it was fraudulent. Gregory Davis then contacted Gac and Gac tried to convince Gregory Davis that the deal, and the investors, were legitimate. Three subsequent wire transfers of approximately $10,000 each were wired by Gac to Gregory Davis, which appeared to reassure Gregory Davis.

    d.     Gregory Davis told Melissa Davis that two additional wires transfers occurred later, which came to a TD Bank account for Gregory Davis' company, Mode Commodities. The first one was $40,000. The second, more recent transfer, was for $75,000. Melissa understood that the purpose of these wires was for Gac to show Gregory Davis the investors were real and to provide some compensation to Gregory Davis. The Davis family lived off this money and made some improvements to the 884 Hawkins Road property. Gregory Davis told his wife that he planned to talk to the FBI about the potential fraud matter and that he had told Gac that he was going to the FBI.

    e.     After the Davis family moved to Vermont, Gregory Davis took a job with a company in Barre, VT called Safety Kleen.

    8.     On January 9, 2018, Detective Baker told Agent Emmons that Gregory Davis' cellular phone was located on his body in his left inner coat pocket. The phone is an Apple iPhone. According to Melissa Davis, the phone number is 802-377-1303. The service provider for this phone is Verizon Wireless. The phone is owned by Safety Kleen. Detective Baker told Agent Emmons that Safety Kleen management provided consent for the search of the phone.

    9.     Record checks conducted by the employees of the FBI Albany – Burlington Vermont Resident Agency revealed that a Gregory Gac resides at 19705 Chartwell Hill, Excelsior, Minnesota 55331. FBI records show that Gac was interviewed for an FBI investigation regarding an investment fraud matter. The investigation was based in Los Angeles, California, and resulted in the arrest of Serhat Gumrukcu in February 2017.

    10.    On January 9, 2018, Agent Emmons contacted FBI Special Agent Heather Stachnik of the Los Angeles Division. Agent Stachnik advised that she began investigating Serhat Gumrukcu for a real estate investment scheme and a check fraud scheme. She told Agent Emmons the following:

    a.     During the course of the investigation, she learned that Serhat was involved in additional fraud schemes, to include claiming to be an American doctor who had a special cure for cancer and AIDS, and another involving the oil industry. Serhat is a Turkish national currently living in the USA. Serhat is known to be married to a William Anderson Wittekind.

    b.     According to Agent Stachnik, Serhat was charged by the state of California with fraud-related offenses that included his dealings with Gac. He pleaded guilty and was sentenced to five years of probation.

    11.    I reviewed a report of a July 7, 2017 interview Agent Stachnik had with Gac. Gac advised he was an escrow agent for Serhat. Gac claimed he met Serhat through a friend of a friend and that Gac wrote the term sheet for an oil investment deal. The investment deal was in an oil trading company with a company called Mode Lauren LLC (hereinafter "Mode"). The

investors were Serhat and Murat Gumrukcu, Serhat's older brother. Gac drafted the term sheet for the deal. Gac expected to receive residuals from the deal. The Gumrukcus did not make payments as specified in the deal's term sheet and got in arrears with the obligations to Mode. Serhat ended up transferring his interest in Mode to his brother, Murat. Gac was told by a business associate that the Gumrukcus are very wealthy and part of the Turkish royal family. Gac also told Agent Stachnik that he had talked to "Greg Davis" on the phone but had not met him in person.

12.    Record checks performed by employees of the Albany Division – Burlington Vermont Resident Agency, further identified Serhat Gumrukcu. The records indicate that in early 2018 he lived in West Hollywood, California and used the cellular telephone number 310-590-8250. The service provider for this phone is T-Mobile.

13.    I reviewed information obtained from FBI Task Force Officer Jeff Sweeney of Customs and Border Protection that shows Murat Gumrukcu, a Turkish national, traveled alone to the United States on December 18, 2017, from Germany to Las Vegas, Nevada. Murat Gumrukcu's I-94 travel record shows a Las Vegas address, "2700 2704 Las Vegas, Las Vegas, NV 89109." CBP system records show that Murat planned to depart from the United States on March 28, 2018 to Turkey.

14.    In the course of the FBI Los Angeles investigation regarding Serhat, an additional person by the name of Berk Eratay was identified as having partnered with Serhat in a potential fraud scheme in Las Vegas, in which Serhat introduced a person claiming to be a Saudi Arabian prince to a potential victim. According to record checks performed by FBI Los Angeles, Eratay showed an early 2018 address of 2700 Las Vegas Blvd. S, Unit 2704, Las Vegas, Nevada. This appears to be the destination address listed by Murat on his I-94 information.

15.    On January 9, 2018, VSP Detective Sergeant Tyson Kinney reviewed text messages on Gregory Davis' phone. Further investigation by other state police personnel showed that Gregory Davis' phone had a contact for a gac@quadfin.com, with the address: 19705 Chartwell Hill, Shorewood, Minnesota, 55331, phone: 612-395-5317, home: 952-470-1969. Gregory Davis had exchanged text messages with Gregory Gac at 612-669-9441 as recently as January 4, 2018.

16.    Detective Sergeant Tyson Kinney told Special Agent Jennie Emmons about his review of certain text messages contained on Gregory Davis' phone between what appears to be Gregory Davis and Gac.

a.    According to these messages, in summary, it appears Gregory Davis and Gac were involved in a business venture with investors. A contract was in place with the investors. The contract stipulated that if the investors failed to meet their responsibilities, a $75,000 monthly late fee would be levied. As of October 2016, the investors collectively had accrued over $900,000 in late fees. As of October 2016, Gregory Davis was offering several options to Gac to resolve matters with the investors so they could move forward with the business.

b.      On December 13, 2017, Gregory Davis texted Gac the following: "Greg, it is always best to square things between people. Goodness when it is the prosecutor's office it's nasty, hard and very unforgiving. Can we agree to seriously work to come to the table this week."

c.      On December 27, 2017, Gregory Davis texted Gac: "Happy post Christmas. We need to get things resolved and settled. Please advise as to what they are going to put on the table to accomplish this. Clearly the UBS was just another misrepresenting distraction. It's been duly noted. I look to your reply. GD."

d.      On December 28, 2017, Gregory Davis wrote a long text message to Gac, which in summary, showed Greg Davis wished to terminate the business relationship under the terms of the contract or, Greg Davis threatened, the relationship "conversely will end in a series of indictments, clearly bearing civil and criminal repercussions. They are in control of how it ends, but it is the end." From the context of the text messages, "they" appears to refer to Serhat and Murat.

e.      On December 29, 2017, Gregory Davis wrote a text message to Gac, demanding a settlement of approximately $980,000 to exit the business deal with Gac, Serhat, and Murat, pursuant to their contract. Further conversation continued at the end of December in which Gac references conversations with Serhat.

f.      A final text message to Gac from Gregory Davis, dated January 4, 2018 was located on Gregory Davis' phone which states: "There has now been a history of fraudulent banking documentation that has become the standard. In many instances the banks could not corroborate the claims of the partners. However, in some instances the banks very seriously denied association with the documents and their intention. As regards the TS, all have had a hand in crafting it. Murat himself was directly involved the late sheet segment, to which we gave NO rebuttal. This was then fully executed. We have suffered multiple banking debacles which of itself are VERY serious instances. Therefore, as we've discussed it would be prudent to address the outstanding accounting. Have Murat and Serhat present something to speak to. Let's hopefully close that matter and move forward. Without this our hands will be forced to turn this into authorities which neither party wants. Please have an honest but serious discussion with the brothers as regards all of the above and let's re-congregate to resolve the immediate matter and discuss how we can move forward. Regards, GD."

17.     On January 12, 2018, I participated in the execution of a search warrant at 19705 Chartwell Hill, Excelsior, MN, the residence of Gregory Gac. Gac was also interviewed by me, along with VSP Detectives. Gac stated:

a.      Gac owns a company called Quadrant Financial which he runs out of his home in Excelsior, MN. Gac conducts investment business with brothers, Serhat and Murat Gumrukcu. The brothers own a business called Lauran Trading, which is based in Oman. Serhat and Murat have been working with Gac on deals for over three years.

b.     Gac met Gregory Davis through other business associates. They have never met in person and have only communicated through phone, text and email. Gac put together an oil-related deal with the Gumrukcu brothers and Gregory Davis. Gac is aware that Gregory Davis has expressed frustration with the Gumrukcu brothers' failure to perform on their obligations in the deal. Gac advised that a third, $40,000, payment is still due to Gregory Davis. A total of three payments, totaling $100,000, were to be paid to Gregory Davis in lieu of the large late fee that had been accrued by the Gumrukcu brothers.

c.     Gac advised that in February 2016, Serhat told Gac that Murat was upset that Gregory Davis had called officials at the National Bank of Abu Dhabi to verify that Serhat and Murat maintained accounts there. The bank did not provide an answer to Gregory Davis, but the brothers learned of this inquiry and Murat was angered because it threatened the brothers' reputations at the bank. During the search warrant at Gac's residence, Gac's notes regarding this matter were located and the notes reflect that Murat was offended.

d.     Gac does not believe Gregory Davis and the Gumrukcu brothers have ever met in person though they have talked in conference calls. Gac does not believe Gregory Davis and the Gumrukcu brothers ever spoke directly outside the conference calls.

e.     Gac communicates with Murat exclusively through email, Serhat has told Gac that no one is provided with Murat's phone number.

f.     According to Gac, while Serhat is the main point of contact for the brothers, Murat is in control of the money.

g.     When the interviewers told Gac that Gregory Davis had been murdered, Gac claimed to have no knowledge about the murder.

h.     On January 12, 2018, Serhat told Gac that his brother was arranging for the third payment to be made to Gregory Davis and directed Gac to contact Murat via email about that payment.

i.     Gac noted that penalties for not completing the deal, or funding the deal, were $75,000 per month, per the term sheet which was agreed to by all parties and executed a couple of years ago. Davis could sue the Gumruckus per the term sheet.

j.     Gac said that about a year ago Davis was "really, really upset" and that "Murat was pretty upset as a result of that and said you know what, we'll do this transaction with Gregg, but we're not gonna do anything else. I don't want to deal with this kind of guy…"

k.     Gac did not recall providing an address for Davis to the Gumrukcus. Specifically Gac said there "Would have been no reason for me to release it (Davis' address) to Murat." But then stated, "I think they probably knew he lived in Vermont. I'm sure that would've been something that just came up in passing, you know, the Greg's in Vermont or something like that. I don't know for sure, but it wouldn't be unusual for me to mention that."

l.     Gac also said, "I have absolutely no indication that these guys ever intended anybody bodily harm."

18.     On January 26, 2018, Agent Emmons spoke to VSP Detective Angela Baker about her review of the contents of Gac's phone, which was seized during the aforementioned search warrant at Gac's residence. According to Detective Baker, Gac's recent texts with Gregory Davis are consistent with those found on Gregory Davis' phone.  Further, Detective Baker observed Gac communicated with Serhat at the telephone number 301-590-8250.

a.     Detective Baker observed that Gac alerted Serhat to Gregory Davis' discontent with Serhat and Murat. On December 29, 2017, Gac forwarded the aforementioned December 28, 2017 text from Gregory Davis to Gac along to Serhat.  In this text, Gregory Davis stated that he believed he has witnessed fraud and alluded to potential civil and criminal repercussions. On prior dates, dating back over a year, Gac summarized in text messages to Serhat, Gregory Davis' anger about the business dealings with the Gumrukcu brothers.

b.     In the fall of 2017, numerous texts were sent to Serhat from Gac regarding Gregory Davis' communications with Gac, to include a September 17, 2017 text to Serhat stating, "Gregg is going ballistic, and I don't know if I can control him anymore. I heard from Murat that he was returning to Miami today or tomorrow, but nothing specific about meeting. I've heard nothing about meeting with your parents, and nothing from Marc. I'll be getting a call from Gregg soon, and he's going to explode." Further, on September 25, 2017, Gac texted Serhat, stating, "I'm getting nastygrams from Gregg Davis. Anything I can tell him? I'll reach out to UBS shortly," and on October 31, 2017, "Thanks for pinging Murat. Our friend is all over me again." And, on December 13, 2017, Gac texted Serhat, "Gregg Davis is getting antsy again, and I haven't heard from Murat in four weeks. Gregg wants to see a path forward with ML. . . . I believe he's on the road to prosecution again, believing there's no future."

19.     I have spoken with FBI personnel who have been reviewing bank records obtained during the investigation, including bank records for a U.S. bank account in Serhat Gumrukcu's name. Those bank records show that between March 2017 and October 2017, Serhat received funds from an unknown Turkish bank account totaling over $220,000. Some of these funds appear to be have funded the payments to Gac and Davis.

20.     On February 9, 2018, a search warrant was served on Google for records and information associated with murtagumrukcu@gmail.com and serhat.gumrukcu@gmail.com, which had been identified through Gac directly or Gac's electronic devices. Google returned records related to this warrant on February 28, 2018, some of which have been reviewed.  The review of the email messages corroborates that the Gumrukcu brothers, Gac and Gregory Davis were involved in a business deal, and that Davis was applying pressure on the Gumrukcu brothers by threatening to go to the authorities about the Gumrukcus' fraud. Moreover, the emails show that Murat expressed anger at these threats. In late 2015, Murat told Gac that he was finding Gregory Davis' behavior "unacceptable," that he was "highly disturbed" and that he did "NOT wanna hear ridiculous and vulgar threats from him" because his 50k payment was on the way.  About two weeks after this email, Murat wrote to Gac, expressing more frustration with Gregory Davis, stating (in part), "As planned, we will initiate this trade to shut him up but I doubt our partnership will survive longer than a couple of lifts ... He called me a fraud a second time, there will be no third time. I am trying to clean a mess here and all I hear are threats. . . . If

7

he will harm you or Serhat in any means I will make sure I will find something to return the favor." The records further show that on December 13, 2017, Gac wrote an email message to Murat, in part stating "Gregg Davis again has expressed concern and frustration at the lack of progress and at the absence of firm direction in proceeding toward implementation of the Mode Lauran program. I fear he may pursue a 'nuclear option' if I can't offer him clear guidance on how we are going to move forward."

21.    On March 16, 2018, FBI personnel in Las Vegas conducted a search warrant at the residence of Berk Eratay when Murat was present at the residence. Multiple phones and other computer-related items were collected, and Murat was interviewed. Murat claimed to have difficulty speaking and understanding English. Murat adamantly denied ever having any communication with Gac and stated he only knew of him through his brother, Serhat. Murat stated he has no knowledge about the death of any business partner of Gac's. Law enforcement has not completed a review of these devices, in part because of translation difficulties.

C.    The 911 Phone

22.    I listened to a suspicious 911 call made around the time of Gregory Davis' kidnapping. The call took place approximately 15 to 25 minutes prior to the kidnapping and within a mile of Davis' residence. The VT 911 call center received a call from (802) 473-0535 at 8:40 p.m. on January 6, 2018. The 911 call center's technology identified the call as coming from a location on North Danville Road, Danville, VT, only a short distance from the Davis residence.

a.    During the call, a male stated that he shot his wife and was going to shoot himself, and gave an address of 71772 Cross Road (with no town information), after which the caller hung up. The call information was relayed to VSP in St. Johnsbury, Vermont. VSP attempted to locate a Cross Road in the St. Johnsbury area without success.

b.    VSP thereafter requested that AT&T ping the phone in question due to the exigent circumstance. Several pings were conducted. The ping information showed that the call came from the North Danville Road location. It was learned that the phone was a prepaid phone with AT&T service with no subscriber information available. After VSP checked the North Danville location and several possible Cross Roads outside the town of St. Johnsbury, the matter was closed. At that time, Gregory Davis' body had not been discovered.

23.    On January 15, 2018, AT&T responded to a search warrant for information associated with the cellular number (802) 473-0535, which placed the suspicious call to 911 on January 6, 2018, near the time and location of Gregory Davis' kidnapping.

24.    The data provided by AT&T was reviewed by Special Agent James Wines of the FBI's Cellular Analysis Survey Team. After this review, and consultation with AT&T security personnel, Agent Wines advised that the phone was a prepaid phone purchased at a Walmart on January 5, 2018. The records showed only two calls made by the phone, a four-second call to a Pizza Hut in St. Johnsbury, VT at 4:14 p.m. on January 6 and the 911 call at 8:42 p.m. on January 6. The phone used only two sectors of the same cell tower, located in St. Johnsbury,

VT, for all cell site activity. Agent Wines also advised that this phone was activated, meaning that it could operate on the network, shortly before 4:00 p.m. on January 6, within minutes of the Pizza Hut call.

25.     Agent Wines advised me that he learned from contacts at Walmart security that the prepaid phone was purchased with $100 cash on January 5, 2018 at 4:14 p.m. at the Walmart located at 100 Supercenter Drive, Clearfield, PA. Agent Wines forwarded numerous security camera images of the individual purchasing the phone, which were obtained from Walmart security. The images show a bearded, adult, white male purchasing the phone. The male arrived and departed in a white Ford Explorer. The camera footage indicates the vehicle parked in the Walmart parking lot around 3:55 p.m. and exited the lot around 4:17 p.m. A front license plate is not observed on the Ford Explorer. A rear license is observed on the Ford Explorer. The rear plate is light in color and appears to be white. Numbers and/or letters are not recognizable on the rear plate.

26.     On January 19, 2018, I learned that FBI personnel in Pennsylvania had canvassed gas stations and other locations in the vicinity of the Walmart at 100 Supercenter Drive, Clearfield, PA, to determine if additional security camera footage of the bearded, white male and/or the white Ford Explorer could be located. Additional video footage of the suspect male and vehicle were located at a BP gas station at 14624 Clearfield Shawville Highway, Clearfield, PA 16830.

27.     I reviewed stills of this footage, which included images of the bearded, white male and the white Ford Explorer, and they appear to be the same person and vehicle shown in the Walmart security video. The suspect male purchased gas at the BP station. I saw what appears to be a smartphone in the suspect male's hand. A time stamp on this video put the stop at the gas station in the 4:27 p.m. time period on January 5, 2018. My review of the reports of the agents who travelled to Clearfield, Pennsylvania indicate the display times from the gas station security footage appear to be plus six or seven minutes relative to the actual time. The person depicted in the still images does not appear consistent with photographs obtained of Gac or either of the Gumrukcus.

D.     The (201) 208-7436 Phone Identified Through Cell Tower Connection Data

28.     In early March 2018, I learned from Agent Wines about his review of certain AT&T tower data obtained as a result of search warrants issued by this court in January 2018. Agent Wines received a list of cellular devices connecting to a tower covering the area of Clearfield, Pennsylvania, where the 911 Phone was purchased. The data included devices connecting to the tower at or about the time the 911 Phone was purchased. Agent Wines compared this data to data he received listing cellular devices connecting to a tower covering the area of Danville, Vermont, where the abduction took place. The data included devices connecting to the tower at or about the time of Gregory Davis' abduction. Only one cellular phone was common to both sets of data, and it was a device with phone number (201) 208-7436 and IMEI number 86423703243563 (the "201 Phone").

9

29.     Further investigation by Agent Wines determined that the device that connected to towers in Pennsylvania and Danville, Vermont, is an Android cell phone purchased at a Walmart located at 201 Southeast Salem Street, Oak Grove, Missouri on November 13, 2017 at approximately 10:58 a.m., and additional service (minutes/data) for that phone were purchased at a Walmart located at 2025 W. Business Highway 60, Dexter, Missouri on January 4, 2018 at approximately 10:20 a.m. Agent Wines obtained receipts for these purchases, which show these purchases, like the 911 Phone purchase in Pennsylvania on January 6, 2018, were each made with $100 cash.  The details on the receipt suggest that the customer paid with a $100 bill for all three purchases.

30.     I obtained a search warrant for historical cell site and location information for this phone on March 2, 2018, from this Court.  Agent Wines and I have reviewed the information obtained from this warrant.  Analysis of the data shows the phone assigned number (201) 208-7436 first interacted with cell towers in the area of Monte Vista, Colorado for a brief time on December 29, 2017 between 10:00 a.m. and 1:00 p.m. The phone next interacted with a cell tower in the area of Dexter, Missouri from 6:00 p.m. January 3, 2018 to 1 p.m. January 4, 2018. Thereafter, the phone interacted with cell towers near roads following a path in a northern and eastern direction through Illinois, Indiana and Ohio.  Analysis of the data shows the phone interacted with cell towers in the Columbus, Ohio, area for a time period between 7:30 p.m. January 4, 2018 to 11:20 a.m. January 5, 2018.  The phone thereafter continued to interact with cell towers near roads through Pennsylvania, New York and Connecticut.  Analysis of the data shows the phone interacted for a period of time with cell towers in the area Southington, Connecticut, from 12:00 a.m. to 10:00 a.m. on January 6, 2018.  The data shows the phone then continued through Massachusetts and arrived in Vermont on January 6, 2018, at approximately 11:37 a.m.  The phone then traveled north, consistent with travel on Interstate 91, and arrived in the area of St. Johnsbury, Vermont, at about 1:30 p.m.  Throughout the afternoon and into the evening of January 6, 2018, the data shows the phone was in the areas of St. Johnsbury and Danville, Vermont.  The phone remained in the general area in which Gregory Davis' abduction took place (at approximately 9:00 p.m.) and where his body was recovered the next day.  After approximately 9:24 p.m., the phone appears to have traveled south out of the Danville/St. Johnsbury area, consistent with travel on Interstate 91.  The last reported cell site or location data was at 10:01 p.m., after which the phone had no more interaction with the AT&T network. Based on this information, there is probable cause to believe that the 201 Phone was used by someone involved in Davis' abduction and murder.

31.     Further analysis of the data shows that during the travel to Vermont, the 201 Phone passed through the area of Clearfield, Pennsylvania at the time the 911 Phone was purchased at the Walmart in Clearfield, Pennsylvania.

32.     I have attempted to obtain information from Google about the use of this phone by subpoena and search warrant, but have to date been unsuccessful in obtaining any useful information from Google.

E.     Ford Motor Company and Ford Explorer research

33.     I consulted with Matthew Fyie, Manager, Design Analysis Engineering, at Ford Motor Company, to determine the model and year range of the Ford Explorer observed in photographs and video obtained from Clearfield, Pennsylvania. Fyie told me that the Clearfield Explorer was a 2013 to 2015 Police Interceptor model. He noted that the Clearfield Explorer was pictured with Ford Explorer XLT wheels, which were not an option for the 2013 to 2015 Police Interceptor models. Fyie provided photographs of the three wheel styles offered for those Police Interceptors, each of which is different from the XLT wheel. Fyie suggested the XLT wheels were installed on the vehicle at a later time or as an after-market change. Ford later provided information, including VIN numbers, for the 17,291 White Explorer Police Inceptors for model years 2013 to 2015 manufactured and sold by Ford.

34.     The Vermont Intelligence Center (VIC) conducted searches to identify and find vehicles of interest based on certain parameters/criteria (vehicles registered in states of interest, in this case Colorado, vehicles sold at auction with high mileage, and vehicles with sales or service records that occured around the time of the kidnapping and homicide.)

35.     Leads were generated to locate the vehicles of interest and identify the owners at the time of the kidnapping/homicide. One lead was sent to Colorado Bureau of Investigation (CBI) Agent Joseph Cahill, who was then assigned to an FBI Task Force. This particular lead, based on the additional research and identifiers provided by the Vermont Intelligence Center (VIC), was specific to a 2013 Ford Explorer with VIN 1FM5K8AR6DGC73609. CARFAX records indicated that on October 6, 2017, a 2013 white Ford Explorer from Highline Automotive Inc., VIN 1FM5K8AR6DGC73609, was offered for sale. Mileage on the Explorer at the time was 117,138. On December 22, 2017, the Ford Explorer was serviced at Downey Car Center, Downey, California per CARFAX records. Mileage on the Ford Explorer at the time was 130,404. CARFAX records indicate the mileage on the vehicle was 137,168 on March 16, 2018, the next time the vehicle was offered for sale by Maximum Auto Search.

F.     Identification of Jerry Banks

36.     Agent Cahill and CBI Agent Kevin Koback conducted interviews in connection with the Ford Explorer and the dealership, Highline Automotive, which is located in Denver, Colorado. Prior to the interviews my preliminary review of the CARFAX records suggested that Highline was renting the Explorer at the time of the abduction and murder of Davis. Agent Cahill provided me verbal and written reports of the interviews.

a.     Record checks revealed that Vyacheslav "Steve" Iskhakov was a salesman for Highline Automotive. The owner of Highline at the time of interest was Amnun Iskhakov, Steve's father.

b.     Steve Iskhakov was interviewed on 2/19/2020. Iskhakov stated that Highline Automotive purchased the Explorer in 2017 and offered it for sale in late 2017. Highline sold the Explorer but it was later returned to Highline, and the Explorer was finally sold to a different

person later in 2018.  Carmine Gulli dealt with the first buyer.  Iskhakov said he would obtain the deal jacket from his storage unit.  Iskhakov noted that Highline paid for no significant modifications or changes to the vehicle.

c.     Carmine Gulli was also interviewed on 2/19/2020.  Gulli was a Highline Automotive salesperson and its finance manager.  Steve Iskhakov was his boss.  Gulli recalled the initial sale of Ford Explorer – Police Interceptor.  The buyer said he "lived off the grid" near the New Mexico border.  Gulli recalled there were financing problems with the buyer.  The buyer had had no real credit score, the buyer "was a ghost."  Gulli recalled there was a female in a brown 70's Dodge "dually" style pickup truck with the buyer when the buyer later returned the vehicle.  Gulli looked at a photo pack of the vehicle of interest and recalled that at the time of the initial sale the Explorer had cutouts for police equipment, no driver's light but there was a hole, Gulli looked at the Walmart security camera photographs and stated he felt it appeared to depict the same person as the buyer but with more facial hair.

d.     Steve Iskhakov was interviewed again on 2/26/2020. Iskhakov provided CBI Agents with documents, including the original Highline Automotive sales jacket for the Explorer, which reflect a transaction with Jerry Dean Banks on 11/16/2017.  Iskhakov said he never had anyone drive so many miles on a car in the short period of time Banks had the Explorer. Iskhakov reviewed the photograph package of the vehicle of interest and stated he felt the wheels were consistent with the ones on it when Highline was in possession of it.

e.     Mark Wilcox was interviewed on March 7, 2019 by Agent Cahill.  Wilcox is the Chief of Mountain States Emergency Medical Services in Denver, Colorado.  He is the current owner of the Ford Explorer of interest.  Wilcox purchased it on April 17, 2018 from Maximum Auto Search in Englewood, Colorado.  Wilcox recalled the person he dealt with at Maximum told him that the Explorer was being sold on consignment for Highline Automotive due to a pending bankruptcy. The XLT wheels can be seen in a photograph taken during the time of the interview.

37.     I spoke with Wilcox on April 15, 2020.  Wilcox confirmed that the same XLT wheels were on the Explorer when he purchased it from Maximum Auto Search.  Wilcox also told me the Explorer did not have a spotlight attached on the driver's side when he bought it. I note that the Clearfield photos, while not clear, do appear to show a spotlight on the driver's side. This light, even if present, could have been attached while Banks had the Explorer and removed before Banks returned it to Highline Automotive.

38.     I have reviewed the Highline Auto sales information. I found the following information regarding the sale/purchase of the 2013 white Ford Explorer:
   a.     purchaser: Jerry Banks, including his date of birth and social security number;
   b.     address: 1179 Pfotenhauer Road, Fort Garland, CO 81133;
   c.     phone number: (719) 480-3879;
   d.     email address: banksavs@gmail.com;
   e.     additional phone number: (718) 298-2328;

12

f.    registration information: plate B094536 for the 2013 white Ford Explorer;

g.    Progressive Insurance, policy number 917738127, effective 10/26/2017 to 4/26/2018, for the Ford Explorer and a 1999 Ford F350;

h.    purchase date: 11/16/2017 with mileage reading of 117,138;

i.    surrender date: 1/24/2018, documents indicate "miles and use paid for" and "loan is being written off, no harm to borrower." A receipt for the additional "miles and use" indicates Banks paid $1,500 in cash when he surrendered the vehicle;

j.    Banks "surrendered" the Ford Explorer to Highline Automotive Inc.

39.    I also reviewed records provided by Progressive Insurance involving Banks' purchase of the 2013 Ford Explorer. The insured is listed as Jerry Banks with phone numbers (661) 433-5327 and (719) 480-3879 and an email address of banksavs@gmail.com. The primary use of the vehicle is designated "Pleasure." This vehicle was added to the policy on 10/26/2017. This vehicle was removed from the policy on 1/25/2018. Banks provided a valid Arizona driver license of D08379473. His employment was noted as police/fire/security with an occupation of correctional or probation officer. Banks also insured a 1999 Ford F350 Super Duty VIN 1FTWW33FXXEA13443 and a 2003 Land Rover Discovery II VIN SALTY16423A789183.

40.    I have reviewed Colorado driver's license information about Banks. On December 18, 2017, a Colorado driver's license was issued to Jerry Dean Robert Banks. The Colorado Driver's License number is 170647692. The license expires 9/22/2022 and the given mailing address for Banks is 1179 Pfotenhauer Road, Fort Garland, CO.

41.    I have also reviewed Colorado vehicle registration information about the Highline Explorer. Those records show that Banks got a temporary registration for the Explorer first on 10/26/17, consistent with the Progressive Insurance Records. The Colorado registration records further show that Banks got a second temporary registration for the Explorer on 11/16/17, the purchase date in the Highline Auto records. The temporary tag issued on 11/16/17 was B094536. Agent Cahill, who is familiar with Colorado temporary registration tags, told me that those tags are white in color and made of paper. Colorado only issues a temporary tag for the rear of car not a second for the front. This kind of temporary tag is consistent with the images from the Clearfield Explorer, which had a light colored rear tag and no front tag. I cannot make out the tag number from the Clearfield images.

G.    The (719) 480-3879 Phone

42.    I have reviewed records from Verizon Wireless that identify Jerry Banks as the subscriber of the phone with number (719) 480-3879 (the "719 Phone") during the relevant timeframe. The device used was a Samsung Galaxy Note with IMEI 3520 7809 1178 251. Banks is the effective subscriber from 10/20/2017 through 11/8/2018. Phone number (661) 433-5327 is listed as Banks' home phone number and work phone number.

43.    I have also reviewed Verizon Wireless Billing Statements, which show the approximate location of the Banks phone when calls are made. I have confirmed with Verizon

Wireless personal that this location information is associated with the cell towers and switch connecting to the phone at the time of calls. I also learned that Verizon Wireless maintained more precise location information for this phone for only approximately one year. I found the following locations of note for this phone in the Billing Statements:

      a.     On 10/26/2017, a call from this phone originated in Denver, CO.

      b.     On 12/13/2017, a call from this phone originated in Dexter, MO.

      c.     On 12/28/2017 a call from this phone originated in Alamosa, CO.

      d.     On 12/29/2017, another call from this phone originated in Alamosa, CO, which is close to Monte Vista, CO. As noted above, the 201 Phone first interacted with cell towers in the area of Monte Vista, CO on 12/29/2017.

      e.     On 1/2/2018 and 1/3/2018, calls from this phone originated in Dexter, MO. As noted above, the 201 Phone interacted with cell towers in Dexter, MO on 1/3/2018.

      f.     No calls are made between 12:59 p.m. on 1/3/2018 and 1/7/2018, when the 201 Phone was actively being used.

      g.     On 1/7/2018, at approximately 9:24 p.m., a call from this phone originated in O'Fallon, MO, which is along I-70 in Missouri. The time between the last use of the 201 Phone and this call on the 719 Phone is approximately 25 hours. Google Maps shows that driving time from Barnet, VT to O'Fallon, MO is approximately 19 hours.

      h.     On 1/8/2018, a call from this phone originated in Alma, KS. This call takes place approximately 15 minutes after the Kansas Highway Patrol car stop of Banks in Alma, KS, described below. The call connects with (573) 421-4798 for approximately 20 minutes.

      i.     On 1/9/2018, multiple calls are made from this phone, all originating in Colorado (Alamosa, Sanford and Colorado Springs).

44.     Banks' use of the 719 Phone is consistent with him buying and using the 201 Phone.

### H.    The (661) 433-5327 phone number

45.     I reviewed Verizon Wireless records obtained for the phone using number (661) 433-5327 during the relevant period. The subscriber is All Valley Solar (AVS). The IMEI is 9900 0435 4670 824. The mailing address for the billing statement is All Valley Solar (AVS), 12623 Sherman Way Ste. A, N. Hollywood, CA 91605. As noted above, Progressive records show that Banks provided this phone number as his work phone number, and Verizon Wireless records for the 719 Phone show Banks provided this number as his home and work phone.

46.     The 661 Phone records also show approximate location information for the calls. On the morning of 11/18/2017, three calls were made from this phone all originating from Barnet, Vermont. The 719 Phone records show no phone activity between 11/10/17 and 11/20/17, while Banks was apparently traveling to Vermont.

### I.    The (573) 421-4798 phone number

47.     I have reviewed AT&T records obtained for the phone using (573) 421-4798. Jami Machovec is the user of this phone from 12/12/2017 through 8/16/2018, user address 1206 E Stoddard Street, Dexter, MO 63841, home email chov47@gmail.com.  The IMEI is 3104 1002 6681 050.

48.     The AT&T records show that between 12/12/17 and 1/31/18 the (573) 421-4798 number is in text communication with the (719) 480-3879 number hundreds of times, which suggests to me that Machovec has a close relationship with Banks.  There are no text communications between the phones during the following discrete time periods (hours are listed in UTC):

    a.     12/23/17 from 18:05 hours through 12/27/17 at 16:43 hours
    b.     12/29/17 from 21:59 hours through 12/31/17 at 18:24 hours
    c.     1/4/18 from 15:00 hours through 1/8/18 at 16:08 hours (this period overlaps the time period between the approximate time of the purchase of the 201 Phone minutes at the Dexter Walmart and approximate time of the first call made on the 719 Phone on 1/8/18 from O'Fallon, MO)
    d.     1/12/18 from 15:44 hours through 1/15/18 at 13:19 hours
    e.     1/20/18 from 15:38 hours through 1/22/18 at 11:45 hours
    f.     1/26/18 from 22:34 hours to 1/28/18 at 12:06 hours

### J.     Kansas Highway Patrol vehicle stop

49.     Based on reviews of law enforcement contact with Banks, I discovered that on 1/8/2018 at approximately 1:48 p.m. Central Standard Time, a traffic stop was conducted by Kansas Highway Patrol Technical Trooper Clark in the vicinity of mile post 337 on I-70 Westbound in Alma, KS.  I have reviewed reports about the stop.  Jerry Banks was operating a white Ford Explorer.  Banks was stopped for a lane violation.  I spoke with Technical Trooper Clark and reviewed a DVD recording of the traffic stop he provided.  Trooper Clark described Banks as extremely nervous.  The vehicle contained multiple law enforcement items including a gun, tactical vest and law enforcement equipment.  Trooper Clark noted the back seat of the Ford Explorer was folded down and a mattress was observed in the middle to back area of the Explorer.  The Call Summary Report indicates the vehicle that was stopped was a 2013 white Ford Explorer with VIN 1FM5K8AR6DGC73609 and Colorado plate B094536.

50.     On 3/3/2020, I reviewed a DVD copy of the traffic stop conducted by Technical Trooper Clark on 1/8/2018.  Jerry Banks said that he was traveling from Dexter, Missouri.  During the traffic stop, a phone can be heard ringing inside the Ford Explorer.  The phone ringtone is consistent with a Samsung Galaxy phone standard ringtone.

51.     I compared the video of Banks from the car stop to the photos/video from the Clearfield, PA Walmart purchasing the 911 Phone and BP gas station, described above.  Banks looks similar to the person in the Clearfield images.

52.     I compared Banks' voice in the video to the voice of the 911 caller. Banks' voice sounds similar to the 911 caller's voice.

K.     Banksavs@gmail.com email account

53.     I reviewed Google subscriber records for the email address Banks provided to Highline Automotive, banksavs@gmail.com. Jerry Banks is the subscriber of the email account. He uses bankspes@gmail.com for his recovery email. The account was created on 6/5/2009. SMS (texts) are connected to phone number (719) 480-3879 (the 719 Phone). The Google account ID is 332795558920. The subscriber services listed are Android, Gmail, Google Calendar, Google Chrome Sync, Google Cloud Print, Google Drive, Google Hangouts, Google Keep, Google My Maps, Google Payments, Google Photos, Google Play, Google Play Music, Google Services, Google Voice, Has Madison Account, Location History, Web & App Activity, YouTube, and iGoogle.

54.     On April 22, 2020, I obtained a search warrant for information from the banksavs@gmail.com account. I and other investigators working with me have begun reviewing the information. We have identified a number of pieces of information in the Google data that further support the conclusion that Banks was involved in the shooting of Greg Davis, including the following:

a.     Within the Google maps data there are a number of pieces of information including searches for Vermont on October 10, 2017, December 12, 2017 and January 4, 2018.

b.     Within the Google search history data are a number of pieces of information including searches for: Explorer Police Interceptors for sale on October 26, 2017; Ford Explorer Police Interceptor rims as well as steel wheels and a police spotlight on October 29, 2017; ARC-22 .22 LR Conversion Kits on December 17, 2017; and body armor on December 26, 2017. As noted above .22 caliber ammunition was used to kill Mr. Davis.

c.     Within the Google location information are thousands of GPS coordinates including coordinates showing that the Google account user was at the Dexter, MO Walmart at 9:20 a.m. on January 4, 2018, the same time the minutes were purchased for the 201 Phone. Though there are hundreds of pieces of location information on most days, there is no location information for certain periods of time including: 1) between 9:51 a.m. (CST) on January 4, 2018 and 9:22 p.m. (CST) on January 7, 2018; 2) between 3:53 p.m. (CST) on November 11, 2017 and 11:09 a.m. (CST) on November 13, 2017; and 3) 2:31 p.m. (CST) on November 13, 2017 and 9:17 p.m. (CST) on November 20, 2017. As noted above, the 201 Phone was purchased in Oak Grove, MO at 9:58 a.m. (CST) on November 13, 2017. On November 13, 2017 at 11:09 a.m., when the location information was turned on, it shows the user 50 miles east of Oak Grove, MO on Interstate 70. Interstate 70 also travels through Oak Grove, MO. This information suggests to me that the user was in Oak Grove at the time the 201 Phone was purchased.

d.    Within the Google email data are numerous emails with information related to purchases including the following: 1) On November 3, 2017, an order confirmation email to Jerry Banks describing the purchase from Amazon of a public safety scanner; 2) on November 8, 2017 a shipping confirmation email to Jerry Banks for a blue/red flashing modes; and 3) on December 20, 2017, an email containing a Paypal purchase confirmation to "Jerru Banks" for purchases of an Antique Gold Marshal Badge, a US Marshal Shoulder Patch and a US Marshal embroidery patch.

55. .    The Google data also provides evidence that Banks was using Tinder, a dating app, on his phone during the relevant period of time. Specifically, the Google data includes a "purchase history" folder. In this folder was a purchase dated 12/27/17 for Tinder Plus (Tinder) in the amount of $9.99. An additional purchase for Tinder Gold (Tinder) was noted on 01/15/18 and again on 02/12/18 and 03/15/18 in the amount of $14.99.

L.    Information linking Banks to the Gumrukcus through Aron Ethridge and Berk Eratay

56.    One matter we are investigating is the connection between Banks and the Gumrukcus. The investigation to date links Banks to the Gumrukcus through Aron Ethridge and Berk Eratay. I have found no communications between Banks and the Gumrukcus directly. As I describe above, the evidence suggests that the murder for hire scheme began at some point in or about early October 2017. For example, the text messaging between Serhat Gumrukcu and Gregory Gac show that the tensions pick back up between Greg Davis and Serhat in late September 2017. Moreover, the banksavs Google records suggest that Banks was involved in the scheme before October 10, 2017, when he searched for directions to Vermont.

57.    The first call made from the 719 Phone after Mr. Davis' homicide occurred at 9:24 p.m. (CST) on January 7, 2018. This call was made to 760-220-0478. I have reviewed Verizon wireless billing records which show that that number was used by Aron Ethridge at that time.   The 719 Phone received a call from the Ethridge number on January 8, 2018 at 5:44 p.m. (CST).

58.    The banksavs Google data described above includes several connections between Banks and Aron Ethridge. First, the Google account contains contact information for Aron with phone number 760-220-0478. Second, the Google account shows searches for 1137 Sport of Kings Avenue, Henderson, NV on October 5, 2017 and January 11, 2018. The Vermont State Police Intelligence Center (VIC) has reviewed Accurint data, which includes property sales information and utility information, showing Aron Ethridge residing at 1137 Sport of Kings Avenue in October 2017. The 661 Phone records show that Banks was in Henderson, NV on October 7, 2017 at 1:00 p.m. (PST).

59.    I have reviewed data from a search warrant return from the serhat.gumrukcu@gmail.com account. That data includes contact information showing Aron Ethridge with phone number 760-220-0478.

17

60. As noted above, my investigation has shown connections between the Gumrukcus and Berk Eratay. I have reviewed Verizon Wireless phone records for a number subscribed to by Berk Eratay, 702-336-2264, which show numerous contacts between July 2017 and January 2018 with a phone number subscribed to Serhat Gumrukcu, 310-590-8250. Those records also show contacts during the relevant period between Berk Eratay's phone number and Aron Ethridge's phone, including five calls on September 22, 2017, two calls on October 10, 2017, and a call at 11:26 p.m. (PST) on January 7, 2018. The first call made after the Ethridge phone has contact with the 719 Phone on January 7, 2018 is this call to the Eratay phone. Accurint records show that for a period before 2017, Eratay resided next door to Aron Ethridge on Skytop Drive in Henderson, NV.

61. The phone records for the Eratay and Ethridge phones also show that on December 18, 2017, the Eratay phone was in contact with both the Ethridge phone and the Serhat phone. As described above, email records show that on December 13, 2017, Gregory Gac wrote an email to Murat fearing the "nuclear option" from Gregory Davis, and Davis text messages to Gac show him talking about "the prosecutor's office."

62. The banksavs Google data shows that on January 9, 2018, the user searched for flights to Las Vegas, NV, which is near Henderson, NV. The Google location information shows that the user traveled to Henderson, NV on January 11, 2018. The Eratay and Ethridge phone records show that the Eratay phone was in contact with both the Ethridge phone and the Serhat phone on January 11, 2018.

63. I have reviewed the results of a search warrant obtained for Banks' Facebook account. I have not identified any communications with Facebook identities associated with Ethridge. However the Facebook records support the conclusion that Ethridge met with Banks in early October 2017. The first reference to "Aron" in the Banks Facebook data is a communication with a third party on March 23, 2017, in which Banks refers to "Aron" as "his buddy." The Facebook records show that Banks was communicating with Facebook user John Cooper. Banks calls this user "Mr. Bruce." On September 24, 2017, "Bruce" wrote to Banks that "Aron was looking to get in touch with you." On October 4, 2017, "Bruce" wrote to Banks about Banks' plan to travel to visit "Aron." On October 5, 2017, Banks wrote to "Bruce" asking about "arons Addy." "Bruce" responded "1137 Sport of Kings Ave. Henderson, NV 89015." On October 9, 2017, Banks wrote to "Bruce" saying that he had returned from the trip "at like 6am" on October 8, 2017. In early December, Banks wrote to "Bruce" about communicating with Aron by "message," but those messages are not in the Facebook data.

64. I have reviewed records provide by Bancorp for Banks' credit card. Those records corroborate that Banks made a debit card purchase in Henderson, NV on October 6, 2017.

65.     I have examined records regarding Banks' travel from Christmas 2017 to early January 2018.  The Google location data shows that Banks was at Ethridge's home in Henderson, NV on December 26 and 27, 2017.  The location information shows that between December 27 and 28 he travelled to his home in Ft. Garland where he appears to stay until January 1, 2018.  On January 1, 2018 he began driving from his home, arriving in Dexter, MO at approximately 3:20 a.m. on January 2, 2018 (CST).  As noted above, there is no location data for the period from 9:51 a.m. (CST) on January 4th to 9:22 p.m. (CST) on January 7th, 2018.  (During that time, the 201 phone travelled from Dexter, MO to Vermont and was in Vermont at the time of the murder.)  From January 3, 2018, when the 201 Phone was turned on, until January 4th when the location data ends (likely because the 719 Phone is turned off) both phones are in Dexter, MO.  When the location data turned back on January 7 at 9:22 p.m. (CST) it shows the user in O'Fallon, MO, the same location as the Verizon records show for the phone call placed to Ethridge at 9:24 p.m (CST).  The location information shows Banks driving home to Ft. Garland, CO and then driving to Henderson, NV, where he arrives on January 11, 2018 at approximately 2:35 p.m. (PST).

M.     Berkeratay@gmail.com email account

66.     On March 2, 2020 a preservation letter was sent to Google LLC, pursuant to 18 U.S.C. § 2703(f), requesting preservation of all stored communications, records, and other evidence regarding berkeratay@gmail.com (the "SUBJECT ACCOUNT") for a period of 90 days.  On May 28, 2020, a preservation extension letter was sent to Google LLC extending the preservation for an additional 90 days.

67.     I reviewed PayPal records for the account of Berk Eratay.  Paypal subscriber records show the email address for Berk Eratay as berkduffy@gmail.com.  Google subscriber records for the email address berkduffy@gmail.com list a recovery email address of berkeratay@gmail.com.

68.     I reviewed Google records regarding berkeratay@gmail.com.  Berk Eratay is the subscriber of the email account.  He uses beratay@live.com for his recovery email.  The account was created on October 31, 2004. Recovery SMS (texts) is connected to phone number 702-336-2264. The Google account ID is 602866930227.  The subscriber services listed are Gmail, Google Shopping, Google Books, Google Page Creator, Google Hangouts, Google Services, Google Payments, Blogger, Google Drive, iGoogle, Google Notebook, Google Search Console, Google Docs, Google Reader, Android, Google Calendar, Google Analytics, Website Optimizer, YouTube, Google AdWords, Google Groups, Google Photos, Location History, Google Play Console, Google Chrome Sync, AdMob, Google URL Shortener, Google Voice, Google Developers Console, Google Cloud Print, Google Maps Engine, Google AdSense, Web & App Activity, Has Madison Account, Google My Maps, Google Play Music, Google Keep, Yeti, Billing, Has Google One Membership Information, Nest Auth, Is In Family and Chromeos Login.

Background concerning Google Data

69.    In my training and experience, I have learned that Google provides a variety of online services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts at the domain name Gmail.com. Subscribers obtain an account by registering with Google. Google maintains records concerning the devices used to connect to its services. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

70.    A Google subscriber can also store with the Provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google. This files are associated with a Google email account. For example, Google Voice allows for incoming or outgoing phone calls, voicemails, including voicemail content and any and all incoming or outgoing text message history, together with text message communication. Google Hangouts allows for communication including, but not limited to, audio, video, text message and/or chat. Google + allows for posts, status updates, and/or any other information including photographs and/or video. Photographs and/or videos can also contained and/or were uploaded in the Google, Inc. services known as Google Photos, Picasa web albums, or any other Google, Inc. service designed to store video, photographs, and/or data. Electronic files, folders, media, and/or data can also be uploaded and/or contained on the Google, Inc. service known as Google Drive. Google Keep stores entries created, deleted, or modified. Contacts can be stored in Gmail or in the Google. Inc. service known as Google Contacts. Further, Google allows Android users to purchase and download applications for their devices. Google Servers will store the applications downloaded, installed, and purchase. In my training and experience, evidence of who was using an account may be found in all of these services.

71.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

72.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This

information can include the date on which the account was created, the length of service, records of login (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

73.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

74.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the government to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, email providers typically log the IP addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

75.     In my training and experience, I have learned that Google provides a variety of online services that track and store location information, including Google Maps and Waze that allow a user to maps their travels and get directions to various locations. These services allow Google to store frequent locations, favorite locations, travel searches, and even certain travel of the device itself. Moreover, I have learned that various Google services may contain information about location history of the device including GPS data, cell site data, and Wi-Fi location, which may the location and the estimated radius that the device was from the location.

76.     According to representatives of Google, the company keeps records that can reveal Google accounts accessed from the same electronic device, such as the same computer or mobile phone, including accounts that are linked by "cookies," which are small pieces of text sent to the user's Internet browser when visiting websites. This warrant requires Google to identify any other accounts accessed by the same device(s) that accessed the Subject Account described in Attachment A, including accounts linked by cookies, recovery email address, or telephone number. This warrant will ask that Google identify such accounts and produce associated subscriber information (not content of those accounts).

<u>Authorization Request</u>

77.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

78.     I further request that the Court direct Google, Inc. to disclose to the government any information described in Attachment A that is within its possession, custody, or control. Because the warrant will be served on Google, Inc. who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

79.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  See 18 U.S.C. §§2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

80.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Dated at Burlington, in the District of Vermont, this _25th_ day of August 2020.

Patrick Hanna
Special Agent - FBI

Sworn to and subscribed before me this _25th_ day of August 2020.

Honorable John M. Conroy
United States Magistrate Judge

23