# EXHIBIT 1

AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and state as follows:

Introduction

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently assigned to the Burlington Resident Agency in Vermont. I have been an FBI Special Agent for 19 years. My duties as an FBI Special Agent include investigating violations of Title 18 of the United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement, public corruption, money laundering and related white-collar crimes, as well as violent crimes and criminal enterprises. I have participated in investigations of criminal violations of various federal laws. I have executed search and arrest warrants, interviewed and interrogated subjects, witnesses, and victims, and conducted surveillance. In the course of these investigations, I have gained an understanding of current technology, to include computers and online accounts, cellular telephones and associated records and data, and have conducted analyses of the data related to such accounts and devices, for the purpose of solving and proving crimes.

2. I make this affidavit in support of an application for a search warrant authorizing the examination of an electronic device – a Seagate Expansion Desktop Drive with serial number NA8FNSXM (the "SUBJECT DEVICE"), currently in the custody of the FBI in Colchester, Vermont – and the extraction of electronically stored information described in Attachment B.

3. As discussed below, there is probable cause to believe that Jerry Banks was involved in the kidnapping and murder of Gregory Davis, whose deceased body was discovered on January 7, 2018. There is probable cause to believe that Davis' kidnapping and murder involved the following federal crimes: kidnapping, in violation of 18 U.S.C. § 1201, murder to obstruct justice, in violation of 18 U.S.C. § 1512(a)(1); and murder for hire, in violation of 18 U.S.C. § 1958. There is probable cause to believe that device described in Attachment A contains evidence of those crimes.

4. This case is being investigated by the FBI and the Vermont State Police (VSP). Since this affidavit is being submitted for the limited purpose of establishing probable cause to search data already in law enforcement's custody, I have not included details of every aspect of the investigation. Except as otherwise noted, the information contained in this Affidavit is based upon my personal knowledge and observations, my training and experience, conversations with other law enforcement officers and witnesses, and my review of documents and records.

Probable Cause

5. On March 30, 2022, I obtained a Criminal Complaint charging Jerry Banks with the kidnapping of Gregory Davis in violation of 18 U.S.C. § 1201(a)(1). A copy of my affidavit submitted in support of the Criminal Complaint is attached as Exhibit 1. Its contents remain true and correct.

6. On April 6, 2022, I applied for and obtained a search warrant for the premises of 1179 Pfotenhauer Road, Fort Garland, Colorado (hereafter "Residence Warrant"), a property

1

owned by Jerry Banks. A copy of my affidavit submitted in support of the Residence Warrant is attached as Exhibit 2. Its contents remain true and correct.

7. As set forth in more detail in Exhibit 2, there is probable cause to believe that prior to his murder, Davis was the victim of a financial fraud scheme involving Serhat Gumrukcu and his brother, Murat Gumrukcu. This financial fraud scheme involved investments in an oil trading company, and agreements between Murat Gumrukcu's entity Lauran Trading, LLC; Gregory Davis' entity Mode Commodities, LLC; and Gregory Gac's entity Quadrant Financial Group, LLC (functioning as an "escrow agent" for the parties).

8. As set forth in Exhibits 1 and 2, there is probable cause to believe that Jerry Banks murdered Davis, and that he was hired to do so on behalf of a third party. As set forth in Exhibit 2, the only known link between Banks and the Gumrukcus is through Aron Ethridge and Berk Eratay.

9. On April 6, 2022, Jerry Banks was arrested in Yellowstone National Park. On April 7, 2022, FBI agents executed the Residence Warrant at Banks' property in Colorado. During the search, in the trailer-type residence, agents located 9mm ammunition; a hand-held radio; two firearm magazines; a green law-enforcement style duty belt; and the SUBJECT DEVICE. In a storage shed, agents recovered a short-barrel AR-15 with no serial numbers or manufacturer labels; an AR-15 "upper" (no lower receiver) with a scope; handcuffs; a pepper blaster; and a FedEx envelope containing purchase paperwork and registration for a Ford Explorer from Highline Automotive. In a maroon Chevy Blazer located on the property, agents recovered a vehicle spotlight, which was disassembled into two pieces.

10. On April 7, 2022, I interviewed Aron Ethridge near his home in Henderson, Nevada. During this initial interview, Ethridge denied all knowledge of a murder-for-hire scheme involving Banks. On the morning of April 9, 2022, I received a call from Ethridge, who agreed to meet again later that day. At this second meeting, Ethridge admitted he had lied during the first meeting, and then confirmed the murder-for-hire scheme involving Banks and Eratay. A third meeting with Ethridge was held on April 10, 2022, during which Ethridge admitted he had omitted some of his knowledge of the plan to abduct Davis during his interview on April 9. The following is a summary of the information that Ethridge provided to law enforcement during the April 9 and April 10 interviews, with corrections as provided by Ethridge on April 10:

  a. Ethridge and Eratay used to be neighbors in Henderson, Nevada, and became friends during that period.

  b. Eratay approached Ethridge over a year before the murder of Davis, asking if Ethridge could arrange a murder. Ethridge eventually agreed to assist Eratay.

  c. Ethridge approached Banks, asking Banks to assist with the murder.

      d.     Ethridge received over $110,000 in cash from Eratay as payment for the murder. A portion of this cash was paid to Banks.

      e.     The initial plan had been for Banks to "snipe" Davis, but after Banks made a reconnaissance trip to Vermont, Banks advised the plan would have to be revised and requested additional payment due to the increased difficulty of the job.

      f.     Ethridge knew that Banks would impersonate a law enforcement officer and abduct Davis from his residence prior to murdering him.

      g.     Ethridge and Banks communicated via an encrypted application called "Threema." Ethridge also communicated with Eratay on the "Threema" application.

      h.     On at least one occasion, Banks used a physical data card to pass along a digital image of Davis that Banks had taken during a trip to Vermont. Ethridge provided this data card to Eratay.

      i.     On January 7, 2022, while Banks was traveling back from Vermont, Banks called Ethridge and advised him the job was done. Ethridge then called Eratay to relay the message.

      j.     Ethridge had met Serhat Gumrucku on multiple occasions prior to the murder of Davis. Ethridge believed that, based on these meetings and statements made by Eratay, Serhat was the man who wanted Davis killed. Eratay told Ethridge that Serhat had a problem with Davis. However, Serhat and Ethridge never directly communicated about the abduction and murder. All communications went through Eratay, who Ethridge knew to work for Serhat.

      k.     After the murder of Davis, Eratay provided Ethridge with an additional payment in the form of Bitcoin.

<u>Electronic Storage and Forensic Analysis</u>

11.    Based on my knowledge, training, and experience, I know that the SUBJECT DEVICE, a Seagate Expansion Desktop Drive, is typically utilized as an external data storage device. The external markings on the SUBJECT DEVICE indicate it has a capacity of 3 TB, the equivalent of 3,000 gigabytes (GBs). Such a device is capable of storing thousands of digital photographs and thousands of document files. The SUBJECT DEVICE could also store backups of other electronic devices, including the data stored on a cellular phone. Devices such as the SUBJECT DEVICE can store information for long periods of time.

12.    There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

3

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

13. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

4

   e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  14. The SUBJECT DEVICE has been stored in such a manner that the data on them likely remains in the same condition as when law enforcement first seized it.

  15. Based on the above and the contents of Exhibits 1 and 2, I believe it is probable that digital evidence and records related to the scheme to abduct and kill Gregory Davis existed, and it is probable that Jerry Banks stored records related to those crimes on the SUBJECT DEVICE. Given that Banks retained records of purchases of the Ford Explorer and other physical items involved in the scheme, it is reasonable to conclude that Banks may have retained digital records of his many digital purchases outlined in Exhibits 1 and 2. Further, given the digital nature of communications between Banks and Ethridge and the use of a physical data card to transfer a photograph of Davis during the scheme, and because the SUBJECT DEVICE may contain backups of data from electronic devices such as cellular phones, it is reasonable to conclude that the SUBJECT DEVICE may contain information related to communications regarding the scheme to kill Davis.

  16. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

  17. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed search warrant would authorize the government to conduct a forensic examination of the SUBJECT DEVICE. Because the government already has custody of the SUBJECT DEVICE, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Dated at Burlington, in the District of Vermont, this 29th day of April 2022.

*[signature]*
Patrick Hanna
Special Agent - FBI

Sworn to and subscribed before me this 29 day of April 2022.

*[signature]*
Honorable Geoffrey W. Crawford
United States District Judge

5