# EXHIBIT 1

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Vermont

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 MAR 30 PM 2:51

CLERK

BY _____
DEPUTY CLERK

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Jerry Banks | ) | Case No. 5:22-mj-37-01-gwc |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  **January 6, 2018**  in the county of  **Caledonia**  in the
**_____** District of  **Vermont**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1201(a)(1) | The unlawful seizure, confinement, inveigling, decoying, kidnapping, abduction, and carrying away, for reward and otherwise, GD, and in committing and in furtherance of the commission of the offense, travelling in interstate commerce and using a facility and instrumentality of interstate commerce. |

This criminal complaint is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

*signed by reliable electronic means*
GWC
*Complainant's signature*

Patrick Hanna, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 03/30/2022

*Judge's signature*

City and state: Rutland, Vermont     Hon. Geoffrey W. Crawford, Chief US District Judge
*Printed name and title*

AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and say:

Introduction

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently assigned to the Burlington Resident Agency in Vermont. I have been an FBI Special Agent for 19 years. My duties as an FBI Special Agent include investigating violations of Title 18 of the United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement, public corruption, money laundering and related white-collar crimes, as well as violent crimes and criminal enterprises. I have participated in investigations of criminal violations of various federal laws. I have executed search and arrest warrants, interviewed and interrogated subjects, witnesses, and victims, and conducted surveillance. In the course of these investigations, I have gained an understanding of current technology, to include computers and online accounts, cellular telephones and associated records and data, and have conducted analyses of the data related to such accounts and devices, for the purpose of solving and proving crimes.

2. I am submitting this Affidavit in support of a complaint alleging that Jerry Banks kidnapped GD (the victim) on January 6, 2018, in violation of 18 U.S.C. § 1201(a)(1).

3. This case is being investigated by the FBI and the Vermont State Police (VSP). Since this affidavit is being submitted for the limited purpose of supporting a complaint, I have not included details of every aspect of the investigation. Except as otherwise noted, the information contained in this Affidavit is based upon my personal knowledge and observations, my training and experience, conversations with other law enforcement officers and witnesses, and my review of documents and records.

Probable Cause

A. The Kidnapping and Shooting

4. On January 7, 2018, VSP responded to a homicide in Barnet, VT. The victim, identified as GD, was found partially covered by snow near the base of a snowbank on a pull off area near the west side of Peacham Road. The victim was found handcuffed and had been shot multiple times in the head and torso. GD resided at 884 Hawkins Road, Danville, VT at the time. The victim's body was discovered approximately 15 miles from his residence. Evidence gathered from the crime scene included .22 caliber cartridge casings.

5. VSP Detectives responded to GD's home and interviewed his wife, MD, and their 12-year-old son (minor child #1). Both were interviewed again later. MD told VSP Detectives that at approximately 9:00 p.m. on January 6, 2018, she and her husband were in a first-floor bedroom in their Danville home. They heard someone knock on the door. GD went to the door to see who was there. GD came back to the bedroom and told MD that a man claiming to be a U.S. Marshal came to the victim's home to arrest him. GD got his clothes on and left with the man. MD saw the man and described him as having handcuffs, a rifle, and wearing a jacket and mask with an eye opening, both of which had a U.S. Marshals emblem. MD also reported that the man

1

said he had an arrest warrant for GD for racketeering and was bringing him to Virginia. Minor child #1, who observed the man and his car from a second-floor window, told police that the man drove a white four-door car with red and blue emergency lights activated on the dash. GD left in the man's car. The man was wearing black clothes and had a gun and a belt with various law enforcement tools on it. MD did not contact police.

      6.      On January 10, 2018, Agent Jennie Emmons confirmed with Supervisory Deputy U.S. Marshal Carl Staley of the Burlington Vermont office of the U.S. Marshals Service that GD was not arrested by their agency. Further, Deputy Marshal Staley said that there had been no active federal warrants for GD.

      B.     <u>The 911 Phone</u>

      7.      I listened to a 911 call made around the time of the victim's kidnapping. The call took place approximately 15 minutes prior to the kidnapping and originated within a mile of the victim's residence. The VT 911 call center received a call from (802) 473-0535 (the 911 Phone) at 8:42 p.m. on January 6, 2018. The 911 call center's technology identified the call as coming from a location on North Danville Road, Danville, VT, only a short distance from the victim's residence. I believe that Banks used the 911 Phone to facilitate the victim's kidnapping and murder.

      a.      During the call, a man stated that he shot his wife and was going to shoot himself. The caller gave an address of "71772 Cross Road" (with no town information), after which the caller hung up. The call information was relayed to VSP in St. Johnsbury, Vermont. VSP attempted to locate a Cross Road in the St. Johnsbury area without success.

      b.      VSP thereafter requested that AT&T provide location information for the phone in question due to the exigent circumstance. AT&T confirmed that the 911 call came from the North Danville Road location. AT&T also reported that the phone was a prepaid phone with no subscriber information available. After VSP checked the North Danville location and several possible "Cross Roads" outside the town of St. Johnsbury, the matter was closed. At that time, the victim's body had not been discovered.

      c.      I later obtained search warrants for various accounts used by Banks, including his Facebook account, where Banks listed his user name as Grizz Sands. Among the data in the Facebook account were video recordings, including a video in which Banks narrated a tour of his residence in Fort Garland, CO. Banks' voice sounds similar to the voice of the 911 caller.

      8.      AT&T responded to a search warrant for information associated with the 911 Phone. The AT&T search warrant data confirmed the location of the 911 call on January 6, 2018, near the time and location of victim's kidnapping.

      9.      The data provided by AT&T was reviewed by Special Agent James Wines of the FBI's Cellular Analysis Survey Team. After this review, and consultation with AT&T security personnel, Agent Wines advised that the 911 Phone was a prepaid phone purchased at a Walmart on January 5, 2018. The records showed only two calls made by the phone, a four-second call to a Pizza Hut in St. Johnsbury, VT at 4:14 p.m. on January 6 and the 911 call at 8:42 p.m. on

January 6. The phone used only two sectors of the same cell tower, located in St. Johnsbury, VT, for all cell site activity. Agent Wines also advised that this phone was activated, meaning that it could operate on the AT&T network, shortly before 4:00 p.m. on January 6, within minutes of the Pizza Hut call. I have not been able to establish how the phone was activated.

10. Agent Wines advised me that he learned from contacts at Walmart security that the prepaid phone was purchased with $100 cash on January 5, 2018, at 4:14 p.m. at the Walmart located at 100 Supercenter Drive, Clearfield, PA. Agent Wines forwarded me numerous security camera images of the individual purchasing the phone, which were obtained from Walmart security. The images show a bearded, adult, white man purchasing the phone. The man arrived and departed in a white Ford Explorer. The camera footage indicates the vehicle parked in the Walmart parking lot around 3:55 p.m. and left the lot around 4:17 p.m. The Explorer does not appear to have a front license plate. The rear plate was light in color and appeared to be white. Numbers and/or letters were not recognizable on the rear plate. The Explorer is generally consistent with minor child #1's description of the kidnapper's car.

11. FBI personnel in Pennsylvania canvassed gas stations and other locations in the vicinity of the Walmart at 100 Supercenter Drive, Clearfield, PA, to determine if additional security camera footage of the bearded, white male and/or the white Ford Explorer could be located. Additional video footage of the suspect and vehicle were located at a BP gas station at 14624 Clearfield Shawville Highway, Clearfield, PA 16830.

12. I reviewed stills of this footage, which included images of the bearded, white man and the white Ford Explorer, and they appear to be the same person and vehicle shown in the Walmart security video. The suspect purchased gas at the BP station. I saw what appears to be a smartphone in the suspect's hand. A time stamp on this video put the stop at the gas station at 4:27 p.m. on January 5, 2018. My review of the reports of the agents who travelled to Clearfield, Pennsylvania shows that the display times from the gas station security footage appear to be plus six or seven minutes relative to the actual time.

13. I have reviewed Colorado driver's license information about Banks. On December 18, 2017, a Colorado driver's license was issued to Jerry Dean Robert Banks. Banks gave his mailing address as 1179 Pfotenhauer Road, Fort Garland, CO. Based on the driver's license photo of Banks (taken only three weeks before the kidnapping), Banks resembles the man depicted in the Walmart surveillance images as the purchaser of the 911 Phone. Below is the license photo (on the right) and an edited image of the face of the 911 Phone purchaser (on the left) for comparison.




C.  The 201 Phone

14. Agent Wines also reviewed AT&T tower data obtained as a result of search warrants issued by this court. Agent Wines received a list of cellular devices connecting to a tower covering the area of Clearfield, Pennsylvania, where the 911 Phone was purchased. The data included a list of devices connecting to the tower at or about the time the 911 Phone was purchased. Agent Wines compared this data to data he received listing cellular devices connecting to a tower covering the area of Danville, Vermont, where the abduction took place. The data included devices connecting to the tower at or about the time of GD's abduction. Only one cellular phone was common to both sets of data, and it was a device with phone number (201) 208-7436 (the 201 Phone). Based on the information below, I believe that Banks used the 201 Phone to facilitate the victim's kidnapping and murder.

15. Further investigation by Agent Wines determined that 201 Phone is an Android cell phone purchased at a Walmart located at 201 Southeast Salem Street, Oak Grove, Missouri on November 13, 2017, at approximately 9:58 a.m. (CST), and additional service (minutes/data) for that phone were purchased at a Walmart located at 2025 W. Business Highway 60, Dexter, Missouri on January 4, 2018 at approximately 9:20 a.m. (CST). Agent Wines obtained receipts for these purchases, which show these purchases, like the 911 Phone purchase in Pennsylvania on January 6, 2018, were each made with $100 cash. The details on the receipts suggest that the customer paid with a $100 bill for all three purchases: the 201 Phone, the extra minutes for the 201 Phone, and the 911 Phone.

16. I obtained a search warrant for historical cell site and location information for the 201 Phone. The 201 Phone did not make or receive any phone calls or texts during the relevant period. Its only interactions with the AT&T network involved data transmissions. The records do not reveal the kind of data transmitted. Agent Wines and I have reviewed the information obtained from this warrant. Analysis of the data shows the 201 Phone assigned number was registered with the AT&T network on November 14, 2017. It first interacted with the network through cell towers in the area of Monte Vista, Colorado for a brief time on December 29, 2017.

The phone next interacted with a cell tower in the area of Dexter, Missouri on January 3, 2018, and January 4, 2018, again for short periods. Thereafter, the phone interacted with cell towers near roads following a path in a northern and eastern direction through Illinois, Indiana, and Ohio. Analysis of the data shows the phone interacted with cell towers in the Columbus, Ohio, area for a time period between 7:30 p.m. January 4, 2018 to 11:20 a.m. January 5, 2018. The phone thereafter continued to interact with cell towers near roads through Pennsylvania, New York, and Connecticut. Analysis of the data shows the phone interacted for a period of time with cell towers in the area Southington, Connecticut, from 12:00 a.m. to 10:00 a.m. on January 6, 2018. The data shows the phone then continued through Massachusetts and arrived in Vermont on January 6, 2018, at approximately 11:37 a.m. The phone then traveled north, consistent with travel on Interstate 91, and arrived in the area of St. Johnsbury, Vermont, at about 1:30 p.m. Throughout the afternoon and into the evening of January 6, 2018, the data shows the phone was in the areas of St. Johnsbury and Danville, Vermont. The phone remained in the general area in which the victim's kidnapping took place (at approximately 9:00 p.m.) and where his body was recovered the next day. After approximately 9:24 p.m., the phone appears to have traveled south out of the Danville/St. Johnsbury area, consistent with travel on Interstate 91. The last reported cell site or location data was at 10:01 p.m., after which the phone had no more interaction with the AT&T network. Based on this information, there is probable cause to believe that the 201 Phone was used for the purpose of the victim's kidnapping and murder.

   17. Further analysis of the data shows that during the travel to Vermont, the 201 Phone passed through the area of Clearfield, Pennsylvania at the time the 911 Phone was purchased at the Walmart in Clearfield, Pennsylvania.

   18. I have attempted to obtain information from Google about the use of this phone by subpoena. The only information Google could provide showed that the 201 Phone connected to Google servers for the first time on November 14, 2017, and for the last time on January 6, 2018.

   19. I have reviewed records from Verizon Wireless that identify Jerry Banks as the subscriber of the phone with number (719) 480-3879 (the 719 Phone) during the relevant timeframe. Banks was the effective subscriber from 10/20/2017 through 11/8/2018. Banks listed (661) 433-5327 (the 661 Phone) as his home phone number and work phone number.

   20. I have also reviewed Verizon Wireless Billing Statements, which show the approximate location of the 719 Phone when calls were made. I have confirmed with Verizon Wireless personal that this location information is associated with the cell towers and switch connecting to the phone at the time of calls. I also learned that Verizon Wireless maintained more precise location information for this phone for only approximately one year. That data was gone by the time I obtained the search warrant. I found the following locations of note for this phone in the Billing Statements:
   a. On 10/26/2017, a call from this phone originated in Denver, CO.
   b. On 12/13/2017, a call from this phone originated in Dexter, MO.
   c. On 12/28/2017 a call from this phone originated in Alamosa, CO.

        d.      On 12/29/2017, another call from this phone originated in Alamosa, CO, which is close to Monte Vista, CO. As noted above, the 201 Phone first interacted with cell towers in the area of Monte Vista, CO on 12/29/2017.

        e.      On 1/2/2018 and 1/3/2018, calls from this phone originated in Dexter, MO. As noted above, the 201 Phone interacted with cell towers in Dexter, MO on 1/3/2018.

        f.      No calls are made between 12:59 p.m. on 1/3/2018 and 1/7/2018, when the 201 Phone was actively being used.

        g.      On 1/7/2018, at approximately 9:24 p.m., a call from this phone originated in O'Fallon, MO, which is along I-70 in Missouri. The time between the last use of the 201 Phone and this call on the 719 Phone is approximately 25 hours. Google Maps shows that driving time from Barnet, VT to O'Fallon, MO is approximately 19 hours.

        h.      On 1/8/2018, a call from this phone originated in Alma, KS. This call takes place approximately 15 minutes after the Kansas Highway Patrol car stop of Banks in Alma, KS, described below. The call connects with (573) 421-4798 for approximately 20 minutes.

        i.      On 1/9/2018, multiple calls are made from this phone, all originating in Colorado (Alamosa, Sanford and Colorado Springs).

        21.      Banks' use of the 719 Phone connected to his Google account, described below, is consistent with him buying and using the 201 Phone.

        22.      I have reviewed Google records for the email address banksavs@gmail.com. Jerry Banks is the subscriber of the email account. He uses bankspes@gmail.com for his recovery email. The account was created on 6/5/2009. SMS (texts) are connected to the 719 Phone. The subscriber services listed are Android, Gmail, Google Calendar, Google Chrome Sync, Google Cloud Print, Google Drive, Google Hangouts, Google Keep, Google My Maps, Google Payments, Google Photos, Google Play, Google Play Music, Google Services, Google Voice, Has Madison Account, Location History, Web & App Activity, YouTube, and iGoogle.

        23.      I obtained a search warrant for information from the banksavs@gmail.com account. I and other investigators working with me have reviewed the information. We have identified a number of pieces of information in the Google data that further support the conclusion that Banks was responsible for GD's kidnapping and murder, including the following:

        a.      Within the Google maps data there are a number of pieces of information including searches for Vermont on October 10, 2017, December 12, 2017, and January 4, 2018.

        b.      Within the Google search history data are a number of pieces of information including searches for: Explorer Police Interceptors for sale on October 26, 2017; Ford Explorer Police Interceptor rims as well as steel wheels and a police spotlight on October 29, 2017; ARC-22 .22 LR Conversion Kits on December 17, 2017; and body armor on December 26, 2017. As noted above, .22 caliber ammunition was used to kill GD.

      c.      Within the Google location information are thousands of GPS coordinates including coordinates connecting the Google user to the 201 Phone. As noted above, the 201 Phone was purchased in Oak Grove, MO at 9:58 a.m. (CST) on November 13, 2017. On November 13, 2017 at 11:09 a.m., when the location information was turned on, it shows the user 50 miles east of Oak Grove, MO on Interstate 70, travelling east. Interstate 70 also travels through Oak Grove, MO. This information suggests to me that the Google user was in Oak Grove at the time the 201 Phone was purchased. The location information also shows that the Google account user travelled from Fort Garland, CO to Dexter, MO on January 2, 2018, and stayed there until January 4, 2018. I have reviewed records from the Dexter Inn, which show that Banks was staying at the motel on the nights of January 2 and 3, 2018. Further, the location information shows that the Google user was inside the Dexter, MO Walmart at 9:20 a.m. on January 4, 2018, the same time the extra minutes were purchased for the 201 Phone.

      d.      Though there are hundreds of pieces of location information on most days, there is no location information for certain relevant periods of time including: 1) between 9:51 a.m. (CST) on January 4, 2018, and 9:22 p.m. (CST) on January 7, 2018; 2) between 3:53 p.m. (CST) on November 11, 2017 and 11:09 a.m. (CST) on November 13, 2017; and 3) 2:31 p.m. (CST) on November 13, 2017 and 9:17 p.m. (CST) on November 20, 2017. When the location information was turned on after 9:22 p.m. (CST) on January 7, 2018, the Google user was travelling west on Route 70 in eastern Missouri. The location information shows that the Google user spent the night of January 7 near a Route 70 exit in Missouri, before travelling towards Fort Garland on January 8. This data shows that except for a few hours on November 13, 2017, Banks was not using his 719 Phone while travelling to Vermont both in November 2017 for a reconnaissance trip and in January 2018 for the kidnapping/murder trip.

    24.    The Google data also confirms that Banks used the Grizz Sands Facebook account.

    D.    <u>The Ford Explorer</u>

    25.    I consulted with Matthew Fyie, Manager, Design Analysis Engineering, at Ford Motor Company, to determine the model and year range of the Ford Explorer observed in photographs and video obtained from Clearfield, Pennsylvania. Fyie told me that the Clearfield Explorer was a 2013 to 2015 Police Interceptor model. He noted that the Clearfield Explorer was pictured with Ford Explorer XLT wheels, which were not an option for the 2013 to 2015 Police Interceptor models. Fyie provided photographs of the three wheel styles offered for those Police Interceptors, each of which is different from the XLT wheel. Fyie suggested the XLT wheels were installed on the vehicle at a later time or as an after-market change. Ford later provided information, including VIN numbers, for the 17,291 White Explorer Police Inceptors for model years 2013 to 2015 manufactured and sold by Ford.

    26.    The Vermont Intelligence Center (VIC) conducted searches to identify and find vehicles of interest based on certain parameters/criteria (vehicles registered in states of interest,

7

in this case Colorado, vehicles sold at auction with high mileage, and vehicles with sales or service records that occured around the time of the kidnapping and homicide.)

27.     Leads were generated to locate the vehicles of interest and identify the owners at the time of the kidnapping/homicide. One lead was sent to Colorado Bureau of Investigation (CBI) Agent Joseph Cahill, who was then assigned to an FBI Task Force. This particular lead, based on the additional research and identifiers provided by the Vermont Intelligence Center (VIC), was specific to a 2013 Ford Explorer with VIN 1FM5K8AR6DGC73609. CARFAX records indicated that on October 6, 2017, a 2013 white Ford Explorer from Highline Automotive Inc., VIN 1FM5K8AR6DGC73609, was offered for sale. Mileage on the Explorer at the time was 117,138. On December 22, 2017, the Ford Explorer was serviced at Downey Car Center, Downey, California per CARFAX records. Mileage on the Ford Explorer at the time was 130,404. CARFAX records indicate the mileage on the vehicle was 137,168 on March 16, 2018, the next time the vehicle was offered for sale by Maximum Auto Search.

28.     Agent Cahill and CBI Agent Kevin Koback conducted interviews in connection with the Ford Explorer and the dealership, Highline Automotive, which was located in Denver, Colorado. (Highline has since gone out of business.) Agent Cahill provided me verbal and written reports of the interviews. Those reports show that Banks was using the Explorer at the time of the kidnapping. Steve Iskhakov, who ran Highline, provided CBI Agents with documents, including the Highline Automotive sales jacket for the Explorer, which show that Banks had possession of the Explorer at the time of the kidnapping. Iskhakov said he never had anyone drive so many miles on a car in the short period of time Banks had the Explorer.

29.     Agent Cahill and I interviewed Carmine Gulli, the salesman and finance manager who dealt initially with Banks, on separate occasions. Gulli told me that Banks picked up the Explorer on October 26, 2017, with an agreement to purchase it with financing. Banks made a down payment of $3,000 in cash. Gulli was not able to obtain financing for Banks from the first finance company that he tried. Gulli then tried to finance the Explorer through a second finance company in mid-November. He did not meet with Banks in person at that point but dealt with him by phone and email. Gulli was not able to get financing arranged through the second finance company either. He then had to arrange for Banks to return the vehicle. Banks told Gulli that he "lived off the grid" near the New Mexico border. According to Gulli, Banks had no real credit score. Gulli described Banks as "a ghost." Gulli looked at the Walmart security camera photographs and stated he felt it appeared to depict the same person as the Explorer buyer but with more facial hair.

30.     Mark Wilcox was also interviewed by Agent Cahill. Wilcox is the Chief of Mountain States Emergency Medical Services in Denver, Colorado. He is the current owner of the Ford Explorer. Wilcox purchased it on April 17, 2018, from Maximum Auto Search in Englewood, Colorado. Wilcox recalled the person he dealt with at Maximum told him that the Explorer was being sold on consignment for Highline Automotive due to a pending bankruptcy. The XLT wheels can be seen in a photograph taken during the time of the interview.

31.  I also spoke with Wilcox. Wilcox confirmed that the same XLT wheels were on the Explorer when he purchased it from Maximum Auto Search. Wilcox also told me the Explorer did not have a spotlight attached on the driver's side when he bought it. The Clearfield photos, while not clear, do appear to show a spotlight on the driver's side. This light, as described below, appears to have been attached while Banks had the Explorer and removed before Banks returned it to Highline Automotive.

32.  I have reviewed the Highline Auto sales information. I found the following information regarding the sale/purchase of the Explorer:
   a. purchaser: Jerry Banks, including his date of birth and social security number;
   b. address: 1179 Pfotenhauer Road, Fort Garland, CO 81133;
   c. phone number: (719) 480-3879;
   d. email address: banksavs@gmail.com;
   e. additional phone number: (718) 298-2328;
   f. registration information: plate B094536 for the 2013 white Ford Explorer;
   g. Progressive Insurance, policy number 917738127, effective 10/26/2017 to 4/26/2018, for the Ford Explorer;
   h. purchase date: 11/16/2017 with mileage reading of 117,138;
   i. surrender date: 1/24/2018, documents indicate "miles and use paid for" and "loan is being written off, no harm to borrower." A receipt for the additional "miles and use" indicates Banks paid $1,500 in cash when he surrendered the vehicle;
   j. Banks "surrendered" the Ford Explorer to Highline Automotive Inc.

33.  I also reviewed records provided by Progressive Insurance involving Banks' purchase of the 2013 Ford Explorer. The insured is listed as Jerry Banks with phone numbers (661) 433-5327 and (719) 480-3879 and an email address of banksavs@gmail.com. The primary use of the vehicle is designated "Pleasure." This vehicle was added to the policy on 10/26/2017. This vehicle was removed from the policy on 1/25/2018.

34.  I have also reviewed Colorado vehicle registration information about the Highline Explorer. Those records show that Banks got a temporary registration for the Explorer first on 10/26/17, consistent with the Progressive Insurance Records. The Colorado registration records further show that Banks got a second temporary registration for the Explorer on 11/16/17, the purchase date in the Highline Auto records. The temporary tag issued on 11/16/17 was B094536. Agent Cahill, who is familiar with Colorado temporary registration tags, told me that those tags are white in color and made of paper. Colorado only issues a temporary tag for the rear of car not a second for the front. This kind of temporary tag is consistent with the images from the Clearfield Explorer, which had a light colored rear tag and no front tag.

E.  The 661 Phone

35.  I reviewed Verizon Wireless records obtained for the phone using number (661) 433-5327 (the 661 Phone) during the relevant period. The subscriber is All Valley Solar (AVS).

The mailing address for the billing statement is All Valley Solar (AVS), 12623 Sherman Way Ste. A, N. Hollywood, CA 91605. As noted above, Progressive records show that Banks provided this phone number as his work phone number, and Verizon Wireless records for the 719 Phone show Banks provided this number as his home and work phone. The investigation has revealed information that Banks worked for All Valley Solar before 2017.

36. The 661 Phone records also show approximate location information for the calls. On the morning of 11/18/2017, three calls were made from this phone all originating from Barnet, Vermont. As noted above, the 719 Phone records show no phone activity between 11/10/17 and 11/20/17, while Banks appears to have travelled to Vermont for a reconnaissance trip.

F. Kansas Highway Patrol Stop

37. Based on reviews of law enforcement contact with Banks, I discovered that on 1/8/2018 at approximately 1:48 p.m. CST, a traffic stop was conducted by Kansas Highway Patrol Technical Trooper Clark in the vicinity of mile post 337 on I-70 Westbound in Alma, KS. I have reviewed reports about the stop. Jerry Banks was operating the white Ford Explorer. Banks was stopped for a lane violation. I spoke with Technical Trooper Clark and reviewed a DVD recording of the traffic stop he provided. Trooper Clark described Banks as extremely nervous. The vehicle contained multiple law enforcement items including a gun, tactical vest and law enforcement equipment. Trooper Clark noted the back seat of the Ford Explorer was folded down and a mattress was observed in the middle to back area of the Explorer.

38. On 3/3/2020, I reviewed a DVD copy of the traffic stop conducted by Technical Trooper Clark on 1/8/2018. Jerry Banks falsely said that he was traveling from Dexter, MO. During the traffic stop, a phone can be heard ringing inside the Ford Explorer. The phone ringtone is consistent with a Samsung Galaxy phone standard ringtone.

39. I compared the video of Banks from the car stop to the photos/video from the Clearfield, PA Walmart purchasing the 911 Phone and BP gas station, described above. Banks looks similar to the person in the Clearfield images. The Google location information shows that Banks drove from Fort Garland, CO to Dexter, MO on January 2 driving a route further south than Route 70 through Kansas. If he had been driving directly home from Dexter on January 8 he would likely have used that more southerly route rather than Route 70, which is the most direct route to CO from the Northeast.

G. Banks' Finances

40. We have attempted to figure out Banks' financial situation to help prove that he received money in connection with the murder, because I have found no evidence of any personal connection between Banks and the victim. The Highline Auto records show that Banks worked for the Costilla County Sheriff during the fall of 2017. I have learned from search warrant materials that Banks was attending Community College full time during the first several

months of 2018. The Highline records include a copy of a pay stub from Costilla County provided in connection with his attempted financing of the Explorer. Banks was earning $640 a week gross and less than $500 a week net. I have reviewed records from Green Dot, a business that allows users to deposit money onto a debit card. In addition to the $4,500 in cash paid for the Explorer, Banks put $2,600 in cash on his Green Dot card in November and December 2017, and $12,500 in cash on his Green Dot card during the first half of 2018.

41.   Banks' Facebook account includes statements Banks made on Facebook Messenger. He has several conversations with Stephanie Giambra, with whom Banks appears to be close. Banks apparently worked with Giambra at All Valley Solar, used an AVS credit card in the past, and owed her money. In October 2017, he wrote her that he had a side job and a "bunch of money for her." On December 8, he asked Giambra what he owed her and reported doing well financially and wanting to take care of her while he could. I believe that Banks, who had not personal connection with Banks, was paid to kidnap and murder GD.

H.   Banks' Purchases

42.   Within the Google email data are emails with information related to purchases including the following: 1) On November 3, 2017, an order confirmation email to Jerry Banks describing the purchase from Amazon of a public safety scanner; 2) on November 8, 2017 a shipping confirmation email to Jerry Banks for a blue/red flashing modes; and 3) on December 20, 2017, an email containing a Paypal purchase confirmation to "Jerru Banks" for purchases of an Antique Gold Marshal Badge, a US Marshal Shoulder Patch and a US Marshal embroidery patch.

43.   I have reviewed records from Amazon that reflect Banks has been a customer since July 31, 2013 and has used the email address banksavs@gmail.com. I have reviewed the order history which shows the following purchases. On November 4, 2017, he purchased a handheld scanner and police-style car antenna. On December 4, 2017, he purchased a Police Interceptor nameplate for the Ford Explorer. On December 10, 2017, he purchased a police spotlight that could be attached to the Explorer. On December 26, 2017, he purchased two sets of handcuffs and a set of automotive parts that can be used to assemble a silencer. On December 27, 2017, he purchased dashboard red and blue emergency lights.

44.   I have reviewed PayPal records for Jerru Banks that reflect that the account was opened on December 20, 2017, and the email address provided was banksavs@gmail.com. The records show purchases on December 20, 2017, of a Marshal's badge and various Marshal's patches.

45.   I have reviewed records provided by Spartan Armor Systems which reflect Jerry Banks purchasing two body armor jackets on December 20, 2017.

## Conclusion

46. For the reasons described above, there exists probable cause to believe that Jerry Banks unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away for reward and otherwise GD, when Banks travelled in interstate commerce and used a facility or instrumentality of interstate commerce in committing and in furtherance of the commission of the offense, in violation of 18 U.S.C. § 1201(a)(1).

Dated at Rutland, in the District of Vermont, this 30 day of March, 2022.

*Sworn to by reliable electronic means*

_____
Patrick Hanna
Special Agent - FBI

gwc

Sworn to and subscribed before me this 30 day of March, 2022.

_____
Honorable Geoffrey W. Crawford
Chief United States District Judge