# EXHIBIT 2

# UNITED STATES DISTRICT COURT

for the
District of Colorado

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched* | ) | Case No. |
| *or identify the person by name and address)* | ) | |
| | ) | |
| **1179 Pfotenhauer Road,** | ) | |
| **Fort Garland, Colorado** | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the _____State and_____ District of _____Colorado_____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1201 | Kidnapping with Death Resulting |
| 18 U.S.C. § 1512(a)(1) | Murder to Obstruct Justice |
| 18 U.S.C. § 1958 | Murder for Hire |

The application is based on these facts:

**X** Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Patrick Hanna*
*Applicant's signature*

**Special Agent Patrick Hanna, FBI**
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **06 Apr 2022**

*Judge's signature*

Kristen L. Mix
United States Magistrate Judge
*Printed name and title*

City and state: _____Denver, CO_____

## ATTACHMENT A

### Location to be searched: 1179 Pfotenhauer Road, Fort Garland, Colorado.

The premises to be searched, **1179 Pfotenhauer Road, Fort Garland, Colorado,** is described as a tan in color, single level residence, converted camper/trailer and tan outbuilding next to the camper/trailer. The property is secluded and is on low ground at edge of scrub oak/sage brush. The entrance to the property is marked by the numbers "1179" on a post located next to the driveway. The driveway is directly off Pfotenhauer Rd. There is a tan outbuilding next to the camper/trailer. There are two vehicles located at the residence: a red Chevrolet Blazer and a White/Black Ford truck unknown registrations. Authority is also sought to search these vehicles if they are on the curtilage of the Subject Location when the warrant is executed. Below are photographs taken on April 1, 2022 depicting the residence.





**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEARCHED FOR AND SEIZED FROM:**
**1179 Pfotenhauer Road, Fort Garland, Colorado 81133**

**as described in Attachment A (the "Subject Premises")**

Agents and investigative officers are authorized to search for and seize the following particular items, that constitute evidence of the commission of criminal offenses; and property designed or intended for use or which is or has been used as the means of committing criminal offenses, namely, violations of: 18 U.S.C. §§ 1201(a)(1), 1512(a)(1) & 1958, including:

1. Items used in connection with the kidnapping and murder of Gregory Davis on January 6, 2018, such as:

- Firearms including 9mm handguns and AR-15 style rifles
- Ammunition
- Stun Gun
- Pepper Blaster
- 300 Channel handheld scanner, Tram 1094-BNC Scanner 3 1/2 –magnet antenna with BNC male connector
- 100 Watt post-mount spotlight
- Body armor carriers
- Marshal Badge
- US Marshals embroidery patches with hook on back
- 4" green subdued Department of Justice US Marshals shoulder patches
- Handcuffs
- Wix Oil Filter
- Oil filter suppressor
- ½ -28 NPT threaded adapter, Aluminum automotive oil filter adapter
- Xprite 16 LED high intensity Red Blue windshield dash emergency strobe lights w/suction cups for police law enforcement vehicles truck interior roof hazard warning flashlight.
- .22 LR conversion kits

2. Cellphones: (I will seize cellphones but will apply for further warrant before searching cellphones)

- ZTE Model Z835 (the model number identified by investigators as associated with phone number 201-208-7436 during the relevant period)
- LG Model B470 (the model number identified by investigators as associated with phone number 802-473-0535 during the relevant period)
- Samsung Galaxy V (the model number identified by investigators as associated with phone number 661-433-5327 during the relevant period)

- Samsung Galaxy Note 4 (the first model number identified by investigators as associated with phone number 719-480-3879 during the relevant period)
- Samsung Galaxy Note 8 (the second model number identified by investigators as associated with phone number 719-480-3879 during the relevant period)

3.      Documents and records relating to Jerry Banks' employment, earnings, or finances between July 1, 2017, and July 1, 2018

2

AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and say:

<u>Introduction</u>

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently assigned to the Burlington Resident Agency in Vermont. I have been an FBI Special Agent for 19 years. My duties as an FBI Special Agent include investigating violations of Title 18 of the United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement, public corruption, money laundering and related white-collar crimes, as well as violent crimes and criminal enterprises. I have participated in investigations of criminal violations of various federal laws. I have executed search and arrest warrants, interviewed and interrogated subjects, witnesses, and victims, and conducted surveillance. In the course of these investigations, I have gained an understanding of current technology, to include computers and online accounts, cellular telephones and associated records and data, and have conducted analyses of the data related to such accounts and devices, for the purpose of solving and proving crimes.

2.      On April 6, 2022, Jerry Banks was arrested in Wyoming based on a federal Complaint charging kidnapping, signed by Chief Judge Geoffrey Crawford, District of Vermont. As discussed below, there is probable cause to believe that Jerry Banks kidnapped and murdered Gregory Davis, whose deceased body was discovered on January 7, 2018. There is probable cause to believe that Davis's kidnapping and murder involved the following federal crimes: kidnapping with death resulting, in violation of 18 U.S.C. § 1201; murder to obstruct justice, in violation of 18 U.S.C. § 1512(a)(1), and murder for hire, 18 U.S.C. § 1958 (Subject Offenses). At the time of his arrest, Banks was working as a seasonal employee for a contractor within Yellowstone National Park. Since the time of the murder scheme, Banks' permanent residence has been 1179 Pfotenhauer Road, Fort Garland, CO. I submit this Affidavit in support of an Application for a Search Warrant for Banks' residence, as described in Attachment A, for evidence and instrumentalities of the Subject Offenses, as described in Attachment B.

3.      This case is being investigated by the FBI and the Vermont State Police (VSP). Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included details of every aspect of the investigation. Except as otherwise noted, the information contained in this Affidavit is based upon my personal knowledge and observations, my training and experience, conversations with other law enforcement officers and witnesses, and my review of documents and records.

<u>Probable Cause</u>

A.      <u>The Kidnapping and Shooting</u>

4.      On January 7, 2018, VSP responded to a homicide in Barnet, VT. The victim, identified as Gregory Davis, was found partially covered by snow near the base of a snowbank on a pull off area near the west side of Peacham Road. The victim was found handcuffed and had been shot multiple times in the head and torso. Davis resided at 884 Hawkins Road, Danville,

VT at the time. The victim's body was discovered approximately 15 miles from his residence. Evidence gathered from the crime scene included .22 caliber cartridge casings.

5.      VSP Detectives responded to Davis's home and interviewed his wife, Melissa Davis, and their 12-year-old son (minor child #1). Both were interviewed again later. Melissa Davis told VSP Detectives that at approximately 9:00 p.m. on January 6, 2018, she and her husband were in a first-floor bedroom in their Danville home. They heard someone knock on the door. Gregory Davis went to the door to see who was there. Davis came back to the bedroom and told Melissa Davis that a man claiming to be a U.S. Marshal came to the victim's home to arrest him. Davis got his clothes on and left with the man. Melissa Davis saw the man and described him as having handcuffs, a rifle, and wearing a jacket and mask with an eye opening, both of which had a U.S. Marshals emblem. Melissa Davis also reported that the man said he had an arrest warrant for Gregg Davis for racketeering and was bringing him to Virginia. Minor child #1, who observed the man and his car from a second-floor window, told police that the man drove a white four-door car with red and blue emergency lights activated on the dash. Davis left in the man's car. The man was wearing black clothes and had a gun and a belt with various law enforcement tools on it. Melissa Davis did not contact police.

6.      On January 10, 2018, Agent Jennie Emmons confirmed with Supervisory Deputy U.S. Marshal Carl Staley of the Burlington Vermont office of the U.S. Marshals Service that Davis was not arrested by their agency. Further, Deputy Marshal Staley said that there had been no active federal warrants for Gregory Davis.

B.      The 911 Phone

7.      I listened to a 911 call made around the time of the victim's kidnapping. The call took place approximately 15 minutes prior to the kidnapping and originated within a mile of the victim's residence. The VT 911 call center received a call from (802) 473-0535 (the "911 Phone"; this phone number was found by investigators to be associated to an LG Model B470) at 8:42 p.m. on January 6, 2018. The 911 call center's technology identified the call as coming from a location on North Danville Road, Danville, VT, only a short distance from the victim's residence. I believe that Banks used the 911 Phone to facilitate the victim's kidnapping and murder.

a.      During the call, a man stated that he shot his wife and was going to shoot himself. The caller gave an address of "71772 Cross Road" (with no town information), after which the caller hung up. The call information was relayed to VSP in St. Johnsbury, Vermont. VSP attempted to locate a Cross Road in the St. Johnsbury area without success.

b.      VSP thereafter requested that AT&T provide location information for the phone in question due to the exigent circumstance. AT&T confirmed that the 911 call came from the North Danville Road location. AT&T also reported that the phone was a prepaid phone with no subscriber information available. After VSP checked the North Danville location and several possible "Cross Roads" outside the town of St. Johnsbury, the matter was closed. At that time, the victim's body had not been discovered.

2

c.      I later obtained search warrants for various accounts used by Banks, including his Facebook account, where Banks listed his user name as Grizz Sands. Among the data in the Facebook account were video recordings, including a video in which Banks narrated a tour of his residence in Fort Garland, CO. Banks' voice sounds similar to the voice of the 911 caller.

8.      AT&T responded to a search warrant for information associated with the 911 Phone. The AT&T search warrant data confirmed the location of the 911 call on January 6, 2018, near the time and location of victim's kidnapping.

9.      The data provided by AT&T was reviewed by Special Agent James Wines of the FBI's Cellular Analysis Survey Team. After this review, and consultation with AT&T security personnel, Agent Wines advised that the 911 Phone was a prepaid phone purchased at a Walmart on January 5, 2018. The records showed only two calls made by the phone, a four-second call to a Pizza Hut in St. Johnsbury, VT at 4:14 p.m. on January 6 and the 911 call at 8:42 p.m. on January 6. The phone used only two sectors of the same cell tower, located in St. Johnsbury, VT, for all cell site activity. Agent Wines also advised that this phone was activated, meaning that it could operate on the AT&T network, shortly before 4:00 p.m. on January 6, within minutes of the Pizza Hut call. I have not been able to establish how the phone was activated.

10.      Agent Wines advised me that he learned from contacts at Walmart security that the prepaid phone was purchased with $100 cash on January 5, 2018, at 4:14 p.m. at the Walmart located at 100 Supercenter Drive, Clearfield, PA. Agent Wines forwarded me numerous security camera images of the individual purchasing the phone, which were obtained from Walmart security. The images show a bearded, adult, white man purchasing the phone. The man arrived and departed in a white Ford Explorer. The camera footage indicates the vehicle parked in the Walmart parking lot around 3:55 p.m. and left the lot around 4:17 p.m. The Explorer does not appear to have a front license plate. The rear plate was light in color and appeared to be white. Numbers and/or letters were not recognizable on the rear plate. The Explorer is generally consistent with minor child #1's description of the kidnapper's car.

11.      FBI personnel in Pennsylvania canvassed gas stations and other locations in the vicinity of the Walmart at 100 Supercenter Drive, Clearfield, PA, to determine if additional security camera footage of the bearded, white male and/or the white Ford Explorer could be located. Additional video footage of the suspect and vehicle were located at a BP gas station at 14624 Clearfield Shawville Highway, Clearfield, PA 16830.

12.      I reviewed stills of this footage, which included images of the bearded, white man and the white Ford Explorer, and they appear to be the same person and vehicle shown in the Walmart security video. The suspect purchased gas at the BP station. I saw what appears to be a smartphone in the suspect's hand. A time stamp on this video put the stop at the gas station at 4:27 p.m. on January 5, 2018. My review of the reports of the agents who travelled to Clearfield, Pennsylvania shows that the display times from the gas station security footage appear to be plus six or seven minutes relative to the actual time.

13.      I have reviewed Colorado driver's license information about Banks. On December 18, 2017, a Colorado driver's license was issued to Jerry Dean Robert Banks. Banks

3

gave his mailing address as 1179 Pfotenhauer Road, Fort Garland, CO. Based on the driver's license photo of Banks (taken only three weeks before the kidnapping), Banks resembles the man depicted in the Walmart surveillance images as the purchaser of the 911 Phone. Below is the license photo (on the right) and an edited image of the face of the 911 Phone purchaser (on the left) for comparison.

 

C.    The 201 Phone

14.    Agent Wines also reviewed AT&T tower data obtained as a result of search warrants issued by this court. Agent Wines received a list of cellular devices connecting to a tower covering the area of Clearfield, Pennsylvania, where the 911 Phone was purchased. The data included a list of devices connecting to the tower at or about the time the 911 Phone was purchased. Agent Wines compared this data to data he received listing cellular devices connecting to a tower covering the area of Danville, Vermont, where the kidnapping took place. The data included devices connecting to the tower at or about the time of Davis's kidnapping. Only one cellular phone was common to both sets of data, and it was a device with phone number (201) 208-7436 (the "201 Phone"; this phone number was found by investigators to be associated to a ZTE Model Z835 phone). Based on the information below, I believe that Banks used the 201 Phone to facilitate the victim's kidnapping and murder.

15.    Further investigation by Agent Wines determined that 201 Phone is an Android cell phone purchased at a Walmart located at 201 Southeast Salem Street, Oak Grove, Missouri on November 13, 2017, at approximately 9:58 a.m. (CST), and additional service (minutes/data) for that phone were purchased at a Walmart located at 2025 W. Business Highway 60, Dexter, Missouri on January 4, 2018 at approximately 9:20 a.m. (CST). Agent Wines obtained receipts for these purchases, which show these purchases, like the 911 Phone purchase in Pennsylvania on January 6, 2018, were each made with $100 cash. The details on the receipts suggest that the customer paid with a $100 bill for all three purchases: the 201 Phone, the extra minutes for the 201 Phone, and the 911 Phone.

4

16.     I obtained a search warrant for historical cell site and location information for the 201 Phone. The 201 Phone did not make or receive any phone calls or texts during the relevant period. Its only interactions with the AT&T network involved data transmissions. The records do not reveal the kind of data transmitted. Agent Wines and I have reviewed the information obtained from this warrant. Analysis of the data shows the 201 Phone assigned number was registered with the AT&T network on November 14, 2017. It first interacted with the network through cell towers in the area of Monte Vista, Colorado for a brief time on December 29, 2017. The phone next interacted with a cell tower in the area of Dexter, Missouri on January 3, 2018, and January 4, 2018, again for short periods. Thereafter, the phone interacted with cell towers near roads following a path in a northern and eastern direction through Illinois, Indiana, and Ohio. Analysis of the data shows the phone interacted with cell towers in the Columbus, Ohio, area for a time period between 7:30 p.m. January 4, 2018 to 11:20 a.m. January 5, 2018. The phone thereafter continued to interact with cell towers near roads through Pennsylvania, New York, and Connecticut. Analysis of the data shows the phone interacted for a period of time with cell towers in the area Southington, Connecticut, from 12:00 a.m. to 10:00 a.m. on January 6, 2018. The data shows the phone then continued through Massachusetts and arrived in Vermont on January 6, 2018, at approximately 11:37 a.m. The phone then traveled north, consistent with travel on Interstate 91, and arrived in the area of St. Johnsbury, Vermont, at about 1:30 p.m. Throughout the afternoon and into the evening of January 6, 2018, the data shows the phone was in the areas of St. Johnsbury and Danville, Vermont. The phone remained in the general area in which the victim's kidnapping took place (at approximately 9:00 p.m.) and where his body was recovered the next day. After approximately 9:24 p.m., the phone appears to have traveled south out of the Danville/St. Johnsbury area, consistent with travel on Interstate 91. The last reported cell site or location data was at 10:01 p.m., after which the phone had no more interaction with the AT&T network. Based on this information, there is probable cause to believe that the 201 Phone was used for the purpose of the victim's kidnapping and murder.

17.     Further analysis of the data shows that during the travel to Vermont, the 201 Phone passed through the area of Clearfield, Pennsylvania at the time the 911 Phone was purchased at the Walmart in Clearfield, Pennsylvania.

18.     I have attempted to obtain information from Google about the use of this phone by subpoena. The only information Google could provide showed that the 201 Phone connected to Google servers for the first time on November 14, 2017, and for the last time on January 6, 2018.

19.     I have reviewed records from Verizon Wireless that identify Jerry Banks as the subscriber of the phone with number (719) 480-3879 (the "719 Phone"; this phone number was found to be associated with two different physical phones during the relevant periods, a Samsung Galaxy Note 4 and a Samsung Galaxy Note 8) during the relevant timeframe. Banks was the effective subscriber from 10/20/2017 through 11/8/2018. Banks listed (661) 433-5327 (the "661 Phone"; this phone number was found by investigators to be associated with a Samsung Galazy V) as his home phone number and work phone number.

5

20.     I have also reviewed Verizon Wireless Billing Statements, which show the approximate location of the 719 Phone when calls were made. I have confirmed with Verizon Wireless personal that this location information is associated with the cell towers and switch connecting to the phone at the time of calls. I also learned that Verizon Wireless maintained more precise location information for this phone for only approximately one year. That data was gone by the time I obtained the search warrant. I found the following locations of note for this phone in the Billing Statements:

     a.     On 10/26/2017, a call from this phone originated in Denver, CO.

     b.     On 12/13/2017, a call from this phone originated in Dexter, MO.

     c.     On 12/28/2017 a call from this phone originated in Alamosa, CO.

     d.     On 12/29/2017, another call from this phone originated in Alamosa, CO, which is close to Monte Vista, CO. As noted above, the 201 Phone first interacted with cell towers in the area of Monte Vista, CO on 12/29/2017.

     e.     On 1/2/2018 and 1/3/2018, calls from this phone originated in Dexter, MO. As noted above, the 201 Phone interacted with cell towers in Dexter, MO on 1/3/2018.

     f.     No calls are made between 12:59 p.m. on 1/3/2018 and 1/7/2018, when the 201 Phone was actively being used.

     g.     On 1/7/2018, at approximately 9:24 p.m., a call from this phone originated in O'Fallon, MO, which is along I-70 in Missouri. The time between the last use of the 201 Phone and this call on the 719 Phone is approximately 25 hours.  Google Maps shows that driving time from Barnet, VT to O'Fallon, MO is approximately 19 hours.

     h.     On 1/8/2018, a call from this phone originated in Alma, KS.  This call takes place approximately 15 minutes after the Kansas Highway Patrol car stop of Banks in Alma, KS, described below. The call connects with (573) 421-4798 for approximately 20 minutes.

     i.     On 1/9/2018, multiple calls are made from this phone, all originating in Colorado (Alamosa, Sanford and Colorado Springs).

21.     Banks' use of the 719 Phone connected to his Google account, described below, is consistent with him buying and using the 201 Phone.

22.     I have reviewed Google records for the email address banksavs@gmail.com. Jerry Banks is the subscriber of the email account. He uses bankspes@gmail.com for his recovery email.  The account was created on 6/5/2009. SMS (texts) are connected to the 719 Phone. The subscriber services listed are Android, Gmail, Google Calendar, Google Chrome Sync, Google Cloud Print, Google Drive, Google Hangouts, Google Keep, Google My Maps, Google Payments, Google Photos, Google Play, Google Play Music, Google Services, Google Voice, Has Madison Account, Location History, Web & App Activity, YouTube, and iGoogle.

23.     I obtained a search warrant for information from the banksavs@gmail.com account. I and other investigators working with me have reviewed the information. I have identified a number of pieces of information in the Google data that further support the conclusion that Banks was responsible for Davis's kidnapping and murder, including the following:

a.      Within the Google maps data there are a number of pieces of information including searches for Vermont on October 10, 2017, December 12, 2017, and January 4, 2018.

b.      Within the Google search history data are a number of pieces of information including searches for: Explorer Police Interceptors for sale on October 26, 2017; Ford Explorer Police Interceptor rims as well as steel wheels and a police spotlight on October 29, 2017; ARC-22 .22 LR Conversion Kits on December 17, 2017; and body armor on December 26, 2017.  As noted above, .22 caliber ammunition was used to kill Davis.

c.      Within the Google location information are thousands of GPS coordinates including coordinates connecting the Google user to the 201 Phone. As noted above, the 201 Phone was purchased in Oak Grove, MO at 9:58 a.m. (CST) on November 13, 2017. On November 13, 2017 at 11:09 a.m., when the location information was turned on, it shows the user 50 miles east of Oak Grove, MO on Interstate 70, travelling east. Interstate 70 also travels through Oak Grove, MO. This information suggests to me that the Google user was in Oak Grove at the time the 201 Phone was purchased. The location information also shows that the Google account user travelled from Fort Garland, CO to Dexter, MO on January 2, 2018, and stayed there until January 4, 2018. I have reviewed records from the Dexter Inn, which show that Banks was staying at the motel on the nights of January 2 and 3, 2018. Further, the location information shows that the Google user was inside the Dexter, MO Walmart at 9:20 a.m. on January 4, 2018, the same time the extra minutes were purchased for the 201 Phone.

d.      Though there are hundreds of pieces of location information on most days, there is no location information for certain relevant periods of time including: 1) between 9:51 a.m. (CST) on January 4, 2018, and 9:22 p.m. (CST) on January 7, 2018; 2) between 3:53 p.m. (CST) on November 11, 2017 and 11:09 a.m. (CST) on November 13, 2017; and 3) 2:31 p.m. (CST) on November 13, 2017 and 9:17 p.m. (CST) on November 20, 2017. When the location information was turned on after 9:22 p.m. (CST) on January 7, 2018, the Google user was travelling west on Route 70 in eastern Missouri. The location information shows that the Google user spent the night of January 7 near a Route 70 exit in Missouri, before travelling towards Fort Garland on January 8. This data shows that except for a few hours on November 13, 2017, Banks was not using his 719 Phone while travelling to Vermont both in November 2017 for a reconnaissance trip and in January 2018 for the kidnapping/murder trip.

24.     The Google data also confirms that Banks used the Grizz Sands Facebook account.

D.      The Ford Explorer

25.     I consulted with Matthew Fyie, Manager, Design Analysis Engineering, at Ford Motor Company, to determine the model and year range of the Ford Explorer observed in photographs and video obtained from Clearfield, Pennsylvania. Fyie told me that the Clearfield Explorer was a 2013 to 2015 Police Interceptor model. He noted that the Clearfield Explorer was pictured with Ford Explorer XLT wheels, which were not an option for the 2013 to 2015 Police

Interceptor models. Fyie provided photographs of the three wheel styles offered for those Police Interceptors, each of which is different from the XLT wheel. Fyie suggested the XLT wheels were installed on the vehicle at a later time or as an after-market change. Ford later provided information, including VIN numbers, for the 17,291 White Explorer Police Inceptors for model years 2013 to 2015 manufactured and sold by Ford.

26.     The Vermont Intelligence Center (VIC) conducted searches to identify and find vehicles of interest based on certain parameters/criteria (vehicles registered in states of interest, in this case Colorado, vehicles sold at auction with high mileage, and vehicles with sales or service records that occured around the time of the kidnapping and homicide.)

27.     Leads were generated to locate the vehicles of interest and identify the owners at the time of the kidnapping/homicide. One lead was sent to Colorado Bureau of Investigation (CBI) Agent Joseph Cahill, who was then assigned to an FBI Task Force. This particular lead, based on the additional research and identifiers provided by the Vermont Intelligence Center (VIC), was specific to a 2013 Ford Explorer with VIN 1FM5K8AR6DGC73609. CARFAX records indicated that on October 6, 2017, a 2013 white Ford Explorer from Highline Automotive Inc., VIN 1FM5K8AR6DGC73609, was offered for sale. Mileage on the Explorer at the time was 117,138. On December 22, 2017, the Ford Explorer was serviced at Downey Car Center, Downey, California per CARFAX records. Mileage on the Ford Explorer at the time was 130,404. CARFAX records indicate the mileage on the vehicle was 137,168 on March 16, 2018, the next time the vehicle was offered for sale by Maximum Auto Search.

28.     Agent Cahill and CBI Agent Kevin Koback conducted interviews in connection with the Ford Explorer and the dealership, Highline Automotive, which was located in Denver, Colorado. (Highline has since gone out of business.) Agent Cahill provided me verbal and written reports of the interviews. Those reports show that Banks was using the Explorer at the time of the kidnapping. Steve Iskhakov, who ran Highline, provided CBI Agents with documents, including the Highline Automotive sales jacket for the Explorer, which show that Banks had possession of the Explorer at the time of the kidnapping. Iskhakov said he never had anyone drive so many miles on a car in the short period of time Banks had the Explorer.

29.     Agent Cahill and I interviewed Carmine Gulli, the salesman and finance manager who dealt initially with Banks, on separate occasions. Gulli told me that Banks picked up the Explorer on October 26, 2017, with an agreement to purchase it with financing. Banks made a down payment of $3,000 in cash. Gulli was not able to obtain financing for Banks from the first finance company that he tried. Gulli then tried to finance the Explorer through a second finance company in mid-November. He did not meet with Banks in person at that point but dealt with him by phone and email. Gulli was not able to get financing arranged through the second finance company either. He then had to arrange for Banks to return the vehicle. Banks told Gulli that he "lived off the grid" near the New Mexico border. According to Gulli, Banks had no real credit score. Gulli described Banks as "a ghost." Gulli looked at the Walmart security camera

photographs and stated he felt it appeared to depict the same person as the Explorer buyer but with more facial hair.

30.    Mark Wilcox was also interviewed by Agent Cahill. Wilcox is the Chief of Mountain States Emergency Medical Services in Denver, Colorado. He is the current owner of the Ford Explorer. Wilcox purchased it on April 17, 2018, from Maximum Auto Search in Englewood, Colorado. Wilcox recalled the person he dealt with at Maximum told him that the Explorer was being sold on consignment for Highline Automotive due to a pending bankruptcy. The XLT wheels can be seen in a photograph taken during the time of the interview.

31.    I also spoke with Wilcox. Wilcox confirmed that the same XLT wheels were on the Explorer when he purchased it from Maximum Auto Search. Wilcox also told me the Explorer did not have a spotlight attached on the driver's side when he bought it. The Clearfield photos, while not clear, do appear to show a spotlight on the driver's side. This light, as described below, appears to have been attached while Banks had the Explorer and removed before Banks returned it to Highline Automotive.

32.    I have reviewed the Highline Auto sales information. I found the following information regarding the sale/purchase of the Explorer:
   a.    purchaser: Jerry Banks, including his date of birth and social security number;
   b.    address: 1179 Pfotenhauer Road, Fort Garland, CO 81133;
   c.    phone number: (719) 480-3879;
   d.    email address: banksavs@gmail.com;
   e.    additional phone number: (718) 298-2328;
   f.    registration information: plate B094536 for the 2013 white Ford Explorer;
   g.    Progressive Insurance, policy number 917738127, effective 10/26/2017 to 4/26/2018, for the Ford Explorer;
   h.    purchase date: 11/16/2017 with mileage reading of 117,138;
   i.    surrender date: 1/24/2018, documents indicate "miles and use paid for" and "loan is being written off, no harm to borrower." A receipt for the additional "miles and use" indicates Banks paid $1,500 in cash when he surrendered the vehicle;
   j.    Banks "surrendered" the Ford Explorer to Highline Automotive Inc.

33.    I also reviewed records provided by Progressive Insurance involving Banks' purchase of the 2013 Ford Explorer. The insured is listed as Jerry Banks with phone numbers (661) 433-5327 and (719) 480-3879 and an email address of banksavs@gmail.com. The primary use of the vehicle is designated "Pleasure." This vehicle was added to the policy on 10/26/2017. This vehicle was removed from the policy on 1/25/2018.

34.    I have also reviewed Colorado vehicle registration information about the Highline Explorer. Those records show that Banks got a temporary registration for the Explorer first on 10/26/17, consistent with the Progressive Insurance Records. The Colorado registration records further show that Banks got a second temporary registration for the Explorer on

11/16/17, the purchase date in the Highline Auto records. The temporary tag issued on 11/16/17 was B094536. Agent Cahill, who is familiar with Colorado temporary registration tags, told me that those tags are white in color and made of paper. Colorado only issues a temporary tag for the rear of car not a second for the front. This kind of temporary tag is consistent with the images from the Clearfield Explorer, which had a light colored rear tag and no front tag.

      E.    The 661 Phone

    35.    I reviewed Verizon Wireless records obtained for the phone using number (661) 433-5327 (the 661 Phone) during the relevant period. The subscriber is All Valley Solar (AVS). The mailing address for the billing statement is All Valley Solar (AVS), 12623 Sherman Way Ste. A, N. Hollywood, CA 91605. As noted above, Progressive records show that Banks provided this phone number as his work phone number, and Verizon Wireless records for the 719 Phone show Banks provided this number as his home and work phone. The investigation has revealed information that Banks worked for All Valley Solar before 2017.

    36.    The 661 Phone records also show approximate location information for the calls. On the morning of 11/18/2017, three calls were made from this phone all originating from Barnet, Vermont. As noted above, the 719 Phone records show no phone activity between 11/10/17 and 11/20/17, while Banks appears to have travelled to Vermont for a reconnaissance trip.

      F.    Kansas Highway Patrol Stop

    37.    Based on reviews of law enforcement contact with Banks, I discovered that on 1/8/2018 at approximately 1:48 p.m. CST, a traffic stop was conducted by Kansas Highway Patrol Technical Trooper Clark in the vicinity of mile post 337 on I-70 Westbound in Alma, KS. I have reviewed reports about the stop. Jerry Banks was operating the white Ford Explorer. Banks was stopped for a lane violation. I spoke with Technical Trooper Clark and reviewed a DVD recording of the traffic stop he provided. Trooper Clark described Banks as extremely nervous. The vehicle contained multiple law enforcement items including a gun, tactical vest and law enforcement equipment. Trooper Clark noted the back seat of the Ford Explorer was folded down and a mattress was observed in the middle to back area of the Explorer.

    38.    On 3/3/2020, I reviewed a DVD copy of the traffic stop conducted by Technical Trooper Clark on 1/8/2018. Jerry Banks falsely said that he was traveling from Dexter, MO. During the traffic stop, a phone can be heard ringing inside the Ford Explorer. The phone ringtone is consistent with a Samsung Galaxy phone standard ringtone.

    39.    I compared the video of Banks from the car stop to the photos/video from the Clearfield, PA Walmart purchasing the 911 Phone and BP gas station, described above. Banks looks similar to the person in the Clearfield images. The Google location information shows that Banks drove from Fort Garland, CO to Dexter, MO on January 2 driving a route further south than Route 70 through Kansas. If he had been driving directly home from Dexter on January 8 he

would likely have used that more southerly route rather than Route 70, which is the most direct route to CO from the Northeast.

G.   Banks' Finances

40.    As part of the investigation, I have analyzed evidence concerning Banks's finances in part to help prove that he received money in connection with the kidnapping and murder.  The Highline Auto records show that Banks worked for the Costilla County Sheriff during the fall of 2017. I have learned from search warrant materials that Banks was attending community college full time during the first several months of 2018.  Specifically, he began attending Otero Junior College in January 2018 to obtain a law enforcement certification.  He appears to have attended full time until April 2018. The Highline records include a copy of a pay stub from Costilla County provided in connection with his attempted financing of the Explorer. Banks was earning $640 a week gross and less than $500 a week net. I have reviewed records from Green Dot, a business that allows users to deposit money onto a debit card. In addition to the $4,500 in cash paid for the Explorer, Banks put $2,600 in cash on his Green Dot card in November and December 2017, and $12,500 in cash on his Green Dot card during the first half of 2018.

41.    Banks' Facebook account includes statements Banks made on Facebook Messenger. He has several conversations with Stephanie Giambra, with whom Banks appears to be close. Banks apparently worked with Giambra at All Valley Solar, used an AVS credit card in the past, and owed her money. In October 2017, he wrote her that he had a side job and a "bunch of money for her." On December 8, he asked Giambra what he owed her and reported doing well financially and wanting to take care of her while he could. I believe that Banks, who had no personal connection with Davis, was paid to kidnap and murder Davis.

H.   Banks' Purchases

42.    Within the Google email data are emails with information related to purchases including the following: 1) On November 3, 2017, an order confirmation email to Jerry Banks describing the purchase from Amazon of a public safety scanner; 2) on November 8, 2017 a shipping confirmation email to Jerry Banks for a blue/red flashing modes; and 3) on December 20, 2017, an email containing a Paypal purchase confirmation to "Jerru Banks" for purchases of an Antique Gold Marshal Badge, a US Marshal Shoulder Patch and a US Marshal embroidery patch.

43.    I have reviewed records from Amazon that reflect Banks has been a customer since July 31, 2013 and has used the email address banksavs@gmail.com.  I have reviewed the order history which shows the following purchases. On September 18, 2017, he purchased a heavy duty stun gun and a pepperblaster.  November 4, 2017, he purchased a handheld scanner and police-style car antenna. On December 4, 2017, he purchased a Police Interceptor nameplate for the Ford Explorer. On December 10, 2017, he purchased a police spotlight that could be attached to the Explorer. On December 26, 2017, he purchased two sets of handcuffs and

automotive parts that can be used to assemble a silencer, specifically a Wix oil filter, oil filter suppressor and a ½ -28 NPT threaded adapter, Aluminum automotive oil filter adapter. On December 27, 2017, he purchased dashboard red and blue emergency lights.

44.    I have reviewed PayPal records for Jerru Banks that reflect that the account was opened on December 20, 2017, and the email address provided was banksavs@gmail.com. The records show purchases on December 20, 2017, of a Marshal's badge and various Marshal's patches.

45.    I have reviewed records provided by Spartan Armor Systems which reflect Jerry Banks purchasing two body armor jackets on December 20, 2017.

I.    The Murder Conspiracy

46.    Based on the investigation to date, I believe that Banks was hired by one or both of two brothers who were involved in a business dispute with Davis. I have found no evidence that Banks and Davis knew each other. As described below, I have developed information about connections between Banks and Serhat and Murat Gumrukcu.

a.    Gregg Davis's Business Dispute with the Gumrukcus

47.    The only serious trouble Davis appeared to be having with anyone at the time of his death was connected to a business Davis started in 2012 called Mode Commodities. According to Davis's wife, Davis was involved in the oil investment business and had concerns about his business partners being involved in fraud. Davis began working several years before on an oil investment deal with a person named Gregory Gac. Davis contacted Gac by phone, text, and possibly by email. Davis told her that he had supply contacts for the oil, and Gac was able to bring in investors. Davis mentioned that Gac had two specific investors, Serhat and Murat.

48.    In 2017, the FBI was investigating Serhat for a real estate investment scheme and a check fraud scheme. By late 2017, Serhat was charged by the state of California with fraud-related offenses that include dealings with Gac. He was sentenced to five years' probation.

49.    Gac, who lives in Excelsior, Minnesota, was interviewed in 2017 by FBI Special Agent Heather Stachnik of the Los Angeles Division in connection with the Serhat investigation. Gac told Agent Stachnik that he was an escrow agent for Serhat. Gac claimed he met Serhat through a friend of a friend and that Gac wrote the term sheet for an oil investment deal. The investment deal was in an oil trading company with a company called Mode Lauren LLC (hereinafter "Mode"). The investors were Serhat and Murat Gumrukcu, Serhat's older brother. Gac expected to receive residuals from the deal. The Gumrukcus did not make payments as specified in the deal's term sheet and got in arrears with the obligations to Mode. Serhat ended up transferring his interest in Mode to his brother, Murat. Gac was told by a business associate that the Gumrukcus are very wealthy and part of the Turkish royal family. Gac also told Agent Stachnik that he had talked to "Gregg Davis" on the phone but had not met him in person. Gac did not tell Davis about the FBI contact.

50.     During the investigation, Agent Stachnik learned that Serhat was involved in additional fraud schemes, to include purporting to be an American doctor who had a special cure for cancer and AIDS and another involving the oil industry. Agent Shachnik also learned that Berk Eratay worked with Serhat in a potential fraud scheme in Las Vegas, in which Serhat introduced a person claiming to be a Saudi Arabian prince to a potential victim. Eratay lives in Las Vegas, Nevada.

51.     Murat Gumrukcu, Serhat's brother, is not a U.S. resident. He travelled to the U.S. in December 2017, staying until March 2018, at Eratay's residence in Vegas.

52.     On November 29, 2017, shortly after the suspected reconnaissance trip to Vermont by Banks, Murat, who appears to have been in Turkey at the time, performed several English Google searches related to American license plate look-up. That series of searches included this text: "vermont gho 103." At the time, Davis had a vehicle, mostly unused, parked in their driveway with Vermont license plate GHD 103. The conspirators appear to have been confirming the location of Banks' residence.

53.     Davis's cellphone contained numerous text messages with Gac, showing Davis's concerns about the Gumrukcus.  I located the contract between Davis and the Gumrukcus. The contract stipulated that if the Gumrukcus failed to meet their responsibilities late fees would be levied. As of October 2017, the Gumrukcus collectively had accrued over $900,000 in late fees, according to Davis. In the text messages, Davis offered several options to Gac to resolve matters with the investors so they could move forward with the business.

- On December 13, 2017, Gregory Davis texted Gac the following: "Greg, it is always best to square things between people. Goodness when it is the prosecutor's office it's nasty, hard and very unforgiving. Can we agree to seriously work to come to the table this week."

- On December 27, 2017, Gregory Davis texted Gac: "Happy post Christmas. We need to get things resolved and settled. Please advise as to what they are going to put on the table to accomplish this. Clearly the UBS was just another misrepresenting distraction. It's been duly noted. I look to your reply. GD."

- On December 28, 2017, Gregory Davis wrote a long text message to Gac, which in summary, showed Gregg Davis wished to terminate the business relationship under the terms of the contract or, Gregg Davis threatened, the relationship "conversely will end in a series of indictments, clearly bearing civil and criminal repercussions. They are in control of how it ends, but it is the end." From the context of the text messages, "they" appears to refer to Serhat and Murat.

- On December 29, 2017, Gregory Davis wrote a text message to Gac, demanding a settlement of approximately $980,000 to exit the business deal with Gac, Serhat, and Murat, pursuant to their contract. Further conversation continued at the end of December in which Gac references conversations with Serhat.

13

- A final text message to Gac from Gregory Davis, dated January 4, 2018 was located on Gregory Davis's phone which states: "There has now been a history of fraudulent banking documentation that has become the standard. In many instances the banks could not corroborate the claims of the partners. However, in some instances the banks very seriously denied association with the documents and their intention. As regards the TS, all have had a hand in crafting it. Murat himself was directly involved the late sheet segment, to which we gave NO rebuttal. This was then fully executed. We have suffered multiple banking debacles which of itself are VERY serious instances. Therefore, as we've discussed it would be prudent to address the outstanding accounting. Have Murat and Serhat present something to speak to. Let's hopefully close that matter and move forward. Without this our hands will be forced to turn this in to authorities which neither party wants. Please have an honest but serious discussion with the brothers as regards all of the above and let's re-congregate to resolve the immediate matter and discuss how we can move forward. Regards, GD."

54.    In early January 2018, I met with Gac, seizing evidence and interviewing him more extensively about Davis and the Gumrukcus. Gac owns a company called Quadrant Financial, which he runs out of his home in Excelsior, MN. Gac conducts investment business with Serhat and Murat Gumrukcu. The brothers own a business called Lauran Trading, which is supposedly based in Oman. Serhat and Murat have been working successfully with Gac on deals for over three years.

55.    Gac said he met Davis through other business associates. They have never met in person and have only communicated through phone, text and email. Gac put together an oil-related deal with the Gumrukcu brothers and Davis. Gac is aware that Davis has expressed frustration with the Gumrukcu brothers' failure to perform on their obligations in the deal. Gac advised that a third, $40,000, payment is still due to Davis. A total of three payments, totaling $100,000, were to be paid to Davis in lieu of the large late fee that had been accrued by the Gumrukcu brothers.

56.    Gac advised that in February 2016, Serhat told Gac that Murat was upset that Davis had called officials at the National Bank of Abu Dhabi to verify that Serhat and Murat maintained accounts there. The bank did not provide an answer to Davis, but the brothers learned of this inquiry and Murat was angered because it threatened the brothers' reputations at the bank. During the search warrant at Gac's residence, Gac's notes regarding this matter were located and the notes reflect that Murat was offended.

57.    Gac does not believe Davis and the Gumrukcu brothers have ever met in person though they have participated in conference calls. Gac also does not believe Davis and the Gumrukcu brothers ever spoke directly outside the conference calls. Gac communicates with Murat through email. Serhat has told Gac that no one is provided with Murat's phone number. According to Gac, while Serhat is the main point of contact for the brothers, Murat is in control of the money.

14

58.     When the interviewers told Gac that Davis had been murdered, Gac claimed to have no knowledge about the murder. On January 12, 2018, (after the murder) Serhat told Gac that his brother was arranging for the third payment to be made to Davis and directed Gac to contact Murat via email about that payment.

59.     I have reviewed data from Gac's devices. In the fall of 2017, numerous texts were sent to Serhat from Gac regarding Davis's communications with Gac:

- On September 17, 2017 Gac texted, "Gregg is going ballistic, and I don't know if I can control him any more. I heard from Murat that he was returning to Miami today or tomorrow, but nothing specific about meeting. I've heard nothing about meeting with your parents, and nothing from Marc. I'll be getting a call from Gregg soon, and he's going to explode."

- On September 25, 2017, Gac texted, "I'm getting nastygrams from Gregg Davis. Anything I can tell him? I'll reach out to UBS shortly."

- On October 31, 2017, "...Thanks for pinging Murat. Our friend is all over me again."

- On December 13, 2017, "Gregg Davis is getting antsy again, and I haven't heard from Murat in four weeks. Gregg wants to see a path forward with ML. With nothing from UBS, I haven misting to tell him. I believe he's on the road to prosecution again, believing there's no future."

- On December 29, 2017, Gac forwarded the December 28 text from Davis, alluding to potential civil and criminal repercussions.

- On prior dates, dating back over a year, Gac summarized for Serhat Davis's anger about the business dealings with the Gumrukcu brothers.

60.     I also got search warrants in 2018 for Serhat's and Murhat's Google accounts. The emails do not contain any direct reference to Davis's murder. The email messages further corroborate that the Gumrukcu brothers, Gac and Davis were involved in a business deal, and that Davis was applying pressure on the Gumrukcu brothers by threating to go to the authorities about the Gumrukcus' frauds. Moreover, the emails show that Murat expressed anger at these threats. In late 2015, Murat told Gac that he was finding Davis's behavior "unacceptable," that he was "highly disturbed" and that he did "NOT wanna hear ridiculous and vulgar threats from him" because his 50k payment was on the way.  About two weeks after this email, Murat wrote to Gac, expressing more frustration with Davis, stating (in part),  "As planned, we will initiate this trade to shut him up but I doubt our partnership will survive longer than a couple of lifts ... He called me a fraud a second time, there will be no third time. I am trying to clean a mess here and all I hear are threats. . . . If he will harm you or Serhat in any means I will make sure I will find something to return the favor." The records further show that on December 13, 2017, Gac wrote an email message to Murat, in part stating: "Gregg Davis again has expressed concern and frustration at the lack of progress and at the absence of firm direction in proceeding toward

implementation of the Mode Lauran program. I fear he may pursue a 'nuclear option' if I can't offer him clear guidance on how we are going to move forward."

    a.    Eratay and Ethridge

61.    As stated above, an individual named Berk Eratay was previously involved with the brothers. Specifically, Serhat worked with Eratay on a potential fraud scheme in Las Vegas, where Eratay lives. Also, from December 2017 through March 2018, Murat travelled to the U.S. and stayed at Eratay's residence in Las Vegas. The investigation has revealed a connection between Jerry Banks and Eratay through a person named Aron Ethridge, as further explained below.

62.    The banksavs Google data described above includes several connections between Banks and Aron Ethridge. First, the Google account contains contact information for Aron with phone number 760-220-0478. Second, the Google account shows searches for 1137 Sport of Kings Avenue, Henderson, NV on October 5, 2017 and January 11, 2018. The Vermont State Police Intelligence Center (VIC) has reviewed Accurint data, which includes property sales information and utility information, showing Aron Ethridge residing at 1137 Sport of Kings Avenue in October 2017. The 661 Phone records show that Banks was in Henderson, NV on October 7, 2017 at 1:00 p.m. (PST).

63.    The phone records for the Eratay and Ethridge phones also show that on December 18, 2017, the Eratay phone was in contact with both the Ethridge phone and the Serhat phone. As described above, email records show that on December 13, 2017, Gregory Gac wrote an email to Murat fearing the "nuclear option" from Gregory Davis, and Davis text messages to Gac show him talking about "the prosecutor's office."

64.    I have reviewed data from a search warrant return from the serhat.gumrukcu@gmail.com account. That data includes contact information showing Aron Ethridge with phone number 760-220-0478.

65.    As noted above, the Gumrukcus do not appear to have communicated with Banks. But the investigation has revealed relevant lines of communication between Banks and the Gumrukcus through Eratay and Ethridge.

66.    Eratay, like the Gumrukcus, is Turkish. He lives in Las Vegas. His bank records show little income from that work in 2017 and 2018. The records do show, however, that Serhat sent Eratay tens of thousands of dollars between mid-2017 and mid-2018. Much of that money was withdraw by Eratay in cash.

67.    As noted above, my investigation has shown connections between the Gumrukcus and Berk Eratay. I have reviewed Verizon Wireless phone records for a number subscribed to by Berk Eratay, 702-336-2264, which show numerous contacts between July 2017 and January 2018 with a phone number subscribed to Serhat Gumrukcu, 310-590-8250.

68.     Aron Ethridge, who lives in Henderson, NV, just outside Vegas, works as a conductor for a large freight railroad company. He is married and has no criminal record. I have obtained phone records that show that Ethridge and Eratay were in contact with in 2017 and 2018. Ethridge's phone, including five calls on September 22, 2017, two calls on October 10, 2017, and a call at 11:26 p.m. (PST) on January 7, 2018. The first call made after the Ethridge phone has contact with the 719 Phone on January 7, 2018 is this call to the Eratay phone. Accurint records show that for a period before 2017, Eratay resided next door to Aron Ethridge on Skytop Drive in Henderson, NV.

69.     Bank's Facebook messages and bank records show that Banks saw Ethridge on a trip to Vegas in July, at the time Banks tells Giambra that he's going to Vegas on business. Banks visited Ethridge's home in Henderson on October 5, 2017, just before Banks' Google maps search for "Vermont" and Banks telling Giambra that he has a side job and money for her. Banks returned to Henderson in early December. As noted above, Banks wrote to Giambra that he was doing well financially on December 8. On December 18, Murat arrived at Eratay's residence from Turkey. That same day, Eratay spoke on the phone with both Serhat and Ethridge. Banks went to Ethridge's house (precise Google location data) the next day, December 19, and again on December 26. Banks' first call made when he turned on the 719 Phone on January 7 in Missouri was to Ethridge. Banks called Ethridge again the next day and traveled to Henderson on Saturday, January 13, the first free day after he started his law enforcement classes, and again the next Saturday, January 20.

J.     Banks' Fort Garland Residence

70.     Even though over four years have passed since Banks returned to his residence in Fort Garland after the kidnapping and murder, I believe that there is probable cause to believe that evidence and instrumentalities of the Subject Offenses can be found in the residence in two ways. First, there is probable cause to believe that he kept certain items he purchased in connection with the murder scheme at his residence. Second, there is probable cause to believe that he kept financial records relevant to the Subject Offenses at his residence. Further, the investigators have managed the investigation to avoid having Banks learn that he is a suspect.

71.     The digital location evidence associated with Banks shows that he traveled directly from Kansas to his residence at 1179 Pfotenhauer Road, Fort Garland, CO, arriving in Fort Garland CO on January 9, 2017.

72.     Banks demonstrated his willingness to keep items used to facilitate the victim kidnapping and murder by having such items in his car at the time of the Kansas traffic stop. This stop occurred along his way back to Fort Garland from Vermont. The Trooper stated he observed law enforcement equipment and a tactical vest in Banks' vehicle at the time of the stop. Banks informed the Trooper he had a gun. Banks had opportunities to dispose of evidence of the crime on his way back to his residence. I believe Banks would not have assumed the risk of driving these items over one thousand miles had he not intended to keep them long term and likely still has them today.

17

73.     Moreover, some of the items that Banks purchased and used while committing the Subject Offenses could be used by Banks after the offenses. As described above, I uncovered evidence that Banks attended community college between January 2018 and April 2018, in order to be certified as a law enforcement officer. Some of the purchases by Banks would also be valuable to someone interested in a law enforcement career. For example, Banks purchased a police-style spotlight in December 2017. Video surveillance from the Clearfield gas station shows that Banks had mounted the spotlight on the Explorer. Witnesses from Highline Auto who saw the car when Banks returned it told law enforcement that there was no spotlight mounted on the car when Banks returned the Explorer to Highline Auto. I believe that there is probable cause to believe that Banks kept the spotlight and other items used in the kidnapping and murder and stored them at his residence.

74.     Based on the investigation as well as my training and experience, Banks appears to be a person who largely lives "off the grid." My training and experience, as well as consultation with other law enforcement officers, leads me to conclude that these people frequently highly value, and are likely to keep, certain material related to protecting themselves including body armor, suppressors, and guns. Additionally, because records reflect that Banks does not typically earn a large amount of money, the expense of replacing these materials makes it likely that they are still present in the subject residence.

75.     As noted above, I have developed evidence that Banks was in possession of large amounts of currency in late 2017 and early 2018. I believe that these payments reflect proceeds from the murder for hire. As noted above, Banks tells others that he has a side job at the time. I believe that there is probable cause that there will be evidence or a lack of evidence relevant to the source of these funds. Based on my training and experience, I know that people usually maintain records about their legitimate employment for lengthy periods of time. Moreover, they usually keep those records at their main residence. Thus, I believe that if Banks had a legitimate source of currency in 2017 and 2018, there would be records about that employment in his residence. A search of the residence showing no such documents would provide relevant evidence of the Subject Offenses. Finally, based on my training and experience, people often keep documents and records about their purchases in their residence for lengthy periods of time. Thus I believe that there is probable cause that Banks keeps financial information about his earnings at his residence.

76.     There are several items Banks used in the Subject Offenses, including a rifle, for which I have been unable to find digital records. Based on my training and experience, gun purchasers regularly keep their guns and ammunition for long periods of time and store them in their residences. Banks made statements to me after receiving his Miranda warnings, among other things he denied ever traveling to Vermont. He refused to discuss several topics including topics closely related to the Davis murder. Banks admitted, however, that he has owned this residence in Fort Garland since 2016, that he currently stores, in a shed adjacent to the residence, firearms including a 9mm pistol and an AR-15, and that there is at least one storage shed on the property. Thus I believe there is probable cause that Banks stores firearms and ammunition at his residence.

77.     As described above, I believe Banks has used multiple phones over the years. Based on my training and experience it is common for phone users to keep cellphone devices that they are no longer using and maintain them at their residences. Thus I believe there is probable cause that Banks kept cellphones relevant to this investigation at his residence.

K.     Bank's Property

78.     In the social media post found in the Facebook search warrant, Banks gives a walking tour of his property and describes a makeshift shed used for storage.

79.     1179 Pfotenhauer Road, Fort Garland, Colorado as described in more detail in Attachment A, is Banks only known residence. As described above, Banks listed this address as his residence in 2017. I have reviewed Verizon Wireless records related to a phone currently subscribed to by Banks in which he listed his address as of September 2021 as this Fort Garland, Colorado address. Agents have observed the same red Chevy Blazer on the property in both 2020 and this week. Thus I believe there is probable cause that this address is still Banks' residence.

Conclusion

80.     For the reasons described above, I submit probable cause exists to believe evidence and instrumentalities of the Subject Offenses will be located at 1179 Pfotenhauer Road, Fort Garland, CO, as further described in Attachment A. Therefore, I request permission to search the property identified in Attachment A for the items enumerated within Attachment B and seize those items.

Dated at ___Denver_____, in the District of Colorado, this ___6th___ day of April, 2022.

/s/ Patrick Hanna
Patrick Hanna
Special Agent - FBI

Sworn to and subscribed before me this ___6th___ day of April, 2022.

Honorable Kristen L. Mix

This application and affidavit was reviewed by Assistant U.S. Attorney Garreth Winstead.