# EXHIBIT 2

AO 106 (Rev. 04/10) Application for a Search Warrant

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

# UNITED STATES DISTRICT COURT

for the

District of Vermont

2022 SEP 13  PM 3: 04

CLERK

BY _____

Case No. 2:18-mj-4      DEPUTY CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

a CLX personal computer tower, a Razer laptop and an Apple iPad currently in the custody of the FBI in Colchester, VT, previously possessed by Berk Eratay, further described in Attachment A

)
)
)
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ Vermont _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512(a)(1) | Killing another person with intent to prevent communication to law enforcement |
| 18 U.S.C. § 1201 | Use of interstate facility or interstate travel for kidnapping |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1958 | Murder for hire |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Patrick R. Hanna, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/13/22

_____
*Judge's signature*

City and state: Burlington, Vermont

Hon. Geoffrey W. Crawford, U.S. District Judge
*Printed name and title*

## ATTACHMENT A

The property to be searched is a CLX personal computer tower, a Razer laptop and an
Apple iPad, hereinafter the "SUBJECT DEVICES", previously possessed by Berk Eratay and
obtained via subpoena on July 13, 2022. The SUBJECT DEVICES are currently located at the
FBI office in Colchester, Vermont.

This warrant authorizes the forensic examination of the SUBJECT DEVICES for the
purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.     All records on the SUBJECT DEVICES described in Attachment A that relate to
the following federal crimes involving the murder of Gregory Davis: murder to obstruct justice,
in violation of 18 U.S.C. § 1512(a)(1); kidnapping, in violation of 18 U.S.C. § 1201; wire fraud,
in violation of 18 U.S.C. § 1343; and murder for hire, in violation of 18 U.S.C. § 1958,
including:

> a. any and all data related to Gregory Davis, including his personal identifiers,
>    address, residence, vehicles, and businesses;

> b. any and all data related to the death of Gregory Davis, including information
>    related to efforts to locate his whereabouts prior to his murder;

> c. any and all data related to communications involving Jerry Banks, Aron Ethridge,
>    Berk Eratay, Murat Gumrukcu, and Serhat Gumrukcu from January 1, 2015 to the
>    present;

d.  any and all data relating to Berk Eratay or Serhat Gumrukcu's business activity from January 1, 2015 to the present, including all data relating to businesses associated with Serhat Gumrukcu, such as Enochian Bioscience.

e.  any and all data relating to the schedule, travel or location of Serhat Gumrukcu, Murat Gumrukcu, Berk Eratay and Aron Ethridge from January 1, 2017 to July 1, 2018, and from April 6, 2022 to the present;

f.  any and all bank records, checks, credit card bills, account information, and other financial records relating to Berk Eratay or Serhat Gumrukcu's employment, earnings, and finances.

2.    Evidence of user attribution showing who used or owned the SUBJECT DEVICES at the time the things described in this warrant were created, edited, or deleted.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or

2

copied electronic data to the custody and control of attorneys for the government and their

support staff for their independent review.

AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and state as follows:

### Introduction

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently
assigned to the Burlington Resident Agency in Vermont.  I have been an FBI Special Agent for
19 years. My duties as an FBI Special Agent include investigating violations of Title 18 of the
United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement,
public corruption, money laundering and related white-collar crimes, as well as violent crimes
and criminal enterprises. I have participated in investigations of criminal violations of various
federal laws. I have executed search and arrest warrants, interviewed and interrogated subjects,
witnesses, and victims, and conducted surveillance. In the course of these investigations, I have
gained an understanding of current technology, to include computers and online accounts,
cellular telephones and associated records and data, and have conducted analyses of the data
related to such accounts and devices, for the purpose of solving and proving crimes.

2.     I make this affidavit in support of an application for a search warrant authorizing
the extraction and examination of data from three electronic devices – a computer tower, a laptop
and an iPad (the "SUBJECT DEVICES"), currently in the custody of the FBI in Colchester,
Vermont, as described in Attachment A – and the seizure of electronically stored information
described in Attachment B.

3.     On May 19, 2022, the federal grand jury sitting in Burlington, Vermont, charged
Serhat Gumrukcu with conspiring with Berk Eratay and others between May 2017 and February
2018 to pay someone to murder Gregory Davis, whose body was discovered on January 7, 2018.
As discussed below, there is probable cause to believe that Gumrukcu was involved in this
murder-for-hire conspiracy, along with Eratay, Aron Ethridge, and Jerry Banks. Davis's murder
involved the following federal crimes: kidnapping, in violation of 18 U.S.C. § 1201; murder to
obstruct justice, in violation of 18 U.S.C. § 1512(a)(1); murder for hire, in violation of 18 U.S.C.
§ 1958; and wire fraud, in violation of 18 U.S.C. § 1343. There is probable cause to believe that
the SUBJECT DEVICES contain evidence of those crimes, as described in Attachment B.

4.     This case is being investigated by the FBI and the Vermont State Police (VSP).
Since this affidavit is being submitted for the limited purpose of establishing probable cause to
search data already in law enforcement's custody, I have not included details of every aspect of
the investigation. Except as otherwise noted, the information contained in this affidavit is based
upon my personal knowledge and observations, my training and experience, conversations with
other law enforcement officers and witnesses, and my review of documents and records.

### Probable Cause

5.     On April 29, 2022, I obtained a search warrant for a computer hard drive seized
during a search at Jerry Banks' Colorado residence. A copy of my affidavit submitted in support
of the search warrant is attached as Exhibit 1. Its contents remain true and correct, and I

incorporate those contents here. On July 7, 2022, I obtained a search warrant for an iPhone used by Berk Eratay prior to his arrest, relying on much of the information in this affidavit.

6.     As set forth in more detail in Exhibit 1, there is probable cause to believe that prior to his murder, Davis was the victim of a financial fraud scheme involving Serhat Gumrukcu and his brother, Murat Gumrukcu. This financial fraud scheme involved false statements by the Gumrukcus about their ability to provide funding to support investments in an oil trading company, as described in agreements between the Gumrukcus' company, Lauran Trading, LLC; Gregory Davis's company, Mode Commodities, LLC; and Gregory Gac's company, Quadrant Financial Group, LLC (functioning as an "escrow agent" for the parties). Exhibit 1 contains evidence about Davis's complaints about the Gumrukcus' alleged fraud and Davis's threats to report the Gumrukcus' fraud to the FBI during the second half of 2017. My review of Davis's text messaging with Gac and Gac's text messaging with Serhat Gumrukcu show that Davis was alleging fraud by the Gumrukcus as early as late 2015. Davis's complaints continued in 2016 and early 2017. During this two-year period, Serhat Gumrukcu made various claims to Gac about his ability and plans to complete the funding for Mode Lauran. Gumrukcu never came up with the Letter of Credit funding contemplated by the Mode Lauran agreements. Davis complained through Gac repeatedly about the falsity of Gumrukcu's claims. The messaging from Gregory Davis clearly shows he used the nickname "Gregg," not "Greg."

7.     As set forth in Exhibit 1, there is probable cause to believe that Jerry Banks murdered Davis, and that he was hired to do so on behalf of a third party. As set forth in Exhibit 1, the only known link between Banks and the Gumrukcus was Aron Ethridge and Berk Eratay.

8.     On April 6, 2022, Jerry Banks was arrested in Yellowstone National Park. The arrest generated substantial media attention.

9.     On April 7, 2022, I interviewed Aron Ethridge near his home in Henderson, Nevada. During this initial interview, Ethridge denied all knowledge of a murder-for-hire scheme involving Banks. On the morning of April 9, 2022, I received a call from Ethridge, who agreed to meet again later that day. At this second meeting, Ethridge admitted he had lied during the first meeting, and then confirmed the murder-for-hire scheme involving Banks, Eratay, and Gumrukcu. A third meeting with Ethridge was held on April 10, 2022, during which Ethridge admitted he had omitted some of his knowledge of the plan to abduct Davis during his interview on April 9. The following is a summary of the information that Ethridge provided to law enforcement during the April 9 and April 10 interviews, with corrections as provided by Ethridge on April 10:

   a.     Ethridge and Eratay used to be neighbors in Henderson, Nevada, and became friends during that period. Eratay told Ethridge that Eratay had been involved in computer hacking while living in Turkey and before moving to the United States.

   b.     Eratay approached Ethridge over a year before the murder of Davis, asking if Ethridge could arrange a murder. Ethridge eventually agreed to assist Eratay.

2

  c.  Ethridge approached Banks, asking Banks to assist with the murder.

  d.  Ethridge received over $110,000 in cash from Eratay as payment for the murder. A portion of this cash was paid to Banks.

  e.  The initial plan had been for Banks to "snipe" Davis, but after Banks made a reconnaissance trip to Vermont, Banks advised the plan would have to be revised and requested additional payment due to the increased difficulty of the job.

  f.  Ethridge knew that Banks would impersonate a law enforcement officer and abduct Davis from his residence prior to murdering him.

  g.  Ethridge and Banks communicated via an encrypted application called "Threema." Ethridge also communicated with Eratay on the "Threema" application.

  h.  On at least one occasion, Banks used a physical data card to pass along a digital image of Davis that Banks had taken during a trip to Vermont. Ethridge provided this data card to Eratay.

  i.  On January 7, 2018, while Banks was traveling back from Vermont, Banks called Ethridge and advised him the job was done. Ethridge then called Eratay to relay the message.

  j.  Ethridge had met Serhat Gumrukcu on multiple occasions prior to the murder of Davis. Ethridge believed that, based on these meetings and statements made by Eratay, Serhat was the man who wanted Davis killed. Eratay told Ethridge that Serhat had a problem with Davis and asked Ethridge to help them get rid of the problem. However, Serhat and Ethridge never directly communicated about the abduction and murder. All communications went through Eratay, who Ethridge knew to work for Serhat.

  k.  After the murder of Davis, Eratay provided Ethridge with an additional payment in the form of Bitcoin.

  l.  Eratay attempted to contact Ethridge in early April after Ethridge and Eratay were separately contacted by federal agents.

  10.  FBI Special Agent Christopher McPeak interviewed Eratay on April 7, 2022. I have spoken with Agent McPeak and reviewed the report summarizing the interview. Eratay denied knowing anything about Davis or his oil deal with the Gumrukcus. Eratay admitted the Gumrukcu brothers are family friends from Turkey. Eratay stated that he had done IT work for companies involving Serhat Gumrukcu, including Enochian Biosciences. He admitted to various financial transactions with Serhat Gumrukcu but initially denied receiving transfers totaling over

$30,000. When agents noted that they had seen the transfers described above, Eratay said that Gumrukcu was repaying him for prior medical expenses loaned to Gumrukcu by Eratay's father. Eratay also said that Serhat Gumrukcu gave him Enochian stock, which Eratay estimated to be worth approximately $100,000.

11.     I have reviewed some of the contents of the berkeratay@gmail.com account, used by Eratay. Data from July 27, 2017 has a subject line of "Person's Details." This data appears to reflect Google's capture of an Apple Note, which is an Apple application that allows users to wrote notes on an Apple device, including an iPhone. The body of the "Note" reads as follows:

Person's Details;

Gregory Charles Davis

Birth Date: 27 Oct 1968

Place Of Birth: NJ USA

His Company Name is Mode Commodities LLC:
101 Hudson Street
Jersey City NJ 07302

Gregg's cell is +1 802 377 1303

Based on my investigation, this "Note" accurately captures Davis's middle name and date of birth. Thus, I believe that Eratay was provided with details about Davis for purposes of the murder-for-hire conspiracy.

12.     I have reviewed bank records of Serhat Gumrukcu and Berk Eratay obtained by grand jury subpoena. Between May 2017 and October 2017, Gumrukcu transferred over $200,000 from a Turkish bank account to U.S. accounts controlled by Eratay. During those same months, Eratay withdrew over $150,000 of those funds in cash, regularly withdrawing funds in amounts of $9,000, an amount below the $10,000 currency reporting trigger.

13.     I have reviewed some of the contents of the Google account serhat.gumrukcu@gmail.com, used by Serhat Gumrukcu. Records of chats from the serhat.gumrukcu@gmail.com account reveal chats with the berkeratay@gmail.com account as far back as 2014 and include discussions of Paypal transactions. The contents of the serhat.gumrukcu@gmail.com email account reveal that Eratay has been involved in assisting Serhat with his business ventures since at least the summer of 2015. These business ventures reflect that Eratay is involved in coordinating and arranging investment discussions between Serhat and others. They also reflect that Eratay assisted Serhat in arranging for personal transactions.

4

14.     On May 24, 2022, Eratay was arrested outside his residence in Las Vegas, Nevada. On June 16, 2022, I went to Eratay's Las Vegas residence to interview HK, a friend of Eratay's, and to serve him with a grand jury subpoena. During the interview, HK told me that Eratay allowed HK to use Eratay's residence, where HK had access to the SUBJECT DEVICES. On July 13, 2022, HK turned over the SUBJECT DEVICES to a federal agent pursuant to a grand jury subpoena. HK also told me that Eratay had told him that he and Serhat Gumrukcu were close, that they worked together in the past, and that they had been working more closely together more recently. HK also said that Eratay told him that he was in communication with Gumrukcu after Eratay was interviewed by the FBI in April 2022. HK told me that Eratay spoke with him about downloading an encryption communication application called Threema, which HK should use to communicate with Gumrukcu and a friend of Eratay's from Turkey should Eratay be arrested.  Threema was downloaded onto HK's phone, and HK did attempt to communicate with Gumrukcu after Eratay was arrested.

15.     On May 24, 2022, Serhat Gumrukcu was arrested in Los Angeles, California. Agents seized a phone and a laptop at the time of Gumrukcu's arrest.  On June 10, 2022, I obtained a search warrant to search the Gumrukcu devices based on much of the information described in this affidavit.

16.     My review of Gumrukcu's text messages with Gac from 2017 and a review of Gumrukcu's email account, obtained by search warrant, show that during 2017, while the murder plot was pursued, Gumrukcu was putting together a financial transaction creating Enochian Bioscience. Enochian Bioscience was created out of a merger between Enochian Biopharm, which Gumrukcu controlled, and DanDrit Bioscience, a publicly traded company owned and controlled by third parties. I have reviewed SEC submissions showing that the Enochian merger closed in January 2018, soon after the murder. Thereafter, in 2018, Enochian Bioscience began trading on the NASDAQ. As a result of the merger deal, Gumrukcu and his spouse controlled a majority of the shares in Enochian Bioscience.  Those shares had a market value of approximately $100 million in early May 2022. The SEC filings and publicly available internet information show that Gumrukcu maintained active involvement in Enochian up to the time of his arrest.

17.     During 2017, Gumrukcu faced felony fraud charges prosecuted by the State of California. He was arrested in early 2017 and charged by complaint with two fraud schemes. The first involved evidence that Gumrukcu obtained approximately $1 million from a Turkish investor to buy and renovate a Los Angeles residential property for resale. According to the FBI agent who participated in this investigation, Gumrukcu did not buy or renovate the property with the funds he obtained from the investor; Gumrukcu spent the funds on other expenses; and Gumrukcu submitted false and forged documents to the investor to cover up his embezzlement. The second fraud scheme involved bounced checks written by Gumrukcu to Gac in May 2016 to pay fees and penalties for the Mode Lauran deal with Gregory Davis. Gumrukcu wrote checks totaling $600,000 on an account that had a negative balance at the beginning and end of May

2016. The California court held a probable cause hearing on the Gumrukcu charges in October 2017 and found probable cause for all the charges. The California prosecutor then filed an information containing those charges. In early January 2018, shortly after the murder of Davis, Gumrukcu pleaded guilty to a single felony charge and was sentenced to five years of probation. In 2020, Gumrukcu successfully had the charge amended to a misdemeanor under California law.

18.     Based on the information above, I believe that there is probable cause that the Enochian deal played a role in the motive for the murder for hire. Based on my training and experience, I believe that the SUBJECT DEVICES contain information about Eratay's business and financial relationships involving Enochian.

19.     Based on the information above, as well as my training and experience, I believe it is likely that Eratay communicated with other co-conspirators about the developments in the Davis murder investigation after Banks was arrested and Eratay was interviewed. Moreover, I believe that there is probable cause that the SUBJECT DEVICES contain evidence about those communications.

Electronic Storage and Forensic Analysis

20.     Based upon my training and experience, and my discussions with other law enforcement officials, I know the following:

a.     Users of digital devices increasingly choose to store items in digital form (e.g. pictures or documents) because digital data takes up less physical space, and can be easily organized and searched. Users also choose to store data in their digital devices because it is more convenient for them to access data in devices they own, rather than to later spend time searching for it. Keeping things in digital form can be safer because data can be easily copied and stored off site as a failsafe.

b.     Users also increasingly store things in digital form because storage continues to become less expensive. Today, one terabyte (TB) hard drives are not uncommon in computers. As a rule of thumb, users with one gigabyte of storage space can store the equivalent of 500,000 double spaced pages of text. Thus, each computer can easily contain the equivalent of 500 million pages, that, if printed, would fill six 35' x 35' x 10' rooms. Similarly, a one TB drive could contain 900 full run movies, or 900,000 songs, or four million images. With digital devices, users can store data for years at little cost to no cost.

c.     Storing data in digital form and not deleting it mirrors users' online habits where users have, for many years, been encouraged to never delete their emails. For example, since June 2007, Google, Inc. has promoted free, increasingly larger storage "so you should never have to delete mail." *See* Bill Kee, *Welcome to Official Gmail Blog*, https://gmail.googleblog.com/2007/06/welcome-to-official-gmail-blog.html (July 3, 2007); *see also* Rob Siembroski, *More Gmail Storage Coming For All*,

https://gmail.googleblog.com/2007/10/more-gmail-storage-coming-for-all.html (Oct. 12, 2007)
(promoting its "Infinity+1" plan to constantly give subscribers more storage).

     d.     Digital devices can also store data automatically, without a user's input. For
example, network logs may track an employee's actions for company auditing purposes or
email headers may automatically list the servers which transmitted the email. Similarly, a web
browser (i.e. an application such as Internet Explorer used to access web pages) can track a
user's history of websites visited so users can more easily re-access those sites. Browsers also
temporarily cache files from recently accessed web pages to improve the user's experience by
reducing that page's loading time. These examples illustrate how the interaction between
software and operating systems often results in data being stored without a user's knowledge.
Even if a sophisticated user understands this automatic storage of data, attempts at deleting this
data often fail because the data may be automatically stored multiple times and in different
locations. Thus, digital evidence may exist despite attempts at deleting it.

     e.     Digital data is practically resilient to deletion. First, as noted, data is often
automatically stored multiple times in multiple locations, where even sophisticated users may
not be able to locate. Second, digital data can be recovered years after it has been saved, or
viewed even after such data has been deleted. For example, when a user deletes a file on a
computer, the file is sent to the recycle bin, where it can still be retrieved. Even if the file is
deleted from the recycle bin, the data does not actually disappear; rather it remains in "free
space" or "slack space" (i.e. in unused space) until it is overwritten by new data. Third, an
operating system may also keep deleted data in a "recovery" or "swap file." Fourth, files from
websites are automatically retained in a temporary cache which is only overwritten as they are
replaced with more recently viewed web pages. Thus, the ability to retrieve residues of an
electronic file from a hard drive depends less on when the file was downloaded or viewed than
on a particular user's operating system, storage capacity, and computer use habits.

     21.     Based on my training, my experience, and information provided to me by those
involved in the forensic examination of digital devices, I know that completely segregating
information before an examiner has started reviewing digital evidence is inconsistent with the
evidence assessment process. This is true for the following reasons:

     a.     This application seeks permission to locate and seize not only data that might
serve as direct evidence of the Subject Offenses, but also for evidence that establishes how
digital devices were used, the purpose of their use, and who used them. Additionally, this
application seeks information about the possible location of other evidence.

     b.     This application seeks permission to search and seize evidence, fruits, or
instrumentalities found in the devices described in Attachment A. Some of these items may be
files and other data that is generated by a user (e.g. documents, pictures, and videos).
Alternatively, other items may be device generated data that becomes meaningful only upon
forensic analysis. For example, as noted, a hard drive may contain records of how a computer

was used, the purposes for which it was used, and who has used these records. These items are the subject of this warrant.

c.     For instance, based upon my training, my experience, and information provided by others involved in the forensic examination of digital devices, I know the following: First, as noted, data that is not currently associated with any file can provide evidence of a file that once existed, but which has since been deleted or altered. This can include a deleted portion of a file (e.g. a paragraph deleted from a document). Second, applications such as web browsers, email, and chat programs store configuration information that can reveal information such as online nicknames and passwords. Third, operating systems can record information, such as the attachment of peripherals (e.g. USB flash drives), and the times the device was in use. Similarly, file systems record the dates files were created and the sequence in which they were created. Any of this information may be evidence of a crime, or indicate the existence and location of evidence in other locations on the digital device.

d.     In determining how a digital device has been used, the purpose for which it was used, and who has used it, it is sometimes necessary to establish that a particular thing is not present. For example, in cases where more than one person has used a digital device, agents can infer that a defendant must have been the person who used that device to commit a crime by eliminating the possibility that other people used that device during that time. Because file systems often list the dates and times those files were created, this information can help exclude the possibility that other people were using that digital device. As another example, by reviewing a computer's Index.dat files (a system file that keeps track of activity conducted in Internet Explorer), a forensic examiner can determine whether a user accessed other information close in time to the file creation dates, times, and sequences so as to establish user identity and exclude others as having used that computer during times related to the criminal activity. Demonstrating the significance of the absence of certain data on a digital device may require analysis of the digital device as a whole.

e.     The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence or a space where evidence was once located, contextual evidence identifying a user or excluding a user. All of these types of evidence may indicate ownership, knowledge, and intent.

f.     This type of evidence is not "data" that can be segregated, that is, this type of data cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators. Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves and how computers are used. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

22.     In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to

undertaking a cursory inspection of all emails within the Subject Account. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

23.     Based on my training, my experience, and information given to me by others involved in the forensic examination of digital devices, I know that searching for this kind of evidence involves technical, complex, and dynamic processes, which may require expertise, specialized equipment and a knowledge of how digital devices are often used to commit the Subject Offenses.

24.     There is probable cause to believe that things that were once stored on the SUBJECT DEVICES may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

25.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

9

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26.     The SUBJECT DEVICES have been stored in such a manner that the data on it likely remains in the same condition as when law enforcement first seized it.

27.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed search warrant would authorize the government to conduct a forensic examination of the SUBJECT DEVICES. Because the government already has custody of the SUBJECT DEVICES, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Dated at Burlington, in the District of Vermont, this __13th__ day of September 2022.

Patrick Hanna
Special Agent - FBI

Sworn to and subscribed before me this __13th__ day of September 2022.

Honorable Geoffrey W. Crawford
United States District Judge

11

# EXHIBIT 1

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 18 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 2 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 1 of 56

AO 106 (Rev. 04/10) Application for a Search Warrant

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

# UNITED STATES DISTRICT COURT

for the

District of Vermont

2022 APR 29  AM 9: 12

CLERK

BY _____

DEPUTY CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

a Seagate Expansion Desktop Drive,
Serial Number NA8FNSXM,
further described in Attachment A.

)
)
)
)
)

Case No.  5:18-mj-4

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____ **Vermont** _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512(a)(1) | Killing another person with intent to prevent communication to law enforcement |
| 18 U.S.C. § 1201 | Use of interstate facility or interstate travel for kidnapping |
| 18 U.S.C. § 1958 | Murder for hire |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Patrick R. Hanna, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  4/29/22

_____
*Judge's signature*

City and state:  Burlington, Vermont

Hon. Geoffrey W. Crawford, U.S. District Judge
*Printed name and title*

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 19 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 3 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 2 of 56

## **ATTACHMENT A**

The property to be searched is a Seagate Expansion Desktop Drive, Serial Number NA8FNSXM, hereinafter the "SUBJECT DEVICE." The SUBJECT DEVICE is currently located at the FBI office in Colchester, Vermont.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 20 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 4 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 3 of 56

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to the following federal crimes: kidnapping, in violation of 18 U.S.C. § 1201, murder to obstruct justice, in violation of 18 U.S.C. § 1512(a)(1); and murder for hire, in violation of 18 U.S.C. § 1958, including:

      a.   any and all data related to Gregory Davis, including his personal identifiers, address, residence, vehicles, and businesses;

      b.   any and all data related to the death of Gregory Davis, including information related to efforts to locate his whereabouts prior to his murder;

      c.   all communications and records related to communications between Jerry Banks, Aron Ethridge, Berk Eratay, Murat Gumrukcu, and Serhat Gumrukcu from January 1, 2017 to July 1, 2018;

      d.   all records and correspondence related to the purchases of cellular devices and cellular services, vehicles, law enforcement equipment and insignia, firearms, firearm components, firearm accessories, and ammunition;

      e.   any information relating to the schedule or travel of Jerry Banks and Aron Ethridge from January 1, 2017 to July 1, 2018;

      f.   all bank records, checks, credit card bills, account information, and other financial records relating to Jerry Banks' employment, earnings, and finances between January 1, 2017 to July 1, 2018.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 21 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 5 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 4 of 56

2.      Evidence of user attribution showing who used or owned the Device at the time
the things described in this warrant were created, edited, or deleted.

As used above, the terms "records" and "information" include all of the foregoing items
of evidence in whatever form and by whatever means they may have been created or stored,
including any form of computer or electronic storage (such as flash memory or other media that
can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored
information seized or copied pursuant to this warrant in order to locate evidence, fruits, and
instrumentalities described in this warrant.  The review of this electronic data may be conducted
by any government personnel assisting in the investigation, who may include, in addition to law
enforcement officers and agents, attorneys for the government, attorney support staff, and
technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or
copied electronic data to the custody and control of attorneys for the government and their
support staff for their independent review.

2

## AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and state as follows:

### Introduction

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently
assigned to the Burlington Resident Agency in Vermont. I have been an FBI Special Agent for
19 years. My duties as an FBI Special Agent include investigating violations of Title 18 of the
United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement,
public corruption, money laundering and related white-collar crimes, as well as violent crimes
and criminal enterprises. I have participated in investigations of criminal violations of various
federal laws. I have executed search and arrest warrants, interviewed and interrogated subjects,
witnesses, and victims, and conducted surveillance. In the course of these investigations, I have
gained an understanding of current technology, to include computers and online accounts,
cellular telephones and associated records and data, and have conducted analyses of the data
related to such accounts and devices, for the purpose of solving and proving crimes.

2.      I make this affidavit in support of an application for a search warrant authorizing
the examination of an electronic device – a Seagate Expansion Desktop Drive with serial number
NA8FNSXM (the "SUBJECT DEVICE"), currently in the custody of the FBI in Colchester,
Vermont – and the extraction of electronically stored information described in Attachment B.

3.      As discussed below, there is probable cause to believe that Jerry Banks was
involved in the kidnapping and murder of Gregory Davis, whose deceased body was discovered
on January 7, 2018. There is probable cause to believe that Davis' kidnapping and murder
involved the following federal crimes: kidnapping, in violation of 18 U.S.C. § 1201, murder to
obstruct justice, in violation of 18 U.S.C. § 1512(a)(1); and murder for hire, in violation of 18
U.S.C. § 1958. There is probable cause to believe that device described in Attachment A
contains evidence of those crimes.

4.      This case is being investigated by the FBI and the Vermont State Police (VSP).
Since this affidavit is being submitted for the limited purpose of establishing probable cause to
search data already in law enforcement's custody, I have not included details of every aspect of
the investigation. Except as otherwise noted, the information contained in this Affidavit is based
upon my personal knowledge and observations, my training and experience, conversations with
other law enforcement officers and witnesses, and my review of documents and records.

### Probable Cause

5.      On March 30, 2022, I obtained a Criminal Complaint charging Jerry Banks with
the kidnapping of Gregory Davis in violation of 18 U.S.C. § 1201(a)(1). A copy of my affidavit
submitted in support of the Criminal Complaint is attached as Exhibit 1. Its contents remain true
and correct.

6.      On April 6, 2022, I applied for and obtained a search warrant for the premises of
1179 Pfotenhauer Road, Fort Garland, Colorado (hereafter "Residence Warrant"), a property

1

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 23 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 7 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 6 of 56

owned by Jerry Banks.  A copy of my affidavit submitted in support of the Residence Warrant is attached as Exhibit 2.  Its contents remain true and correct.

7.      As set forth in more detail in Exhibit 2, there is probable cause to believe that prior to his murder, Davis was the victim of a financial fraud scheme involving Serhat Gumrukcu and his brother, Murat Gumrukcu.  This financial fraud scheme involved investments in an oil trading company, and agreements between Murat Gumrukcu's entity Lauran Trading, LLC; Gregory Davis' entity Mode Commodities, LLC; and Gregory Gac's entity Quadrant Financial Group, LLC (functioning as an "escrow agent" for the parties).

8.      As set forth in Exhibits 1 and 2, there is probable cause to believe that Jerry Banks murdered Davis, and that he was hired to do so on behalf of a third party.  As set forth in Exhibit 2, the only known link between Banks and the Gumrukcus is through Aron Ethridge and Berk Eratay.

9.      On April 6, 2022, Jerry Banks was arrested in Yellowstone National Park.  On April 7, 2022, FBI agents executed the Residence Warrant at Banks' property in Colorado. During the search, in the trailer-type residence, agents located 9mm ammunition; a hand-held radio; two firearm magazines; a green law-enforcement style duty belt; and the SUBJECT DEVICE.  In a storage shed, agents recovered a short-barrel AR-15 with no serial numbers or manufacturer labels; an AR-15 "upper" (no lower receiver) with a scope; handcuffs; a pepper blaster; and a FedEx envelope containing purchase paperwork and registration for a Ford Explorer from Highline Automotive.  In a maroon Chevy Blazer located on the property, agents recovered a vehicle spotlight, which was disassembled into two pieces.

10.     On April 7, 2022, I interviewed Aron Ethridge near his home in Henderson, Nevada.  During this initial interview, Ethridge denied all knowledge of a murder-for-hire scheme involving Banks.  On the morning of April 9, 2022, I received a call from Ethridge, who agreed to meet again later that day.  At this second meeting, Ethridge admitted he had lied during the first meeting, and then confirmed the murder-for-hire scheme involving Banks and Eratay.  A third meeting with Ethridge was held on April 10, 2022, during which Ethridge admitted he had omitted some of his knowledge of the plan to abduct Davis during his interview on April 9.  The following is a summary of the information that Ethridge provided to law enforcement during the April 9 and April 10 interviews, with corrections as provided by Ethridge on April 10:

            a.      Ethridge and Eratay used to be neighbors in Henderson, Nevada, and became friends during that period.

            b.      Eratay approached Ethridge over a year before the murder of Davis, asking if Ethridge could arrange a murder.  Ethridge eventually agreed to assist Eratay.

            c.      Ethridge approached Banks, asking Banks to assist with the murder.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 24 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 8 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 7 of 56

    d.    Ethridge received over $110,000 in cash from Eratay as payment for the murder. A portion of this cash was paid to Banks.

    e.    The initial plan had been for Banks to "snipe" Davis, but after Banks made a reconnaissance trip to Vermont, Banks advised the plan would have to be revised and requested additional payment due to the increased difficulty of the job.

    f.    Ethridge knew that Banks would impersonate a law enforcement officer and abduct Davis from his residence prior to murdering him.

    g.    Ethridge and Banks communicated via an encrypted application called "Threema." Ethridge also communicated with Eratay on the "Threema" application.

    h.    On at least one occasion, Banks used a physical data card to pass along a digital image of Davis that Banks had taken during a trip to Vermont. Ethridge provided this data card to Eratay.

    i.    On January 7, 2022, while Banks was traveling back from Vermont, Banks called Ethridge and advised him the job was done. Ethridge then called Eratay to relay the message.

    j.    Ethridge had met Serhat Gumrucku on multiple occasions prior to the murder of Davis. Ethridge believed that, based on these meetings and statements made by Eratay, Serhat was the man who wanted Davis killed. Eratay told Ethridge that Serhat had a problem with Davis. However, Serhat and Ethridge never directly communicated about the abduction and murder. All communications went through Eratay, who Ethridge knew to work for Serhat.

    k.    After the murder of Davis, Eratay provided Ethridge with an additional payment in the form of Bitcoin.

Electronic Storage and Forensic Analysis

    11.    Based on my knowledge, training, and experience, I know that the SUBJECT DEVICE, a Seagate Expansion Desktop Drive, is typically utilized as an external data storage device. The external markings on the SUBJECT DEVICE indicate it has a capacity of 3 TB, the equivalent of 3,000 gigabytes (GBs). Such a device is capable of storing thousands of digital photographs and thousands of document files. The SUBJECT DEVICE could also store backups of other electronic devices, including the data stored on a cellular phone. Devices such as the SUBJECT DEVICE can store information for long periods of time.

    12.    There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

3

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 25 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 9 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 8 of 56

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

13.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

4

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 26 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 10 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 9 of 56

     e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

14.     The SUBJECT DEVICE has been stored in such a manner that the data on them likely remains in the same condition as when law enforcement first seized it.

15.     Based on the above and the contents of Exhibits 1 and 2, I believe it is probable that digital evidence and records related to the scheme to abduct and kill Gregory Davis existed, and it is probable that Jerry Banks stored records related to those crimes on the SUBJECT DEVICE.   Given that Banks retained records of purchases of the Ford Explorer and other physical items involved in the scheme, it is reasonable to conclude that Banks may have retained digital records of his many digital purchases outlined in Exhibits 1 and 2.  Further, given the digital nature of communications between Banks and Ethridge and the use of a physical data card to transfer a photograph of Davis during the scheme, and because the SUBJECT DEVICE may contain backups of data from electronic devices such as cellular phones, it is reasonable to conclude that the SUBJECT DEVICE may contain information related to communications regarding the scheme to kill Davis.

16.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

17.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed search warrant would authorize the government to conduct a forensic examination of the SUBJECT DEVICE. Because the government already has custody of the SUBJECT DEVICE, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Dated at Burlington, in the District of Vermont, this 29th day of April 2022.

_____
Patrick Hanna
Special Agent - FBI

Sworn to and subscribed before me this 29 day of April 2022.

_____
Honorable Geoffrey W. Crawford
United States District Judge

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 27 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 11 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 10 of 56

# EXHIBIT 1

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 28 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 12 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 11 of 56
Case 5:22-mj-00037-gwc   Document 1   Filed 03/30/22   Page 1 of 1

AO 91 (Rev. 11/11)  Criminal Complaint

## UNITED STATES DISTRICT COURT

for the

District of Vermont

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 MAR 30  PM 2: 51

CLERK

BY _____ Edlu
DEPUTY CLERK

|  |  |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 5:22-mj-37-gwc |
| Jerry Banks | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ **January 6, 2018** _____ in the county of _____ **Caledonia** _____ in the
_____ District of _____ **Vermont** _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1201(a)(1) | The unlawful seizure, confinement, inveigling, decoying, kidnapping, abduction, and carrying away, for reward and otherwise, GD, and in committing and in furtherance of the commission of the offense, travelling in interstate commerce and using a facility and instrumentality of interstate commerce. |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

*gu signed by reliable electronic means*

GWC

_____
*Complainant's signature*

**Patrick Hanna, Special Agent, FBI**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 03/30/2022 _____

_____
*Judge's signature*

City and state: _____ Rutland, Vermont _____

**Hon. Geoffrey W. Crawford, Chief US District Judge**
*Printed name and title*

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 29 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 13 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 12 of 56
Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 1 of 12

## AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and say:

### Introduction

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently
assigned to the Burlington Resident Agency in Vermont. I have been an FBI Special Agent for
19 years. My duties as an FBI Special Agent include investigating violations of Title 18 of the
United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement,
public corruption, money laundering and related white-collar crimes, as well as violent crimes
and criminal enterprises. I have participated in investigations of criminal violations of various
federal laws. I have executed search and arrest warrants, interviewed and interrogated subjects,
witnesses, and victims, and conducted surveillance. In the course of these investigations, I have
gained an understanding of current technology, to include computers and online accounts,
cellular telephones and associated records and data, and have conducted analyses of the data
related to such accounts and devices, for the purpose of solving and proving crimes.

2.      I am submitting this Affidavit in support of a complaint alleging that Jerry Banks
kidnapped GD (the victim) on January 6, 2018, in violation of 18 U.S.C. § 1201(a)(1).

3.      This case is being investigated by the FBI and the Vermont State Police (VSP).
Since this affidavit is being submitted for the limited purpose of supporting a complaint, I have
not included details of every aspect of the investigation. Except as otherwise noted, the
information contained in this Affidavit is based upon my personal knowledge and observations,
my training and experience, conversations with other law enforcement officers and witnesses,
and my review of documents and records.

### Probable Cause

A.      The Kidnapping and Shooting

4.      On January 7, 2018, VSP responded to a homicide in Barnet, VT. The victim,
identified as GD, was found partially covered by snow near the base of a snowbank on a pull off
area near the west side of Peacham Road. The victim was found handcuffed and had been shot
multiple times in the head and torso. GD resided at 884 Hawkins Road, Danville, VT at the time.
The victim's body was discovered approximately 15 miles from his residence. Evidence
gathered from the crime scene included .22 caliber cartridge casings.

5.      VSP Detectives responded to GD's home and interviewed his wife, MD, and their
12-year-old son (minor child #1). Both were interviewed again later. MD told VSP Detectives
that at approximately 9:00 p.m. on January 6, 2018, she and her husband were in a first-floor
bedroom in their Danville home. They heard someone knock on the door. GD went to the door to
see who was there. GD came back to the bedroom and told MD that a man claiming to be a U.S.
Marshal came to the victim's home to arrest him. GD got his clothes on and left with the man.
MD saw the man and described him as having handcuffs, a rifle, and wearing a jacket and mask
with an eye opening, both of which had a U.S. Marshals emblem. MD also reported that the man

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 30 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 14 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 13 of 56
Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 2 of 12

said he had an arrest warrant for GD for racketeering and was bringing him to Virginia. Minor child #1, who observed the man and his car from a second-floor window, told police that the man drove a white four-door car with red and blue emergency lights activated on the dash. GD left in the man's car. The man was wearing black clothes and had a gun and a belt with various law enforcement tools on it. MD did not contact police.

6.      On January 10, 2018, Agent Jennie Emmons confirmed with Supervisory Deputy U.S. Marshal Carl Staley of the Burlington Vermont office of the U.S. Marshals Service that GD was not arrested by their agency. Further, Deputy Marshal Staley said that there had been no active federal warrants for GD.

B.      The 911 Phone

7.      I listened to a 911 call made around the time of the victim's kidnapping. The call took place approximately 15 minutes prior to the kidnapping and originated within a mile of the victim's residence. The VT 911 call center received a call from (802) 473-0535 (the 911 Phone) at 8:42 p.m. on January 6, 2018. The 911 call center's technology identified the call as coming from a location on North Danville Road, Danville, VT, only a short distance from the victim's residence. I believe that Banks used the 911 Phone to facilitate the victim's kidnapping and murder.

a.      During the call, a man stated that he shot his wife and was going to shoot himself. The caller gave an address of "71772 Cross Road" (with no town information), after which the caller hung up. The call information was relayed to VSP in St. Johnsbury, Vermont. VSP attempted to locate a Cross Road in the St. Johnsbury area without success.

b.      VSP thereafter requested that AT&T provide location information for the phone in question due to the exigent circumstance. AT&T confirmed that the 911 call came from the North Danville Road location. AT&T also reported that the phone was a prepaid phone with no subscriber information available. After VSP checked the North Danville location and several possible "Cross Roads" outside the town of St. Johnsbury, the matter was closed. At that time, the victim's body had not been discovered.

c.      I later obtained search warrants for various accounts used by Banks, including his Facebook account, where Banks listed his user name as Grizz Sands. Among the data in the Facebook account were video recordings, including a video in which Banks narrated a tour of his residence in Fort Garland, CO. Banks' voice sounds similar to the voice of the 911 caller.

8.      AT&T responded to a search warrant for information associated with the 911 Phone. The AT&T search warrant data confirmed the location of the 911 call on January 6, 2018, near the time and location of victim's kidnapping.

9.      The data provided by AT&T was reviewed by Special Agent James Wines of the FBI's Cellular Analysis Survey Team. After this review, and consultation with AT&T security personnel, Agent Wines advised that the 911 Phone was a prepaid phone purchased at a Walmart on January 5, 2018. The records showed only two calls made by the phone, a four-second call to a Pizza Hut in St. Johnsbury, VT at 4:14 p.m. on January 6 and the 911 call at 8:42 p.m. on

2

January 6. The phone used only two sectors of the same cell tower, located in St. Johnsbury, VT, for all cell site activity. Agent Wines also advised that this phone was activated, meaning that it could operate on the AT&T network, shortly before 4:00 p.m. on January 6, within minutes of the Pizza Hut call. I have not been able to establish how the phone was activated.

10.    Agent Wines advised me that he learned from contacts at Walmart security that the prepaid phone was purchased with $100 cash on January 5, 2018, at 4:14 p.m. at the Walmart located at 100 Supercenter Drive, Clearfield, PA. Agent Wines forwarded me numerous security camera images of the individual purchasing the phone, which were obtained from Walmart security. The images show a bearded, adult, white man purchasing the phone. The man arrived and departed in a white Ford Explorer. The camera footage indicates the vehicle parked in the Walmart parking lot around 3:55 p.m. and left the lot around 4:17 p.m. The Explorer does not appear to have a front license plate. The rear plate was light in color and appeared to be white. Numbers and/or letters were not recognizable on the rear plate. The Explorer is generally consistent with minor child #1's description of the kidnapper's car.

11.    FBI personnel in Pennsylvania canvassed gas stations and other locations in the vicinity of the Walmart at 100 Supercenter Drive, Clearfield, PA, to determine if additional security camera footage of the bearded, white male and/or the white Ford Explorer could be located. Additional video footage of the suspect and vehicle were located at a BP gas station at 14624 Clearfield Shawville Highway, Clearfield, PA 16830.

12.    I reviewed stills of this footage, which included images of the bearded, white man and the white Ford Explorer, and they appear to be the same person and vehicle shown in the Walmart security video. The suspect purchased gas at the BP station. I saw what appears to be a smartphone in the suspect's hand. A time stamp on this video put the stop at the gas station at 4:27 p.m. on January 5, 2018. My review of the reports of the agents who travelled to Clearfield, Pennsylvania shows that the display times from the gas station security footage appear to be plus six or seven minutes relative to the actual time.

13.    I have reviewed Colorado driver's license information about Banks. On December 18, 2017, a Colorado driver's license was issued to Jerry Dean Robert Banks. Banks gave his mailing address as 1179 Pfotenhauer Road, Fort Garland, CO. Based on the driver's license photo of Banks (taken only three weeks before the kidnapping), Banks resembles the man depicted in the Walmart surveillance images as the purchaser of the 911 Phone. Below is the license photo (on the right) and an edited image of the face of the 911 Phone purchaser (on the left) for comparison.

3

 

C.    The 201 Phone

14.    Agent Wines also reviewed AT&T tower data obtained as a result of search warrants issued by this court. Agent Wines received a list of cellular devices connecting to a tower covering the area of Clearfield, Pennsylvania, where the 911 Phone was purchased. The data included a list of devices connecting to the tower at or about the time the 911 Phone was purchased. Agent Wines compared this data to data he received listing cellular devices connecting to a tower covering the area of Danville, Vermont, where the abduction took place. The data included devices connecting to the tower at or about the time of GD's abduction. Only one cellular phone was common to both sets of data, and it was a device with phone number (201) 208-7436 (the 201 Phone). Based on the information below, I believe that Banks used the 201 Phone to facilitate the victim's kidnapping and murder.

15.    Further investigation by Agent Wines determined that 201 Phone is an Android cell phone purchased at a Walmart located at 201 Southeast Salem Street, Oak Grove, Missouri on November 13, 2017, at approximately 9:58 a.m. (CST), and additional service (minutes/data) for that phone were purchased at a Walmart located at 2025 W. Business Highway 60, Dexter, Missouri on January 4, 2018 at approximately 9:20 a.m. (CST). Agent Wines obtained receipts for these purchases, which show these purchases, like the 911 Phone purchase in Pennsylvania on January 6, 2018, were each made with $100 cash. The details on the receipts suggest that the customer paid with a $100 bill for all three purchases: the 201 Phone, the extra minutes for the 201 Phone, and the 911 Phone.

16.    I obtained a search warrant for historical cell site and location information for the 201 Phone. The 201 Phone did not make or receive any phone calls or texts during the relevant period. Its only interactions with the AT&T network involved data transmissions. The records do not reveal the kind of data transmitted. Agent Wines and I have reviewed the information obtained from this warrant. Analysis of the data shows the 201 Phone assigned number was registered with the AT&T network on November 14, 2017. It first interacted with the network through cell towers in the area of Monte Vista, Colorado for a brief time on December 29, 2017.

4

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 33 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 17 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 16 of 56
Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 5 of 12

The phone next interacted with a cell tower in the area of Dexter, Missouri on January 3, 2018, and January 4, 2018, again for short periods. Thereafter, the phone interacted with cell towers near roads following a path in a northern and eastern direction through Illinois, Indiana, and Ohio. Analysis of the data shows the phone interacted with cell towers in the Columbus, Ohio, area for a time period between 7:30 p.m. January 4, 2018 to 11:20 a.m. January 5, 2018. The phone thereafter continued to interact with cell towers near roads through Pennsylvania, New York, and Connecticut. Analysis of the data shows the phone interacted for a period of time with cell towers in the area Southington, Connecticut, from 12:00 a.m. to 10:00 a.m. on January 6, 2018. The data shows the phone then continued through Massachusetts and arrived in Vermont on January 6, 2018, at approximately 11:37 a.m. The phone then traveled north, consistent with travel on Interstate 91, and arrived in the area of St. Johnsbury, Vermont, at about 1:30 p.m. Throughout the afternoon and into the evening of January 6, 2018, the data shows the phone was in the areas of St. Johnsbury and Danville, Vermont. The phone remained in the general area in which the victim's kidnapping took place (at approximately 9:00 p.m.) and where his body was recovered the next day. After approximately 9:24 p.m., the phone appears to have traveled south out of the Danville/St. Johnsbury area, consistent with travel on Interstate 91. The last reported cell site or location data was at 10:01 p.m., after which the phone had no more interaction with the AT&T network. Based on this information, there is probable cause to believe that the 201 Phone was used for the purpose of the victim's kidnapping and murder.

17.    Further analysis of the data shows that during the travel to Vermont, the 201 Phone passed through the area of Clearfield, Pennsylvania at the time the 911 Phone was purchased at the Walmart in Clearfield, Pennsylvania.

18.    I have attempted to obtain information from Google about the use of this phone by subpoena. The only information Google could provide showed that the 201 Phone connected to Google servers for the first time on November 14, 2017, and for the last time on January 6, 2018.

19.    I have reviewed records from Verizon Wireless that identify Jerry Banks as the subscriber of the phone with number (719) 480-3879 (the 719 Phone) during the relevant timeframe. Banks was the effective subscriber from 10/20/2017 through 11/8/2018. Banks listed (661) 433-5327 (the 661 Phone) as his home phone number and work phone number.

20.    I have also reviewed Verizon Wireless Billing Statements, which show the approximate location of the 719 Phone when calls were made. I have confirmed with Verizon Wireless personal that this location information is associated with the cell towers and switch connecting to the phone at the time of calls. I also learned that Verizon Wireless maintained more precise location information for this phone for only approximately one year. That data was gone by the time I obtained the search warrant. I found the following locations of note for this phone in the Billing Statements:

    a.    On 10/26/2017, a call from this phone originated in Denver, CO.
    b.    On 12/13/2017, a call from this phone originated in Dexter, MO.
    c.    On 12/28/2017 a call from this phone originated in Alamosa, CO.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 34 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 18 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 17 of 56
Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 6 of 12

d.      On 12/29/2017, another call from this phone originated in Alamosa, CO, which is close to Monte Vista, CO. As noted above, the 201 Phone first interacted with cell towers in the area of Monte Vista, CO on 12/29/2017.

e.      On 1/2/2018 and 1/3/2018, calls from this phone originated in Dexter, MO. As noted above, the 201 Phone interacted with cell towers in Dexter, MO on 1/3/2018.

f.      No calls are made between 12:59 p.m. on 1/3/2018 and 1/7/2018, when the 201 Phone was actively being used.

g.      On 1/7/2018, at approximately 9:24 p.m., a call from this phone originated in O'Fallon, MO, which is along I-70 in Missouri. The time between the last use of the 201 Phone and this call on the 719 Phone is approximately 25 hours. Google Maps shows that driving time from Barnet, VT to O'Fallon, MO is approximately 19 hours.

h.      On 1/8/2018, a call from this phone originated in Alma, KS. This call takes place approximately 15 minutes after the Kansas Highway Patrol car stop of Banks in Alma, KS, described below. The call connects with (573) 421-4798 for approximately 20 minutes.

i.      On 1/9/2018, multiple calls are made from this phone, all originating in Colorado (Alamosa, Sanford and Colorado Springs).

21.     Banks' use of the 719 Phone connected to his Google account, described below, is consistent with him buying and using the 201 Phone.

22.     I have reviewed Google records for the email address banksavs@gmail.com. Jerry Banks is the subscriber of the email account. He uses bankspes@gmail.com for his recovery email. The account was created on 6/5/2009. SMS (texts) are connected to the 719 Phone. The subscriber services listed are Android, Gmail, Google Calendar, Google Chrome Sync, Google Cloud Print, Google Drive, Google Hangouts, Google Keep, Google My Maps, Google Payments, Google Photos, Google Play, Google Play Music, Google Services, Google Voice, Has Madison Account, Location History, Web & App Activity, YouTube, and iGoogle.

23.     I obtained a search warrant for information from the banksavs@gmail.com account. I and other investigators working with me have reviewed the information. We have identified a number of pieces of information in the Google data that further support the conclusion that Banks was responsible for GD's kidnapping and murder, including the following:

a.      Within the Google maps data there are a number of pieces of information including searches for Vermont on October 10, 2017, December 12, 2017, and January 4, 2018.

b.      Within the Google search history data are a number of pieces of information including searches for: Explorer Police Interceptors for sale on October 26, 2017; Ford Explorer Police Interceptor rims as well as steel wheels and a police spotlight on October 29, 2017; ARC-22 .22 LR Conversion Kits on December 17, 2017; and body armor on December 26, 2017. As noted above, .22 caliber ammunition was used to kill GD.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 35 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 19 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 18 of 56
Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 7 of 12

c.      Within the Google location information are thousands of GPS coordinates
including coordinates connecting the Google user to the 201 Phone. As noted above, the 201
Phone was purchased in Oak Grove, MO at 9:58 a.m. (CST) on November 13, 2017. On
November 13, 2017 at 11:09 a.m., when the location information was turned on, it shows the
user 50 miles east of Oak Grove, MO on Interstate 70, travelling east. Interstate 70 also travels
through Oak Grove, MO. This information suggests to me that the Google user was in Oak
Grove at the time the 201 Phone was purchased. The location information also shows that the
Google account user travelled from Fort Garland, CO to Dexter, MO on January 2, 2018, and
stayed there until January 4, 2018. I have reviewed records from the Dexter Inn, which show that
Banks was staying at the motel on the nights of January 2 and 3, 2018. Further, the location
information shows that the Google user was inside the Dexter, MO Walmart at 9:20 a.m. on
January 4, 2018, the same time the extra minutes were purchased for the 201 Phone.

d.      Though there are hundreds of pieces of location information on most days, there
is no location information for certain relevant periods of time including: 1) between 9:51 a.m.
(CST) on January 4, 2018, and 9:22 p.m. (CST) on January 7, 2018; 2) between 3:53 p.m. (CST)
on November 11, 2017 and 11:09 a.m. (CST) on November 13, 2017; and 3) 2:31 p.m. (CST) on
November 13, 2017 and 9:17 p.m. (CST) on November 20, 2017. When the location information
was turned on after 9:22 p.m. (CST) on January 7, 2018, the Google user was travelling west on
Route 70 in eastern Missouri. The location information shows that the Google user spent the
night of January 7 near a Route 70 exit in Missouri, before travelling towards Fort Garland on
January 8. This data shows that except for a few hours on November 13, 2017, Banks was not
using his 719 Phone while travelling to Vermont both in November 2017 for a reconnaissance
trip and in January 2018 for the kidnapping/murder trip.

24.     The Google data also confirms that Banks used the Grizz Sands Facebook
account.

D.      The Ford Explorer

25.     I consulted with Matthew Fyie, Manager, Design Analysis Engineering, at Ford
Motor Company, to determine the model and year range of the Ford Explorer observed in
photographs and video obtained from Clearfield, Pennsylvania. Fyie told me that the Clearfield
Explorer was a 2013 to 2015 Police Interceptor model. He noted that the Clearfield Explorer was
pictured with Ford Explorer XLT wheels, which were not an option for the 2013 to 2015 Police
Interceptor models. Fyie provided photographs of the three wheel styles offered for those Police
Interceptors, each of which is different from the XLT wheel. Fyie suggested the XLT wheels
were installed on the vehicle at a later time or as an after-market change. Ford later provided
information, including VIN numbers, for the 17,291 White Explorer Police Inceptors for model
years 2013 to 2015 manufactured and sold by Ford.

26.     The Vermont Intelligence Center (VIC) conducted searches to identify and find
vehicles of interest based on certain parameters/criteria (vehicles registered in states of interest,

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 36 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 20 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 19 of 56
Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 8 of 12

in this case Colorado, vehicles sold at auction with high mileage, and vehicles with sales or
service records that occured around the time of the kidnapping and homicide.)

27.     Leads were generated to locate the vehicles of interest and identify the owners at
the time of the kidnapping/homicide.  One lead was sent to Colorado Bureau of Investigation
(CBI) Agent Joseph Cahill, who was then assigned to an FBI Task Force. This particular lead,
based on the additional research and identifiers provided by the Vermont Intelligence Center
(VIC), was specific to a 2013 Ford Explorer with VIN 1FM5K8AR6DGC73609. CARFAX
records indicated that on October 6, 2017, a 2013 white Ford Explorer from Highline
Automotive Inc., VIN 1FM5K8AR6DGC73609, was offered for sale. Mileage on the Explorer at
the time was 117,138. On December 22, 2017, the Ford Explorer was serviced at Downey Car
Center, Downey, California per CARFAX records. Mileage on the Ford Explorer at the time was
130,404. CARFAX records indicate the mileage on the vehicle was 137,168 on March 16, 2018,
the next time the vehicle was offered for sale by Maximum Auto Search.

28.     Agent Cahill and CBI Agent Kevin Koback conducted interviews in connection
with the Ford Explorer and the dealership, Highline Automotive, which was located in Denver,
Colorado. (Highline has since gone out of business.) Agent Cahill provided me verbal and
written reports of the interviews. Those reports show that Banks was using the Explorer at the
time of the kidnapping. Steve Iskhakov, who ran Highline, provided CBI Agents with
documents, including the Highline Automotive sales jacket for the Explorer, which show that
Banks had possession of the Explorer at the time of the kidnapping.  Iskhakov said he never had
anyone drive so many miles on a car in the short period of time Banks had the Explorer.

29.     Agent Cahill and I interviewed Carmine Gulli, the salesman and finance manager
who dealt initially with Banks, on separate occasions. Gulli told me that Banks picked up the
Explorer on October 26, 2017, with an agreement to purchase it with financing. Banks made a
down payment of $3,000 in cash. Gulli was not able to obtain financing for Banks from the first
finance company that he tried. Gulli then tried to finance the Explorer through a second finance
company in mid-November. He did not meet with Banks in person at that point but dealt with
him by phone and email.  Gulli was not able to get financing arranged through the second
finance company either.  He then had to arrange for Banks to return the vehicle. Banks told Gulli
that he "lived off the grid" near the New Mexico border. According to Gulli, Banks had no real
credit score. Gulli described Banks as "a ghost." Gulli looked at the Walmart security camera
photographs and stated he felt it appeared to depict the same person as the Explorer buyer but
with more facial hair.

30.     Mark Wilcox was also interviewed by Agent Cahill.  Wilcox is the Chief of
Mountain States Emergency Medical Services in Denver, Colorado.  He is the current owner of
the Ford Explorer.  Wilcox purchased it on April 17, 2018, from Maximum Auto Search in
Englewood, Colorado. Wilcox recalled the person he dealt with at Maximum told him that the
Explorer was being sold on consignment for Highline Automotive due to a pending bankruptcy.
The XLT wheels can be seen in a photograph taken during the time of the interview.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 37 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 21 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 20 of 56
Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 9 of 12

31.     I also spoke with Wilcox.  Wilcox confirmed that the same XLT wheels were on the Explorer when he purchased it from Maximum Auto Search.  Wilcox also told me the Explorer did not have a spotlight attached on the driver's side when he bought it. The Clearfield photos, while not clear, do appear to show a spotlight on the driver's side. This light, as described below, appears to have been attached while Banks had the Explorer and removed before Banks returned it to Highline Automotive.

32.     I have reviewed the Highline Auto sales information. I found the following information regarding the sale/purchase of the Explorer:
   a.     purchaser: Jerry Banks, including his date of birth and social security number;
   b.     address: 1179 Pfotenhauer Road, Fort Garland, CO 81133;
   c.     phone number: (719) 480-3879;
   d.     email address: banksavs@gmail.com;
   e.     additional phone number: (718) 298-2328;
   f.      registration information: plate B094536 for the 2013 white Ford Explorer;
   g.     Progressive Insurance, policy number 917738127, effective 10/26/2017 to 4/26/2018, for the Ford Explorer;
   h.     purchase date: 11/16/2017 with mileage reading of 117,138;
   i.      surrender date: 1/24/2018, documents indicate "miles and use paid for" and "loan is being written off, no harm to borrower."  A receipt for the additional "miles and use" indicates Banks paid $1,500 in cash when he surrendered the vehicle;
   j.      Banks "surrendered" the Ford Explorer to Highline Automotive Inc.

33.     I also reviewed records provided by Progressive Insurance involving Banks' purchase of the 2013 Ford Explorer.  The insured is listed as Jerry Banks with phone numbers (661) 433-5327 and (719) 480-3879 and an email address of banksavs@gmail.com.  The primary use of the vehicle is designated "Pleasure."  This vehicle was added to the policy on 10/26/2017. This vehicle was removed from the policy on 1/25/2018.

34.     I have also reviewed Colorado vehicle registration information about the Highline Explorer. Those records show that Banks got a temporary registration for the Explorer first on 10/26/17, consistent with the Progressive Insurance Records. The Colorado registration records further show that Banks got a second temporary registration for the Explorer on 11/16/17, the purchase date in the Highline Auto records. The temporary tag issued on 11/16/17 was B094536. Agent Cahill, who is familiar with Colorado temporary registration tags, told me that those tags are white in color and made of paper.  Colorado only issues a temporary tag for the rear of car not a second for the front. This kind of temporary tag is consistent with the images from the Clearfield Explorer, which had a light colored rear tag and no front tag.

E.     The 661 Phone

35.     I reviewed Verizon Wireless records obtained for the phone using number (661) 433-5327 (the 661 Phone) during the relevant period.  The subscriber is All Valley Solar (AVS).

9

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 38 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 22 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 21 of 56
Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 10 of 12

The mailing address for the billing statement is All Valley Solar (AVS), 12623 Sherman Way Ste. A, N. Hollywood, CA 91605. As noted above, Progressive records show that Banks provided this phone number as his work phone number, and Verizon Wireless records for the 719 Phone show Banks provided this number as his home and work phone. The investigation has revealed information that Banks worked for All Valley Solar before 2017.

36.      The 661 Phone records also show approximate location information for the calls. On the morning of 11/18/2017, three calls were made from this phone all originating from Barnet, Vermont. As noted above, the 719 Phone records show no phone activity between 11/10/17 and 11/20/17, while Banks appears to have travelled to Vermont for a reconnaissance trip.

F.      Kansas Highway Patrol Stop

37.      Based on reviews of law enforcement contact with Banks, I discovered that on 1/8/2018 at approximately 1:48 p.m. CST, a traffic stop was conducted by Kansas Highway Patrol Technical Trooper Clark in the vicinity of mile post 337 on I-70 Westbound in Alma, KS. I have reviewed reports about the stop. Jerry Banks was operating the white Ford Explorer. Banks was stopped for a lane violation. I spoke with Technical Trooper Clark and reviewed a DVD recording of the traffic stop he provided. Trooper Clark described Banks as extremely nervous. The vehicle contained multiple law enforcement items including a gun, tactical vest and law enforcement equipment. Trooper Clark noted the back seat of the Ford Explorer was folded down and a mattress was observed in the middle to back area of the Explorer.

38.      On 3/3/2020, I reviewed a DVD copy of the traffic stop conducted by Technical Trooper Clark on 1/8/2018. Jerry Banks falsely said that he was traveling from Dexter, MO. During the traffic stop, a phone can be heard ringing inside the Ford Explorer. The phone ringtone is consistent with a Samsung Galaxy phone standard ringtone.

39.      I compared the video of Banks from the car stop to the photos/video from the Clearfield, PA Walmart purchasing the 911 Phone and BP gas station, described above. Banks looks similar to the person in the Clearfield images. The Google location information shows that Banks drove from Fort Garland, CO to Dexter, MO on January 2 driving a route further south than Route 70 through Kansas. If he had been driving directly home from Dexter on January 8 he would likely have used that more southerly route rather than Route 70, which is the most direct route to CO from the Northeast.

G.      Banks' Finances

40.      We have attempted to figure out Banks' financial situation to help prove that he received money in connection with the murder, because I have found no evidence of any personal connection between Banks and the victim. The Highline Auto records show that Banks worked for the Costilla County Sheriff during the fall of 2017. I have learned from search warrant materials that Banks was attending Community College full time during the first several

10

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 39 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 23 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 22 of 56
Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 11 of 12

months of 2018. The Highline records include a copy of a pay stub from Costilla County provided in connection with his attempted financing of the Explorer. Banks was earning $640 a week gross and less than $500 a week net. I have reviewed records from Green Dot, a business that allows users to deposit money onto a debit card. In addition to the $4,500 in cash paid for the Explorer, Banks put $2,600 in cash on his Green Dot card in November and December 2017, and $12,500 in cash on his Green Dot card during the first half of 2018.

41.    Banks' Facebook account includes statements Banks made on Facebook Messenger. He has several conversations with Stephanie Giambra. with whom Banks appears to be close. Banks apparently worked with Giambra at All Valley Solar, used an AVS credit card in the past, and owed her money. In October 2017, he wrote her that he had a side job and a "bunch of money for her." On December 8, he asked Giambra what he owed her and reported doing well financially and wanting to take care of her while he could. I believe that Banks, who had not personal connection with Banks, was paid to kidnap and murder GD.

H.    Banks' Purchases

42.    Within the Google email data are emails with information related to purchases including the following: 1) On November 3, 2017, an order confirmation email to Jerry Banks describing the purchase from Amazon of a public safety scanner; 2) on November 8, 2017 a shipping confirmation email to Jerry Banks for a blue/red flashing modes; and 3) on December 20, 2017, an email containing a Paypal purchase confirmation to "Jerru Banks" for purchases of an Antique Gold Marshal Badge, a US Marshal Shoulder Patch and a US Marshal embroidery patch.

43.    I have reviewed records from Amazon that reflect Banks has been a customer since July 31, 2013 and has used the email address banksavs@gmail.com. I have reviewed the order history which shows the following purchases. On November 4, 2017, he purchased a handheld scanner and police-style car antenna. On December 4, 2017, he purchased a Police Interceptor nameplate for the Ford Explorer. On December 10, 2017, he purchased a police spotlight that could be attached to the Explorer. On December 26, 2017, he purchased two sets of handcuffs and a set of automotive parts that can be used to assemble a silencer. On December 27, 2017, he purchased dashboard red and blue emergency lights.

44.    I have reviewed PayPal records for Jerru Banks that reflect that the account was opened on December 20, 2017, and the email address provided was banksavs@gmail.com. The records show purchases on December 20, 2017, of a Marshal's badge and various Marshal's patches.

45.    I have reviewed records provided by Spartan Armor Systems which reflect Jerry Banks purchasing two body armor jackets on December 20, 2017.

11

Case 5:18-mj-00004-gwc Document 426-5 Filed 03/24/23 Page 40 of 119
Case 5:18-mj-00004-gwc Document 414-3 Filed 09/13/22 Page 24 of 103
Case 5:18-mj-00004-gwc Document 389 Filed 04/29/22 Page 23 of 56
Case 5:22-mj-00037-gwc Document 1-1 Filed 03/30/22 Page 12 of 12

## Conclusion

46.  For the reasons described above, there exists probable cause to believe that Jerry
Banks unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away
for reward and otherwise GD, when Banks travelled in interstate commerce and used a facility or
instrumentality of interstate commerce in committing and in furtherance of the commission of
the offense, in violation of 18 U.S.C. § 1201(a)(1).

Dated at Rutland, in the District of Vermont, this ___30___ day of March, 2022.

*Sworn to by reliable electronic means*

_____
Patrick Hanna
Special Agent - FBI

Sworn to and subscribed before me this ___30___ day of March, 2022.

_____
Honorable Geoffrey W. Crawford
Chief United States District Judge

12

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 41 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 25 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 24 of 56

# EXHIBIT 2

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 42 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 26 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 25 of 56

# UNITED STATES DISTRICT COURT

### for the
### District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**1179 Pfotenhauer Road,**<br>**Fort Garland, Colorado** | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. _____

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the ___State and___ District of ___Colorado___, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1201 | Kidnapping with Death Resulting |
| 18 U.S.C. § 1512(a)(1) | Murder to Obstruct Justice |
| 18 U.S.C. § 1958 | Murder for Hire |

The application is based on these facts:

**X** Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Patrick Hanna*
*Applicant's signature*

**Special Agent Patrick Hanna, FBI**
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **06 Apr 2022**

*Judge's signature*

Kristen L. Mix
**United States Magistrate Judge**
*Printed name and title*

City and state: ___Denver, CO___

## ATTACHMENT A

### Location to be searched: 1179 Pfotenhauer Road, Fort Garland, Colorado.

The premises to be searched, **1179 Pfotenhauer Road, Fort Garland, Colorado,** is described as a tan in color, single level residence, converted camper/trailer and tan outbuilding next to the camper/trailer. The property is secluded and is on low ground at edge of scrub oak/sage brush. The entrance to the property is marked by the numbers "1179" on a post located next to the driveway. The driveway is directly off Pfotenhauer Rd. There is a tan outbuilding next to the camper/trailer. There are two vehicles located at the residence: a red Chevrolet Blazer and a White/Black Ford truck unknown registrations. Authority is also sought to search these vehicles if they are on the curtilage of the Subject Location when the warrant is executed. Below are photographs taken on April 1, 2022 depicting the residence.





## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEARCHED FOR AND SEIZED FROM:
### 1179 Pfotenhauer Road, Fort Garland, Colorado 81133

#### as described in Attachment A (the "Subject Premises")

Agents and investigative officers are authorized to search for and seize the following particular items, that constitute evidence of the commission of criminal offenses; and property designed or intended for use or which is or has been used as the means of committing criminal offenses, namely, violations of: 18 U.S.C. §§ 1201(a)(1), 1512(a)(1) & 1958, including:

1. Items used in connection with the kidnapping and murder of Gregory Davis on January 6, 2018, such as:

- Firearms including 9mm handguns and AR-15 style rifles
- Ammunition
- Stun Gun
- Pepper Blaster
- 300 Channel handheld scanner, Tram 1094-BNC Scanner 3 1/2 –magnet antenna with BNC male connector
- 100 Watt post-mount spotlight
- Body armor carriers
- Marshal Badge
- US Marshals embroidery patches with hook on back
- 4" green subdued Department of Justice US Marshals shoulder patches
- Handcuffs
- Wix Oil Filter
- Oil filter suppressor
- ½ -28 NPT threaded adapter, Aluminum automotive oil filter adapter
- Xprite 16 LED high intensity Red Blue windshield dash emergency strobe lights w/suction cups for police law enforcement vehicles truck interior roof hazard warning flashlight.
- .22 LR conversion kits

2.    Cellphones: (I will seize cellphones but will apply for further warrant before searching cellphones)

- ZTE Model Z835 (the model number identified by investigators as associated with phone number 201-208-7436 during the relevant period)
- LG Model B470 (the model number identified by investigators as associated with phone number 802-473-0535 during the relevant period)
- Samsung Galaxy V (the model number identified by investigators as associated with phone number 661-433-5327 during the relevant period)

1

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 45 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 29 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 28 of 56

- Samsung Galaxy Note 4 (the first model number identified by investigators as associated with phone number 719-480-3879 during the relevant period)
- Samsung Galaxy Note 8 (the second model number identified by investigators as associated with phone number 719-480-3879 during the relevant period)

    3.      Documents and records relating to Jerry Banks' employment, earnings, or finances between July 1, 2017, and July 1, 2018

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 46 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 30 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 29 of 56

## AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and say:

### Introduction

1.　　　I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently assigned to the Burlington Resident Agency in Vermont. I have been an FBI Special Agent for 19 years. My duties as an FBI Special Agent include investigating violations of Title 18 of the United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement, public corruption, money laundering and related white-collar crimes, as well as violent crimes and criminal enterprises. I have participated in investigations of criminal violations of various federal laws. I have executed search and arrest warrants, interviewed and interrogated subjects, witnesses, and victims, and conducted surveillance. In the course of these investigations, I have gained an understanding of current technology, to include computers and online accounts, cellular telephones and associated records and data, and have conducted analyses of the data related to such accounts and devices, for the purpose of solving and proving crimes.

2.　　　On April 6, 2022, Jerry Banks was arrested in Wyoming based on a federal Complaint charging kidnapping, signed by Chief Judge Geoffrey Crawford, District of Vermont. As discussed below, there is probable cause to believe that Jerry Banks kidnapped and murdered Gregory Davis, whose deceased body was discovered on January 7, 2018. There is probable cause to believe that Davis's kidnapping and murder involved the following federal crimes: kidnapping with death resulting, in violation of 18 U.S.C. § 1201; murder to obstruct justice, in violation of 18 U.S.C. § 1512(a)(1), and murder for hire, 18 U.S.C. § 1958 (Subject Offenses). At the time of his arrest, Banks was working as a seasonal employee for a contractor within Yellowstone National Park. Since the time of the murder scheme, Banks' permanent residence has been 1179 Pfotenhauer Road, Fort Garland, CO. I submit this Affidavit in support of an Application for a Search Warrant for Banks' residence, as described in Attachment A, for evidence and instrumentalities of the Subject Offenses, as described in Attachment B.

3.　　　This case is being investigated by the FBI and the Vermont State Police (VSP). Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included details of every aspect of the investigation. Except as otherwise noted, the information contained in this Affidavit is based upon my personal knowledge and observations, my training and experience, conversations with other law enforcement officers and witnesses, and my review of documents and records.

### Probable Cause

#### A.　　The Kidnapping and Shooting

4.　　　On January 7, 2018, VSP responded to a homicide in Barnet, VT. The victim, identified as Gregory Davis, was found partially covered by snow near the base of a snowbank on a pull off area near the west side of Peacham Road. The victim was found handcuffed and had been shot multiple times in the head and torso. Davis resided at 884 Hawkins Road, Danville,

1

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 47 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 31 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 30 of 56

VT at the time. The victim's body was discovered approximately 15 miles from his residence. Evidence gathered from the crime scene included .22 caliber cartridge casings.

5.      VSP Detectives responded to Davis's home and interviewed his wife, Melissa Davis, and their 12-year-old son (minor child #1). Both were interviewed again later. Melissa Davis told VSP Detectives that at approximately 9:00 p.m. on January 6, 2018, she and her husband were in a first-floor bedroom in their Danville home. They heard someone knock on the door. Gregory Davis went to the door to see who was there. Davis came back to the bedroom and told Melissa Davis that a man claiming to be a U.S. Marshal came to the victim's home to arrest him. Davis got his clothes on and left with the man. Melissa Davis saw the man and described him as having handcuffs, a rifle, and wearing a jacket and mask with an eye opening, both of which had a U.S. Marshals emblem. Melissa Davis also reported that the man said he had an arrest warrant for Gregg Davis for racketeering and was bringing him to Virginia. Minor child #1, who observed the man and his car from a second-floor window, told police that the man drove a white four-door car with red and blue emergency lights activated on the dash. Davis left in the man's car. The man was wearing black clothes and had a gun and a belt with various law enforcement tools on it. Melissa Davis did not contact police.

6.      On January 10, 2018, Agent Jennie Emmons confirmed with Supervisory Deputy U.S. Marshal Carl Staley of the Burlington Vermont office of the U.S. Marshals Service that Davis was not arrested by their agency. Further, Deputy Marshal Staley said that there had been no active federal warrants for Gregory Davis.

B.      The 911 Phone

7.      I listened to a 911 call made around the time of the victim's kidnapping. The call took place approximately 15 minutes prior to the kidnapping and originated within a mile of the victim's residence. The VT 911 call center received a call from (802) 473-0535 (the "911 Phone"; this phone number was found by investigators to be associated to an LG Model B470) at 8:42 p.m. on January 6, 2018. The 911 call center's technology identified the call as coming from a location on North Danville Road, Danville, VT, only a short distance from the victim's residence. I believe that Banks used the 911 Phone to facilitate the victim's kidnapping and murder.

a.      During the call, a man stated that he shot his wife and was going to shoot himself. The caller gave an address of "71772 Cross Road" (with no town information), after which the caller hung up. The call information was relayed to VSP in St. Johnsbury, Vermont. VSP attempted to locate a Cross Road in the St. Johnsbury area without success.

b.      VSP thereafter requested that AT&T provide location information for the phone in question due to the exigent circumstance. AT&T confirmed that the 911 call came from the North Danville Road location. AT&T also reported that the phone was a prepaid phone with no subscriber information available. After VSP checked the North Danville location and several possible "Cross Roads" outside the town of St. Johnsbury, the matter was closed. At that time, the victim's body had not been discovered.

2

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 48 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 32 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 31 of 56

c.      I later obtained search warrants for various accounts used by Banks, including his Facebook account, where Banks listed his user name as Grizz Sands. Among the data in the Facebook account were video recordings, including a video in which Banks narrated a tour of his residence in Fort Garland, CO. Banks' voice sounds similar to the voice of the 911 caller.

8.      AT&T responded to a search warrant for information associated with the 911 Phone. The AT&T search warrant data confirmed the location of the 911 call on January 6, 2018, near the time and location of victim's kidnapping.

9.      The data provided by AT&T was reviewed by Special Agent James Wines of the FBI's Cellular Analysis Survey Team. After this review, and consultation with AT&T security personnel, Agent Wines advised that the 911 Phone was a prepaid phone purchased at a Walmart on January 5, 2018. The records showed only two calls made by the phone, a four-second call to a Pizza Hut in St. Johnsbury, VT at 4:14 p.m. on January 6 and the 911 call at 8:42 p.m. on January 6. The phone used only two sectors of the same cell tower, located in St. Johnsbury, VT, for all cell site activity. Agent Wines also advised that this phone was activated, meaning that it could operate on the AT&T network, shortly before 4:00 p.m. on January 6, within minutes of the Pizza Hut call. I have not been able to establish how the phone was activated.

10.     Agent Wines advised me that he learned from contacts at Walmart security that the prepaid phone was purchased with $100 cash on January 5, 2018, at 4:14 p.m. at the Walmart located at 100 Supercenter Drive, Clearfield, PA. Agent Wines forwarded me numerous security camera images of the individual purchasing the phone, which were obtained from Walmart security. The images show a bearded, adult, white man purchasing the phone. The man arrived and departed in a white Ford Explorer. The camera footage indicates the vehicle parked in the Walmart parking lot around 3:55 p.m. and left the lot around 4:17 p.m. The Explorer does not appear to have a front license plate. The rear plate was light in color and appeared to be white. Numbers and/or letters were not recognizable on the rear plate. The Explorer is generally consistent with minor child #1's description of the kidnapper's car.

11.     FBI personnel in Pennsylvania canvassed gas stations and other locations in the vicinity of the Walmart at 100 Supercenter Drive, Clearfield, PA, to determine if additional security camera footage of the bearded, white male and/or the white Ford Explorer could be located. Additional video footage of the suspect and vehicle were located at a BP gas station at 14624 Clearfield Shawville Highway, Clearfield, PA 16830.

12.     I reviewed stills of this footage, which included images of the bearded, white man and the white Ford Explorer, and they appear to be the same person and vehicle shown in the Walmart security video. The suspect purchased gas at the BP station. I saw what appears to be a smartphone in the suspect's hand. A time stamp on this video put the stop at the gas station at 4:27 p.m. on January 5, 2018. My review of the reports of the agents who travelled to Clearfield, Pennsylvania shows that the display times from the gas station security footage appear to be plus six or seven minutes relative to the actual time.

13.     I have reviewed Colorado driver's license information about Banks. On December 18, 2017, a Colorado driver's license was issued to Jerry Dean Robert Banks. Banks

3

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 49 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 33 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 32 of 56

gave his mailing address as 1179 Pfotenhauer Road, Fort Garland, CO. Based on the driver's license photo of Banks (taken only three weeks before the kidnapping), Banks resembles the man depicted in the Walmart surveillance images as the purchaser of the 911 Phone. Below is the license photo (on the right) and an edited image of the face of the 911 Phone purchaser (on the left) for comparison.

 

C.    The 201 Phone

14.    Agent Wines also reviewed AT&T tower data obtained as a result of search warrants issued by this court. Agent Wines received a list of cellular devices connecting to a tower covering the area of Clearfield, Pennsylvania, where the 911 Phone was purchased. The data included a list of devices connecting to the tower at or about the time the 911 Phone was purchased. Agent Wines compared this data to data he received listing cellular devices connecting to a tower covering the area of Danville, Vermont, where the kidnapping took place. The data included devices connecting to the tower at or about the time of Davis's kidnapping. Only one cellular phone was common to both sets of data, and it was a device with phone number (201) 208-7436 (the "201 Phone"; this phone number was found by investigators to be associated to a ZTE Model Z835 phone). Based on the information below, I believe that Banks used the 201 Phone to facilitate the victim's kidnapping and murder.

15.    Further investigation by Agent Wines determined that 201 Phone is an Android cell phone purchased at a Walmart located at 201 Southeast Salem Street, Oak Grove, Missouri on November 13, 2017, at approximately 9:58 a.m. (CST), and additional service (minutes/data) for that phone were purchased at a Walmart located at 2025 W. Business Highway 60, Dexter, Missouri on January 4, 2018 at approximately 9:20 a.m. (CST). Agent Wines obtained receipts for these purchases, which show these purchases, like the 911 Phone purchase in Pennsylvania on January 6, 2018, were each made with $100 cash. The details on the receipts suggest that the customer paid with a $100 bill for all three purchases: the 201 Phone, the extra minutes for the 201 Phone, and the 911 Phone.

4

16.     I obtained a search warrant for historical cell site and location information for the 201 Phone. The 201 Phone did not make or receive any phone calls or texts during the relevant period. Its only interactions with the AT&T network involved data transmissions. The records do not reveal the kind of data transmitted. Agent Wines and I have reviewed the information obtained from this warrant. Analysis of the data shows the 201 Phone assigned number was registered with the AT&T network on November 14, 2017. It first interacted with the network through cell towers in the area of Monte Vista, Colorado for a brief time on December 29, 2017. The phone next interacted with a cell tower in the area of Dexter, Missouri on January 3, 2018, and January 4, 2018, again for short periods. Thereafter, the phone interacted with cell towers near roads following a path in a northern and eastern direction through Illinois, Indiana, and Ohio. Analysis of the data shows the phone interacted with cell towers in the Columbus, Ohio, area for a time period between 7:30 p.m. January 4, 2018 to 11:20 a.m. January 5, 2018. The phone thereafter continued to interact with cell towers near roads through Pennsylvania, New York, and Connecticut. Analysis of the data shows the phone interacted for a period of time with cell towers in the area Southington, Connecticut, from 12:00 a.m. to 10:00 a.m. on January 6, 2018. The data shows the phone then continued through Massachusetts and arrived in Vermont on January 6, 2018, at approximately 11:37 a.m. The phone then traveled north, consistent with travel on Interstate 91, and arrived in the area of St. Johnsbury, Vermont, at about 1:30 p.m. Throughout the afternoon and into the evening of January 6, 2018, the data shows the phone was in the areas of St. Johnsbury and Danville, Vermont. The phone remained in the general area in which the victim's kidnapping took place (at approximately 9:00 p.m.) and where his body was recovered the next day. After approximately 9:24 p.m., the phone appears to have traveled south out of the Danville/St. Johnsbury area, consistent with travel on Interstate 91. The last reported cell site or location data was at 10:01 p.m., after which the phone had no more interaction with the AT&T network. Based on this information, there is probable cause to believe that the 201 Phone was used for the purpose of the victim's kidnapping and murder.

17.     Further analysis of the data shows that during the travel to Vermont, the 201 Phone passed through the area of Clearfield, Pennsylvania at the time the 911 Phone was purchased at the Walmart in Clearfield, Pennsylvania.

18.     I have attempted to obtain information from Google about the use of this phone by subpoena. The only information Google could provide showed that the 201 Phone connected to Google servers for the first time on November 14, 2017, and for the last time on January 6, 2018.

19.     I have reviewed records from Verizon Wireless that identify Jerry Banks as the subscriber of the phone with number (719) 480-3879 (the "719 Phone"; this phone number was found to be associated with two different physical phones during the relevant periods, a Samsung Galaxy Note 4 and a Samsung Galaxy Note 8) during the relevant timeframe. Banks was the effective subscriber from 10/20/2017 through 11/8/2018. Banks listed (661) 433-5327 (the "661 Phone"; this phone number was found by investigators to be associated with a Samsung Galazy V) as his home phone number and work phone number.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 51 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 35 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 34 of 56

20.     I have also reviewed Verizon Wireless Billing Statements, which show the approximate location of the 719 Phone when calls were made. I have confirmed with Verizon Wireless personal that this location information is associated with the cell towers and switch connecting to the phone at the time of calls. I also learned that Verizon Wireless maintained more precise location information for this phone for only approximately one year. That data was gone by the time I obtained the search warrant. I found the following locations of note for this phone in the Billing Statements:

a.      On 10/26/2017, a call from this phone originated in Denver, CO.

b.      On 12/13/2017, a call from this phone originated in Dexter, MO.

c.      On 12/28/2017 a call from this phone originated in Alamosa, CO.

d.      On 12/29/2017, another call from this phone originated in Alamosa, CO, which is close to Monte Vista, CO. As noted above, the 201 Phone first interacted with cell towers in the area of Monte Vista, CO on 12/29/2017.

e.      On 1/2/2018 and 1/3/2018, calls from this phone originated in Dexter, MO. As noted above, the 201 Phone interacted with cell towers in Dexter, MO on 1/3/2018.

f.      No calls are made between 12:59 p.m. on 1/3/2018 and 1/7/2018, when the 201 Phone was actively being used.

g.      On 1/7/2018, at approximately 9:24 p.m., a call from this phone originated in O'Fallon, MO, which is along I-70 in Missouri. The time between the last use of the 201 Phone and this call on the 719 Phone is approximately 25 hours. Google Maps shows that driving time from Barnet, VT to O'Fallon, MO is approximately 19 hours.

h.      On 1/8/2018, a call from this phone originated in Alma, KS. This call takes place approximately 15 minutes after the Kansas Highway Patrol car stop of Banks in Alma, KS, described below. The call connects with (573) 421-4798 for approximately 20 minutes.

i.      On 1/9/2018, multiple calls are made from this phone, all originating in Colorado (Alamosa, Sanford and Colorado Springs).

21.     Banks' use of the 719 Phone connected to his Google account, described below, is consistent with him buying and using the 201 Phone.

22.     I have reviewed Google records for the email address banksavs@gmail.com. Jerry Banks is the subscriber of the email account. He uses bankspes@gmail.com for his recovery email. The account was created on 6/5/2009. SMS (texts) are connected to the 719 Phone. The subscriber services listed are Android, Gmail, Google Calendar, Google Chrome Sync, Google Cloud Print, Google Drive, Google Hangouts, Google Keep, Google My Maps, Google Payments, Google Photos, Google Play, Google Play Music, Google Services, Google Voice, Has Madison Account, Location History, Web & App Activity, YouTube, and iGoogle.

23.     I obtained a search warrant for information from the banksavs@gmail.com account. I and other investigators working with me have reviewed the information. I have identified a number of pieces of information in the Google data that further support the conclusion that Banks was responsible for Davis's kidnapping and murder, including the following:

6

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 52 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 36 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 35 of 56

a.      Within the Google maps data there are a number of pieces of information including searches for Vermont on October 10, 2017, December 12, 2017, and January 4, 2018.

b.      Within the Google search history data are a number of pieces of information including searches for: Explorer Police Interceptors for sale on October 26, 2017; Ford Explorer Police Interceptor rims as well as steel wheels and a police spotlight on October 29, 2017; ARC-22 .22 LR Conversion Kits on December 17, 2017; and body armor on December 26, 2017. As noted above, .22 caliber ammunition was used to kill Davis.

c.      Within the Google location information are thousands of GPS coordinates including coordinates connecting the Google user to the 201 Phone. As noted above, the 201 Phone was purchased in Oak Grove, MO at 9:58 a.m. (CST) on November 13, 2017. On November 13, 2017 at 11:09 a.m., when the location information was turned on, it shows the user 50 miles east of Oak Grove, MO on Interstate 70, travelling east. Interstate 70 also travels through Oak Grove, MO. This information suggests to me that the Google user was in Oak Grove at the time the 201 Phone was purchased. The location information also shows that the Google account user travelled from Fort Garland, CO to Dexter, MO on January 2, 2018, and stayed there until January 4, 2018. I have reviewed records from the Dexter Inn, which show that Banks was staying at the motel on the nights of January 2 and 3, 2018. Further, the location information shows that the Google user was inside the Dexter, MO Walmart at 9:20 a.m. on January 4, 2018, the same time the extra minutes were purchased for the 201 Phone.

d.      Though there are hundreds of pieces of location information on most days, there is no location information for certain relevant periods of time including: 1) between 9:51 a.m. (CST) on January 4, 2018, and 9:22 p.m. (CST) on January 7, 2018; 2) between 3:53 p.m. (CST) on November 11, 2017 and 11:09 a.m. (CST) on November 13, 2017; and 3) 2:31 p.m. (CST) on November 13, 2017 and 9:17 p.m. (CST) on November 20, 2017. When the location information was turned on after 9:22 p.m. (CST) on January 7, 2018, the Google user was travelling west on Route 70 in eastern Missouri. The location information shows that the Google user spent the night of January 7 near a Route 70 exit in Missouri, before travelling towards Fort Garland on January 8. This data shows that except for a few hours on November 13, 2017, Banks was not using his 719 Phone while travelling to Vermont both in November 2017 for a reconnaissance trip and in January 2018 for the kidnapping/murder trip.

24.      The Google data also confirms that Banks used the Grizz Sands Facebook account.

D.      The Ford Explorer

25.      I consulted with Matthew Fyie, Manager, Design Analysis Engineering, at Ford Motor Company, to determine the model and year range of the Ford Explorer observed in photographs and video obtained from Clearfield, Pennsylvania. Fyie told me that the Clearfield Explorer was a 2013 to 2015 Police Interceptor model. He noted that the Clearfield Explorer was pictured with Ford Explorer XLT wheels, which were not an option for the 2013 to 2015 Police

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 53 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 37 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 36 of 56

Interceptor models. Fyie provided photographs of the three wheel styles offered for those Police Interceptors, each of which is different from the XLT wheel. Fyie suggested the XLT wheels were installed on the vehicle at a later time or as an after-market change. Ford later provided information, including VIN numbers, for the 17,291 White Explorer Police Inceptors for model years 2013 to 2015 manufactured and sold by Ford.

26.     The Vermont Intelligence Center (VIC) conducted searches to identify and find vehicles of interest based on certain parameters/criteria (vehicles registered in states of interest, in this case Colorado, vehicles sold at auction with high mileage, and vehicles with sales or service records that occured around the time of the kidnapping and homicide.)

27.     Leads were generated to locate the vehicles of interest and identify the owners at the time of the kidnapping/homicide.  One lead was sent to Colorado Bureau of Investigation (CBI) Agent Joseph Cahill, who was then assigned to an FBI Task Force. This particular lead, based on the additional research and identifiers provided by the Vermont Intelligence Center (VIC), was specific to a 2013 Ford Explorer with VIN 1FM5K8AR6DGC73609. CARFAX records indicated that on October 6, 2017, a 2013 white Ford Explorer from Highline Automotive Inc., VIN 1FM5K8AR6DGC73609, was offered for sale. Mileage on the Explorer at the time was 117,138. On December 22, 2017, the Ford Explorer was serviced at Downey Car Center, Downey, California per CARFAX records. Mileage on the Ford Explorer at the time was 130,404. CARFAX records indicate the mileage on the vehicle was 137,168 on March 16, 2018, the next time the vehicle was offered for sale by Maximum Auto Search.

28.     Agent Cahill and CBI Agent Kevin Koback conducted interviews in connection with the Ford Explorer and the dealership, Highline Automotive, which was located in Denver, Colorado. (Highline has since gone out of business.) Agent Cahill provided me verbal and written reports of the interviews. Those reports show that Banks was using the Explorer at the time of the kidnapping. Steve Iskhakov, who ran Highline, provided CBI Agents with documents, including the Highline Automotive sales jacket for the Explorer, which show that Banks had possession of the Explorer at the time of the kidnapping. Iskhakov said he never had anyone drive so many miles on a car in the short period of time Banks had the Explorer.

29.     Agent Cahill and I interviewed Carmine Gulli, the salesman and finance manager who dealt initially with Banks, on separate occasions. Gulli told me that Banks picked up the Explorer on October 26, 2017, with an agreement to purchase it with financing. Banks made a down payment of $3,000 in cash. Gulli was not able to obtain financing for Banks from the first finance company that he tried. Gulli then tried to finance the Explorer through a second finance company in mid-November. He did not meet with Banks in person at that point but dealt with him by phone and email.  Gulli was not able to get financing arranged through the second finance company either.  He then had to arrange for Banks to return the vehicle. Banks told Gulli that he "lived off the grid" near the New Mexico border. According to Gulli, Banks had no real credit score. Gulli described Banks as "a ghost."  Gulli looked at the Walmart security camera

8

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 54 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 38 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 37 of 56

photographs and stated he felt it appeared to depict the same person as the Explorer buyer but
with more facial hair.

30.     Mark Wilcox was also interviewed by Agent Cahill. Wilcox is the Chief of
Mountain States Emergency Medical Services in Denver, Colorado. He is the current owner of
the Ford Explorer. Wilcox purchased it on April 17, 2018, from Maximum Auto Search in
Englewood, Colorado. Wilcox recalled the person he dealt with at Maximum told him that the
Explorer was being sold on consignment for Highline Automotive due to a pending bankruptcy.
The XLT wheels can be seen in a photograph taken during the time of the interview.

31.     I also spoke with Wilcox. Wilcox confirmed that the same XLT wheels were on
the Explorer when he purchased it from Maximum Auto Search. Wilcox also told me the
Explorer did not have a spotlight attached on the driver's side when he bought it. The Clearfield
photos, while not clear, do appear to show a spotlight on the driver's side. This light, as
described below, appears to have been attached while Banks had the Explorer and removed
before Banks returned it to Highline Automotive.

32.     I have reviewed the Highline Auto sales information. I found the following
information regarding the sale/purchase of the Explorer:
      a.     purchaser: Jerry Banks, including his date of birth and social security number;
      b.     address: 1179 Pfotenhauer Road, Fort Garland, CO 81133;
      c.     phone number: (719) 480-3879;
      d.     email address: banksavs@gmail.com;
      e.     additional phone number: (718) 298-2328;
      f.     registration information: plate B094536 for the 2013 white Ford Explorer;
      g.     Progressive Insurance, policy number 917738127, effective 10/26/2017 to
             4/26/2018, for the Ford Explorer;
      h.     purchase date: 11/16/2017 with mileage reading of 117,138;
      i.     surrender date: 1/24/2018, documents indicate "miles and use paid for" and "loan
             is being written off, no harm to borrower." A receipt for the additional "miles and
             use" indicates Banks paid $1,500 in cash when he surrendered the vehicle;
      j.     Banks "surrendered" the Ford Explorer to Highline Automotive Inc.

33.     I also reviewed records provided by Progressive Insurance involving Banks'
purchase of the 2013 Ford Explorer. The insured is listed as Jerry Banks with phone numbers
(661) 433-5327 and (719) 480-3879 and an email address of banksavs@gmail.com. The primary
use of the vehicle is designated "Pleasure." This vehicle was added to the policy on 10/26/2017.
This vehicle was removed from the policy on 1/25/2018.

34.     I have also reviewed Colorado vehicle registration information about the
Highline Explorer. Those records show that Banks got a temporary registration for the Explorer
first on 10/26/17, consistent with the Progressive Insurance Records. The Colorado registration
records further show that Banks got a second temporary registration for the Explorer on

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 55 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 39 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 38 of 56

11/16/17, the purchase date in the Highline Auto records. The temporary tag issued on 11/16/17 was B094536. Agent Cahill, who is familiar with Colorado temporary registration tags, told me that those tags are white in color and made of paper. Colorado only issues a temporary tag for the rear of car not a second for the front. This kind of temporary tag is consistent with the images from the Clearfield Explorer, which had a light colored rear tag and no front tag.

E.   The 661 Phone

35.   I reviewed Verizon Wireless records obtained for the phone using number (661) 433-5327 (the 661 Phone) during the relevant period. The subscriber is All Valley Solar (AVS). The mailing address for the billing statement is All Valley Solar (AVS), 12623 Sherman Way Ste. A, N. Hollywood, CA 91605. As noted above, Progressive records show that Banks provided this phone number as his work phone number, and Verizon Wireless records for the 719 Phone show Banks provided this number as his home and work phone. The investigation has revealed information that Banks worked for All Valley Solar before 2017.

36.   The 661 Phone records also show approximate location information for the calls. On the morning of 11/18/2017, three calls were made from this phone all originating from Barnet, Vermont. As noted above, the 719 Phone records show no phone activity between 11/10/17 and 11/20/17, while Banks appears to have travelled to Vermont for a reconnaissance trip.

F.   Kansas Highway Patrol Stop

37.   Based on reviews of law enforcement contact with Banks, I discovered that on 1/8/2018 at approximately 1:48 p.m. CST, a traffic stop was conducted by Kansas Highway Patrol Technical Trooper Clark in the vicinity of mile post 337 on I-70 Westbound in Alma, KS. I have reviewed reports about the stop. Jerry Banks was operating the white Ford Explorer. Banks was stopped for a lane violation. I spoke with Technical Trooper Clark and reviewed a DVD recording of the traffic stop he provided. Trooper Clark described Banks as extremely nervous. The vehicle contained multiple law enforcement items including a gun, tactical vest and law enforcement equipment. Trooper Clark noted the back seat of the Ford Explorer was folded down and a mattress was observed in the middle to back area of the Explorer.

38.   On 3/3/2020, I reviewed a DVD copy of the traffic stop conducted by Technical Trooper Clark on 1/8/2018. Jerry Banks falsely said that he was traveling from Dexter, MO. During the traffic stop, a phone can be heard ringing inside the Ford Explorer. The phone ringtone is consistent with a Samsung Galaxy phone standard ringtone.

39.   I compared the video of Banks from the car stop to the photos/video from the Clearfield, PA Walmart purchasing the 911 Phone and BP gas station, described above. Banks looks similar to the person in the Clearfield images. The Google location information shows that Banks drove from Fort Garland, CO to Dexter, MO on January 2 driving a route further south than Route 70 through Kansas. If he had been driving directly home from Dexter on January 8 he

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 56 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 40 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 39 of 56

would likely have used that more southerly route rather than Route 70, which is the most direct route to CO from the Northeast.

### G.   Banks' Finances

40.    As part of the investigation, I have analyzed evidence concerning Banks's finances in part to help prove that he received money in connection with the kidnapping and murder. The Highline Auto records show that Banks worked for the Costilla County Sheriff during the fall of 2017. I have learned from search warrant materials that Banks was attending community college full time during the first several months of 2018. Specifically, he began attending Otero Junior College in January 2018 to obtain a law enforcement certification. He appears to have attended full time until April 2018. The Highline records include a copy of a pay stub from Costilla County provided in connection with his attempted financing of the Explorer. Banks was earning $640 a week gross and less than $500 a week net. I have reviewed records from Green Dot, a business that allows users to deposit money onto a debit card. In addition to the $4,500 in cash paid for the Explorer, Banks put $2,600 in cash on his Green Dot card in November and December 2017, and $12,500 in cash on his Green Dot card during the first half of 2018.

41.    Banks' Facebook account includes statements Banks made on Facebook Messenger. He has several conversations with Stephanie Giambra, with whom Banks appears to be close. Banks apparently worked with Giambra at All Valley Solar, used an AVS credit card in the past, and owed her money. In October 2017, he wrote her that he had a side job and a "bunch of money for her." On December 8, he asked Giambra what he owed her and reported doing well financially and wanting to take care of her while he could. I believe that Banks, who had no personal connection with Davis, was paid to kidnap and murder Davis.

### H.   Banks' Purchases

42.    Within the Google email data are emails with information related to purchases including the following: 1) On November 3, 2017, an order confirmation email to Jerry Banks describing the purchase from Amazon of a public safety scanner; 2) on November 8, 2017 a shipping confirmation email to Jerry Banks for a blue/red flashing modes; and 3) on December 20, 2017, an email containing a Paypal purchase confirmation to "Jerru Banks" for purchases of an Antique Gold Marshal Badge, a US Marshal Shoulder Patch and a US Marshal embroidery patch.

43.    I have reviewed records from Amazon that reflect Banks has been a customer since July 31, 2013 and has used the email address banksavs@gmail.com. I have reviewed the order history which shows the following purchases. On September 18, 2017, he purchased a heavy duty stun gun and a pepperblaster. November 4, 2017, he purchased a handheld scanner and police-style car antenna. On December 4, 2017, he purchased a Police Interceptor nameplate for the Ford Explorer. On December 10, 2017, he purchased a police spotlight that could be attached to the Explorer. On December 26, 2017, he purchased two sets of handcuffs and

automotive parts that can be used to assemble a silencer, specifically a Wix oil filter, oil filter suppressor and a ½ -28 NPT threaded adapter, Aluminum automotive oil filter adapter. On December 27, 2017, he purchased dashboard red and blue emergency lights.

44.    I have reviewed PayPal records for Jerru Banks that reflect that the account was opened on December 20, 2017, and the email address provided was banksavs@gmail.com. The records show purchases on December 20, 2017, of a Marshal's badge and various Marshal's patches.

45.    I have reviewed records provided by Spartan Armor Systems which reflect Jerry Banks purchasing two body armor jackets on December 20, 2017.

I.    The Murder Conspiracy

46.    Based on the investigation to date, I believe that Banks was hired by one or both of two brothers who were involved in a business dispute with Davis. I have found no evidence that Banks and Davis knew each other. As described below, I have developed information about connections between Banks and Serhat and Murat Gumrukcu.

a.    Gregg Davis's Business Dispute with the Gumrukcus

47.    The only serious trouble Davis appeared to be having with anyone at the time of his death was connected to a business Davis started in 2012 called Mode Commodities. According to Davis's wife, Davis was involved in the oil investment business and had concerns about his business partners being involved in fraud. Davis began working several years before on an oil investment deal with a person named Gregory Gac. Davis contacted Gac by phone, text, and possibly by email. Davis told her that he had supply contacts for the oil, and Gac was able to bring in investors. Davis mentioned that Gac had two specific investors, Serhat and Murat.

48.    In 2017, the FBI was investigating Serhat for a real estate investment scheme and a check fraud scheme. By late 2017, Serhat was charged by the state of California with fraud-related offenses that include dealings with Gac. He was sentenced to five years' probation.

49.    Gac, who lives in Excelsior, Minnesota, was interviewed in 2017 by FBI Special Agent Heather Stachnik of the Los Angeles Division in connection with the Serhat investigation. Gac told Agent Stachnik that he was an escrow agent for Serhat. Gac claimed he met Serhat through a friend of a friend and that Gac wrote the term sheet for an oil investment deal. The investment deal was in an oil trading company with a company called Mode Lauren LLC (hereinafter "Mode"). The investors were Serhat and Murat Gumrukcu, Serhat's older brother. Gac expected to receive residuals from the deal. The Gumrukcus did not make payments as specified in the deal's term sheet and got in arrears with the obligations to Mode. Serhat ended up transferring his interest in Mode to his brother, Murat. Gac was told by a business associate that the Gumrukcus are very wealthy and part of the Turkish royal family. Gac also told Agent Stachnik that he had talked to "Gregg Davis" on the phone but had not met him in person. Gac did not tell Davis about the FBI contact.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 58 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 42 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 41 of 56

50.     During the investigation, Agent Stachnik learned that Serhat was involved in additional fraud schemes, to include purporting to be an American doctor who had a special cure for cancer and AIDS and another involving the oil industry. Agent Shachnik also learned that Berk Eratay worked with Serhat in a potential fraud scheme in Las Vegas, in which Serhat introduced a person claiming to be a Saudi Arabian prince to a potential victim. Eratay lives in Las Vegas, Nevada.

51.     Murat Gumrukcu, Serhat's brother, is not a U.S. resident. He travelled to the U.S. in December 2017, staying until March 2018, at Eratay's residence in Vegas.

52.     On November 29, 2017, shortly after the suspected reconnaissance trip to Vermont by Banks, Murat, who appears to have been in Turkey at the time, performed several English Google searches related to American license plate look-up. That series of searches included this text: "vermont gho 103." At the time, Davis had a vehicle, mostly unused, parked in their driveway with Vermont license plate GHD 103. The conspirators appear to have been confirming the location of Banks' residence.

53.     Davis's cellphone contained numerous text messages with Gac, showing Davis's concerns about the Gumrukcus. I located the contract between Davis and the Gumrukcus. The contract stipulated that if the Gumrukcus failed to meet their responsibilities late fees would be levied. As of October 2017, the Gumrukcus collectively had accrued over $900,000 in late fees, according to Davis. In the text messages, Davis offered several options to Gac to resolve matters with the investors so they could move forward with the business.

- On December 13, 2017, Gregory Davis texted Gac the following: "Greg, it is always best to square things between people. Goodness when it is the prosecutor's office it's nasty, hard and very unforgiving. Can we agree to seriously work to come to the table this week."

- On December 27, 2017, Gregory Davis texted Gac: "Happy post Christmas. We need to get things resolved and settled. Please advise as to what they are going to put on the table to accomplish this. Clearly the UBS was just another misrepresenting distraction. It's been duly noted. I look to your reply. GD."

- On December 28, 2017, Gregory Davis wrote a long text message to Gac, which in summary, showed Gregg Davis wished to terminate the business relationship under the terms of the contract or, Gregg Davis threatened, the relationship "conversely will end in a series of indictments, clearly bearing civil and criminal repercussions. They are in control of how it ends, but it is the end." From the context of the text messages, "they" appears to refer to Serhat and Murat.

- On December 29, 2017, Gregory Davis wrote a text message to Gac, demanding a settlement of approximately $980,000 to exit the business deal with Gac, Serhat, and Murat, pursuant to their contract. Further conversation continued at the end of December in which Gac references conversations with Serhat.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 59 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 43 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 42 of 56

- A final text message to Gac from Gregory Davis, dated January 4, 2018 was located on Gregory Davis's phone which states: "There has now been a history of fraudulent banking documentation that has become the standard. In many instances the banks could not corroborate the claims of the partners. However, in some instances the banks very seriously denied association with the documents and their intention. As regards the TS, all have had a hand in crafting it. Murat himself was directly involved the late sheet segment, to which we gave NO rebuttal. This was then fully executed. We have suffered multiple banking debacles which of itself are VERY serious instances. Therefore, as we've discussed it would be prudent to address the outstanding accounting. Have Murat and Serhat present something to speak to. Let's hopefully close that matter and move forward. Without this our hands will be forced to turn this in to authorities which neither party wants. Please have an honest but serious discussion with the brothers as regards all of the above and let's re-congregate to resolve the immediate matter and discuss how we can move forward. Regards, GD."

54.     In early January 2018, I met with Gac, seizing evidence and interviewing him more extensively about Davis and the Gumrukcus. Gac owns a company called Quadrant Financial, which he runs out of his home in Excelsior, MN. Gac conducts investment business with Serhat and Murat Gumrukcu. The brothers own a business called Lauran Trading, which is supposedly based in Oman. Serhat and Murat have been working successfully with Gac on deals for over three years.

55.     Gac said he met Davis through other business associates. They have never met in person and have only communicated through phone, text and email. Gac put together an oil-related deal with the Gumrukcu brothers and Davis. Gac is aware that Davis has expressed frustration with the Gumrukcu brothers' failure to perform on their obligations in the deal. Gac advised that a third, $40,000, payment is still due to Davis. A total of three payments, totaling $100,000, were to be paid to Davis in lieu of the large late fee that had been accrued by the Gumrukcu brothers.

56.     Gac advised that in February 2016, Serhat told Gac that Murat was upset that Davis had called officials at the National Bank of Abu Dhabi to verify that Serhat and Murat maintained accounts there. The bank did not provide an answer to Davis, but the brothers learned of this inquiry and Murat was angered because it threatened the brothers' reputations at the bank. During the search warrant at Gac's residence, Gac's notes regarding this matter were located and the notes reflect that Murat was offended.

57.     Gac does not believe Davis and the Gumrukcu brothers have ever met in person though they have participated in conference calls. Gac also does not believe Davis and the Gumrukcu brothers ever spoke directly outside the conference calls. Gac communicates with Murat through email. Serhat has told Gac that no one is provided with Murat's phone number. According to Gac, while Serhat is the main point of contact for the brothers, Murat is in control of the money.

14

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 60 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 44 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 43 of 56

58.     When the interviewers told Gac that Davis had been murdered, Gac claimed to have no knowledge about the murder. On January 12, 2018, (after the murder) Serhat told Gac that his brother was arranging for the third payment to be made to Davis and directed Gac to contact Murat via email about that payment.

59.     I have reviewed data from Gac's devices. In the fall of 2017, numerous texts were sent to Serhat from Gac regarding Davis's communications with Gac:

- On September 17, 2017 Gac texted, "Gregg is going ballistic, and I don't know if I can control him any more. I heard from Murat that he was returning to Miami today or tomorrow, but nothing specific about meeting. I've heard nothing about meeting with your parents, and nothing from Marc. I'll be getting a call from Gregg soon, and he's going to explode."

- On September 25, 2017, Gac texted, "I'm getting nastygrams from Gregg Davis. Anything I can tell him? I'll reach out to UBS shortly."

- On October 31, 2017, "…Thanks for pinging Murat. Our friend is all over me again."

- On December 13, 2017, "Gregg Davis is getting antsy again, and I haven't heard from Murat in four weeks. Gregg wants to see a path forward with ML. With nothing from UBS, I haven misting to tell him. I believe he's on the road to prosecution again, believing there's no future."

- On December 29, 2017, Gac forwarded the December 28 text from Davis, alluding to potential civil and criminal repercussions.

- On prior dates, dating back over a year, Gac summarized for Serhat Davis's anger about the business dealings with the Gumrukcu brothers.

60.     I also got search warrants in 2018 for Serhat's and Murhat's Google accounts. The emails do not contain any direct reference to Davis's murder. The email messages further corroborate that the Gumrukcu brothers, Gac and Davis were involved in a business deal, and that Davis was applying pressure on the Gumrukcu brothers by threating to go to the authorities about the Gumrukcus' frauds. Moreover, the emails show that Murat expressed anger at these threats. In late 2015, Murat told Gac that he was finding Davis's behavior "unacceptable," that he was "highly disturbed" and that he did "NOT wanna hear ridiculous and vulgar threats from him" because his 50k payment was on the way. About two weeks after this email, Murat wrote to Gac, expressing more frustration with Davis, stating (in part), "As planned, we will initiate this trade to shut him up but I doubt our partnership will survive longer than a couple of lifts … He called me a fraud a second time, there will be no third time. I am trying to clean a mess here and all I hear are threats. . . . If he will harm you or Serhat in any means I will make sure I will find something to return the favor." The records further show that on December 13, 2017, Gac wrote an email message to Murat, in part stating: "Gregg Davis again has expressed concern and frustration at the lack of progress and at the absence of firm direction in proceeding toward

implementation of the Mode Lauran program. I fear he may pursue a 'nuclear option' if I can't offer him clear guidance on how we are going to move forward."

       a.     Eratay and Ethridge

    61.    As stated above, an individual named Berk Eratay was previously involved with the brothers. Specifically, Serhat worked with Eratay on a potential fraud scheme in Las Vegas, where Eratay lives. Also, from December 2017 through March 2018, Murat travelled to the U.S. and stayed at Eratay's residence in Las Vegas. The investigation has revealed a connection between Jerry Banks and Eratay through a person named Aron Ethridge, as further explained below.

    62.    The banksavs Google data described above includes several connections between Banks and Aron Ethridge. First, the Google account contains contact information for Aron with phone number 760-220-0478. Second, the Google account shows searches for 1137 Sport of Kings Avenue, Henderson, NV on October 5, 2017 and January 11, 2018. The Vermont State Police Intelligence Center (VIC) has reviewed Accurint data, which includes property sales information and utility information, showing Aron Ethridge residing at 1137 Sport of Kings Avenue in October 2017. The 661 Phone records show that Banks was in Henderson, NV on October 7, 2017 at 1:00 p.m. (PST).

    63.    The phone records for the Eratay and Ethridge phones also show that on December 18, 2017, the Eratay phone was in contact with both the Ethridge phone and the Serhat phone. As described above, email records show that on December 13, 2017, Gregory Gac wrote an email to Murat fearing the "nuclear option" from Gregory Davis, and Davis text messages to Gac show him talking about "the prosecutor's office."

    64.    I have reviewed data from a search warrant return from the serhat.gumrukcu@gmail.com account. That data includes contact information showing Aron Ethridge with phone number 760-220-0478.

    65.    As noted above, the Gumrukcus do not appear to have communicated with Banks. But the investigation has revealed relevant lines of communication between Banks and the Gumrukcus through Eratay and Ethridge.

    66.    Eratay, like the Gumrukcus, is Turkish. He lives in Las Vegas. His bank records show little income from that work in 2017 and 2018. The records do show, however, that Serhat sent Eratay tens of thousands of dollars between mid-2017 and mid-2018. Much of that money was withdraw by Eratay in cash.

    67.    As noted above, my investigation has shown connections between the Gumrukcus and Berk Eratay. I have reviewed Verizon Wireless phone records for a number subscribed to by Berk Eratay, 702-336-2264, which show numerous contacts between July 2017 and January 2018 with a phone number subscribed to Serhat Gumrukcu, 310-590-8250.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 62 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 46 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 45 of 56

68.     Aron Ethridge, who lives in Henderson, NV, just outside Vegas, works as a conductor for a large freight railroad company. He is married and has no criminal record. I have obtained phone records that show that Ethridge and Eratay were in contact with in 2017 and 2018. Ethridge's phone, including five calls on September 22, 2017, two calls on October 10, 2017, and a call at 11:26 p.m. (PST) on January 7, 2018. The first call made after the Ethridge phone has contact with the 719 Phone on January 7, 2018 is this call to the Eratay phone. Accurint records show that for a period before 2017, Eratay resided next door to Aron Ethridge on Skytop Drive in Henderson, NV.

69.     Bank's Facebook messages and bank records show that Banks saw Ethridge on a trip to Vegas in July, at the time Banks tells Giambra that he's going to Vegas on business. Banks visited Ethridge's home in Henderson on October 5, 2017, just before Banks' Google maps search for "Vermont" and Banks telling Giambra that he has a side job and money for her. Banks returned to Henderson in early December. As noted above, Banks wrote to Giambra that he was doing well financially on December 8. On December 18, Murat arrived at Eratay's residence from Turkey. That same day, Eratay spoke on the phone with both Serhat and Ethridge. Banks went to Ethridge's house (precise Google location data) the next day, December 19, and again on December 26. Banks' first call made when he turned on the 719 Phone on January 7 in Missouri was to Ethridge. Banks called Ethridge again the next day and traveled to Henderson on Saturday, January 13, the first free day after he started his law enforcement classes, and again the next Saturday, January 20.

J.      Banks' Fort Garland Residence

70.     Even though over four years have passed since Banks returned to his residence in Fort Garland after the kidnapping and murder, I believe that there is probable cause to believe that evidence and instrumentalities of the Subject Offenses can be found in the residence in two ways. First, there is probable cause to believe that he kept certain items he purchased in connection with the murder scheme at his residence. Second, there is probable cause to believe that he kept financial records relevant to the Subject Offenses at his residence. Further, the investigators have managed the investigation to avoid having Banks learn that he is a suspect.

71.     The digital location evidence associated with Banks shows that he traveled directly from Kansas to his residence at 1179 Pfotenhauer Road, Fort Garland, CO, arriving in Fort Garland CO on January 9, 2017.

72.     Banks demonstrated his willingness to keep items used to facilitate the victim kidnapping and murder by having such items in his car at the time of the Kansas traffic stop. This stop occurred along his way back to Fort Garland from Vermont. The Trooper stated he observed law enforcement equipment and a tactical vest in Banks' vehicle at the time of the stop. Banks informed the Trooper he had a gun. Banks had opportunities to dispose of evidence of the crime on his way back to his residence. I believe Banks would not have assumed the risk of driving these items over one thousand miles had he not intended to keep them long term and likely still has them today.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 63 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 47 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 46 of 56

73.     Moreover, some of the items that Banks purchased and used while committing the Subject Offenses could be used by Banks after the offenses. As described above, I uncovered evidence that Banks attended community college between January 2018 and April 2018, in order to be certified as a law enforcement officer. Some of the purchases by Banks would also be valuable to someone interested in a law enforcement career. For example, Banks purchased a police-style spotlight in December 2017. Video surveillance from the Clearfield gas station shows that Banks had mounted the spotlight on the Explorer. Witnesses from Highline Auto who saw the car when Banks returned it told law enforcement that there was no spotlight mounted on the car when Banks returned the Explorer to Highline Auto. I believe that there is probable cause to believe that Banks kept the spotlight and other items used in the kidnapping and murder and stored them at his residence.

74.     Based on the investigation as well as my training and experience, Banks appears to be a person who largely lives "off the grid." My training and experience, as well as consultation with other law enforcement officers, leads me to conclude that these people frequently highly value, and are likely to keep, certain material related to protecting themselves including body armor, suppressors, and guns. Additionally, because records reflect that Banks does not typically earn a large amount of money, the expense of replacing these materials makes it likely that they are still present in the subject residence.

75.     As noted above, I have developed evidence that Banks was in possession of large amounts of currency in late 2017 and early 2018. I believe that these payments reflect proceeds from the murder for hire. As noted above, Banks tells others that he has a side job at the time. I believe that there is probable cause that there will be evidence or a lack of evidence relevant to the source of these funds. Based on my training and experience, I know that people usually maintain records about their legitimate employment for lengthy periods of time. Moreover, they usually keep those records at their main residence. Thus, I believe that if Banks had a legitimate source of currency in 2017 and 2018, there would be records about that employment in his residence. A search of the residence showing no such documents would provide relevant evidence of the Subject Offenses. Finally, based on my training and experience, people often keep documents and records about their purchases in their residence for lengthy periods of time. Thus I believe that there is probable cause that Banks keeps financial information about his earnings at his residence.

76.     There are several items Banks used in the Subject Offenses, including a rifle, for which I have been unable to find digital records. Based on my training and experience, gun purchasers regularly keep their guns and ammunition for long periods of time and store them in their residences. Banks made statements to me after receiving his Miranda warnings, among other things he denied ever traveling to Vermont. He refused to discuss several topics including topics closely related to the Davis murder. Banks admitted, however, that he has owned this residence in Fort Garland since 2016, that he currently stores, in a shed adjacent to the residence, firearms including a 9mm pistol and an AR-15, and that there is at least one storage shed on the property. Thus I believe there is probable cause that Banks stores firearms and ammunition at his residence.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 64 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 48 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 47 of 56

77.     As described above, I believe Banks has used multiple phones over the years. Based on my training and experience it is common for phone users to keep cellphone devices that they are no longer using and maintain them at their residences. Thus I believe there is probable cause that Banks kept cellphones relevant to this investigation at his residence.

K.     Bank's Property

78.     In the social media post found in the Facebook search warrant, Banks gives a walking tour of his property and describes a makeshift shed used for storage.

79.     1179 Pfotenhauer Road, Fort Garland, Colorado as described in more detail in Attachment A, is Banks only known residence. As described above, Banks listed this address as his residence in 2017. I have reviewed Verizon Wireless records related to a phone currently subscribed to by Banks in which he listed his address as of September 2021 as this Fort Garland, Colorado address. Agents have observed the same red Chevy Blazer on the property in both 2020 and this week. Thus I believe there is probable cause that this address is still Banks' residence.

Conclusion

80.     For the reasons described above, I submit probable cause exists to believe evidence and instrumentalities of the Subject Offenses will be located at 1179 Pfotenhauer Road, Fort Garland, CO, as further described in Attachment A. Therefore, I request permission to search the property identified in Attachment A for the items enumerated within Attachment B and seize those items.

Dated at   Denver       , in the District of Colorado, this    6th   day of April, 2022.

_/s/ Patrick Hanna_____
Patrick Hanna
Special Agent - FBI

Sworn to and subscribed before me this    6th    day of April, 2022.


Honorable Kristen L. Mix

This application and affidavit was reviewed by Assistant U.S. Attorney Garreth Winstead.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 65 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 49 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 48 of 56

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

### for the

### District of Vermont

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   5:18-mj-4 |
| a Seagate Expansion Desktop Drive, Serial Number NA8FNSXM, further described in Attachment A. | ) ) ) | |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ **Vermont**
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____5/13/22_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Geoffrey W. Crawford_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  **4/29/22    4:00 am**          _____
                                                                             *Judge's signature*

City and state:    Burlington, Vermont                Hon. Geoffrey W. Crawford, U.S. District Judge
                                                                     *Printed name and title*

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 66 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 50 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 49 of 56

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  5:18-mj-4 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____          _____
                                                                *Executing officer's signature*

                                                        _____
                                                                *Printed name and title*

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 67 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 51 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 50 of 56

## ATTACHMENT A

The property to be searched is a Seagate Expansion Desktop Drive, Serial Number NA8FNSXM, hereinafter the "SUBJECT DEVICE." The SUBJECT DEVICE is currently located at the FBI office in Colchester, Vermont.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 68 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 52 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 51 of 56

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to the following federal crimes: kidnapping, in violation of 18 U.S.C. § 1201, murder to obstruct justice, in violation of 18 U.S.C. § 1512(a)(1); and murder for hire, in violation of 18 U.S.C. § 1958, including:

     a.   any and all data related to Gregory Davis, including his personal identifiers, address, residence, vehicles, and businesses;

     b.   any and all data related to the death of Gregory Davis, including information related to efforts to locate his whereabouts prior to his murder;

     c.   all communications and records related to communications between Jerry Banks, Aron Ethridge, Berk Eratay, Murat Gumrukcu, and Serhat Gumrukcu from January 1, 2017 to July 1, 2018;

     d.   all records and correspondence related to the purchases of cellular devices and cellular services, vehicles, law enforcement equipment and insignia, firearms, firearm components, firearm accessories, and ammunition;

     e.   any information relating to the schedule or travel of Jerry Banks and Aron Ethridge from January 1, 2017 to July 1, 2018;

     f.   all bank records, checks, credit card bills, account information, and other financial records relating to Jerry Banks' employment, earnings, and finances between January 1, 2017 to July 1, 2018.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 69 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 53 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 52 of 56

    2.     Evidence of user attribution showing who used or owned the Device at the time
the things described in this warrant were created, edited, or deleted.

As used above, the terms "records" and "information" include all of the foregoing items
of evidence in whatever form and by whatever means they may have been created or stored,
including any form of computer or electronic storage (such as flash memory or other media that
can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored
information seized or copied pursuant to this warrant in order to locate evidence, fruits, and
instrumentalities described in this warrant. The review of this electronic data may be conducted
by any government personnel assisting in the investigation, who may include, in addition to law
enforcement officers and agents, attorneys for the government, attorney support staff, and
technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or
copied electronic data to the custody and control of attorneys for the government and their
support staff for their independent review.

2

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 70 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 54 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 53 of 56

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 APR 29  AM 9: 12

CLERK

BY _____
DEPUTY CLERK

IN THE MATTER OF THE SEARCH OF
a Seagate Expansion Desktop Drive, Serial
Number NA8FNSXM

Case No.   5:18-mj-4
**Filed Under Seal**

## MOTION TO SEAL SEARCH WARRANT AFTER EXECUTION

On April 28, 2022, the Government applied for a warrant in the matter of the search of a

Seagate Expansion Desktop Drive, Serial Number NA8FNSXM.   The Government moves this

Court to seal this motion, the docket sheet, the Application and Affidavit for the above Search

Warrant, and the Search Warrant until further order of the Court.   Unsealing would seriously

jeopardize the investigation.   Specifically, as described in the Application and Affidavit, this

warrant relates to an ongoing covert investigation involving serious and complex offenses.   The

Affidavit describes information obtained during the investigation.   Disclosure of that information

would likely become known to subjects of the investigation and would impede the potential

success of the investigation.   If sealing is no longer necessary to ensure the safety of individuals

and the investigation's integrity because the target(s) has (have) been arrested or the investigation

has been closed, the government will move to unseal the search warrant.

Dated at Burlington, in the District of Vermont, April 29, 2022.

Respectfully submitted,

UNITED STATES OF AMERICA
NIKOLAS P. KEREST
United States Attorney

By:

PAUL J. VAN DE GRAAF
JONATHAN A. OPHARDT
Assistant U.S. Attorneys

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 71 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 55 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 54 of 56

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2022 APR 29  AM 9: 12**

CLERK

BY _____
DEPUTY CLERK

IN THE MATTER OF THE SEARCH OF
a Seagate Expansion Desktop Drive, Serial
Number NA8FNSXM

Case No.  5:18-mj-4
**Filed Under Seal**

## ORDER

This matter having been presented to the Court by the Government, and the Court having

considered the motion, the Court finds that sealing is necessary to protect the integrity of an

ongoing investigation and the safety of individuals.  The Court finds that, at this time, those

interests substantially outweigh the public interest in right of access.  Accordingly it is hereby

ORDERED, that the Motion to Seal, U.S. District Court's docket sheet, Application and

Affidavit for Search Warrant, Search Warrant and this Order are hereby until further order of the

Court.  If sealing is no longer necessary to ensure the safety of individuals and the investigation's

integrity because targets have been arrested or the investigation has been closed, the government

shall move to unseal the search warrant, related documents and docket entries.

Dated at Burlington, in the District of Vermont, this 29th day of April, 2022.

_____
GEOFFREY W. CRAWFORD
United States District Judge

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 72 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 56 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 55 of 56

## ATTACHMENT A

**Location to be searched: 1179 Pfotenhauer Road, Fort Garland, Colorado.**

The premises to be searched, **1179 Pfotenhauer Road, Fort Garland, Colorado,** is described as a tan in color, single level residence, converted camper/trailer and tan outbuilding next to the camper/trailer. The property is secluded and is on low ground at edge of scrub oak/sage brush. The entrance to the property is marked by the numbers "1179" on a post located next to the driveway. The driveway is directly off Pfotenhauer Rd. There is a tan outbuilding next to the camper/trailer. There are two vehicles located at the residence: a red Chevrolet Blazer and a White/Black Ford truck unknown registrations. Authority is also sought to search these vehicles if they are on the curtilage of the Subject Location when the warrant is executed. Below are photographs taken on April 1, 2022 depicting the residence.





Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 73 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 57 of 103
Case 5:18-mj-00004-gwc   Document 389   Filed 04/29/22   Page 56 of 56

gave his mailing address as 1179 Pfotenhauer Road, Fort Garland, CO. Based on the driver's license photo of Banks (taken only three weeks before the kidnapping), Banks resembles the man depicted in the Walmart surveillance images as the purchaser of the 911 Phone. Below is the license photo (on the right) and an edited image of the face of the 911 Phone purchaser (on the left) for comparison.




C.     The 201 Phone

14.     Agent Wines also reviewed AT&T tower data obtained as a result of search warrants issued by this court. Agent Wines received a list of cellular devices connecting to a tower covering the area of Clearfield, Pennsylvania, where the 911 Phone was purchased. The data included a list of devices connecting to the tower at or about the time the 911 Phone was purchased. Agent Wines compared this data to data he received listing cellular devices connecting to a tower covering the area of Danville, Vermont, where the kidnapping took place. The data included devices connecting to the tower at or about the time of Davis's kidnapping. Only one cellular phone was common to both sets of data, and it was a device with phone number (201) 208-7436 (the "201 Phone"; this phone number was found by investigators to be associated to a ZTE Model Z835 phone). Based on the information below, I believe that Banks used the 201 Phone to facilitate the victim's kidnapping and murder.

15.     Further investigation by Agent Wines determined that 201 Phone is an Android cell phone purchased at a Walmart located at 201 Southeast Salem Street, Oak Grove, Missouri on November 13, 2017, at approximately 9:58 a.m. (CST), and additional service (minutes/data) for that phone were purchased at a Walmart located at 2025 W. Business Highway 60, Dexter, Missouri on January 4, 2018 at approximately 9:20 a.m. (CST). Agent Wines obtained receipts for these purchases, which show these purchases, like the 911 Phone purchase in Pennsylvania on January 6, 2018, were each made with $100 cash. The details on the receipts suggest that the customer paid with a $100 bill for all three purchases: the 201 Phone, the extra minutes for the 201 Phone, and the 911 Phone.

4

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 74 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 58 of 103
Case 5:18-mj-00004-gwc   Document 389-1   Filed 04/29/22   Page 1 of 1

## **ATTACHMENT A**

The property to be searched is a Seagate Expansion Desktop Drive, Serial Number NA8FNSXM, hereinafter the "SUBJECT DEVICE." The SUBJECT DEVICE is currently located at the FBI office in Colchester, Vermont.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

Case 5:18-mj-00004-gwc  Document 426-5  Filed 03/24/23  Page 75 of 119
Case 5:18-mj-00004-gwc  Document 414-3  Filed 09/13/22  Page 59 of 103
Case 5:18-mj-00004-gwc  Document 389-2  Filed 04/29/22  Page 1 of 2

## ATTACHMENT B

1.    All records on the Device described in Attachment A that relate to the following federal crimes: kidnapping, in violation of 18 U.S.C. § 1201, murder to obstruct justice, in violation of 18 U.S.C. § 1512(a)(1); and murder for hire, in violation of 18 U.S.C. § 1958, including:

a.   any and all data related to Gregory Davis, including his personal identifiers, address, residence, vehicles, and businesses;

b.   any and all data related to the death of Gregory Davis, including information related to efforts to locate his whereabouts prior to his murder;

c.   all communications and records related to communications between Jerry Banks, Aron Ethridge, Berk Eratay, Murat Gumrukcu, and Serhat Gumrukcu from January 1, 2017 to July 1, 2018;

d.   all records and correspondence related to the purchases of cellular devices and cellular services, vehicles, law enforcement equipment and insignia, firearms, firearm components, firearm accessories, and ammunition;

e.   any information relating to the schedule or travel of Jerry Banks and Aron Ethridge from January 1, 2017 to July 1, 2018;

f.   all bank records, checks, credit card bills, account information, and other financial records relating to Jerry Banks' employment, earnings, and finances between January 1, 2017 to July 1, 2018.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 76 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 60 of 103
Case 5:18-mj-00004-gwc   Document 389-2   Filed 04/29/22   Page 2 of 2

    2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 77 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 61 of 103
Case 5:18-mj-00004-gwc   Document 389-3   Filed 04/29/22   Page 1 of 5

### AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and state as follows:

### Introduction

1.       I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently
assigned to the Burlington Resident Agency in Vermont. I have been an FBI Special Agent for
19 years. My duties as an FBI Special Agent include investigating violations of Title 18 of the
United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement,
public corruption, money laundering and related white-collar crimes, as well as violent crimes
and criminal enterprises. I have participated in investigations of criminal violations of various
federal laws. I have executed search and arrest warrants, interviewed and interrogated subjects,
witnesses, and victims, and conducted surveillance. In the course of these investigations, I have
gained an understanding of current technology, to include computers and online accounts,
cellular telephones and associated records and data, and have conducted analyses of the data
related to such accounts and devices, for the purpose of solving and proving crimes.

2.       I make this affidavit in support of an application for a search warrant authorizing
the examination of an electronic device – a Seagate Expansion Desktop Drive with serial number
NA8FNSXM (the "SUBJECT DEVICE"), currently in the custody of the FBI in Colchester,
Vermont – and the extraction of electronically stored information described in Attachment B.

3.       As discussed below, there is probable cause to believe that Jerry Banks was
involved in the kidnapping and murder of Gregory Davis, whose deceased body was discovered
on January 7, 2018. There is probable cause to believe that Davis' kidnapping and murder
involved the following federal crimes: kidnapping, in violation of 18 U.S.C. § 1201, murder to
obstruct justice, in violation of 18 U.S.C. § 1512(a)(1); and murder for hire, in violation of 18
U.S.C. § 1958. There is probable cause to believe that device described in Attachment A
contains evidence of those crimes.

4.       This case is being investigated by the FBI and the Vermont State Police (VSP).
Since this affidavit is being submitted for the limited purpose of establishing probable cause to
search data already in law enforcement's custody, I have not included details of every aspect of
the investigation. Except as otherwise noted, the information contained in this Affidavit is based
upon my personal knowledge and observations, my training and experience, conversations with
other law enforcement officers and witnesses, and my review of documents and records.

### Probable Cause

5.       On March 30, 2022, I obtained a Criminal Complaint charging Jerry Banks with
the kidnapping of Gregory Davis in violation of 18 U.S.C. § 1201(a)(1). A copy of my affidavit
submitted in support of the Criminal Complaint is attached as Exhibit 1. Its contents remain true
and correct.

6.       On April 6, 2022, I applied for and obtained a search warrant for the premises of
1179 Pfotenhauer Road, Fort Garland, Colorado (hereafter "Residence Warrant"), a property

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 78 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 62 of 103
Case 5:18-mj-00004-gwc   Document 389-3   Filed 04/29/22   Page 2 of 5

owned by Jerry Banks. A copy of my affidavit submitted in support of the Residence Warrant is attached as Exhibit 2. Its contents remain true and correct.

7.      As set forth in more detail in Exhibit 2, there is probable cause to believe that prior to his murder, Davis was the victim of a financial fraud scheme involving Serhat Gumrukcu and his brother, Murat Gumrukcu. This financial fraud scheme involved investments in an oil trading company, and agreements between Murat Gumrukcu's entity Lauran Trading, LLC; Gregory Davis' entity Mode Commodities, LLC; and Gregory Gac's entity Quadrant Financial Group, LLC (functioning as an "escrow agent" for the parties).

8.      As set forth in Exhibits 1 and 2, there is probable cause to believe that Jerry Banks murdered Davis, and that he was hired to do so on behalf of a third party. As set forth in Exhibit 2, the only known link between Banks and the Gumrukcus is through Aron Ethridge and Berk Eratay.

9.      On April 6, 2022, Jerry Banks was arrested in Yellowstone National Park. On April 7, 2022, FBI agents executed the Residence Warrant at Banks' property in Colorado. During the search, in the trailer-type residence, agents located 9mm ammunition; a hand-held radio; two firearm magazines; a green law-enforcement style duty belt; and the SUBJECT DEVICE. In a storage shed, agents recovered a short-barrel AR-15 with no serial numbers or manufacturer labels; an AR-15 "upper" (no lower receiver) with a scope; handcuffs; a pepper blaster; and a FedEx envelope containing purchase paperwork and registration for a Ford Explorer from Highline Automotive. In a maroon Chevy Blazer located on the property, agents recovered a vehicle spotlight, which was disassembled into two pieces.

10.     On April 7, 2022, I interviewed Aron Ethridge near his home in Henderson, Nevada. During this initial interview, Ethridge denied all knowledge of a murder-for-hire scheme involving Banks. On the morning of April 9, 2022, I received a call from Ethridge, who agreed to meet again later that day. At this second meeting, Ethridge admitted he had lied during the first meeting, and then confirmed the murder-for-hire scheme involving Banks and Eratay. A third meeting with Ethridge was held on April 10, 2022, during which Ethridge admitted he had omitted some of his knowledge of the plan to abduct Davis during his interview on April 9. The following is a summary of the information that Ethridge provided to law enforcement during the April 9 and April 10 interviews, with corrections as provided by Ethridge on April 10:

        a.      Ethridge and Eratay used to be neighbors in Henderson, Nevada, and became friends during that period.

        b.      Eratay approached Ethridge over a year before the murder of Davis, asking if Ethridge could arrange a murder. Ethridge eventually agreed to assist Eratay.

        c.      Ethridge approached Banks, asking Banks to assist with the murder.

2

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 79 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 63 of 103
Case 5:18-mj-00004-gwc   Document 389-3   Filed 04/29/22   Page 3 of 5

     d.     Ethridge received over $110,000 in cash from Eratay as payment for the murder. A portion of this cash was paid to Banks.

     e.     The initial plan had been for Banks to "snipe" Davis, but after Banks made a reconnaissance trip to Vermont, Banks advised the plan would have to be revised and requested additional payment due to the increased difficulty of the job.

     f.     Ethridge knew that Banks would impersonate a law enforcement officer and abduct Davis from his residence prior to murdering him.

     g.     Ethridge and Banks communicated via an encrypted application called "Threema." Ethridge also communicated with Eratay on the "Threema" application.

     h.     On at least one occasion, Banks used a physical data card to pass along a digital image of Davis that Banks had taken during a trip to Vermont. Ethridge provided this data card to Eratay.

     i.     On January 7, 2022, while Banks was traveling back from Vermont, Banks called Ethridge and advised him the job was done. Ethridge then called Eratay to relay the message.

     j.     Ethridge had met Serhat Gumrucku on multiple occasions prior to the murder of Davis. Ethridge believed that, based on these meetings and statements made by Eratay, Serhat was the man who wanted Davis killed. Eratay told Ethridge that Serhat had a problem with Davis. However, Serhat and Ethridge never directly communicated about the abduction and murder. All communications went through Eratay, who Ethridge knew to work for Serhat.

     k.     After the murder of Davis, Eratay provided Ethridge with an additional payment in the form of Bitcoin.

<u>Electronic Storage and Forensic Analysis</u>

     11.     Based on my knowledge, training, and experience, I know that the SUBJECT DEVICE, a Seagate Expansion Desktop Drive, is typically utilized as an external data storage device. The external markings on the SUBJECT DEVICE indicate it has a capacity of 3 TB, the equivalent of 3,000 gigabytes (GBs). Such a device is capable of storing thousands of digital photographs and thousands of document files. The SUBJECT DEVICE could also store backups of other electronic devices, including the data stored on a cellular phone. Devices such as the SUBJECT DEVICE can store information for long periods of time.

     12.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

3

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 80 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 64 of 103
Case 5:18-mj-00004-gwc   Document 389-3   Filed 04/29/22   Page 4 of 5

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

13.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 81 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 65 of 103
Case 5:18-mj-00004-gwc   Document 389-3   Filed 04/29/22   Page 5 of 5

    e.        Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

    14.     The SUBJECT DEVICE has been stored in such a manner that the data on them likely remains in the same condition as when law enforcement first seized it.

    15.     Based on the above and the contents of Exhibits 1 and 2, I believe it is probable that digital evidence and records related to the scheme to abduct and kill Gregory Davis existed, and it is probable that Jerry Banks stored records related to those crimes on the SUBJECT DEVICE. Given that Banks retained records of purchases of the Ford Explorer and other physical items involved in the scheme, it is reasonable to conclude that Banks may have retained digital records of his many digital purchases outlined in Exhibits 1 and 2. Further, given the digital nature of communications between Banks and Ethridge and the use of a physical data card to transfer a photograph of Davis during the scheme, and because the SUBJECT DEVICE may contain backups of data from electronic devices such as cellular phones, it is reasonable to conclude that the SUBJECT DEVICE may contain information related to communications regarding the scheme to kill Davis.

    16.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

    17.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed search warrant would authorize the government to conduct a forensic examination of the SUBJECT DEVICE. Because the government already has custody of the SUBJECT DEVICE, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Dated at Burlington, in the District of Vermont, this 29th day of April 2022.

_____
Patrick Hanna
Special Agent - FBI

Sworn to and subscribed before me this 29 day of April 2022.

_____
Honorable Geoffrey W. Crawford
United States District Judge

5

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 82 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 66 of 103
Case 5:18-mj-00004-gwc   Document 389-4   Filed 04/29/22   Page 1 of 14

# EXHIBIT 1

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 83 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 67 of 103
Case 5:18-mj-00004-gwc   Document 389-4   Filed 04/29/22   Page 2 of 14

Case 5:22-mj-00037-gwc   Document 1   Filed 03/30/22   Page 1 of 1

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Vermont

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 MAR 30  PM 2: 51

CLERK

BY ___-01 ___

| | |
|---|---|
| United States of America<br>v.<br>Jerry Banks | ) <br> ) <br> ) Case No. 5:22-mj-37gwc <br> ) <br> ) <br> ) |

Defendant(s)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 6, 2018 _____ in the county of _____ Caledonia _____ in the _____ District of _____ Vermont _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1201(a)(1) | The unlawful seizure, confinement, inveigling, decoying, kidnapping, abduction, and carrying away, for reward and otherwise, GD, and in committing and in furtherance of the commission of the offense, travelling in interstate commerce and using a facility and instrumentality of interstate commerce. |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

gu signed by reliable electronic means
GWC

_____
Complainant's signature

Patrick Hanna, Special Agent, FBI
_____
Printed name and title

Sworn to before me and signed in my presence.

Date: _____ 03/30/2022 _____

_____
Judge's signature

City and state: _____ Rutland, Vermont _____

Hon. Geoffrey W. Crawford, Chief US District Judge
_____
Printed name and title

## AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and say:

### Introduction

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently assigned to the Burlington Resident Agency in Vermont. I have been an FBI Special Agent for 19 years. My duties as an FBI Special Agent include investigating violations of Title 18 of the United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement, public corruption, money laundering and related white-collar crimes, as well as violent crimes and criminal enterprises. I have participated in investigations of criminal violations of various federal laws. I have executed search and arrest warrants, interviewed and interrogated subjects, witnesses, and victims, and conducted surveillance. In the course of these investigations, I have gained an understanding of current technology, to include computers and online accounts, cellular telephones and associated records and data, and have conducted analyses of the data related to such accounts and devices, for the purpose of solving and proving crimes.

2.      I am submitting this Affidavit in support of a complaint alleging that Jerry Banks kidnapped GD (the victim) on January 6, 2018, in violation of 18 U.S.C. § 1201(a)(1).

3.      This case is being investigated by the FBI and the Vermont State Police (VSP). Since this affidavit is being submitted for the limited purpose of supporting a complaint, I have not included details of every aspect of the investigation. Except as otherwise noted, the information contained in this Affidavit is based upon my personal knowledge and observations, my training and experience, conversations with other law enforcement officers and witnesses, and my review of documents and records.

### Probable Cause

**A.      The Kidnapping and Shooting**

4.      On January 7, 2018, VSP responded to a homicide in Barnet, VT. The victim, identified as GD, was found partially covered by snow near the base of a snowbank on a pull off area near the west side of Peacham Road. The victim was found handcuffed and had been shot multiple times in the head and torso. GD resided at 884 Hawkins Road, Danville, VT at the time. The victim's body was discovered approximately 15 miles from his residence.  Evidence gathered from the crime scene included .22 caliber cartridge casings.

5.      VSP Detectives responded to GD's home and interviewed his wife, MD, and their 12-year-old son (minor child #1). Both were interviewed again later. MD told VSP Detectives that at approximately 9:00 p.m. on January 6, 2018, she and her husband were in a first-floor bedroom in their Danville home. They heard someone knock on the door. GD went to the door to see who was there. GD came back to the bedroom and told MD that a man claiming to be a U.S. Marshal came to the victim's home to arrest him. GD got his clothes on and left with the man. MD saw the man and described him as having handcuffs, a rifle, and wearing a jacket and mask with an eye opening, both of which had a U.S. Marshals emblem. MD also reported that the man

1

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 85 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 69 of 103
Case 5:18-mj-00004-gwc   Document 389-4   Filed 04/29/22   Page 4 of 14

Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 2 of 12

said he had an arrest warrant for GD for racketeering and was bringing him to Virginia. Minor child #1, who observed the man and his car from a second-floor window, told police that the man drove a white four-door car with red and blue emergency lights activated on the dash. GD left in the man's car. The man was wearing black clothes and had a gun and a belt with various law enforcement tools on it. MD did not contact police.

6. On January 10, 2018, Agent Jennie Emmons confirmed with Supervisory Deputy U.S. Marshal Carl Staley of the Burlington Vermont office of the U.S. Marshals Service that GD was not arrested by their agency. Further, Deputy Marshal Staley said that there had been no active federal warrants for GD.

B.   The 911 Phone

7. I listened to a 911 call made around the time of the victim's kidnapping. The call took place approximately 15 minutes prior to the kidnapping and originated within a mile of the victim's residence. The VT 911 call center received a call from (802) 473-0535 (the 911 Phone) at 8:42 p.m. on January 6, 2018. The 911 call center's technology identified the call as coming from a location on North Danville Road, Danville, VT, only a short distance from the victim's residence. I believe that Banks used the 911 Phone to facilitate the victim's kidnapping and murder.

a. During the call, a man stated that he shot his wife and was going to shoot himself. The caller gave an address of "71772 Cross Road" (with no town information), after which the caller hung up. The call information was relayed to VSP in St. Johnsbury, Vermont. VSP attempted to locate a Cross Road in the St. Johnsbury area without success.

b. VSP thereafter requested that AT&T provide location information for the phone in question due to the exigent circumstance. AT&T confirmed that the 911 call came from the North Danville Road location. AT&T also reported that the phone was a prepaid phone with no subscriber information available. After VSP checked the North Danville location and several possible "Cross Roads" outside the town of St. Johnsbury, the matter was closed. At that time, the victim's body had not been discovered.

c. I later obtained search warrants for various accounts used by Banks, including his Facebook account, where Banks listed his user name as Grizz Sands. Among the data in the Facebook account were video recordings, including a video in which Banks narrated a tour of his residence in Fort Garland, CO. Banks' voice sounds similar to the voice of the 911 caller.

8. AT&T responded to a search warrant for information associated with the 911 Phone. The AT&T search warrant data confirmed the location of the 911 call on January 6, 2018, near the time and location of victim's kidnapping.

9. The data provided by AT&T was reviewed by Special Agent James Wines of the FBI's Cellular Analysis Survey Team. After this review, and consultation with AT&T security personnel, Agent Wines advised that the 911 Phone was a prepaid phone purchased at a Walmart on January 5, 2018. The records showed only two calls made by the phone, a four-second call to a Pizza Hut in St. Johnsbury, VT at 4:14 p.m. on January 6 and the 911 call at 8:42 p.m. on

January 6. The phone used only two sectors of the same cell tower, located in St. Johnsbury, VT, for all cell site activity. Agent Wines also advised that this phone was activated, meaning that it could operate on the AT&T network, shortly before 4:00 p.m. on January 6, within minutes of the Pizza Hut call. I have not been able to establish how the phone was activated.

10.     Agent Wines advised me that he learned from contacts at Walmart security that the prepaid phone was purchased with $100 cash on January 5, 2018, at 4:14 p.m. at the Walmart located at 100 Supercenter Drive, Clearfield, PA. Agent Wines forwarded me numerous security camera images of the individual purchasing the phone, which were obtained from Walmart security. The images show a bearded, adult, white man purchasing the phone. The man arrived and departed in a white Ford Explorer. The camera footage indicates the vehicle parked in the Walmart parking lot around 3:55 p.m. and left the lot around 4:17 p.m. The Explorer does not appear to have a front license plate. The rear plate was light in color and appeared to be white. Numbers and/or letters were not recognizable on the rear plate. The Explorer is generally consistent with minor child #1's description of the kidnapper's car.

11.     FBI personnel in Pennsylvania canvassed gas stations and other locations in the vicinity of the Walmart at 100 Supercenter Drive, Clearfield, PA, to determine if additional security camera footage of the bearded, white male and/or the white Ford Explorer could be located. Additional video footage of the suspect and vehicle were located at a BP gas station at 14624 Clearfield Shawville Highway, Clearfield, PA 16830.

12.     I reviewed stills of this footage, which included images of the bearded, white man and the white Ford Explorer, and they appear to be the same person and vehicle shown in the Walmart security video. The suspect purchased gas at the BP station. I saw what appears to be a smartphone in the suspect's hand. A time stamp on this video put the stop at the gas station at 4:27 p.m. on January 5, 2018. My review of the reports of the agents who travelled to Clearfield, Pennsylvania shows that the display times from the gas station security footage appear to be plus six or seven minutes relative to the actual time.

13.     I have reviewed Colorado driver's license information about Banks. On December 18, 2017, a Colorado driver's license was issued to Jerry Dean Robert Banks. Banks gave his mailing address as 1179 Pfotenhauer Road, Fort Garland, CO. Based on the driver's license photo of Banks (taken only three weeks before the kidnapping), Banks resembles the man depicted in the Walmart surveillance images as the purchaser of the 911 Phone. Below is the license photo (on the right) and an edited image of the face of the 911 Phone purchaser (on the left) for comparison.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 87 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 71 of 103
Case 5:18-mj-00004-gwc   Document 389-4   Filed 04/29/22   Page 6 of 14

Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 4 of 12




C.    The 201 Phone

14.    Agent Wines also reviewed AT&T tower data obtained as a result of search warrants issued by this court. Agent Wines received a list of cellular devices connecting to a tower covering the area of Clearfield, Pennsylvania, where the 911 Phone was purchased. The data included a list of devices connecting to the tower at or about the time the 911 Phone was purchased. Agent Wines compared this data to data he received listing cellular devices connecting to a tower covering the area of Danville, Vermont, where the abduction took place. The data included devices connecting to the tower at or about the time of GD's abduction. Only one cellular phone was common to both sets of data, and it was a device with phone number (201) 208-7436 (the 201 Phone). Based on the information below, I believe that Banks used the 201 Phone to facilitate the victim's kidnapping and murder.

15.    Further investigation by Agent Wines determined that 201 Phone is an Android cell phone purchased at a Walmart located at 201 Southeast Salem Street, Oak Grove, Missouri on November 13, 2017, at approximately 9:58 a.m. (CST), and additional service (minutes/data) for that phone were purchased at a Walmart located at 2025 W. Business Highway 60, Dexter, Missouri on January 4, 2018 at approximately 9:20 a.m. (CST). Agent Wines obtained receipts for these purchases, which show these purchases, like the 911 Phone purchase in Pennsylvania on January 6, 2018, were each made with $100 cash. The details on the receipts suggest that the customer paid with a $100 bill for all three purchases: the 201 Phone, the extra minutes for the 201 Phone, and the 911 Phone.

16.    I obtained a search warrant for historical cell site and location information for the 201 Phone. The 201 Phone did not make or receive any phone calls or texts during the relevant period. Its only interactions with the AT&T network involved data transmissions. The records do not reveal the kind of data transmitted. Agent Wines and I have reviewed the information obtained from this warrant. Analysis of the data shows the 201 Phone assigned number was registered with the AT&T network on November 14, 2017. It first interacted with the network through cell towers in the area of Monte Vista, Colorado for a brief time on December 29, 2017.

4

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 88 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 72 of 103
Case 5:18-mj-00004-gwc   Document 389-4   Filed 04/29/22   Page 7 of 14

Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 5 of 12

The phone next interacted with a cell tower in the area of Dexter, Missouri on January 3, 2018, and January 4, 2018, again for short periods. Thereafter, the phone interacted with cell towers near roads following a path in a northern and eastern direction through Illinois, Indiana, and Ohio. Analysis of the data shows the phone interacted with cell towers in the Columbus, Ohio, area for a time period between 7:30 p.m. January 4, 2018 to 11:20 a.m. January 5, 2018. The phone thereafter continued to interact with cell towers near roads through Pennsylvania, New York, and Connecticut. Analysis of the data shows the phone interacted for a period of time with cell towers in the area Southington, Connecticut, from 12:00 a.m. to 10:00 a.m. on January 6, 2018. The data shows the phone then continued through Massachusetts and arrived in Vermont on January 6, 2018, at approximately 11:37 a.m. The phone then traveled north, consistent with travel on Interstate 91, and arrived in the area of St. Johnsbury, Vermont, at about 1:30 p.m. Throughout the afternoon and into the evening of January 6, 2018, the data shows the phone was in the areas of St. Johnsbury and Danville, Vermont. The phone remained in the general area in which the victim's kidnapping took place (at approximately 9:00 p.m.) and where his body was recovered the next day. After approximately 9:24 p.m., the phone appears to have traveled south out of the Danville/St. Johnsbury area, consistent with travel on Interstate 91. The last reported cell site or location data was at 10:01 p.m., after which the phone had no more interaction with the AT&T network. Based on this information, there is probable cause to believe that the 201 Phone was used for the purpose of the victim's kidnapping and murder.

17.     Further analysis of the data shows that during the travel to Vermont, the 201 Phone passed through the area of Clearfield, Pennsylvania at the time the 911 Phone was purchased at the Walmart in Clearfield, Pennsylvania.

18.     I have attempted to obtain information from Google about the use of this phone by subpoena. The only information Google could provide showed that the 201 Phone connected to Google servers for the first time on November 14, 2017, and for the last time on January 6, 2018.

19.     I have reviewed records from Verizon Wireless that identify Jerry Banks as the subscriber of the phone with number (719) 480-3879 (the 719 Phone) during the relevant timeframe. Banks was the effective subscriber from 10/20/2017 through 11/8/2018. Banks listed (661) 433-5327 (the 661 Phone) as his home phone number and work phone number.

20.     I have also reviewed Verizon Wireless Billing Statements, which show the approximate location of the 719 Phone when calls were made. I have confirmed with Verizon Wireless personal that this location information is associated with the cell towers and switch connecting to the phone at the time of calls. I also learned that Verizon Wireless maintained more precise location information for this phone for only approximately one year. That data was gone by the time I obtained the search warrant. I found the following locations of note for this phone in the Billing Statements:

    a.      On 10/26/2017, a call from this phone originated in Denver, CO.
    b.      On 12/13/2017, a call from this phone originated in Dexter, MO.
    c.      On 12/28/2017 a call from this phone originated in Alamosa, CO.

5

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 89 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 73 of 103
Case 5:18-mj-00004-gwc   Document 389-4   Filed 04/29/22   Page 8 of 14

Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 6 of 12

    d.    On 12/29/2017, another call from this phone originated in Alamosa, CO, which is close to Monte Vista, CO. As noted above, the 201 Phone first interacted with cell towers in the area of Monte Vista, CO on 12/29/2017.

    e.    On 1/2/2018 and 1/3/2018, calls from this phone originated in Dexter, MO. As noted above, the 201 Phone interacted with cell towers in Dexter, MO on 1/3/2018.

    f.    No calls are made between 12:59 p.m. on 1/3/2018 and 1/7/2018, when the 201 Phone was actively being used.

    g.    On 1/7/2018, at approximately 9:24 p.m., a call from this phone originated in O'Fallon, MO, which is along I-70 in Missouri. The time between the last use of the 201 Phone and this call on the 719 Phone is approximately 25 hours. Google Maps shows that driving time from Barnet, VT to O'Fallon, MO is approximately 19 hours.

    h.    On 1/8/2018, a call from this phone originated in Alma, KS. This call takes place approximately 15 minutes after the Kansas Highway Patrol car stop of Banks in Alma, KS, described below. The call connects with (573) 421-4798 for approximately 20 minutes.

    i.    On 1/9/2018, multiple calls are made from this phone, all originating in Colorado (Alamosa, Sanford and Colorado Springs).

    21.    Banks' use of the 719 Phone connected to his Google account, described below, is consistent with him buying and using the 201 Phone.

    22.    I have reviewed Google records for the email address banksavs@gmail.com. Jerry Banks is the subscriber of the email account. He uses bankspes@gmail.com for his recovery email. The account was created on 6/5/2009. SMS (texts) are connected to the 719 Phone. The subscriber services listed are Android, Gmail, Google Calendar, Google Chrome Sync, Google Cloud Print, Google Drive, Google Hangouts, Google Keep, Google My Maps, Google Payments, Google Photos, Google Play, Google Play Music, Google Services, Google Voice, Has Madison Account, Location History, Web & App Activity, YouTube, and iGoogle.

    23.    I obtained a search warrant for information from the banksavs@gmail.com account. I and other investigators working with me have reviewed the information. We have identified a number of pieces of information in the Google data that further support the conclusion that Banks was responsible for GD's kidnapping and murder, including the following:

    a.    Within the Google maps data there are a number of pieces of information including searches for Vermont on October 10, 2017, December 12, 2017, and January 4, 2018.

    b.    Within the Google search history data are a number of pieces of information including searches for: Explorer Police Interceptors for sale on October 26, 2017; Ford Explorer Police Interceptor rims as well as steel wheels and a police spotlight on October 29, 2017; ARC-22 .22 LR Conversion Kits on December 17, 2017; and body armor on December 26, 2017. As noted above, .22 caliber ammunition was used to kill GD.

c.      Within the Google location information are thousands of GPS coordinates including coordinates connecting the Google user to the 201 Phone. As noted above, the 201 Phone was purchased in Oak Grove, MO at 9:58 a.m. (CST) on November 13, 2017. On November 13, 2017 at 11:09 a.m., when the location information was turned on, it shows the user 50 miles east of Oak Grove, MO on Interstate 70, travelling east. Interstate 70 also travels through Oak Grove, MO. This information suggests to me that the Google user was in Oak Grove at the time the 201 Phone was purchased. The location information also shows that the Google account user travelled from Fort Garland, CO to Dexter, MO on January 2, 2018, and stayed there until January 4, 2018. I have reviewed records from the Dexter Inn, which show that Banks was staying at the motel on the nights of January 2 and 3, 2018. Further, the location information shows that the Google user was inside the Dexter, MO Walmart at 9:20 a.m. on January 4, 2018, the same time the extra minutes were purchased for the 201 Phone.

d.      Though there are hundreds of pieces of location information on most days, there is no location information for certain relevant periods of time including: 1) between 9:51 a.m. (CST) on January 4, 2018, and 9:22 p.m. (CST) on January 7, 2018; 2) between 3:53 p.m. (CST) on November 11, 2017 and 11:09 a.m. (CST) on November 13, 2017; and 3) 2:31 p.m. (CST) on November 13, 2017 and 9:17 p.m. (CST) on November 20, 2017. When the location information was turned on after 9:22 p.m. (CST) on January 7, 2018, the Google user was travelling west on Route 70 in eastern Missouri. The location information shows that the Google user spent the night of January 7 near a Route 70 exit in Missouri, before travelling towards Fort Garland on January 8. This data shows that except for a few hours on November 13, 2017, Banks was not using his 719 Phone while travelling to Vermont both in November 2017 for a reconnaissance trip and in January 2018 for the kidnapping/murder trip.

24.     The Google data also confirms that Banks used the Grizz Sands Facebook account.

D.      The Ford Explorer

25.     I consulted with Matthew Fyie, Manager, Design Analysis Engineering, at Ford Motor Company, to determine the model and year range of the Ford Explorer observed in photographs and video obtained from Clearfield, Pennsylvania. Fyie told me that the Clearfield Explorer was a 2013 to 2015 Police Interceptor model. He noted that the Clearfield Explorer was pictured with Ford Explorer XLT wheels, which were not an option for the 2013 to 2015 Police Interceptor models. Fyie provided photographs of the three wheel styles offered for those Police Interceptors, each of which is different from the XLT wheel. Fyie suggested the XLT wheels were installed on the vehicle at a later time or as an after-market change. Ford later provided information, including VIN numbers, for the 17,291 White Explorer Police Inceptors for model years 2013 to 2015 manufactured and sold by Ford.

26.     The Vermont Intelligence Center (VIC) conducted searches to identify and find vehicles of interest based on certain parameters/criteria (vehicles registered in states of interest,

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 91 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 75 of 103
Case 5:18-mj-00004-gwc   Document 389-4   Filed 04/29/22   Page 10 of 14

Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 8 of 12

in this case Colorado, vehicles sold at auction with high mileage, and vehicles with sales or
service records that occured around the time of the kidnapping and homicide.)

27.     Leads were generated to locate the vehicles of interest and identify the owners at
the time of the kidnapping/homicide.  One lead was sent to Colorado Bureau of Investigation
(CBI) Agent Joseph Cahill, who was then assigned to an FBI Task Force. This particular lead,
based on the additional research and identifiers provided by the Vermont Intelligence Center
(VIC), was specific to a 2013 Ford Explorer with VIN 1FM5K8AR6DGC73609. CARFAX
records indicated that on October 6, 2017, a 2013 white Ford Explorer from Highline
Automotive Inc., VIN 1FM5K8AR6DGC73609, was offered for sale. Mileage on the Explorer at
the time was 117,138. On December 22, 2017, the Ford Explorer was serviced at Downey Car
Center, Downey, California per CARFAX records. Mileage on the Ford Explorer at the time was
130,404. CARFAX records indicate the mileage on the vehicle was 137,168 on March 16, 2018,
the next time the vehicle was offered for sale by Maximum Auto Search.

28.     Agent Cahill and CBI Agent Kevin Koback conducted interviews in connection
with the Ford Explorer and the dealership, Highline Automotive, which was located in Denver,
Colorado. (Highline has since gone out of business.) Agent Cahill provided me verbal and
written reports of the interviews. Those reports show that Banks was using the Explorer at the
time of the kidnapping. Steve Iskhakov, who ran Highline, provided CBI Agents with
documents, including the Highline Automotive sales jacket for the Explorer, which show that
Banks had possession of the Explorer at the time of the kidnapping.  Iskhakov said he never had
anyone drive so many miles on a car in the short period of time Banks had the Explorer.

29.     Agent Cahill and I interviewed Carmine Gulli, the salesman and finance manager
who dealt initially with Banks, on separate occasions. Gulli told me that Banks picked up the
Explorer on October 26, 2017, with an agreement to purchase it with financing. Banks made a
down payment of $3,000 in cash. Gulli was not able to obtain financing for Banks from the first
finance company that he tried. Gulli then tried to finance the Explorer through a second finance
company in mid-November. He did not meet with Banks in person at that point but dealt with
him by phone and email.  Gulli was not able to get financing arranged through the second
finance company either. He then had to arrange for Banks to return the vehicle. Banks told Gulli
that he "lived off the grid" near the New Mexico border. According to Gulli, Banks had no real
credit score. Gulli described Banks as "a ghost." Gulli looked at the Walmart security camera
photographs and stated he felt it appeared to depict the same person as the Explorer buyer but
with more facial hair.

30.     Mark Wilcox was also interviewed by Agent Cahill. Wilcox is the Chief of
Mountain States Emergency Medical Services in Denver, Colorado. He is the current owner of
the Ford Explorer. Wilcox purchased it on April 17, 2018, from Maximum Auto Search in
Englewood, Colorado. Wilcox recalled the person he dealt with at Maximum told him that the
Explorer was being sold on consignment for Highline Automotive due to a pending bankruptcy.
The XLT wheels can be seen in a photograph taken during the time of the interview.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 92 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 76 of 103
Case 5:18-mj-00004-gwc   Document 389-4   Filed 04/29/22   Page 11 of 14

Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 9 of 12

31.     I also spoke with Wilcox.  Wilcox confirmed that the same XLT wheels were on the Explorer when he purchased it from Maximum Auto Search.  Wilcox also told me the Explorer did not have a spotlight attached on the driver's side when he bought it. The Clearfield photos, while not clear, do appear to show a spotlight on the driver's side. This light, as described below, appears to have been attached while Banks had the Explorer and removed before Banks returned it to Highline Automotive.

32.     I have reviewed the Highline Auto sales information. I found the following information regarding the sale/purchase of the Explorer:

     a.     purchaser: Jerry Banks, including his date of birth and social security number;

     b.     address: 1179 Pfotenhauer Road, Fort Garland, CO 81133;

     c.     phone number: (719) 480-3879;

     d.     email address: banksavs@gmail.com;

     e.     additional phone number: (718) 298-2328;

     f.     registration information: plate B094536 for the 2013 white Ford Explorer;

     g.     Progressive Insurance, policy number 917738127, effective 10/26/2017 to 4/26/2018, for the Ford Explorer;

     h.     purchase date: 11/16/2017 with mileage reading of 117,138;

     i.     surrender date: 1/24/2018, documents indicate "miles and use paid for" and "loan is being written off, no harm to borrower." A receipt for the additional "miles and use" indicates Banks paid $1,500 in cash when he surrendered the vehicle;

     j.     Banks "surrendered" the Ford Explorer to Highline Automotive Inc.

33.     I also reviewed records provided by Progressive Insurance involving Banks' purchase of the 2013 Ford Explorer. The insured is listed as Jerry Banks with phone numbers (661) 433-5327 and (719) 480-3879 and an email address of banksavs@gmail.com.  The primary use of the vehicle is designated "Pleasure."  This vehicle was added to the policy on 10/26/2017. This vehicle was removed from the policy on 1/25/2018.

34.     I have also reviewed Colorado vehicle registration information about the Highline Explorer. Those records show that Banks got a temporary registration for the Explorer first on 10/26/17, consistent with the Progressive Insurance Records. The Colorado registration records further show that Banks got a second temporary registration for the Explorer on 11/16/17, the purchase date in the Highline Auto records. The temporary tag issued on 11/16/17 was B094536. Agent Cahill, who is familiar with Colorado temporary registration tags, told me that those tags are white in color and made of paper.  Colorado only issues a temporary tag for the rear of car not a second for the front. This kind of temporary tag is consistent with the images from the Clearfield Explorer, which had a light colored rear tag and no front tag.

     E.     <u>The 661 Phone</u>

35.     I reviewed Verizon Wireless records obtained for the phone using number (661) 433-5327 (the 661 Phone) during the relevant period.  The subscriber is All Valley Solar (AVS).

The mailing address for the billing statement is All Valley Solar (AVS), 12623 Sherman Way
Ste. A, N. Hollywood, CA 91605. As noted above, Progressive records show that Banks
provided this phone number as his work phone number, and Verizon Wireless records for the
719 Phone show Banks provided this number as his home and work phone. The investigation
has revealed information that Banks worked for All Valley Solar before 2017.

      36.     The 661 Phone records also show approximate location information for the calls.
On the morning of 11/18/2017, three calls were made from this phone all originating from
Barnet, Vermont. As noted above, the 719 Phone records show no phone activity between
11/10/17 and 11/20/17, while Banks appears to have travelled to Vermont for a reconnaissance
trip.

      F.     Kansas Highway Patrol Stop

      37.     Based on reviews of law enforcement contact with Banks, I discovered that on
1/8/2018 at approximately 1:48 p.m. CST, a traffic stop was conducted by Kansas Highway
Patrol Technical Trooper Clark in the vicinity of mile post 337 on I-70 Westbound in Alma, KS.
I have reviewed reports about the stop. Jerry Banks was operating the white Ford Explorer.
Banks was stopped for a lane violation. I spoke with Technical Trooper Clark and reviewed a
DVD recording of the traffic stop he provided. Trooper Clark described Banks as extremely
nervous. The vehicle contained multiple law enforcement items including a gun, tactical vest and
law enforcement equipment. Trooper Clark noted the back seat of the Ford Explorer was folded
down and a mattress was observed in the middle to back area of the Explorer.

      38.     On 3/3/2020, I reviewed a DVD copy of the traffic stop conducted by Technical
Trooper Clark on 1/8/2018. Jerry Banks falsely said that he was traveling from Dexter, MO.
During the traffic stop, a phone can be heard ringing inside the Ford Explorer. The phone
ringtone is consistent with a Samsung Galaxy phone standard ringtone.

      39.     I compared the video of Banks from the car stop to the photos/video from the
Clearfield, PA Walmart purchasing the 911 Phone and BP gas station, described above. Banks
looks similar to the person in the Clearfield images. The Google location information shows that
Banks drove from Fort Garland, CO to Dexter, MO on January 2 driving a route further south
than Route 70 through Kansas. If he had been driving directly home from Dexter on January 8 he
would likely have used that more southerly route rather than Route 70, which is the most direct
route to CO from the Northeast.

      G.     Banks' Finances

      40.     We have attempted to figure out Banks' financial situation to help prove that he
received money in connection with the murder, because I have found no evidence of any
personal connection between Banks and the victim. The Highline Auto records show that Banks
worked for the Costilla County Sheriff during the fall of 2017. I have learned from search
warrant materials that Banks was attending Community College full time during the first several

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 94 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 78 of 103
Case 5:18-mj-00004-gwc   Document 389-4   Filed 04/29/22   Page 13 of 14

Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 11 of 12

months of 2018. The Highline records include a copy of a pay stub from Costilla County provided in connection with his attempted financing of the Explorer. Banks was earning $640 a week gross and less than $500 a week net. I have reviewed records from Green Dot, a business that allows users to deposit money onto a debit card. In addition to the $4,500 in cash paid for the Explorer, Banks put $2,600 in cash on his Green Dot card in November and December 2017, and $12,500 in cash on his Green Dot card during the first half of 2018.

41.     Banks' Facebook account includes statements Banks made on Facebook Messenger. He has several conversations with Stephanie Giambra. with whom Banks appears to be close. Banks apparently worked with Giambra at All Valley Solar, used an AVS credit card in the past, and owed her money. In October 2017, he wrote her that he had a side job and a "bunch of money for her." On December 8, he asked Giambra what he owed her and reported doing well financially and wanting to take care of her while he could. I believe that Banks, who had not personal connection with Banks, was paid to kidnap and murder GD.

H.     Banks' Purchases

42.     Within the Google email data are emails with information related to purchases including the following: 1) On November 3, 2017, an order confirmation email to Jerry Banks describing the purchase from Amazon of a public safety scanner; 2) on November 8, 2017 a shipping confirmation email to Jerry Banks for a blue/red flashing modes; and 3) on December 20, 2017, an email containing a Paypal purchase confirmation to "Jerru Banks" for purchases of an Antique Gold Marshal Badge, a US Marshal Shoulder Patch and a US Marshal embroidery patch.

43.     I have reviewed records from Amazon that reflect Banks has been a customer since July 31, 2013 and has used the email address banksavs@gmail.com. I have reviewed the order history which shows the following purchases. On November 4, 2017, he purchased a handheld scanner and police-style car antenna. On December 4, 2017, he purchased a Police Interceptor nameplate for the Ford Explorer. On December 10, 2017, he purchased a police spotlight that could be attached to the Explorer. On December 26, 2017, he purchased two sets of handcuffs and a set of automotive parts that can be used to assemble a silencer. On December 27, 2017, he purchased dashboard red and blue emergency lights.

44.     I have reviewed PayPal records for Jerru Banks that reflect that the account was opened on December 20, 2017, and the email address provided was banksavs@gmail.com. The records show purchases on December 20, 2017, of a Marshal's badge and various Marshal's patches.

45.     I have reviewed records provided by Spartan Armor Systems which reflect Jerry Banks purchasing two body armor jackets on December 20, 2017.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 95 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 79 of 103
Case 5:18-mj-00004-gwc   Document 389-4   Filed 04/29/22   Page 14 of 14

Case 5:22-mj-00037-gwc   Document 1-1   Filed 03/30/22   Page 12 of 12

<u>Conclusion</u>

46.     For the reasons described above, there exists probable cause to believe that Jerry Banks unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away for reward and otherwise GD, when Banks travelled in interstate commerce and used a facility or instrumentality of interstate commerce in committing and in furtherance of the commission of the offense, in violation of 18 U.S.C. § 1201(a)(1).

Dated at Rutland, in the District of Vermont, this ___30___ day of March, 2022.

*Sworn to by reliable electronic means*

*gwc*

_____
Patrick Hanna
Special Agent - FBI

Sworn to and subscribed before me this ___30___ day of March, 2022.

_____
Honorable Geoffrey W. Crawford
Chief United States District Judge

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 96 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 80 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 1 of 24

# EXHIBIT 2

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 97 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 81 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 2 of 24

# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**1179 Pfotenhauer Road,<br>Fort Garland, Colorado** | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the ____State and____ District of ____Colorado____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1201 | Kidnapping with Death Resulting |
| 18 U.S.C. § 1512(a)(1) | Murder to Obstruct Justice |
| 18 U.S.C. § 1958 | Murder for Hire |

The application is based on these facts:

**X** Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Patrick Hanna*
*Applicant's signature*

**Special Agent Patrick Hanna, FBI**
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: **06 Apr 2022**

*Judge's signature*

Kristen L. Mix
**United States Magistrate Judge**
*Printed name and title*

City and state: ____Denver, CO____

## ATTACHMENT A

**Location to be searched: 1179 Pfotenhauer Road, Fort Garland, Colorado.**

The premises to be searched, **1179 Pfotenhauer Road, Fort Garland, Colorado,** is described as a tan in color, single level residence, converted camper/trailer and tan outbuilding next to the camper/trailer. The property is secluded and is on low ground at edge of scrub oak/sage brush. The entrance to the property is marked by the numbers "1179" on a post located next to the driveway. The driveway is directly off Pfotenhauer Rd. There is a tan outbuilding next to the camper/trailer. There are two vehicles located at the residence: a red Chevrolet Blazer and a White/Black Ford truck unknown registrations. Authority is also sought to search these vehicles if they are on the curtilage of the Subject Location when the warrant is executed. Below are photographs taken on April 1, 2022 depicting the residence.





Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 99 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 83 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 4 of 24

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEARCHED FOR AND SEIZED FROM:**
**1179 Pfotenhauer Road, Fort Garland, Colorado 81133**

**as described in Attachment A (the "Subject Premises")**

Agents and investigative officers are authorized to search for and seize the following particular items, that constitute evidence of the commission of criminal offenses; and property designed or intended for use or which is or has been used as the means of committing criminal offenses, namely, violations of: 18 U.S.C. §§ 1201(a)(1), 1512(a)(1) & 1958, including:

1. Items used in connection with the kidnapping and murder of Gregory Davis on January 6, 2018, such as:

- Firearms including 9mm handguns and AR-15 style rifles
- Ammunition
- Stun Gun
- Pepper Blaster
- 300 Channel handheld scanner, Tram 1094-BNC Scanner 3 1/2 –magnet antenna with BNC male connector
- 100 Watt post-mount spotlight
- Body armor carriers
- Marshal Badge
- US Marshals embroidery patches with hook on back
- 4" green subdued Department of Justice US Marshals shoulder patches
- Handcuffs
- Wix Oil Filter
- Oil filter suppressor
- ½ -28 NPT threaded adapter, Aluminum automotive oil filter adapter
- Xprite 16 LED high intensity Red Blue windshield dash emergency strobe lights w/suction cups for police law enforcement vehicles truck interior roof hazard warning flashlight.
- .22 LR conversion kits

2. Cellphones: (I will seize cellphones but will apply for further warrant before searching cellphones)

- ZTE Model Z835 (the model number identified by investigators as associated with phone number 201-208-7436 during the relevant period)
- LG Model B470 (the model number identified by investigators as associated with phone number 802-473-0535 during the relevant period)
- Samsung Galaxy V (the model number identified by investigators as associated with phone number 661-433-5327 during the relevant period)

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 100 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 84 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 5 of 24

- Samsung Galaxy Note 4 (the first model number identified by investigators as associated with phone number 719-480-3879 during the relevant period)
- Samsung Galaxy Note 8 (the second model number identified by investigators as associated with phone number 719-480-3879 during the relevant period)

3.      Documents and records relating to Jerry Banks' employment, earnings, or finances between July 1, 2017, and July 1, 2018

2

## AFFIDAVIT

I, Patrick Hanna, being duly sworn, depose and say:

### Introduction

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and currently assigned to the Burlington Resident Agency in Vermont. I have been an FBI Special Agent for 19 years. My duties as an FBI Special Agent include investigating violations of Title 18 of the United States Code as they pertain to corporate fraud, complex financial crimes, embezzlement, public corruption, money laundering and related white-collar crimes, as well as violent crimes and criminal enterprises. I have participated in investigations of criminal violations of various federal laws. I have executed search and arrest warrants, interviewed and interrogated subjects, witnesses, and victims, and conducted surveillance. In the course of these investigations, I have gained an understanding of current technology, to include computers and online accounts, cellular telephones and associated records and data, and have conducted analyses of the data related to such accounts and devices, for the purpose of solving and proving crimes.

2.      On April 6, 2022, Jerry Banks was arrested in Wyoming based on a federal Complaint charging kidnapping, signed by Chief Judge Geoffrey Crawford, District of Vermont. As discussed below, there is probable cause to believe that Jerry Banks kidnapped and murdered Gregory Davis, whose deceased body was discovered on January 7, 2018. There is probable cause to believe that Davis's kidnapping and murder involved the following federal crimes: kidnapping with death resulting, in violation of 18 U.S.C. § 1201; murder to obstruct justice, in violation of 18 U.S.C. § 1512(a)(1), and murder for hire, 18 U.S.C. § 1958 (Subject Offenses). At the time of his arrest, Banks was working as a seasonal employee for a contractor within Yellowstone National Park. Since the time of the murder scheme, Banks' permanent residence has been 1179 Pfotenhauer Road, Fort Garland, CO. I submit this Affidavit in support of an Application for a Search Warrant for Banks' residence, as described in Attachment A, for evidence and instrumentalities of the Subject Offenses, as described in Attachment B.

3.      This case is being investigated by the FBI and the Vermont State Police (VSP). Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included details of every aspect of the investigation. Except as otherwise noted, the information contained in this Affidavit is based upon my personal knowledge and observations, my training and experience, conversations with other law enforcement officers and witnesses, and my review of documents and records.

### Probable Cause

A.      The Kidnapping and Shooting

4.      On January 7, 2018, VSP responded to a homicide in Barnet, VT. The victim, identified as Gregory Davis, was found partially covered by snow near the base of a snowbank on a pull off area near the west side of Peacham Road. The victim was found handcuffed and had been shot multiple times in the head and torso. Davis resided at 884 Hawkins Road, Danville,

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 102 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 86 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 7 of 24

VT at the time. The victim's body was discovered approximately 15 miles from his residence. Evidence gathered from the crime scene included .22 caliber cartridge casings.

5.     VSP Detectives responded to Davis's home and interviewed his wife, Melissa Davis, and their 12-year-old son (minor child #1). Both were interviewed again later. Melissa Davis told VSP Detectives that at approximately 9:00 p.m. on January 6, 2018, she and her husband were in a first-floor bedroom in their Danville home. They heard someone knock on the door. Gregory Davis went to the door to see who was there. Davis came back to the bedroom and told Melissa Davis that a man claiming to be a U.S. Marshal came to the victim's home to arrest him. Davis put his clothes on and left with the man. Melissa Davis saw the man and described him as having handcuffs, a rifle, and wearing a jacket and mask with an eye opening, both of which had a U.S. Marshals emblem. Melissa Davis also reported that the man said he had an arrest warrant for Gregg Davis for racketeering and was bringing him to Virginia. Minor child #1, who observed the man and his car from a second-floor window, told police that the man drove a white four-door car with red and blue emergency lights activated on the dash. Davis left in the man's car. The man was wearing black clothes and had a gun and a belt with various law enforcement tools on it. Melissa Davis did not contact police.

6.     On January 10, 2018, Agent Jennie Emmons confirmed with Supervisory Deputy U.S. Marshal Carl Staley of the Burlington Vermont office of the U.S. Marshals Service that Davis was not arrested by their agency. Further, Deputy Marshal Staley said that there had been no active federal warrants for Gregory Davis.

B.     The 911 Phone

7.     I listened to a 911 call made around the time of the victim's kidnapping. The call took place approximately 15 minutes prior to the kidnapping and originated within a mile of the victim's residence. The VT 911 call center received a call from (802) 473-0535 (the "911 Phone"; this phone number was found by investigators to be associated to an LG Model B470) at 8:42 p.m. on January 6, 2018. The 911 call center's technology identified the call as coming from a location on North Danville Road, Danville, VT, only a short distance from the victim's residence. I believe that Banks used the 911 Phone to facilitate the victim's kidnapping and murder.

a.     During the call, a man stated that he shot his wife and was going to shoot himself. The caller gave an address of "71772 Cross Road" (with no town information), after which the caller hung up. The call information was relayed to VSP in St. Johnsbury, Vermont. VSP attempted to locate a Cross Road in the St. Johnsbury area without success.

b.     VSP thereafter requested that AT&T provide location information for the phone in question due to the exigent circumstance. AT&T confirmed that the 911 call came from the North Danville Road location. AT&T also reported that the phone was a prepaid phone with no subscriber information available. After VSP checked the North Danville location and several possible "Cross Roads" outside the town of St. Johnsbury, the matter was closed. At that time, the victim's body had not been discovered.

2

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 103 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 87 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 8 of 24

c.    I later obtained search warrants for various accounts used by Banks, including his Facebook account, where Banks listed his user name as Grizz Sands. Among the data in the Facebook account were video recordings, including a video in which Banks narrated a tour of his residence in Fort Garland, CO. Banks' voice sounds similar to the voice of the 911 caller.

8.    AT&T responded to a search warrant for information associated with the 911 Phone. The AT&T search warrant data confirmed the location of the 911 call on January 6, 2018, near the time and location of victim's kidnapping.

9.    The data provided by AT&T was reviewed by Special Agent James Wines of the FBI's Cellular Analysis Survey Team. After this review, and consultation with AT&T security personnel, Agent Wines advised that the 911 Phone was a prepaid phone purchased at a Walmart on January 5, 2018. The records showed only two calls made by the phone, a four-second call to a Pizza Hut in St. Johnsbury, VT at 4:14 p.m. on January 6 and the 911 call at 8:42 p.m. on January 6. The phone used only two sectors of the same cell tower, located in St. Johnsbury, VT, for all cell site activity. Agent Wines also advised that this phone was activated, meaning that it could operate on the AT&T network, shortly before 4:00 p.m. on January 6, within minutes of the Pizza Hut call. I have not been able to establish how the phone was activated.

10.    Agent Wines advised me that he learned from contacts at Walmart security that the prepaid phone was purchased with $100 cash on January 5, 2018, at 4:14 p.m. at the Walmart located at 100 Supercenter Drive, Clearfield, PA. Agent Wines forwarded me numerous security camera images of the individual purchasing the phone, which were obtained from Walmart security. The images show a bearded, adult, white man purchasing the phone. The man arrived and departed in a white Ford Explorer. The camera footage indicates the vehicle parked in the Walmart parking lot around 3:55 p.m. and left the lot around 4:17 p.m. The Explorer does not appear to have a front license plate. The rear plate was light in color and appeared to be white. Numbers and/or letters were not recognizable on the rear plate. The Explorer is generally consistent with minor child #1's description of the kidnapper's car.

11.    FBI personnel in Pennsylvania canvassed gas stations and other locations in the vicinity of the Walmart at 100 Supercenter Drive, Clearfield, PA, to determine if additional security camera footage of the bearded, white male and/or the white Ford Explorer could be located. Additional video footage of the suspect and vehicle were located at a BP gas station at 14624 Clearfield Shawville Highway, Clearfield, PA 16830.

12.    I reviewed stills of this footage, which included images of the bearded, white man and the white Ford Explorer, and they appear to be the same person and vehicle shown in the Walmart security video. The suspect purchased gas at the BP station. I saw what appears to be a smartphone in the suspect's hand. A time stamp on this video put the stop at the gas station at 4:27 p.m. on January 5, 2018. My review of the reports of the agents who travelled to Clearfield, Pennsylvania shows that the display times from the gas station security footage appear to be plus six or seven minutes relative to the actual time.

13.    I have reviewed Colorado driver's license information about Banks. On December 18, 2017, a Colorado driver's license was issued to Jerry Dean Robert Banks. Banks

3

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 104 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 88 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 9 of 24

gave his mailing address as 1179 Pfotenhauer Road, Fort Garland, CO. Based on the driver's license photo of Banks (taken only three weeks before the kidnapping), Banks resembles the man depicted in the Walmart surveillance images as the purchaser of the 911 Phone. Below is the license photo (on the right) and an edited image of the face of the 911 Phone purchaser (on the left) for comparison.




C.   The 201 Phone

14.   Agent Wines also reviewed AT&T tower data obtained as a result of search warrants issued by this court. Agent Wines received a list of cellular devices connecting to a tower covering the area of Clearfield, Pennsylvania, where the 911 Phone was purchased. The data included a list of devices connecting to the tower at or about the time the 911 Phone was purchased. Agent Wines compared this data to data he received listing cellular devices connecting to a tower covering the area of Danville, Vermont, where the kidnapping took place. The data included devices connecting to the tower at or about the time of Davis's kidnapping. Only one cellular phone was common to both sets of data, and it was a device with phone number (201) 208-7436 (the "201 Phone"; this phone number was found by investigators to be associated to a ZTE Model Z835 phone). Based on the information below, I believe that Banks used the 201 Phone to facilitate the victim's kidnapping and murder.

15.   Further investigation by Agent Wines determined that 201 Phone is an Android cell phone purchased at a Walmart located at 201 Southeast Salem Street, Oak Grove, Missouri on November 13, 2017, at approximately 9:58 a.m. (CST), and additional service (minutes/data) for that phone were purchased at a Walmart located at 2025 W. Business Highway 60, Dexter, Missouri on January 4, 2018 at approximately 9:20 a.m. (CST). Agent Wines obtained receipts for these purchases, which show these purchases, like the 911 Phone purchase in Pennsylvania on January 6, 2018, were each made with $100 cash. The details on the receipts suggest that the customer paid with a $100 bill for all three purchases: the 201 Phone, the extra minutes for the 201 Phone, and the 911 Phone.

4

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 105 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 89 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 10 of 24

16.     I obtained a search warrant for historical cell site and location information for the 201 Phone.  The 201 Phone did not make or receive any phone calls or texts during the relevant period. Its only interactions with the AT&T network involved data transmissions. The records do not reveal the kind of data transmitted. Agent Wines and I have reviewed the information obtained from this warrant. Analysis of the data shows the 201 Phone assigned number was registered with the AT&T network on November 14, 2017.  It first interacted with the network through cell towers in the area of Monte Vista, Colorado for a brief time on December 29, 2017. The phone next interacted with a cell tower in the area of Dexter, Missouri on January 3, 2018, and January 4, 2018, again for short periods. Thereafter, the phone interacted with cell towers near roads following a path in a northern and eastern direction through Illinois, Indiana, and Ohio. Analysis of the data shows the phone interacted with cell towers in the Columbus, Ohio, area for a time period between 7:30 p.m. January 4, 2018 to 11:20 a.m. January 5, 2018.  The phone thereafter continued to interact with cell towers near roads through Pennsylvania, New York, and Connecticut. Analysis of the data shows the phone interacted for a period of time with cell towers in the area Southington, Connecticut, from 12:00 a.m. to 10:00 a.m. on January 6, 2018. The data shows the phone then continued through Massachusetts and arrived in Vermont on January 6, 2018, at approximately 11:37 a.m. The phone then traveled north, consistent with travel on Interstate 91, and arrived in the area of St. Johnsbury, Vermont, at about 1:30 p.m. Throughout the afternoon and into the evening of January 6, 2018, the data shows the phone was in the areas of St. Johnsbury and Danville, Vermont. The phone remained in the general area in which the victim's kidnapping took place (at approximately 9:00 p.m.) and where his body was recovered the next day.  After approximately 9:24 p.m., the phone appears to have traveled south out of the Danville/St. Johnsbury area, consistent with travel on Interstate 91.  The last reported cell site or location data was at 10:01 p.m., after which the phone had no more interaction with the AT&T network. Based on this information, there is probable cause to believe that the 201 Phone was used for the purpose of the victim's kidnapping and murder.

17.     Further analysis of the data shows that during the travel to Vermont, the 201 Phone passed through the area of Clearfield, Pennsylvania at the time the 911 Phone was purchased at the Walmart in Clearfield, Pennsylvania.

18.     I have attempted to obtain information from Google about the use of this phone by subpoena. The only information Google could provide showed that the 201 Phone connected to Google servers for the first time on November 14, 2017, and for the last time on January 6, 2018.

19.     I have reviewed records from Verizon Wireless that identify Jerry Banks as the subscriber of the phone with number (719) 480-3879 (the "719 Phone"; this phone number was found to be associated with two different physical phones during the relevant periods, a Samsung Galaxy Note 4 and a Samsung Galaxy Note 8) during the relevant timeframe. Banks was the effective subscriber from 10/20/2017 through 11/8/2018. Banks listed (661) 433-5327 (the "661 Phone"; this phone number was found by investigators to be associated with a Samsung Galazy V) as his home phone number and work phone number.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 106 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 90 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 11 of 24

20.     I have also reviewed Verizon Wireless Billing Statements, which show the approximate location of the 719 Phone when calls were made. I have confirmed with Verizon Wireless personal that this location information is associated with the cell towers and switch connecting to the phone at the time of calls. I also learned that Verizon Wireless maintained more precise location information for this phone for only approximately one year. That data was gone by the time I obtained the search warrant. I found the following locations of note for this phone in the Billing Statements:

     a.     On 10/26/2017, a call from this phone originated in Denver, CO.

     b.     On 12/13/2017, a call from this phone originated in Dexter, MO.

     c.     On 12/28/2017 a call from this phone originated in Alamosa, CO.

     d.     On 12/29/2017, another call from this phone originated in Alamosa, CO, which is close to Monte Vista, CO. As noted above, the 201 Phone first interacted with cell towers in the area of Monte Vista, CO on 12/29/2017.

     e.     On 1/2/2018 and 1/3/2018, calls from this phone originated in Dexter, MO. As noted above, the 201 Phone interacted with cell towers in Dexter, MO on 1/3/2018.

     f.     No calls are made between 12:59 p.m. on 1/3/2018 and 1/7/2018, when the 201 Phone was actively being used.

     g.     On 1/7/2018, at approximately 9:24 p.m., a call from this phone originated in O'Fallon, MO, which is along I-70 in Missouri. The time between the last use of the 201 Phone and this call on the 719 Phone is approximately 25 hours. Google Maps shows that driving time from Barnet, VT to O'Fallon, MO is approximately 19 hours.

     h.     On 1/8/2018, a call from this phone originated in Alma, KS. This call takes place approximately 15 minutes after the Kansas Highway Patrol car stop of Banks in Alma, KS, described below. The call connects with (573) 421-4798 for approximately 20 minutes.

     i.     On 1/9/2018, multiple calls are made from this phone, all originating in Colorado (Alamosa, Sanford and Colorado Springs).

21.     Banks' use of the 719 Phone connected to his Google account, described below, is consistent with him buying and using the 201 Phone.

22.     I have reviewed Google records for the email address banksavs@gmail.com. Jerry Banks is the subscriber of the email account. He uses bankspes@gmail.com for his recovery email. The account was created on 6/5/2009. SMS (texts) are connected to the 719 Phone. The subscriber services listed are Android, Gmail, Google Calendar, Google Chrome Sync, Google Cloud Print, Google Drive, Google Hangouts, Google Keep, Google My Maps, Google Payments, Google Photos, Google Play, Google Play Music, Google Services, Google Voice, Has Madison Account, Location History, Web & App Activity, YouTube, and iGoogle.

23.     I obtained a search warrant for information from the banksavs@gmail.com account. I and other investigators working with me have reviewed the information. I have identified a number of pieces of information in the Google data that further support the conclusion that Banks was responsible for Davis's kidnapping and murder, including the following:

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 107 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 91 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 12 of 24

a.      Within the Google maps data there are a number of pieces of information including searches for Vermont on October 10, 2017, December 12, 2017, and January 4, 2018.

b.      Within the Google search history data are a number of pieces of information including searches for: Explorer Police Interceptors for sale on October 26, 2017; Ford Explorer Police Interceptor rims as well as steel wheels and a police spotlight on October 29, 2017; ARC-22 .22 LR Conversion Kits on December 17, 2017; and body armor on December 26, 2017.  As noted above, .22 caliber ammunition was used to kill Davis.

c.      Within the Google location information are thousands of GPS coordinates including coordinates connecting the Google user to the 201 Phone. As noted above, the 201 Phone was purchased in Oak Grove, MO at 9:58 a.m. (CST) on November 13, 2017. On November 13, 2017 at 11:09 a.m., when the location information was turned on, it shows the user 50 miles east of Oak Grove, MO on Interstate 70, travelling east. Interstate 70 also travels through Oak Grove, MO. This information suggests to me that the Google user was in Oak Grove at the time the 201 Phone was purchased. The location information also shows that the Google account user travelled from Fort Garland, CO to Dexter, MO on January 2, 2018, and stayed there until January 4, 2018. I have reviewed records from the Dexter Inn, which show that Banks was staying at the motel on the nights of January 2 and 3, 2018. Further, the location information shows that the Google user was inside the Dexter, MO Walmart at 9:20 a.m. on January 4, 2018, the same time the extra minutes were purchased for the 201 Phone.

d.      Though there are hundreds of pieces of location information on most days, there is no location information for certain relevant periods of time including: 1) between 9:51 a.m. (CST) on January 4, 2018, and 9:22 p.m. (CST) on January 7, 2018; 2) between 3:53 p.m. (CST) on November 11, 2017 and 11:09 a.m. (CST) on November 13, 2017; and 3) 2:31 p.m. (CST) on November 13, 2017 and 9:17 p.m. (CST) on November 20, 2017. When the location information was turned on after 9:22 p.m. (CST) on January 7, 2018, the Google user was travelling west on Route 70 in eastern Missouri. The location information shows that the Google user spent the night of January 7 near a Route 70 exit in Missouri, before travelling towards Fort Garland on January 8. This data shows that except for a few hours on November 13, 2017, Banks was not using his 719 Phone while travelling to Vermont both in November 2017 for a reconnaissance trip and in January 2018 for the kidnapping/murder trip.

24.     The Google data also confirms that Banks used the Grizz Sands Facebook account.

D.      The Ford Explorer

25.     I consulted with Matthew Fyie, Manager, Design Analysis Engineering, at Ford Motor Company, to determine the model and year range of the Ford Explorer observed in photographs and video obtained from Clearfield, Pennsylvania. Fyie told me that the Clearfield Explorer was a 2013 to 2015 Police Interceptor model. He noted that the Clearfield Explorer was pictured with Ford Explorer XLT wheels, which were not an option for the 2013 to 2015 Police

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 108 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 92 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 13 of 24

Interceptor models. Fyie provided photographs of the three wheel styles offered for those Police
Interceptors, each of which is different from the XLT wheel. Fyie suggested the XLT wheels
were installed on the vehicle at a later time or as an after-market change. Ford later provided
information, including VIN numbers, for the 17,291 White Explorer Police Inceptors for model
years 2013 to 2015 manufactured and sold by Ford.

26.   The Vermont Intelligence Center (VIC) conducted searches to identify and find
vehicles of interest based on certain parameters/criteria (vehicles registered in states of interest,
in this case Colorado, vehicles sold at auction with high mileage, and vehicles with sales or
service records that occured around the time of the kidnapping and homicide.)

27.   Leads were generated to locate the vehicles of interest and identify the owners at
the time of the kidnapping/homicide.  One lead was sent to Colorado Bureau of Investigation
(CBI) Agent Joseph Cahill, who was then assigned to an FBI Task Force. This particular lead,
based on the additional research and identifiers provided by the Vermont Intelligence Center
(VIC), was specific to a 2013 Ford Explorer with VIN 1FM5K8AR6DGC73609. CARFAX
records indicated that on October 6, 2017, a 2013 white Ford Explorer from Highline
Automotive Inc., VIN 1FM5K8AR6DGC73609, was offered for sale. Mileage on the Explorer at
the time was 117,138. On December 22, 2017, the Ford Explorer was serviced at Downey Car
Center, Downey, California per CARFAX records. Mileage on the Ford Explorer at the time was
130,404. CARFAX records indicate the mileage on the vehicle was 137,168 on March 16, 2018,
the next time the vehicle was offered for sale by Maximum Auto Search.

28.   Agent Cahill and CBI Agent Kevin Koback conducted interviews in connection
with the Ford Explorer and the dealership, Highline Automotive, which was located in Denver,
Colorado. (Highline has since gone out of business.) Agent Cahill provided me verbal and
written reports of the interviews. Those reports show that Banks was using the Explorer at the
time of the kidnapping. Steve Iskhakov, who ran Highline, provided CBI Agents with
documents, including the Highline Automotive sales jacket for the Explorer, which show that
Banks had possession of the Explorer at the time of the kidnapping.  Iskhakov said he never had
anyone drive so many miles on a car in the short period of time Banks had the Explorer.

29.   Agent Cahill and I interviewed Carmine Gulli, the salesman and finance manager
who dealt initially with Banks, on separate occasions. Gulli told me that Banks picked up the
Explorer on October 26, 2017, with an agreement to purchase it with financing. Banks made a
down payment of $3,000 in cash. Gulli was not able to obtain financing for Banks from the first
finance company that he tried. Gulli then tried to finance the Explorer through a second finance
company in mid-November. He did not meet with Banks in person at that point but dealt with
him by phone and email.  Gulli was not able to get financing arranged through the second
finance company either.  He then had to arrange for Banks to return the vehicle. Banks told Gulli
that he "lived off the grid" near the New Mexico border.  According to Gulli, Banks had no real
credit score. Gulli described Banks as "a ghost." Gulli looked at the Walmart security camera

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 109 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 93 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 14 of 24

photographs and stated he felt it appeared to depict the same person as the Explorer buyer but with more facial hair.

30.   Mark Wilcox was also interviewed by Agent Cahill. Wilcox is the Chief of Mountain States Emergency Medical Services in Denver, Colorado. He is the current owner of the Ford Explorer. Wilcox purchased it on April 17, 2018, from Maximum Auto Search in Englewood, Colorado. Wilcox recalled the person he dealt with at Maximum told him that the Explorer was being sold on consignment for Highline Automotive due to a pending bankruptcy. The XLT wheels can be seen in a photograph taken during the time of the interview.

31.   I also spoke with Wilcox. Wilcox confirmed that the same XLT wheels were on the Explorer when he purchased it from Maximum Auto Search. Wilcox also told me the Explorer did not have a spotlight attached on the driver's side when he bought it. The Clearfield photos, while not clear, do appear to show a spotlight on the driver's side. This light, as described below, appears to have been attached while Banks had the Explorer and removed before Banks returned it to Highline Automotive.

32.   I have reviewed the Highline Auto sales information. I found the following information regarding the sale/purchase of the Explorer:
    a.    purchaser: Jerry Banks, including his date of birth and social security number;
    b.    address: 1179 Pfotenhauer Road, Fort Garland, CO 81133;
    c.    phone number: (719) 480-3879;
    d.    email address: banksavs@gmail.com;
    e.    additional phone number: (718) 298-2328;
    f.    registration information: plate B094536 for the 2013 white Ford Explorer;
    g.    Progressive Insurance, policy number 917738127, effective 10/26/2017 to 4/26/2018, for the Ford Explorer;
    h.    purchase date: 11/16/2017 with mileage reading of 117,138;
    i.    surrender date: 1/24/2018, documents indicate "miles and use paid for" and "loan is being written off, no harm to borrower." A receipt for the additional "miles and use" indicates Banks paid $1,500 in cash when he surrendered the vehicle;
    j.    Banks "surrendered" the Ford Explorer to Highline Automotive Inc.

33.   I also reviewed records provided by Progressive Insurance involving Banks' purchase of the 2013 Ford Explorer. The insured is listed as Jerry Banks with phone numbers (661) 433-5327 and (719) 480-3879 and an email address of banksavs@gmail.com. The primary use of the vehicle is designated "Pleasure." This vehicle was added to the policy on 10/26/2017. This vehicle was removed from the policy on 1/25/2018.

34.   I have also reviewed Colorado vehicle registration information about the Highline Explorer. Those records show that Banks got a temporary registration for the Explorer first on 10/26/17, consistent with the Progressive Insurance Records. The Colorado registration records further show that Banks got a second temporary registration for the Explorer on

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 110 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 94 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 15 of 24

11/16/17, the purchase date in the Highline Auto records. The temporary tag issued on 11/16/17 was B094536. Agent Cahill, who is familiar with Colorado temporary registration tags, told me that those tags are white in color and made made of paper. Colorado only issues a temporary tag for the rear of car not a second for the front. This kind of temporary tag is consistent with the images from the Clearfield Explorer, which had a light colored rear tag and no front tag.

E.     The 661 Phone

35.     I reviewed Verizon Wireless records obtained for the phone using number (661) 433-5327 (the 661 Phone) during the relevant period. The subscriber is All Valley Solar (AVS). The mailing address for the billing statement is All Valley Solar (AVS), 12623 Sherman Way Ste. A, N. Hollywood, CA 91605. As noted above, Progressive records show that Banks provided this phone number as his work phone number, and Verizon Wireless records for the 719 Phone show Banks provided this number as his home and work phone. The investigation has revealed information that Banks worked for All Valley Solar before 2017.

36.     The 661 Phone records also show approximate location information for the calls. On the morning of 11/18/2017, three calls were made from this phone all originating from Barnet, Vermont. As noted above, the 719 Phone records show no phone activity between 11/10/17 and 11/20/17, while Banks appears to have travelled to Vermont for a reconnaissance trip.

F.     Kansas Highway Patrol Stop

37.     Based on reviews of law enforcement contact with Banks, I discovered that on 1/8/2018 at approximately 1:48 p.m. CST, a traffic stop was conducted by Kansas Highway Patrol Technical Trooper Clark in the vicinity of mile post 337 on I-70 Westbound in Alma, KS. I have reviewed reports about the stop. Jerry Banks was operating the white Ford Explorer. Banks was stopped for a lane violation. I spoke with Technical Trooper Clark and reviewed a DVD recording of the traffic stop he provided. Trooper Clark described Banks as extremely nervous. The vehicle contained multiple law enforcement items including a gun, tactical vest and law enforcement equipment. Trooper Clark noted the back seat of the Ford Explorer was folded down and a mattress was observed in the middle to back area of the Explorer.

38.     On 3/3/2020, I reviewed a DVD copy of the traffic stop conducted by Technical Trooper Clark on 1/8/2018. Jerry Banks falsely said that he was traveling from Dexter, MO. During the traffic stop, a phone can be heard ringing inside the Ford Explorer. The phone ringtone is consistent with a Samsung Galaxy phone standard ringtone.

39.     I compared the video of Banks from the car stop to the photos/video from the Clearfield, PA Walmart purchasing the 911 Phone and BP gas station, described above. Banks looks similar to the person in the Clearfield images. The Google location information shows that Banks drove from Fort Garland, CO to Dexter, MO on January 2 driving a route further south than Route 70 through Kansas. If he had been driving directly home from Dexter on January 8 he

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 111 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 95 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 16 of 24

would likely have used that more southerly route rather than Route 70, which is the most direct route to CO from the Northeast.

G.    Banks' Finances

40.    As part of the investigation, I have analyzed evidence concerning Banks's finances in part to help prove that he received money in connection with the kidnapping and murder. The Highline Auto records show that Banks worked for the Costilla County Sheriff during the fall of 2017. I have learned from search warrant materials that Banks was attending community college full time during the first several months of 2018. Specifically, he began attending Otero Junior College in January 2018 to obtain a law enforcement certification. He appears to have attended full time until April 2018. The Highline records include a copy of a pay stub from Costilla County provided in connection with his attempted financing of the Explorer. Banks was earning $640 a week gross and less than $500 a week net. I have reviewed records from Green Dot, a business that allows users to deposit money onto a debit card. In addition to the $4,500 in cash paid for the Explorer, Banks put $2,600 in cash on his Green Dot card in November and December 2017, and $12,500 in cash on his Green Dot card during the first half of 2018.

41.    Banks' Facebook account includes statements Banks made on Facebook Messenger. He has several conversations with Stephanie Giambra, with whom Banks appears to be close. Banks apparently worked with Giambra at All Valley Solar, used an AVS credit card in the past, and owed her money. In October 2017, he wrote her that he had a side job and a "bunch of money for her." On December 8, he asked Giambra what he owed her and reported doing well financially and wanting to take care of her while he could. I believe that Banks, who had no personal connection with Davis, was paid to kidnap and murder Davis.

H.    Banks' Purchases

42.    Within the Google email data are emails with information related to purchases including the following: 1) On November 3, 2017, an order confirmation email to Jerry Banks describing the purchase from Amazon of a public safety scanner; 2) on November 8, 2017 a shipping confirmation email to Jerry Banks for a blue/red flashing modes; and 3) on December 20, 2017, an email containing a Paypal purchase confirmation to "Jerru Banks" for purchases of an Antique Gold Marshal Badge, a US Marshal Shoulder Patch and a US Marshal embroidery patch.

43.    I have reviewed records from Amazon that reflect Banks has been a customer since July 31, 2013 and has used the email address banksavs@gmail.com. I have reviewed the order history which shows the following purchases. On September 18, 2017, he purchased a heavy duty stun gun and a pepperblaster.  November 4, 2017, he purchased a handheld scanner and police-style car antenna. On December 4, 2017, he purchased a Police Interceptor nameplate for the Ford Explorer. On December 10, 2017, he purchased a police spotlight that could be attached to the Explorer. On December 26, 2017, he purchased two sets of handcuffs and

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 112 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 96 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 17 of 24

automotive parts that can be used to assemble a silencer, specifically a Wix oil filter, oil filter suppressor and a ½ -28 NPT threaded adapter, Aluminum automotive oil filter adapter. On December 27, 2017, he purchased dashboard red and blue emergency lights.

44.     I have reviewed PayPal records for Jerru Banks that reflect that the account was opened on December 20, 2017, and the email address provided was banksavs@gmail.com. The records show purchases on December 20, 2017, of a Marshal's badge and various Marshal's patches.

45.     I have reviewed records provided by Spartan Armor Systems which reflect Jerry Banks purchasing two body armor jackets on December 20, 2017.

I.     The Murder Conspiracy

46.     Based on the investigation to date, I believe that Banks was hired by one or both of two brothers who were involved in a business dispute with Davis. I have found no evidence that Banks and Davis knew each other. As described below, I have developed information about connections between Banks and Serhat and Murat Gumrukcu.

a.     Gregg Davis's Business Dispute with the Gumrukcus

47.     The only serious trouble Davis appeared to be having with anyone at the time of his death was connected to a business Davis started in 2012 called Mode Commodities. According to Davis's wife, Davis was involved in the oil investment business and had concerns about his business partners being involved in fraud. Davis began working several years before on an oil investment deal with a person named Gregory Gac. Davis contacted Gac by phone, text, and possibly by email. Davis told her that he had supply contacts for the oil, and Gac was able to bring in investors. Davis mentioned that Gac had two specific investors, Serhat and Murat.

48.     In 2017, the FBI was investigating Serhat for a real estate investment scheme and a check fraud scheme. By late 2017, Serhat was charged by the state of California with fraud-related offenses that include dealings with Gac. He was sentenced to five years' probation.

49.     Gac, who lives in Excelsior, Minnesota, was interviewed in 2017 by FBI Special Agent Heather Stachnik of the Los Angeles Division in connection with the Serhat investigation. Gac told Agent Stachnik that he was an escrow agent for Serhat. Gac claimed he met Serhat through a friend of a friend and that Gac wrote the term sheet for an oil investment deal. The investment deal was in an oil trading company with a company called Mode Lauren LLC (hereinafter "Mode"). The investors were Serhat and Murat Gumrukcu, Serhat's older brother. Gac expected to receive residuals from the deal. The Gumrukcus did not make payments as specified in the deal's term sheet and got in arrears with the obligations to Mode. Serhat ended up transferring his interest in Mode to his brother, Murat. Gac was told by a business associate that the Gumrukcus are very wealthy and part of the Turkish royal family. Gac also told Agent Stachnik that he had talked to "Gregg Davis" on the phone but had not met him in person. Gac did not tell Davis about the FBI contact.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 113 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 97 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 18 of 24

50.     During the investigation, Agent Stachnik learned that Serhat was involved in additional fraud schemes, to include purporting to be an American doctor who had a special cure for cancer and AIDS and another involving the oil industry. Agent Shachnik also learned that Berk Eratay worked with Serhat in a potential fraud scheme in Las Vegas, in which Serhat introduced a person claiming to be a Saudi Arabian prince to a potential victim. Eratay lives in Las Vegas, Nevada.

51.     Murat Gumrukcu, Serhat's brother, is not a U.S. resident. He travelled to the U.S. in December 2017, staying until March 2018, at Eratay's residence in Vegas.

52.     On November 29, 2017, shortly after the suspected reconnaissance trip to Vermont by Banks, Murat, who appears to have been in Turkey at the time, performed several English Google searches related to American license plate look-up. That series of searches included this text: "vermont gho 103." At the time, Davis had a vehicle, mostly unused, parked in their driveway with Vermont license plate GHD 103. The conspirators appear to have been confirming the location of Banks' residence.

53.     Davis's cellphone contained numerous text messages with Gac, showing Davis's concerns about the Gumrukcus. I located the contract between Davis and the Gumrukcus. The contract stipulated that if the Gumrukcus failed to meet their responsibilities late fees would be levied. As of October 2017, the Gumrukcus collectively had accrued over $900,000 in late fees, according to Davis. In the text messages, Davis offered several options to Gac to resolve matters with the investors so they could move forward with the business.

- On December 13, 2017, Gregory Davis texted Gac the following: "Greg, it is always best to square things between people. Goodness when it is the prosecutor's office it's nasty, hard and very unforgiving. Can we agree to seriously work to come to the table this week."

- On December 27, 2017, Gregory Davis texted Gac: "Happy post Christmas. We need to get things resolved and settled. Please advise as to what they are going to put on the table to accomplish this. Clearly the UBS was just another misrepresenting distraction. It's been duly noted. I look to your reply. GD."

- On December 28, 2017, Gregory Davis wrote a long text message to Gac, which in summary, showed Gregg Davis wished to terminate the business relationship under the terms of the contract or, Gregg Davis threatened, the relationship "conversely will end in a series of indictments, clearly bearing civil and criminal repercussions. They are in control of how it ends, but it is the end." From the context of the text messages, "they" appears to refer to Serhat and Murat.

- On December 29, 2017, Gregory Davis wrote a text message to Gac, demanding a settlement of approximately $980,000 to exit the business deal with Gac, Serhat, and Murat, pursuant to their contract. Further conversation continued at the end of December in which Gac references conversations with Serhat.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 114 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 98 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 19 of 24

- A final text message to Gac from Gregory Davis, dated January 4, 2018 was located on Gregory Davis's phone which states: "There has now been a history of fraudulent banking documentation that has become the standard. In many instances the banks could not corroborate the claims of the partners. However, in some instances the banks very seriously denied association with the documents and their intention. As regards the TS, all have had a hand in crafting it. Murat himself was directly involved the late sheet segment, to which we gave NO rebuttal. This was then fully executed. We have suffered multiple banking debacles which of itself are VERY serious instances. Therefore, as we've discussed it would be prudent to address the outstanding accounting. Have Murat and Serhat present something to speak to. Let's hopefully close that matter and move forward. Without this our hands will be forced to turn this in to authorities which neither party wants. Please have an honest but serious discussion with the brothers as regards all of the above and let's re-congregate to resolve the immediate matter and discuss how we can move forward. Regards, GD."

54.     In early January 2018, I met with Gac, seizing evidence and interviewing him more extensively about Davis and the Gumrukcus. Gac owns a company called Quadrant Financial, which he runs out of his home in Excelsior, MN. Gac conducts investment business with Serhat and Murat Gumrukcu. The brothers own a business called Lauran Trading, which is supposedly based in Oman. Serhat and Murat have been working successfully with Gac on deals for over three years.

55.     Gac said he met Davis through other business associates. They have never met in person and have only communicated through phone, text and email. Gac put together an oil-related deal with the Gumrukcu brothers and Davis. Gac is aware that Davis has expressed frustration with the Gumrukcu brothers' failure to perform on their obligations in the deal. Gac advised that a third, $40,000, payment is still due to Davis. A total of three payments, totaling $100,000, were to be paid to Davis in lieu of the large late fee that had been accrued by the Gumrukcu brothers.

56.     Gac advised that in February 2016, Serhat told Gac that Murat was upset that Davis had called officials at the National Bank of Abu Dhabi to verify that Serhat and Murat maintained accounts there. The bank did not provide an answer to Davis, but the brothers learned of this inquiry and Murat was angered because it threatened the brothers' reputations at the bank. During the search warrant at Gac's residence, Gac's notes regarding this matter were located and the notes reflect that Murat was offended.

57.     Gac does not believe Davis and the Gumrukcu brothers have ever met in person though they have participated in conference calls. Gac also does not believe Davis and the Gumrukcu brothers ever spoke directly outside the conference calls. Gac communicates with Murat through email. Serhat has told Gac that no one is provided with Murat's phone number. According to Gac, while Serhat is the main point of contact for the brothers, Murat is in control of the money.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 115 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 99 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 20 of 24

58.    When the interviewers told Gac that Davis had been murdered, Gac claimed to have no knowledge about the murder. On January 12, 2018, (after the murder) Serhat told Gac that his brother was arranging for the third payment to be made to Davis and directed Gac to contact Murat via email about that payment.

59.    I have reviewed data from Gac's devices. In the fall of 2017, numerous texts were sent to Serhat from Gac regarding Davis's communications with Gac:

- On September 17, 2017 Gac texted, "Gregg is going ballistic, and I don't know if I can control him any more. I heard from Murat that he was returning to Miami today or tomorrow, but nothing specific about meeting. I've heard nothing about meeting with your parents, and nothing from Marc. I'll be getting a call from Gregg soon, and he's going to explode."

- On September 25, 2017, Gac texted, "I'm getting nastygrams from Gregg Davis. Anything I can tell him? I'll reach out to UBS shortly."

- On October 31, 2017, "...Thanks for pinging Murat. Our friend is all over me again."

- On December 13, 2017, "Gregg Davis is getting antsy again, and I haven't heard from Murat in four weeks. Gregg wants to see a path forward with ML. With nothing from UBS, I haven misting to tell him. I believe he's on the road to prosecution again, believing there's no future."

- On December 29, 2017, Gac forwarded the December 28 text from Davis, alluding to potential civil and criminal repercussions.

- On prior dates, dating back over a year, Gac summarized for Serhat Davis's anger about the business dealings with the Gumrukcu brothers.

60.    I also got search warrants in 2018 for Serhat's and Murhat's Google accounts. The emails do not contain any direct reference to Davis's murder. The email messages further corroborate that the Gumrukcu brothers, Gac and Davis were involved in a business deal, and that Davis was applying pressure on the Gumrukcu brothers by threating to go to the authorities about the Gumrukcus' frauds. Moreover, the emails show that Murat expressed anger at these threats. In late 2015, Murat told Gac that he was finding Davis's behavior "unacceptable," that he was "highly disturbed" and that he did "NOT wanna hear ridiculous and vulgar threats from him" because his 50k payment was on the way.  About two weeks after this email, Murat wrote to Gac, expressing more frustration with Davis, stating (in part),  "As planned, we will initiate this trade to shut him up but I doubt our partnership will survive longer than a couple of lifts … He called me a fraud a second time, there will be no third time. I am trying to clean a mess here and all I hear are threats. . . . If he will harm you or Serhat in any means I will make sure I will find something to return the favor." The records further show that on December 13, 2017, Gac wrote an email message to Murat, in part stating: "Gregg Davis again has expressed concern and frustration at the lack of progress and at the absence of firm direction in proceeding toward

implementation of the Mode Lauran program. I fear he may pursue a 'nuclear option' if I can't offer him clear guidance on how we are going to move forward."

      a.     Eratay and Ethridge

61.     As stated above, an individual named Berk Eratay was previously involved with the brothers. Specifically, Serhat worked with Eratay on a potential fraud scheme in Las Vegas, where Eratay lives. Also, from December 2017 through March 2018, Murat travelled to the U.S. and stayed at Eratay's residence in Las Vegas. The investigation has revealed a connection between Jerry Banks and Eratay through a person named Aron Ethridge, as further explained below.

62.     The banksavs Google data described above includes several connections between Banks and Aron Ethridge. First, the Google account contains contact information for Aron with phone number 760-220-0478. Second, the Google account shows searches for 1137 Sport of Kings Avenue, Henderson, NV on October 5, 2017 and January 11, 2018. The Vermont State Police Intelligence Center (VIC) has reviewed Accurint data, which includes property sales information and utility information, showing Aron Ethridge residing at 1137 Sport of Kings Avenue in October 2017. The 661 Phone records show that Banks was in Henderson, NV on October 7, 2017 at 1:00 p.m. (PST).

63.     The phone records for the Eratay and Ethridge phones also show that on December 18, 2017, the Eratay phone was in contact with both the Ethridge phone and the Serhat phone. As described above, email records show that on December 13, 2017, Gregory Gac wrote an email to Murat fearing the "nuclear option" from Gregory Davis, and Davis text messages to Gac show him talking about "the prosecutor's office."

64.     I have reviewed data from a search warrant return from the serhat.gumrukcu@gmail.com account. That data includes contact information showing Aron Ethridge with phone number 760-220-0478.

65.     As noted above, the Gumrukcus do not appear to have communicated with Banks. But the investigation has revealed relevant lines of communication between Banks and the Gumrukcus through Eratay and Ethridge.

66.     Eratay, like the Gumrukcus, is Turkish. He lives in Las Vegas. His bank records show little income from that work in 2017 and 2018. The records do show, however, that Serhat sent Eratay tens of thousands of dollars between mid-2017 and mid-2018. Much of that money was withdraw by Eratay in cash.

67.     As noted above, my investigation has shown connections between the Gumrukcus and Berk Eratay. I have reviewed Verizon Wireless phone records for a number subscribed to by Berk Eratay, 702-336-2264, which show numerous contacts between July 2017 and January 2018 with a phone number subscribed to Serhat Gumrukcu, 310-590-8250.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 117 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 101 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 22 of 24

68.     Aron Ethridge, who lives in Henderson, NV, just outside Vegas, works as a conductor for a large freight railroad company. He is married and has no criminal record. I have obtained phone records that show that Ethridge and Eratay were in contact with in 2017 and 2018.  Ethridge's phone, including five calls on September 22, 2017, two calls on October 10, 2017, and a call at 11:26 p.m. (PST) on January 7, 2018.  The first call made after the Ethridge phone has contact with the 719 Phone on January 7, 2018 is this call to the Eratay phone. Accurint records show that for a period before 2017, Eratay resided next door to Aron Ethridge on Skytop Drive in Henderson, NV.

69.     Bank's Facebook messages and bank records show that Banks saw Ethridge on a trip to Vegas in July, at the time Banks tells Giambra that he's going to Vegas on business. Banks visited Ethridge's home in Henderson on October 5, 2017, just before Banks' Google maps search for "Vermont" and Banks telling Giambra that he has a side job and money for her. Banks returned to Henderson in early December. As noted above, Banks wrote to Giambra that he was doing well financially on December 8. On December 18, Murat arrived at Eratay's residence from Turkey. That same day, Eratay spoke on the phone with both Serhat and Ethridge. Banks went to Ethridge's house (precise Google location data) the next day, December 19, and again on December 26. Banks' first call made when he turned on the 719 Phone on January 7 in Missouri was to Ethridge. Banks called Ethridge again the next day and traveled to Henderson on Saturday, January 13, the first free day after he started his law enforcement classes, and again the next Saturday, January 20.

J.     Banks' Fort Garland Residence

70.     Even though over four years have passed since Banks returned to his residence in Fort Garland after the kidnapping and murder, I believe that there is probable cause to believe that evidence and instrumentalities of the Subject Offenses can be found in the residence in two ways. First, there is probable cause to believe that he kept certain items he purchased in connection with the murder scheme at his residence. Second, there is probable cause to believe that he kept financial records relevant to the Subject Offenses at his residence. Further, the investigators have managed the investigation to avoid having Banks learn that he is a suspect.

71.     The digital location evidence associated with Banks shows that he traveled directly from Kansas to his residence at 1179 Pfotenhauer Road, Fort Garland, CO, arriving in Fort Garland CO on January 9, 2017.

72.     Banks demonstrated his willingness to keep items used to facilitate the victim kidnapping and murder by having such items in his car at the time of the Kansas traffic stop. This stop occurred along his way back to Fort Garland from Vermont. The Trooper stated he observed law enforcement equipment and a tactical vest in Banks' vehicle at the time of the stop. Banks informed the Trooper he had a gun. Banks had opportunities to dispose of evidence of the crime on his way back to his residence.  I believe Banks would not have assumed the risk of driving these items over one thousand miles had he not intended to keep them long term and likely still has them today.

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 118 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 102 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 23 of 24

73.     Moreover, some of the items that Banks purchased and used while committing the Subject Offenses could be used by Banks after the offenses. As described above, I uncovered evidence that Banks attended community college between January 2018 and April 2018, in order to be certified as a law enforcement officer. Some of the purchases by Banks would also be valuable to someone interested in a law enforcement career. For example, Banks purchased a police-style spotlight in December 2017. Video surveillance from the Clearfield gas station shows that Banks had mounted the spotlight on the Explorer. Witnesses from Highline Auto who saw the car when Banks returned it told law enforcement that there was no spotlight mounted on the car when Banks returned the Explorer to Highline Auto. I believe that there is probable cause to believe that Banks kept the spotlight and other items used in the kidnapping and murder and stored them at his residence.

74.     Based on the investigation as well as my training and experience, Banks appears to be a person who largely lives "off the grid." My training and experience, as well as consultation with other law enforcement officers, leads me to conclude that these people frequently highly value, and are likely to keep, certain material related to protecting themselves including body armor, suppressors, and guns.  Additionally, because records reflect that Banks does not typically earn a large amount of money, the expense of replacing these materials makes it likely that they are still present in the subject residence.

75.     As noted above, I have developed evidence that Banks was in possession of large amounts of currency in late 2017 and early 2018. I believe that these payments reflect proceeds from the murder for hire. As noted above, Banks tells others that he has a side job at the time. I believe that there is probable cause that there will be evidence or a lack of evidence relevant to the source of these funds. Based on my training and experience, I know that people usually maintain records about their legitimate employment for lengthy periods of time. Moreover, they usually keep those records at their main residence. Thus, I believe that if Banks had a legitimate source of currency in 2017 and 2018, there would be records about that employment in his residence. A search of the residence showing no such documents would provide relevant evidence of the Subject Offenses. Finally, based on my training and experience, people often keep documents and records about their purchases in their residence for lengthy periods of time. Thus I believe that there is probable cause that Banks keeps financial information about his earnings at his residence.

76.     There are several items Banks used in the Subject Offenses, including a rifle, for which I have been unable to find digital records. Based on my training and experience, gun purchasers regularly keep their guns and ammunition for long periods of time and store them in their residences. Banks made statements to me after receiving his Miranda warnings, among other things he denied ever traveling to Vermont.  He refused to discuss several topics including topics closely related to the Davis murder.  Banks admitted, however, that he has owned this residence in Fort Garland since 2016, that he currently stores, in a shed adjacent to the residence, firearms including a 9mm pistol and an AR-15, and that there is at least one storage shed on the property. Thus I believe there is probable cause that Banks stores firearms and ammunition at his residence.

18

Case 5:18-mj-00004-gwc   Document 426-5   Filed 03/24/23   Page 119 of 119
Case 5:18-mj-00004-gwc   Document 414-3   Filed 09/13/22   Page 103 of 103
Case 5:18-mj-00004-gwc   Document 389-5   Filed 04/29/22   Page 24 of 24

77.     As described above, I believe Banks has used multiple phones over the years. Based on my training and experience it is common for phone users to keep cellphone devices that they are no longer using and maintain them at their residences. Thus I believe there is probable cause that Banks kept cellphones relevant to this investigation at his residence.

**K.      Bank's Property**

78.     In the social media post found in the Facebook search warrant, Banks gives a walking tour of his property and describes a makeshift shed used for storage.

79.     1179 Pfotenhauer Road, Fort Garland, Colorado as described in more detail in Attachment A, is Banks only known residence. As described above, Banks listed this address as his residence in 2017. I have reviewed Verizon Wireless records related to a phone currently subscribed to by Banks in which he listed his address as of September 2021 as this Fort Garland, Colorado address. Agents have observed the same red Chevy Blazer on the property in both 2020 and this week. Thus I believe there is probable cause that this address is still Banks' residence.

Conclusion

80.     For the reasons described above, I submit probable cause exists to believe evidence and instrumentalities of the Subject Offenses will be located at 1179 Pfotenhauer Road, Fort Garland, CO, as further described in Attachment A. Therefore, I request permission to search the property identified in Attachment A for the items enumerated within Attachment B and seize those items.

Dated at ___Denver___, in the District of Colorado, this ___6th___ day of April, 2022.

_/s/ Patrick Hanna_____
Patrick Hanna
Special Agent – FBI

Sworn to and subscribed before me this ___6th___ day of April, 2022.

Honorable Kristen L. Mix

This application and affidavit was reviewed by Assistant U.S. Attorney Garreth Winstead.